**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| B.L., a minor, by and through her father, | ) | |
| LAWRENCE LEVY, and her mother, | ) | |
| BETTY LOU LEVY, | ) | Civ. No. 3:17-cv-1734-ARC |
| | ) | |
| Plaintiff, | ) | (Hon. A. Richard Caputo) |
| | ) | |
| v. | ) | |
| | ) | |
| MAHANOY AREA SCHOOL | ) | |
| DISTRICT, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLAINTIFF**
**B.L.'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Plaintiff, B.L., by and through her parents,

hereby submits this Statement of Undisputed Facts in Support of Plaintiff's Motion

for Summary Judgment.

**I.    THE PARTIES**

1.    Plaintiff B.L. is a student at the Mahanoy Area High School in the

Mahanoy Area School District.  At the time the complaint was filed, she was

fifteen years old, and in tenth grade.  B.L. lives with her parents, Lawrence Levy

and Betty Lou Levy, who filed this action on her behalf.  Compl. (attached as

Ex. A) ¶¶ 1, 8; Answer (attached as Ex. B) ¶¶ 1, 8; B.L. Dep., Oct. 24, 2018 (attached as Ex. I) 13:1–3.

2.     Defendant Mahanoy Area School District ("the District" or "MASD") is a political subdivision of the Commonwealth of Pennsylvania located in Schuylkill County.  Compl. ¶ 6; Answer ¶ 6.

3.     In 2017, Ms. Nicole Luchetta-Rump and Ms. April Gnall were the cheerleading "advisors" (*i.e.*, coaches) for the Mahanoy Area High School. Luchetta-Rump Dep., Oct. 10, 2018 (attached as Ex. F) 7:19–24.  In that capacity, they reported to the high school athletic director, high school principal, and ultimately to Dr. Joie L. Green, the District Superintendent.  Compl. ¶ 13; Answer ¶ 13.

4.     Coach Luchetta-Rump, Coach Gnall, and Superintendent Green all testified for the District in a 30(b)(6) deposition.  The 30(b)(6) deposition notice and an email from the District's counsel designating these witnesses for various topics are attached at Exhibits D and E, respectively.[1]

---

[1]     Coach Gnall testified that she agreed with all of Ms. Luchetta-Rump's deposition testimony, and did not think any of Ms. Luchetta-Rump's answers were incomplete.  Gnall Dep., Oct. 10, 2018 (attached as Ex. G) 5:22–6:5, 10:24–11:2. Accordingly, we will cite to Coach Luchetta-Rump's deposition testimony as representing the views of both coaches.

### III.   **CHEERLEADING AT MASD**

5.     MASD's cheerleading team consists of both a JV and varsity squad. The squads (which are currently all female) cheer for the varsity and JV boys' football, wrestling, and basketball teams.  Luchetta-Rump Dep. 13:2–8; Compl. ¶ 16; Answer ¶ 16; PI Hr'g Tr. (attached as Ex. C) 9:21–25.

6.     Cheer teams at MASD do not compete.  Luchetta-Rump Dep. 13:9–10.

7.     Cheerleading tryouts at MASD involve a two-day workshop in which the cheerleaders learn and perform "a cheer, a side line, jumps, and a dance." Luchetta-Rump Dep. 8:20–9:1.  They are judged on their performance of these routines by outside judges.  *Id.*  The cheerleaders are ranked in order of their scores, with the highest scores making varsity, and the lowest scores making JV. *Id.*

8.     Cheerleaders are not selected based on their character or leadership abilities.  Luchetta-Rump Dep. 9:25–10:23.

9.     Cheerleaders are selected in May and practice over the summer and during the school year, through the end of March.  Luchetta-Rump Dep. 13:18–25.

10.     The cheerleading advisors allow cheerleaders to participate in any other extracurricular activities or sports that they want, and will schedule

cheerleading practices around other activities.  Luchetta-Rump Dep. 12:6–12, 14:1–21.

11.    The cheer squads generally practice once or twice a week, depending on the cheerleaders' schedules.  Luchetta-Rump Dep. 14:1–5; Compl. ¶ 15; Answer ¶ 15.

12.    During the month of September 2018, the cheerleading squad practiced only once the entire month because of scheduling conflicts.  Luchetta-Rump Dep. 14:6–21.

## IV.    CHEERLEADING RULES

13.    The District authorizes coaches to draft rules for student athletes, including rules regarding students' out-of-school conduct, and to punish students for violations of those rules.  Green Dep., Oct. 10, 2018 (attached as Ex. H) 13:10–19.

14.    Pursuant to this authority, the advisors issued the "Mahanoy Area High School Cheerleading Rules" that apply to cheerleaders at the Mahanoy Area High School.  Compl. ¶ 17; Answer ¶ 17; *see also* Ex. K (Cheerleading Rules).

15.    The District views the Cheerleading Rules as being consistent with District policies.  Green Dep. 20:13–16.

16.    The Cheerleading Rules were approved or ratified by the District administration.  Compl. ¶ 18; Answer ¶ 18.

4

17.    The Cheerleading Rules address topics such as keeping uniforms clean, the use of cell phones during practices and games, and participation in fundraisers to support the team, and they specify that cheerleaders can be benched or dismissed from the squad for missing practices, missing the bus, or failing two or more classes.  Ex. K.

18.    The Cheerleading Rules do not "specifically address out-of-school speech."  Luchetta-Rump Dep. 12:19–13:1.

19.    However, the first bullet point in the "SPORTSMANSHIP AND RESPONSIBILITIES/FUNDRAISING" section states: "Please have respect for your school, coaches, teachers, other cheerleaders and teams.  Remember, you are representing your school when at games, fundraisers, and other events.  Good sportsmanship will be enforced, this includes foul language and inappropriate gestures."  Ex. K.  (This provision will be referred to herein as the "respect" provision.)

20.    In addition, the second bullet point in the "TECHNOLOGY" section states: "There will be no toleration of any negative information regarding cheerleading, cheerleaders, or coaches placed on the internet."  Ex. K.  (This provision will be referred to as the "negative information" provision.)

### A.  *"Respect" Provision*

21.    The coaches interpret the "respect" provision to apply to cheerleaders "at all times they're a cheerleader" whether or not the cheerleader is in uniform. Luchetta-Rump Dep. 20:20–24.

22.    What is "respectful" is determined based on how the coaches "feel," on a "case by case basis."  Luchetta-Rump Dep. 20:25–21:8.

23.    The coaches believe that any use of profanity in a statement about cheerleading—such as "fuck cheer" or "cheerleading is fucking awesome"— violates the "respect" provision.  Luchetta-Rump Dep. 46:7–22.

24.    In determining what constitutes "foul language and inappropriate gestures," coaches hold the cheerleaders to a "higher standard" than the standards that network TV censors apply in deciding what may be shown on television.  In other words, language could be acceptable for prime time television but unacceptable for a MASD cheerleader.  Luchetta-Rump Dep. 23:8–16.

25.    The "respect" rule does not say anything about cheerleaders being prohibited from using "foul language and inappropriate gestures" when they are away from school.  PI Hr'g Tr. 43:1–21; Luchetta-Rump Dep. 21:9–14.

### B.  *"Negative Information" Provision*

26.    The cheerleading coaches interpret the phrase "negative information" in the "negative information" provision to include anything that "demeans" a

6

school, another cheerleader, another team, or cheerleading itself.  Luchetta-Rump

Dep. 24:7–11.

27.     The coaches testified that it would violate the "negative information"

provision to make a social media post that said "I don't really like cheerleading

that much any more," although the coaches would not punish that violation of the

provision with removal from the team.  PI Hr'g Tr. 39:12–23; Luchetta-Rump Dep.

26:12–17.  Ms. Luchetta-Rump failed to explain why there should be a rule

prohibiting this statement.  *See* Luchetta-Rump Dep. 27:10–17.

28.     The coaches stated that they did not think that observing that

cheerleaders are at high risk for eating disorders constituted "negative

information," but struggled to explain why.  PI Hr'g Tr. 40:4–12; Luchetta-Rump

Dep. 24:12–26:10.

29.     The coaches also stated that they did not think that speech criticizing

the selection process for cheerleading would constitute "negative information"

about cheerleading.  Luchetta-Rump Dep. 27:18–28:5.[2]

---

[2]     Earlier in the litigation, the District took the position that B.L. had violated
the "respect" provision by questioning, on two occasions, the fact that some
cheerleaders (including B.L.) were told they needed to do a year of JV before
making varsity while another cheerleader was allowed to participate on the varsity
team as a freshman.  *See* Ex. P (MASD Resp. to Pl.'s First Requests for
Admission, at No. 1).  Later, at deposition, Coach Luchetta-Rump testified that
neither of B.L.'s communications on this topic was a violation of the "respect"
provision, and Coach Gnall agreed.  Luchetta-Rump Dep. 23:17–18, 69:2–13,
70:15–25; Gnall Dep. 5:22–6:2.

30.     The coaches interpret the phrase "placed on the internet" in the "negative information" provision to encompass "communications that travel over the internet, like emails or text messages," as well as "anything that appears on the internet."  Luchetta-Rump Dep. 28:6–9, 28:25–29:3.

31.     The coaches interpret the "negative information" provision to apply to even private internet communications, because these can be shared with other people by the recipient of the communication and eventually become public in that manner.  Luchetta-Rump Dep. 28:16–24; *id.* 34:2–35:9.

## V.     **B.L. AND THE SNAP**

32.     B.L. started cheerleading when she was in fifth grade.  Compl. ¶ 10; Answer ¶ 10; PI Hr'g Tr. 9:9–10.

33.     B.L. joined the junior varsity cheerleading squad at the Mahanoy Area High School in ninth grade.  Compl. ¶ 11; Answer ¶ 11; PI Hr'g Tr. 9:14–20.

34.     Tryouts for the 2017–2018 cheerleading squad took place on Thursday, May 25, 2017, towards the end of B.L.'s freshman year.  PI Hr'g Tr. 27:3–7.

35.     B.L. again did not make the varsity cheerleading squad, and was told she would remain on the JV squad.  PI Hr'g Tr. 27:8–12.  B.L. was "visibly upset" by the news that she had not made varsity, and asked to see her score.  PI Hr'g Tr. 34:22–25.

36.     B.L.'s frustration was compounded by the fact that a rising freshman had made the varsity team, even though B.L., a rising sophomore, had not.  PI Hr'g Tr. 27:18–20.  She was also upset that she had not been assigned to her preferred position in softball (right field)[3] and stressed by her impending final exams in school.  PI Hr'g Tr. 17:2–12.

37.     She vented her anger and frustration by expressing herself on Snapchat.  PI Hr'g Tr. 17:2–18:11.

38.     Snapchat is a popular social media platform that is designed to be temporary and ephemeral.  Nick Bilton, *Why I Use Snapchat: It's Fast, Ugly, and Ephemeral*, N.Y. Times, Jan. 27, 2014, https://bits.blogs.nytimes.com/2014/01/27/why-i-use-snapchat-its-fast-ugly-and-ephemeral/ (attached as Ex. Q).

39.     Unlike other social media platforms on which posts are permanent unless the creator intentionally deletes them, Snaps are self-deleting.  PI Hr'g Tr. 14:24–15:5.  Snapchat users can send a Snap to one or more Snapchat friends, who will be able to access it for up to 10 seconds, or post a Snap to their "Story," where it will be viewable by their Snapchat friends for 24 hours.  PI Hr'g Tr. 13:24–14:9. *See also* Ex. Q (Bilton, *Why I Use Snapchat*).

---

[3]     B.L. played in a summer softball league not affiliated with the Mahanoy Area School District.  B.L. 10/24 Dep. 13:9–14:7, 86:1–15.

40.    Snapchat posts do not appear on the internet.  There is no website that an internet user can navigate to in order to view someone's Snaps.  Rather, one must have the Snapchat smartphone "app" to view Snaps.  Mem. Op., ECF No. 12, at 2 & n.1; PI Hr'g Tr. 14:10–15, 39:1–4; Ex. Q (Bilton, *Why I Use Snapchat*).

41.    B.L. generally uses Snapchat to "rant or post funny stuff," which is typical of how she normally speaks to her friends but different from how she speaks at school.  PI Hr'g Tr. 14:16–23; 17:13–18.

42.    The Snap in question was created and posted on Saturday, May 27, 2017.  PI Hr'g Tr. 15:6–10; Ex. M (June 9, 2017 letter to the District from B.L.'s father, stating, "The snap chat was taken and occurred on a Saturday off campus").[4]

43.    B.L. created the Snap in question on a weekend when B.L. was not participating in cheerleading or any other school activity.  Mem. Op., ECF No. 12, at 2; PI Hr'g Tr. 16:7–9.

44.    The Snap was created after the end of the 2016–2017 sports season and before the beginning of cheerleading practices for the 2017–2018 season.  PI Hr'g Tr. 15:11–25.

---

[4]    The Complaint contained a typographical error that misidentified the date as "Saturday, May 28" instead of "Saturday, May 27."  *See* Compl. ¶ 26.

45.     The Snap was created while B.L. was hanging out with a friend at the Cocoa Hut, a gas station and convenience store in Mahanoy City.  PI Hr'g Tr. 16:1–6.

46.     Using her personal phone, she opened the Snapchat app and took a picture of herself and her friend at the Cocoa Hut with their middle fingers raised, and superimposed the text "fuck school fuck softball fuck cheer fuck everything" on the image, and posted it to her Snapchat story, where it was available to her Snapchat friends to view for a 24-hour period.  *See* Ex. L (the Snap); Compl. ¶¶ 26–27; Answer ¶¶ 26–27; PI Hr'g Tr. 28:23–29:2.

47.     The Snap did not mention the District. B.L.'s school, B.L.'s cheerleading squad, or any individuals, and the photo did not feature any team uniforms or school paraphernalia.  Compl. ¶ 28; Answer ¶ 28; PI Hr'g Tr. 16:10–17:1, 18:12–13; Ex. L; Mem. Op., ECF No. 12, at 2 & n.2.

48.     B.L. used no school resources or school time to create the Snap. Compl. ¶¶ 34–35; Answer ¶¶ 34–35.

## VI.     THE DISTRICT'S REMOVAL OF B.L. FROM THE CHEERLEADING SQUAD

49.     The cheerleading coaches became aware of B.L.'s Snap on the evening of Monday, May 29, 2017, after D.F., a cheerleader who was friends with B.L. on Snapchat, took a photo of the Snap and gave the photo to S., another

cheerleader who was not friends with B.L. on Snapchat, who in turn gave it to

Coach Gnall.  Gnall Dep. 9:18–10:2; Ex. O at Response No. 1.

50.     The coaches testified that cheerleaders "tattling" on other cheerleaders

for perceived rule violations is extremely common.  Luchetta-Rump Dep. 49:10–

18 ("They let me know no matter what, so and so has jewelry on, so and so is

wearing the wrong shirt, so and so forgot their bloomers. . . . I get texts from all

different girls at all times of the day about different situations."); *see also id.*

44:20–45:2 (coaches do not encourage students to "tattle").

51.     The coaches also frequently hear reports about negative things

cheerleaders say to each other and often have to "mediate" these situations, which

are a "fairly typical occurrence" with teenage girls.  Luchetta-Rump Dep. 29:25–

30:16, 31:24–32:22, 37:2–5, 45:3–11.

52.     The coaches consulted with the high school principal at the time, Mr.

Smith, to get his advice on how to handle B.L.'s Snap.  Luchetta-Rump Dep.

51:15–17.

53.     Although the cheerleading coaches are authorized to make

punishment decisions on their own, Green Dep. 10:1–4; Luchetta-Rump Dep.

51:5–9, they generally consult with someone they report to when they are

considering an "extreme" punishment such as removal or suspension from a team.

Luchetta-Rump Dep. 51:24–52:14.

54.   With the support of the high school principal, Mr. Smith, the coaches decided to remove B.L. from the cheerleading squad for the remainder of the academic year as punishment for the Snap.  PI Hr'g Tr. 37:5–7.

55.   On Thursday, June 1, 2017, Ms. Luchetta pulled B.L. out of homeroom to inform B.L. that she was dismissed from the cheerleading squad. Compl. ¶ 36; Answer ¶ 36; Mem. Op., ECF 12, at 2–3.

56.   Ms. Luchetta confronted B.L. with a photo of the Snap containing the phrase "fuck cheer" and told B.L. that the Snap was "disrespectful" to the coaches, the school, and the other cheerleaders, and that the Snap was the reason B.L. was being dismissed from the squad.  Compl. ¶ 37; Answer ¶ 37; Mem. Op., ECF 12, at 3.

57.   B.L.'s punishment was based solely on her creation of the Snap. Luchetta-Rump Dep. 46:23–47:11, 53:10–14.  There were no other rule infractions that contributed to the District's decision to remove her from the cheerleading squad.  *See* Compl. ¶ 38; Answer ¶ 38.

58.   B.L.'s punishment was based on the coaches' view that the phrase "fuck cheer" violated the "negative information" provision and the "respect" provision of the Cheerleading Rules.  Luchetta-Rump Dep. 46:17–22, 47:7–11, 53:15–24, 55:11–56:3, 72:13–22; Ex. K.

59.     B.L.'s punishment was not based on any actual negative impact on students.  Luchetta-Rump Dep. 58:6–12, 61:21–24.

60.     B.L.'s Snap did not cause actual, material disruption of any classroom or school activities.  *See* Luchetta-Rump Dep. 58:13–60:19.

61.     The only effect of the Snap on school activities was students telling Ms. Luchetta-Rump that B.L. had posted something "inappropriate" and asking her what she was going to do about it, which "briefly" diverted Ms. Luchetta-Rump's attention away from her class.  Luchetta-Rump Dep. 58:13–21.  Ms. Luchetta-Rump concedes that it was the students reporting Brandi, rather than the Snap itself, that caused this minor interruption.  Luchetta-Rump Dep. 58:25–60:19.

62.     The District had no reason to believe that B.L.'s Snap would disrupt any classroom or school activities.  Luchetta-Rump Dep. 62:8–11.

63.     The District had not previously experienced disruption of class or school activities because of anything a student said outside of school.  Luchetta-Rump Dep. 61:25–62:7; Green Dep. 29:1–11.

64.     The coaches' decision to punish B.L. for her out-of-school speech did not exceed the authority they had been given by the District.  Green Dep. 21:18–22.

65. Indeed, the District believes coaches have the authority to remove students from sports or extracurricular activities for saying disparaging things even privately, if the coaches find out about it. Green Dep. 21:23–23:25.

66. The District has not identified any other sports team or extracurricular club in the District that has rules purporting to punish students for their out-of-school speech. Green Dep. 28:10–15; Ex. D (30(b)(6) Notice at Topic 2(a)); Ex. E (designating Green on Topic 2).

67. The District agrees that there is no reason that cheerleaders should be subject to more restrictions on their out-of-school speech than students in other sports. Green Dep. 28:17–20.

## VII. REQUESTS FOR REINSTATEMENT AND COMMENCEMENT OF LITIGATION

68. B.L. and her parents made repeated requests that the District reconsider B.L.'s punishment, initiating multiple conversations about the issue with the cheerleading coaches, the athletic director, the high school principal, the superintendent, and the school board, all of whom stood by the coaches' decision. Compl. ¶ 41; Answer ¶ 41; PI Hr'g Tr. 8:3–6; Green Dep. 10:5–16, 14:5–8; B.L. 10/24 Dep. 77:14–78:10; Ex. N (Facebook Message from Superintendent Green).

69. Among other communications, the day that B.L. was told she was being removed from the cheerleading squad because of the Snap, she asked the high school principal, Mr. Smith, if there was anything she could do to get back

15

onto the cheerleading squad.  He told her that he couldn't overrule the coaches'

decisions, and that she could be disciplined for "disrespecting" the school.  Compl.

¶¶ 45–46; Answer ¶¶ 45–46; B.L. 10/24 Dep. 77:14–78:10; Mem. Op., ECF 12, at

3.

70.    In addition, on June 9, 2017, B.L.'s father, Lawrence Levy, wrote to

Dr. Green (the District superintendent), Mr. Smith (the high school principal), and

Mr. Cray (the District athletic director) to appeal B.L.'s dismissal from the team.

In his letter, Mr. Levy explained that the Snap had been posted on a Saturday, off-

campus, and not during any school or district sporting event, and that it was

accessible only to B.L.'s friends.  He also argued that the First Amendment forbids

public schools from punishing students because of their out-of-school speech.

Compl. ¶¶ 48–49; Answer ¶¶ 48–49; Ex. M.

71.    In addition, on June 29, 2017, Lawrence Levy attended a school board

meeting in order to ask the board to reinstate B.L. to the cheerleading squad.  At

that board meeting, Mr. Levy again emphasized that the Snap had been shared with

B.L.'s friends on a weekend, not during any school event, and that the Snap did not

name any particular people or the school or District.  He also again argued that the

First Amendment limits public schools' ability to punish students for their off-

campus speech, and that schools cannot punish students if the speech has not

caused substantial disruption.  Compl. ¶¶ 53–55; Answer ¶¶ 53–55.

72.     After the board meeting, Superintendent Green sent a Facebook message to Mr. Levy to inform him that "the board decided to support the cheer coaches and their decision to remove your daughter from the team." Ex. N. Superintendent Green added that B.L. could try out for the cheerleading squad again next year. *Id.*; Compl. ¶ 56; Answer ¶ 56.

73.     On September 1, 2017, counsel for B.L. and Lawrence Levy wrote a demand letter to the Superintendent Green and the District Solicitor arguing that the First Amendment prohibited the District from punishing B.L. for her out-of-school speech, and requesting that B.L. be reinstated to the team immediately. The letter asked for a response by the close of business on September 6, 2017. Compl. ¶ 57; Answer ¶ 57.

74.     The District Solicitor did not respond to the letter by the appointed time, nor to Plaintiff's counsel's subsequent emails and calls over the following week asking whether the District needed additional time to respond. Compl. ¶ 58; Answer ¶ 58. Plaintiff B.L. commenced this action through her parents by Verified Complaint on September 25, 2017. ECF No. 1.


Dated: December 20, 2018          */s/ Molly Tack-Hooper*
                                  Molly Tack-Hooper (PA 307828)
                                  AMERICAN CIVIL LIBERTIES UNION OF
                                  PENNSYLVANIA
                                  P.O. Box 60173
                                  Philadelphia, PA 19102

mtack-hooper@aclupa.org
 (215) 592-1513 x 113
Fax: (215) 592-1343

Arleigh P. Helfer III (PA 84427)
Theresa E. Loscalzo (PA 52031)
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA  19103-7286
ahelfer@schnader.com
(215) 751-2000
Fax: (215) 751-2205

*Attorneys for Plaintiff, B.L.*