# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| B.L., a minor, by and through her father, LAWRENCE LEVY, and her mother, BETTY LOU LEVY, | )<br>)<br>) Civ. No. *3:17-CV-1734*<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| MAHANOY AREA SCHOOL DISTRICT; | )<br>)<br>) |
| Defendant. | )<br>) |
| ———————————————— | ) |

## VERIFIED COMPLAINT

### INTRODUCTION

This First Amendment case arises out of the Mahanoy Area School District's exclusion of a sophomore high school student from the cheerleading squad as punishment for a single post on Snapchat—created outside of school, on her own time—that school officials believed were "negative," "disrespectful," and "demeaning." Plaintiff seeks injunctive relief and damages.

### JURISDICTION AND VENUE

1. This action seeks to vindicate rights protected by the First and Fourteenth Amendments to the U.S. Constitution, and is brought under 42 U.S.C.

§ 1983. This Court has jurisdiction over this civil rights action under 28 U.S.C. §§ 1331 and 1343. This Court also has jurisdiction under 28 U.S.C. §§ 2201 and 2202 to declare the rights of the parties and to grant all further relief found necessary and proper.

2.      Venue is proper in the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1391(a) because the defendant is subject to personal jurisdiction within the Middle District of Pennsylvania and the events that give rise to this action occurred within the Middle District of Pennsylvania.

## PARTIES

3.      Plaintiff B.L. is a fifteen-year-old student in the Mahanoy Area School District. B.L. lives with her parents in Mahanoy City, Pennsylvania.

4.      Plaintiff Lawrence Levy is B.L.'s father. Mr. Levy brings this action on behalf of his minor daughter, B.L.

5.      Plaintiff Betty Lou Levy is B.L.'s mother. Ms. Levy brings this action on behalf of her minor daughter, B.L.

6.      Defendant Mahanoy Area School District ("the District") is a political subdivision of the Commonwealth of Pennsylvania located in Schuylkill County.

7.      The District maintains its administrative offices at 1 Golden Bear Drive, Mahanoy City, PA 17948.

## FACTS

8.     B.L. is a tenth grade student at the Mahanoy Area High School.

9.     B.L. is in the National Honor Society, and has been an honors student since seventh grade.

10.     B.L. started cheerleading when she was in fifth grade.

11.     B.L. joined the junior varsity cheerleading squad at Mahanoy Area High School in ninth grade.

12.     Ms. Nicole Luchetta and Ms. April Gnall are the cheerleading coaches for the District.

13.     As cheerleading coaches, Ms. Luchetta and Ms. Gnall report to the Band Director, Assistant Band Director, Athletic Director, Principal, and ultimately to Joie L. Green, the Superintendent of the District.

14.     The cheerleading squad is active throughout the year, including the summer.

15.     The squad practices several times a week during the summer.  During the school year, the squad practices twice a week in addition to cheering at games or matches.

16.     The squad cheers for the District football, basketball, and wrestling teams.

*Cheerleading Rules*

17. The District school board authorized the cheerleading coaches to draft rules and regulations for student cheerleaders and required that the rules be submitted to the District administration, including the high school principal and superintendent, for approval.

18. Upon information and belief, the Mahanoy Area High School Cheerleading Rules ("the Cheerleading Rules") were approved or ratified by the District administration.

19. B.L. received a copy of the Cheerleading Rules in May 2016 when she joined the junior varsity cheerleading squad.

20. Upon information and belief, those Cheerleading Rules are currently in effect.

21. The Cheerleading Rules state at the top that "All of the information below is at the coaches' discretions and rules may be subject to change. If there is a situation with extreme circumstances, it will be addressed at that time."

22. Among other provisions, the Cheerleading Rules state that cheerleaders will be benched if they are failing two or more classes, and will be dismissed from the squad if they are benched three times or are failing two or more classes for three consecutive weeks.

23.    The Cheerleading Rules also state that cheerleaders will not be permitted to cheer unless they raise at least $60 for the team or pay off this "debt" themselves.

24.    In addition, the Cheerleading Rules state, "Please have respect for your school, coaches, teachers, other cheerleaders and teams.  Remember, you are representing your school when at games, fundraisers, and other events.  Good sportsmanship will be enforced, this includes foul language and inappropriate gestures."

25.    The Cheerleading Rules also state, "There will be no toleration of any negative information regarding cheerleading, cheerleaders, or coaches placed on the internet."

### B.L.'s Snapchat Post

26.    On or about Saturday, May 28, 2017, B.L. posted a "Snap" to Snapchat—a popular social media platform—featuring a photo of her and a friend holding up their middle fingers with the text "fuck school fuck softball fuck cheer fuck everything" superimposed on the image.

27.    B.L. created and posted the Snap using her phone.

28.    The Snap did not mention the District, B.L.'s school, B.L.'s cheerleading squad, or any individuals by name, and the photo did not feature any team uniforms or school paraphernalia.

29.     The photo was taken at the Cocoa Hut, a local convenience store.

30.     The photo was taken on a weekend, when B.L. was not participating in cheerleading or any other school activity.

31.     B.L. shared the Snap only with her Snapchat friends. It was not accessible to the general public.

32.     Snapchat deletes all Snaps from the platform after 24 hours, so B.L.'s Snap disappeared from Snapchat the next day, which was a Sunday.

33.     B.L. did not access or share the Snap at school.

34.     B.L. used no school resources to create the Snap.

35.     B.L. used no school time to create the Snap.

### B.L.'s Dismissal from the Cheerleading Team

36.     On Thursday, June 1, 2017, Ms. Luchetta pulled B.L. out of homeroom to inform B.L. that she was dismissed from the cheerleading squad.

37.     Ms. Luchetta confronted B.L. with a photo of the Snap containing the phrase "fuck cheer" and told B.L. that the Snap was "disrespectful" to the coaches, the school, and the other cheerleaders, and that the Snap was the reason B.L. was being dismissed from the squad.

38.     Neither the cheerleading coaches nor anyone in the District administration ever suggested there was any basis for B.L.'s dismissal from the team other than the content of the offending Snap.

39.    The Snap did not create any disruption of school activities.

40.    Other than creating the offending Snap, B.L. has never violated any of the Cheerleading Rules.

### Repeated Requests for Reinstatement

41.    Plaintiff and her parents made repeated requests that the District reconsider B.L.'s punishment, initiating multiple conversations about the issue with the cheerleading coaches, the athletic director, the high school principal, the superintendent, and the school board.

42.    After being informed of her suspension from the team, B.L. asked permission to go to the principal's office to telephone her mother. B.L. called her mother and her mother spoke with Ms. Luchetta.

43.    On the call with Ms. Levy, Ms. Luchetta reiterated what she had said to B.L., and added that the punishment was ultimately the principal's decision.

44.    B.L. asked to speak with Mr. Thomas Smith, the high school principal, and asked him whether there was any way for B.L. to be reinstated to the squad.

45.    Mr. Smith told B.L. that he would not overrule the coaches' decision.

46.    Mr. Smith also told B.L. that she could receive school discipline for "disrespecting" the school, explaining that he could not tolerate disrespect.

47.     Lawrence Levy also spoke with Mr. Smith on June 1, 2017, asking
him for a follow-up meeting with the administration to discuss B.L.'s punishment.
The Administration rescheduled that meeting several times before ultimately
scheduling it for June 14, 2017.

48.     On June 9, 2017, Lawrence Levy wrote to Dr. Joie Green (the District
superintendent), Mr. Thomas Smith (the high school principal), and Mr. Kieran
Cray (the District athletic director) to appeal B.L.'s dismissal from the team.

49.     In that letter, Mr. Levy explained that the Snap had been posted on a
weekend, off-campus, and not during any school or district sporting event, and that
it was accessible only to B.L.'s friends.  He also explained that the First
Amendment forbids public schools from punishing students because of their out-
of-school speech.

50.     On June 14, 2017, at 7:30am, Lawrence Levy attended a conference
with the District superintendent, athletic director, and the two cheerleading
coaches.

51.     At that conference, the coaches referred to a copy of the Cheerleading
Rules, and stated that the content of the "fuck cheer" Snap violated the Rules.

52.     Ms. Luchetta explained that she believed the Snap was "demeaning to
me, the school, and the rest of the cheerleaders."

53. On June 29, 2017, Lawrence Levy attended a school board meeting in order to ask the board to reinstate B.L. to the cheerleading squad.

54. At that board meeting, Mr. Levy emphasized that the Snap had been shared with B.L.'s friends on a weekend, not during any school event, and that the Snap did not name any particular people or the school or District.

55. At that board meeting, Mr. Levy also explained that the First Amendment limits public schools' ability to punish students for their off-campus speech, and that schools cannot punish students if the speech has not caused substantial disruption.

56. After the board meeting, Superintendent Green sent a Facebook message to Lawrence Levy to inform him that the school board had decided to stand by the cheer coaches' decision to remove B.L. from the team. Superintendent Green added that B.L. could try out for the cheerleading squad again next year.

57. On September 1, 2017, counsel for B.L. and Lawrence Levy wrote to the Superintendent Green and the District Solicitor to further explain the governing law and request that B.L. be reinstated to the team immediately. The letter asked for a response by the close of business on September 6, 2017.

58.    The District Solicitor did not respond to the letter by the appointed time, nor to Plaintiff's counsel's subsequent emails and calls over the following week asking whether the District needed additional time to respond.

*Harm to B.L.*

59.    Cheerleading is the main extracurricular activity to which B.L. has devoted time and energy.

60.    Colleges and universities judge applicants not only on their academic records, but also on the depth of their involvement in extracurricular activities.

61.    Being removed from the squad impairs B.L.'s opportunities to gain admission to top colleges.

62.    Sustained participation in extracurricular activities also has significant benefits for student well-being.

63.    Among other benefits, students who participate in extracurricular activities are less likely to abuse alcohol or drugs than students who do not participate in extracurriculars.

64.    B.L. misses cheerleading and wants to return to the squad.

65.    B.L.'s exclusion from the cheerleading squad constitutes irreparable harm that cannot be adequately remedied by money damages.

## CLAIMS

**Count I:  The District's Punishment of Plaintiff Violates the First Amendment to the U.S. Constitution and 42 U.S.C. § 1983**

66.    The District's exclusion of B.L. from the cheerleading squad for her

out-of-school speech violates the First Amendment to the U.S. Constitution, as

applied to the states through the Fourteenth Amendment.

**Count II:  The Cheerleading Rules, On Their Face, Violate the First Amendment to the U.S. Constitution and 42 U.S.C. § 1983**

67.    The District's Cheerleading Rules are unconstitutional on their face

because they are overbroad and constitute viewpoint discrimination, in violation of

the First Amendment to the U.S. Constitution.

**Count III:  The Cheerleading Rules, On Their Face, Violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983**

68.    The District's Cheerleading Rules are unconstitutional on their face

because they are unduly vague, in violation of the Due Process Clause of the

Fourteenth Amendment to the U.S. Constitution.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully requests that this Court provide the

following relief:

(a)     Declare that District's disciplinary action against B.L. for her out-of-school speech violated B.L.'s rights under the First and Fourteenth Amendments to the U.S. Constitution;

(b)     Declare that the District's Cheerleading Rules, on their face, violate the First and Fourteenth Amendments to the U.S. Constitution because they are overbroad and constitute viewpoint discrimination;

(c)     Declare that District's Cheerleading Rules that have been used, and may be used, to punish out-of-school speech are unconstitutionally vague, and thereby violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution;

(d)     Enjoin the District from any continuing punishment or sanction against B.L. on account of her constitutionally protected speech, including reinstating B.L. to the cheerleading squad and expunging from B.L.'s school records all references to the incident in question;

(e)     Award Plaintiff damages in an amount to be determined at trial;

(f)     Award Plaintiff costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

(g)     Grant such other relief as this Court deems just and appropriate.

Dated: September 25, 2017

Respectfully submitted,

Molly Tack-Hooper (PA 307828)
Mary Catherine Roper (PA 71107)
AMERICAN CIVIL LIBERTIES
UNION OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
Tel: (215) 592-1513 ext. 113
Fax: (215) 592-1343
mtack-hooper@aclupa.org
mroper@aclupa.org

## **VERIFICATION**

I, B.L., hereby affirm under the penalties of perjury:

1. I am a minor (under eighteen years old).
2. My parents are Lawrence Levy and Betty Lou Levy.
3. I am a Plaintiff in this lawsuit.
4. I have read the factual allegations in the foregoing Verified Complaint.
5. The factual allegations are, to the best of my knowledge and belief, true and correct.

Dated: 9-20-17      B.L.

                      (B.L. Signature)

## <u>VERIFICATION</u>

I, Lawrence Levy, hereby affirm under the penalties of perjury:

1. I am over the age of 18 and competent to testify.
2. I am the parent of B.L., the minor Plaintiff identified in the foregoing Verified Complaint.
3. I have read the factual allegations in the foregoing Verified Complaint.
4. The factual allegations are, to the best of my knowledge and belief, true and correct.

Dated: _9-20-17_ _____

(Lawrence Levy/Signature)

## **VERIFICATION**

I, Betty Lou Levy, hereby affirm under the penalties of perjury:

1. I am over the age of 18 and competent to testify.
2. I am the parent of B.L., the minor Plaintiff identified in the foregoing Verified Complaint.
3. I have read the factual allegations in the foregoing Verified Complaint.
4. The factual allegations are, to the best of my knowledge and belief, true and correct.

Dated: 9-20-17

(Betty Lou Levy Signature)

# Exhibit B

LEVIN LEGAL GROUP, P.C.
Michael Levin, Esquire
David Brown, Esquire
1301 Masons Mill Business Park
1800 Byberry Road
Huntingdon Valley, PA 19006
Phone: (215) 938-6378
*Attorneys for Defendant*
*Mahanoy Area School District*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

---

| | | |
|---|---|---|
| B.L., a minor, by her father, | : | |
| LAWRENCE LEVY, and her mother, | : | |
| BETTY LOU LEVY | : | Civil Action No. 3:17-cv-1734 |
| | : | |
| Plaintiffs, | : | (The Hon. A. Richard Caputo) |
| v. | : | |
| | : | |
| MAHANOY AREA SCHOOL DISTRICT, | : | |
| | : | |
| Defendant. | : | |

---

## ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES
## AND JURY DEMAND

AND NOW, COMES THE Defendant, Mahanoy Area School District (the "District"), by and through its undersigned counsel, the LEVIN LEGAL GROUP, P.C., who files this Answer to Complaint, Affirmative Defenses and Jury Demand, and who, in support thereof, states the following:

1

1.      Admitted in part, and denied in part.  The District admits that this action is brought under 42 U.S.C. § 1983.  The District further admits that this Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as well as 28 U.S.C. §§ 2201 and 2202.  The District denies that there are any rights to be vindicated in this action.

2.      Admitted.

## PARTIES

3.      Admitted.

4.      Admitted.

5.      Admitted.

6.      Admitted.

7.      Admitted.

## FACTS

8.      Admitted.

9.      Denied.   The District admits only that B.L. achieved "superior honors" as a freshman at Mahanoy Area High School.  All other averments of this paragraph are denied.

10.      Admitted.

11.      Admitted.

12.      Admitted.

13.    Admitted in part, and denied in part.  The District admits that the cheerleading coaches report to the athletic director, high school principal, and Superintendent Dr. Joie Green.  The District denies that the cheerleading coaches report to the band director or assistant band director.

14.    Admitted.

15.    Admitted in part, and denied in part.  The District admits that the cheerleading team practices twice a week in June and July.  The District denies that the cheerleading team always practices twice a week during the school year.  In reality, the cheerleading team practices once a week in August and during the school year.

16.    Admitted.

### *Cheerleading Rules*

17.                                         Admitted in part, and denied in part.  The District admits that the cheerleading coaches were authorized to draft and implement rules for student cheerleaders.  The District further admits that the rules were submitted to the District administration for approval.  All other averments of this paragraph are denied.

18.    Admitted.

19.    Admitted.  By way of further explanation, B.L. received another copy of the Cheerleading Rules in May 2017.

3

20.     Admitted.

21.     Admitted.

22.     Admitted.

23.     Admitted in part, and denied in part.  The District admits that the cheerleading rules state, "Each cheerleader must raise at least $60 per year (or pay the boosters this fee) to remain on the squad.  If the $60 is not met the cheerleader will not be able to cheer the following year until the debt is paid off."  All other averments of this paragraph are denied.

24.     Admitted.

25.     Admitted.

### *B.L.'s Snapchat Post*

26.     Admitted in part, and denied in part.  The District admits that B.L. posted a "Snap" to Snapchat featuring her and a friend holding up their middle fingers, with text superimposed on the image stating, "fuck school fuck softball fuck cheer fuck everything."  The District lacks sufficient information to formulate a belief as to the truth of the averments as to the date when the Snap was posted. Accordingly, that averment is denied.

27.     Admitted.

28.     Admitted.

29.     Admitted.

4

30.     Denied.  The District lacks sufficient information to formulate a belief as to the truth of the averments of this paragraph.  Accordingly, they are denied.

31.     Denied.  The District lacks sufficient information to formulate a belief as to the truth of the averments of this paragraph.  Accordingly, they are denied.

32.     Denied.  The District lacks sufficient information to formulate a belief as to the truth of the averments of this paragraph.  Accordingly, they are denied.

33.     Denied.  The District lacks sufficient information to formulate a belief as to the truth of the averments of this paragraph.  Accordingly, they are denied.

34.     Admitted.

35.     Admitted.

### *B.L.'s Dismissal from the Cheerleading Team*

36.     Admitted.

37.     Admitted.

38.     Admitted.

39.     Denied.   The averments of this paragraph constitute conclusions of law or argument to which no response is required.  To the extent that the averments are deemed factual, they are denied.

40.     Denied.  The District lacks sufficient information to formulate a belief as to the truth of the averments of this paragraph.  Accordingly, they are denied.

5

By way of further explanation, at this time the District is not aware of any other violations of the Cheerleading Rules by B.L.

41.    Admitted.

42.    Admitted.

43.    Admitted.

44.    Admitted.

45.    Admitted.

46.    Admitted.

47.    Admitted.

48.    Admitted.

49.    Admitted.  By way of further explanation, the District does not agree with Mr. Levy that public schools may not punish students for out-of-school speech.

50.    Admitted.

51.    Admitted.

52.    Admitted.

53.    Admitted.

54.    Admitted.

55.    Admitted in part, and denied in part.  The District admits only that Mr. Levy's comments to the school board included his interpretation of the First

6

Amendment with regard to school students. All other averments of this paragraph are denied.

56.     Admitted.

57.     Admitted in part, and denied in part. The District admits that on September 1, 2017, counsel for B.L. and Lawrence Levy wrote to Superintendent Green and the District's solicitor about the matter. The District further admits that the letter requested a response by September 6, 2017. All other averments of this paragraph are denied.

58.     Admitted.

### *Harm to B.L.*

59.     Denied. The District lacks sufficient information to formulate a belief as to the truth of the averments of this paragraph. Accordingly, they are denied.

60.     Denied. The District lacks sufficient information to formulate a belief as to the truth of the averments of this paragraph. Accordingly, they are denied.

61.     Denied. The District lacks sufficient information to formulate a belief as to the truth of the averments of this paragraph. Accordingly, they are denied.

62.     Denied. The averments of this paragraph constitute legal conclusions or argument to which no response is required. To the extent that the averments are deemed factual, they are denied.

7

63.     Denied.  The District lacks sufficient information to formulate a belief as to the truth of the averments of this paragraph.  Accordingly, they are denied.

64.     Denied.  The District lacks sufficient information to formulate a belief as to the truth of the averments of this paragraph.  Accordingly, they are denied.

65.     Denied.  The averments of this paragraph constitute legal conclusions or argument to which no response is required.  To the extent that the averments are deemed factual, they are denied.

## CLAIMS

### *Count I*

66.     Denied.  The averments of this paragraph constitute legal conclusions or argument to which no response is required.  To the extent that the averments are deemed factual, they are denied.

### *Count II*

67.     Denied.  The averments of this paragraph constitute legal conclusions or argument to which no response is required.  To the extent that the averments are deemed factual, they are denied.

### *Count III*

68.     Denied.  The averments of this paragraph constitute legal conclusions or argument to which no response is required.  To the extent that the averments are deemed factual, they are denied.

8

WHEREFORE, the Defendants respectfully requests that this Court grant judgment in favor of the Defendant.

## AFFIRMATIVE DEFENSES

1.      The Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

2.      There is no *respondeat superior* liability of the Mahanoy Area School District for the actions of its employees.

3.      The Plaintiffs have suffered no injury in this matter.

4.      No unlawful act or omission caused any injury.

5.      The decision to remove B.L. from the cheerleading team – an extracurricular activity – did not violate the First Amendment.

6.      B.L.'s profane comments and photograph posted on Snapchat are not protected by the First Amendment.

7.      The decision to remove B.L. from the cheerleading team did not affect her ability to advocate her viewpoint.

8.      B.L. breached her agreement to comply with the Cheerleading Rules.

9.      The conduct of B.L. was repugnant to the images of the School District she agreed to uphold as a voluntary member and representative of the School District's cheerleading squad, wearing the uniform of the School District.

9

WHEREFORE, the Defendant respectfully requests that this Court dismiss all claims in the Complaint and grant judgment in the District's favor.

## DEMAND FOR JURY TRIAL

Defendant hereby respectfully requests makes a demand for a trial by jury.

Respectfully submitted,

Date: November 17, 2017

/s/ *David W. Brown*
Michael I. Levin (PA 21232)
David W. Brown (PA 201553)
LEVIN LEGAL GROUP, P.C.
1301 Masons Mill Business Park
1800 Byberry Road
Huntingdon Valley, PA 19006
Phone: (215) 938-6378
Fax: (215) 938-6375
mlevin@levinlegalgroup.com
dbrown@levinlegalgroup.com

*Attorneys for Defendant*
*Mahanoy Area School District*

10

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of November, 2017, I caused the foregoing Defendant's Answer to Complaint, Affirmative Defenses and Jury Demand to be filed using the Court's Electronic Case Filing system, and a Notice of Electronic Case Filing was served upon all counsel in accordance with Fed. R. Civ. P. 5(b) and M.D. Pa. L. R. 5.7.

/s/ *David W. Brown*
David W. Brown

11

Exhibit C

1

### UNITED STATES DISTRICT COURT

### MIDDLE DISTRICT OF PENNSYLVANIA

```
B.L.,                        )
         Plaintiff           )
                             )
      VS.                    )    CASE NO. 3:17-CV-01734
                             )
Mahanoy Area School          )
District,                    )
         Defendant           )
                             )
_____ )
```

### TRANSCRIPT OF PROCEEDING - PRELIMINARY INJUNCTION
### BEFORE THE HONORABLE A. RICHARD CAPUTO
### MONDAY, OCTOBER 2, 2017 AT 9:30 A.M.
### WILKES-BARRE, PENNSYLVANIA

**FOR THE PLAINTIFF:**

    Mary Catherine Roper, Esq.
    ACLU of Pennsylvania
    P.O. Box 40008
    Philadelphia, PA  19106

    Molly Tack-Hooper, Esq.
    ACLU of Pennsylvania
    P.O. Box 60173
    Philadelphia, PA 19102

**FOR THE DEFENDANT:**

    Michael I. Levin, Esq.
    Levin Legal Group, P.C.
    1301 Masons Mill Business Park
    1800 Byberry Road
    Huntingdon Valley, PA  19006

---

### DIANA GILBRIDE, RMR, FCRR
### FEDERAL OFFICIAL COURT REPORTER
### P.O. BOX G
### SCRANTON, PA 18501-0090

1                    <u>INDEX TO WITNESSES</u>

2     FOR PLAINTIFF:   DIRECT  CROSS  REDIRECT  RECROSS  COURT

3     Opening Statement
       by Ms. Tack-Hooper: 4
4
      B█████ L████
5      by Ms. Tack-Hooper: 8            30
       by Mr. Levin:          20
6
      Closing Statement:   46           56
7


8     FOR DEFENDANT:   DIRECT  CROSS  REDIRECT  RECROSS  COURT
9
      Coach Nicole Luchetta-Rump
10     by Mr. Levin:        33         43
       by Ms. Tack-Hooper:      37
11
      Closing Statement:   49
12                    <u>INDEX TO EXHIBITS</u>
13    PLAINTIFF:                       IDENTIFIED   ADMITTED
14
      Exhibit No. 1                       30          32
15
16    DEFENDANT:                       IDENTIFIED   ADMITTED

17    Exhibit No. 1                        7           7
      Exhibit No. 3                        7           7
18    Exhibit No. 7                       21          30
      Exhibit No. 5                       22          30
19    Exhibit No. 4                       24          30
      Exhibit No. 9                       26          --
20    Exhibit No. 10                      28          37
      Exhibit No. 2                       28          30
21

22

23

24

25

3

1                    (9:30 a.m., convene.)

2          THE COURT:  Okay.  We're here on a hearing on a

3   preliminary injunction in the case of B.L. versus Mahanoy Area

4   School District.  And the plaintiff -- are you ready to

5   proceed?

6          MS. TACK-HOOPER:  Yes, your Honor, a couple

7   housekeeping matters before we would proceed, if that's all

8   right?

9          THE COURT:  All right.

10          MS. TACK-HOOPER:  We would propose that the parties

11   do very brief opening statements and then closing argument

12   after the presentation of evidence.  And that my understanding

13   is that the district has brought several witnesses.  We'd

14   request that they -- other than the representative of the

15   district, Superintendent Green, that they be sequestered

16   during --

17          THE COURT:  Okay.  Any problem with that?

18          MR. LEVIN:  Mike Levin for the defense.  We have no

19   problem with that, your Honor.

20          THE COURT:  Okay.  Well then, let's do that, and then

21   let's proceed.  I'm fine with that procedure, as far as the

22   opening and closing.

23          MR. LEVIN:  Is there a room that the witnesses can

24   sit in during sequestration?

25          THE COURT:  I'm sure there is.

4

1            THE DEPUTY CLERK:  There is a conference room in the

2    lobby.  Do you want me to --

3            MR. LEVIN:  Yes.

4            THE COURT:  Yes, we will do that.

5            (Pause.)

6            MS. TACK-HOOPER:  Okay.  Molly Tack-Hooper for the

7    plaintiff, your Honor.  Good morning.

8            THE COURT:  All right.

9            MS. TACK-HOOPER:  The parties agree here that the

10   plaintiff's likelihood of success on the merits is the main

11   issue in deciding plaintiff's motion for a preliminary

12   injunction.  And it's quite clear here that under the Third

13   Circuit decision in J.S. and Layshock the school does not have

14   the power to punish a student for disrespectful or even profane

15   speech that happens entirely outside of school and doesn't

16   cause a substantial material disruption to school activities.

17            In this case the Plaintiff B.L. was punished for a

18   Snap she posted that said, Fuck school, fuck softball, fuck

19   cheer, fuck everything.  She posted it on the weekend from a

20   convenience store that's not on school campus.  It wasn't

21   during any school activities.  And she used no school resources

22   or school time to create it.  All of those facts have already

23   been stipulated to by the district.  That's really all the

24   Court needs to decide this motion.

25            But today we'll provide some additional context.

1  You'll see the Snap.  You'll hear from Plaintiff B.L.  You'll

2  hear that she had a rough week when she posted that.  She was

3  venting to her friends, which is one of the ways she uses

4  Snapchat.  Posting a Snap takes just a few seconds, she'll

5  explain.  You open the app on your phone, you take a photo, you

6  add a line of text, and you share it with some or all of your

7  friends.

8          So that Saturday in May B.L. used Snapchat to vent.

9  She posted a Snap that didn't refer to any particular person or

10 team; it didn't include a school logo; she wasn't wearing her

11 cheerleading uniform; it wasn't even during cheerleading

12 season.  The sports seasons were over.

13         And she'll explain that Snaps are designed to be

14 fleeting and temporary.  They're available for anywhere from

15 one second to 24 hours.  This particular Snap was accessible

16 only by her friends on Snapchat, you couldn't go on-line and

17 see it, the general public couldn't download the Snapchat app

18 and see it.  And even her friends could only access it for 24

19 hours from that Saturday.  So by Monday morning the Snap had

20 already self-deleted from Snapchat.  By the time the school

21 week started it was gone.

22         The school punished B████ for that fleeting

23 expression of frustration that she shared with her friends on

24 the weekend entirely outside of the school.  Thank you, your

25 Honor.

6

1        THE COURT:  Thank you.  Yes.

2        MR. LEVIN:  Your Honor, on behalf of the school

3   district the plaintiffs cite cases which are simply

4   inapplicable here.  The Layshock case, the J.S. case, and the

5   others including Tinker are all cases where the students are

6   suspended or expelled from school.  This is an extracurricular

7   case, where extracurriculars are considered to be privileges,

8   not rights.

9        This student and her parents signed the conduct

10  forms, agreed to comply with the code of conduct, which

11  expressly states that it is applicable during the entire time

12  that the activity, in this case cheerleading, is in session.

13  And the parties stipulated -- it's in paragraph 13 of the

14  stipulations -- as well as the plaintiff's statement, quote,

15  The cheerleaading squad is active throughout the year,

16  including the summer.

17       Sportsmanship is one of the important lessons to

18  learn from extracurriculars.  And you'll hear that this picture

19  of the plaintiff giving her middle finger to everybody who saw

20  that Snap and the plaintiffs, quote, Fuck cheerleading, end of

21  quote, is not really expressive conduct.  I don't know what she

22  intended to mean by that contempt that she showed.  And it

23  didn't disappear after 24 hours because people who got her Snap

24  made pictures, brought pictures into the school district, and

25  in fact the pictures are captured on the exhibits that we'll be

7

1  presenting.

2        When the Court applies the cases that deal with

3  extracurricular activities, the school district was well within

4  its rights in this particular case.  Thank you.

5        THE COURT:  All right.

6        MS. TACK-HOOPER:  Your Honor, to shorten the

7  presentation of evidence the parties have entered into some

8  stipulations of fact and stipulated to two exhibits.  The --

9  they have been pre-marked as Defendant's 1 and 3, but we would

10 jointly move them into evidence, your Honor.  And I've got

11 copies of the stipulated facts and the exhibits.

12       THE COURT:  All right.

13       MS. TACK-HOOPER:  Would you like me to pass them up

14 now, your Honor, or hold them until the end?

15       THE COURT:  Well, you can do either.  Why don't you

16 just hold onto them, as long as there's no --

17       MS. TACK-HOOPER:  Certainly.

18       THE COURT:  There's no disagreement about it, that's

19 fine.  But just be sure to do it at the conclusion of your

20 presentation.

21       MS. TACK-HOOPER:  Okay, all right.  In that case,

22 your Honor, we would call the plaintiff B█████ L███ to the

23 school [sic].  We've used her initials in the complaint, of

24 course, as is required under the Rules --

25       THE COURT:  Right.

1          MS. TACK-HOOPER:  -- but we have -- we're not

2    proceeding anonymously.  Okay.

3          THE DEPUTY CLERK:  Will you raise your right hand.

4                         B███████ L███,

5    called as a witness, having been duly sworn or affirmed

6    according to law, testified as follows:

7          THE DEPUTY CLERK:  Can you please state your name for

8    the record?

9          THE WITNESS:  B██████ L███.

10         THE REPORTER:  And can you just spell your first name

11   for me?

12         THE WITNESS:  B-████████.

13                         DIRECT EXAMINATION

14   BY MS. TACK-HOOPER:

15   Q.   Good morning B████.

16   A.   Good morning.

17   Q.   How old are you?

18         THE COURT:  Just move that microphone a little closer

19   to you.  That's fine.  Thank you.

20   BY MS. TACK-HOOPER:

21   Q.   Can you say your name again so we can see if we can hear

22   you.

23   A.   B██████ L███.

24   Q.   Great.  And how old are you B████?

25   A.   15.

1   Q.   What grade are you in?

2   A.   Tenth.

3   Q.   All right.  And where do you go to school?

4   A.   Mahanoy Area.

5   Q.   And what do you do when you're not in school?

6   A.   I do my homework or I go outside with my friends.

7   Q.   Do you do any sports or activities?

8   A.   Cheerleading and softball.

9   Q.   When did you start cheerleading?

10  A.   In fifth and sixth grade.

11  Q.   Okay.  Did you do cheerleading in seventh and eighth

12  grade?

13  A.   No.

14  Q.   All right.  What about ninth grade?

15  A.   Yes.

16  Q.   Okay.  What -- so, in ninth grade you were on what

17  cheerleading team?

18  A.   JV.

19  Q.   JV, junior varsity?

20  A.   Yes.

21  Q.   Okay, thank you.  What teams do you cheer for on the JV

22  squad?

23  A.   Basketball, football and wrestling.

24  Q.   And those are all men's teams, those teams?

25  A.   Yes.

1  Q.    How did you get on to the JV squad?

2  A.    You had to try out.

3  Q.    When did you try out?

4  A.    Towards like the end of the school years.

5  Q.    So towards the end of eighth grade, before eighth grade?

6  A.    Yeah.

7  Q.    Okay.  And what did you have to do at tryouts?

8  A.    A dance and three cheers.

9  Q.    Okay.  How did you find out that you were -- you had made

10 it onto the JV squad?

11 A.    So they called all of us out, and then we had numbers, and

12 they just said our numbers like if we made it on the JV, on the

13 junior varsity.

14 Q.    Okay.  So they told you right there at tryouts that you

15 were on the team?

16 A.    Yes.

17 Q.    Okay.  And did you have to try out again at the end of

18 ninth grade for tenth grade cheerleading?

19 A.    Yes.

20 Q.    Okay.  And how did -- did that work the same way as the

21 tryouts for ninth grade JV?

22 A.    Yes.

23 Q.    Okay.  And did you make varsity at the end of your ninth

24 grade year?

25 A.    No.

11

1  Q.    Okay.  Do you remember getting a copy of some cheerleading

2  rules?

3  A.    I don't remember.

4  Q.    Okay.  Can I -- may I approach, your Honor?

5          THE COURT:  Yes.

6  BY MS. TACK-HOOPER:

7  Q.    Okay.  All right.  Okay.  Let the record reflect I have

8  handed the witness what has been marked as D-3.  B████, do you

9  see the page that says Mahanoy Area High School Cheerleading

10 Rules at the top?

11 A.    Yes.

12 Q.    Okay.  Do you remember getting these at some point?

13 A.    Yeah.

14 Q.    Okay.  What do you remember about these rules?

15 A.    About how like you needed to keep your grades up and you

16 needed to raise a certain amount of money.

17 Q.    Okay.  Do you remember when you got a copy of these?

18 A.    No.

19 Q.    Okay.  Let's go through a few of the rules.  So there's a

20 section at the top that says Attendance.  Can you read the

21 first sentence of that first bullet point for me, please.

22 A.    All cheerleaders must attend every practice and workshop.

23 Q.    Okay.  Did you attend every practice and workshop?

24 A.    Yes.

25 Q.    Okay.  The next section says Academic Policy.  Is that the

1  one you remember?

2  A.    Yeah.

3  Q.    All right.  Can you read that first bullet point for us,

4  please?

5  A.    All cheerleaders must me academically eligible.  If you

6  are ineligible you are -- if you are failing two or more

7  classes to participate at games.

8  Q.    Have you ever been academically disqualified from doing

9  cheerleading?

10  A.    No.

11  Q.    How are your grades?

12  A.    Good, like honors.

13  Q.    All right.  And do you plan to go to college?

14  A.    Yes.

15  Q.    All right.  The next section is called Uniforms.  Could

16  you read that second bullet point under Uniforms please?

17  A.    Uniforms should be machine washed weekly and line dried

18  during regular season.

19  Q.    Okay.  Have you ever gotten in trouble for having a dirty

20  uniform?

21  A.    No.

22  Q.    All right.  Let's turn the page.  There's another section

23  called Sportsmanship and Responsibilities/Fundraising.  Did you

24  participate in fundraising as part of the cheerleading team?

25  A.    Yes.

1  Q.    What did you guys do?

2  A.    Krispy Kreme Doughnuts and popcorn sales.

3  Q.    Sales, okay.  And the final section is called Technology.

4  Can you read that first bullet point under Technology.

5  A.    The use of cell phones is prohibited during games and

6  other events.

7  Q.    Have you ever gotten in trouble for using your cell phone

8  during a game or other school event?

9  A.    No.

10 Q.    Have you ever been benched at all from cheerleading?

11 A.    No.

12 Q.    All right.  And other than being punished for your Snap,

13 have you ever gotten in trouble at school?

14 A.    No.

15 Q.    Okay.  In that same document, if you could flip back a

16 couple pages to the exhibit that's been marked Exhibit D-1.

17 And can I approach, your Honor?

18            THE COURT:  You may.  You don't have to ask me.

19            MS. TACK-HOOPER:  Okay.

20 BY MS. TACK-HOOPER:

21 Q.    Did you find it?  Great.  B█████, is this a photo of a

22 Snapchat that you made?

23 A.    Yes.

24 Q.    Okay.  I want to talk a little bit about what Snapchat is

25 and how it works.  So how do you post something on Snapchat?

14

1  A.    Like you go onto the app and click on a button and take a
2  picture or a video.  And then you could type like something,
3  anything you want, and then you can post it to your story,
4  which is all of your friends, or send it to like an individual
5  person.
6  Q.    Okay.  And how long do Snaps last?
7  A.    If you send it to an individual person it only lasts ten
8  seconds.  But if you put it on your story it will last 24
9  hours.
10  Q.    And is there a website you can go to to see someone's
11  Snapchat posts?
12  A.    No.
13  Q.    So how do you -- you have to -- you mentioned an app.  You
14  have to have the app, is that how it works?
15  A.    Yes.
16  Q.    So what do you use Snapchat for?
17  A.    To rant or post funny stuff.
18  Q.    Okay.  How does it compare to the things you would say to
19  your friends in person?
20  A.    How I would talk to them normally.
21  Q.    So it's the same way you would talk to them on Snapchat as
22  a person?
23  A.    Yeah.
24  Q.    Are you on other social media, like facebook or Instagram?
25  A.    Yeah.

1  Q.    And how does Snapchat compare to those other sites,

2  platforms?

3  A.    On my facebook, like the stuff you make is permanent

4  unless you delete it and stuff.  And then with Snapchat it only

5  lasts 24 hours.

6  Q.    Okay.  So let's talk about this particular Snap that you

7  have in front of you.  When did you post this?

8  A.    It was on a Saturday after tryouts for cheerleading.

9  Q.    Do you know like roughly what month that was or season?

10  A.    The end of May.

11  Q.    All right.  So you said it was after tryouts.  Were

12  there -- was cheerleading -- were there practices going on at

13  that time?

14  A.    No.

15  Q.    Okay.  Were there games that you were cheering for at that

16  time?

17  A.    No.

18  Q.    All right.  How -- when does cheerleading happen during

19  the school year?

20  A.    Practices would start like a week after school ended, like

21  somewhere around there.  And then they'd go like throughout the

22  entire school year.

23  Q.    Okay.  So this was in the period between the end of

24  cheerleading and the start of practices for the next season?

25  A.    Yes.

16

1  Q.   All right.  And where was this photo taken?

2  A.   The Cocoa Hut.

3  Q.   What's a the Cocoa Hut?

4  A.   It's like a store, a small store.

5  Q.   Is it part of school?

6  A.   No.

7  Q.   All right.  Were there any school activities that you were

8  participating in while you took this photo?

9  A.   No.

10  Q.   All right.  And what are you wearing in this photo?  First

11  of all, is that you on the left there?

12  A.   Yes.

13  Q.   And who is the girl on the right?

14  A.   My friend D█████.

15  Q.   Does she go to school with you?

16  A.   Yeah.

17  Q.   Is she a cheerleader?

18  A.   No.

19  Q.   And what are you wearing in that?

20  A.   A gray shirt.

21  Q.   Is that your school uniform?

22  A.   No.

23  Q.   Is your school uniform what you're wearing today?

24  A.   Yeah.

25  Q.   Okay.  Are there any school logos in this photo?

1  A.    No.

2  Q.    And why did you make this post?

3  A.    I was angry about a lot of stuff that day.

4  Q.    What were you angry about?

5  A.    That I didn't make varsity for cheerleading, and I didn't

6  get the spot I wanted for softball.

7  Q.    What spot did you want for softball?

8  A.    Right field.

9  Q.    And what were you playing?

10 A.    The left.

11 Q.    Okay.  And why were you angry about school?

12 A.    Because of finals.

13 Q.    Okay.  And this language on this Snap, how does that

14 compare to the way you speak when you're at school?

15 A.    Different.  Because I know I'd get in like big trouble if

16 like a teacher or something hears it.

17 Q.    So that's not the kind of language you use at school?

18 A.    No.

19 Q.    Okay.  How did you think your friends would react to the

20 Snap?

21        MR. LEVIN:  Objection, irrelevant and speculative.

22        THE COURT:  What's the purpose of the question?

23        MS. TACK-HOOPER:  Your Honor, the district's brief

24 emphasizes that she was being disrespectful and that this

25 impacted her coaches and her team.  So, asking about the intent

1  of the post is --

2          THE COURT:  Well I think you can rephrase the

3  question and ask her what she intended to happen rather than

4  what she expected the result to be.

5          MS. TACK-HOOPER:  Certainly.

6  BY MS. TACK-HOOPER:

7  Q.    What did you intend when you posted this Snapchat?

8  A.    What does that mean?

9  Q.    It means -- were you trying to send a message to someone

10  with this?

11  A.    I was just mad about everything.

12  Q.    Okay.  Was it directed at a particular person?

13  A.    No.

14  Q.    All right.  And do you know how this photo came to be?

15  A.    No.

16  Q.    All right.  How do you -- so if a Snapchat only lasts ten

17  seconds or 24 hours, is there a way to make them last longer?

18  A.    Other than taking a picture of it like this, no.

19  Q.    So how do you take a picture of somebody's Snapchat?

20  A.    You'd have to get another phone to take a picture of it

21  from someone else's phone.

22  Q.    Okay, all right.  So you posted this on a Saturday.  Was

23  there school the following Monday?

24  A.    Yes.

25  Q.    And how did your friends react to this post?

19

1   A.   No one said anything to me about it.

2   Q.   Not on the weekend?

3   A.   No.

4   Q.   Not on Monday?

5   A.   No.

6   Q.   What about on Tuesday?  Did anyone say anything to you

7   about the post on Tuesday?

8   A.   No.

9   Q.   What about Wednesday?

10  A.   No.

11  Q.   Okay.  When was the first time anyone said anything to you

12  about this post?

13  A.   Thursday Morning.

14  Q.   And what was that conversation?

15  A.   Mrs. Luchetta called me to her room at homeroom, and she

16  showed me the picture and said it was disrespectful towards

17  her, the school, and everyone -- like all the students.  And

18  then she told me I wasn't allowed to do cheerleading that year.

19  Q.   Okay.  Did she say what in particular about the Snap was

20  disrespectful?

21  A.   No -- oh yeah.  She pointed at it.

22  Q.   What did she point to?

23  A.   The words fuck cheer.

24  Q.   Okay.  One moment, your Honor.

25           (Pause.)

20

1        MS. TACK-HOOPER:  Nothing else, your Honor.

2        THE COURT:  Cross-examine.

3        MR. LEVIN:  Yes.  I have a packet of exhibits that

4   I'd like to hand up.  I have a packet for the Court.

5        THE COURT:  All right.

6                        CROSS EXAMINATION

7   BY MR. LEVIN:

8   Q.    May I call you B████?

9   A.    Yes.

10  Q.    Okay.  Good morning.  I'm Mike Levin.  I'm an attorney,

11  and I represent the school district.  I'm going to ask you some

12  questions.  Is that okay with you?

13  A.    Okay.

14  Q.    If you don't understand any question let me know and I'll

15  be happy to rephrase it, is that all right?

16  A.    Yes.

17  Q.    Okay.  Cheerleading is an extracurricular activity, isn't

18  that true?

19  A.    Yes.

20  Q.    Cheerleading is totally voluntary, isn't that true?

21  A.    Yes.

22  Q.    There's no requirement that students participate in

23  cheerleading in order to graduate, is that correct?

24  A.    Yes.

25  Q.    None of your grades in your academic classes or even gym

1  or phys ed take cheerleading into account, isn't that correct?

2  A.    Yes.

3  Q.    You're not listed -- cheerleading is not listed on your

4  transcript, isn't that correct?

5  A.    I don't know what a transcript is.

6  Q.    In order to join the cheerleading squad your parents have

7  to sign an application giving you permission, isn't that

8  correct?

9  A.    Yeah.

10  Q.    Please take a look at Exhibit D-7.  That's behind the 7th

11  tab.  Tell me when you have it in front of you.

12  A.    I have it.

13  Q.    Okay.  Do you recognize that as an application form for

14  cheerleading?

15  A.    For tryouts, yes.

16  Q.    And do you recognize your mother's signature about

17  one-third of the way down?

18  A.    Yeah.

19  Q.    And in fact, under what has been blacked out, have you

20  ever heard of the word redacted?

21  A.    No.

22  Q.    Well, redacted means in documents like this when we block

23  something out.  I blocked out your name.  But do you remember

24  signing this form on April 28, 2017?

25  A.    Yeah.

1  Q.    Okay.  And the third sentence right above where your

2  signature would be says, quote, If elected, I promise to abide

3  by the rules and regulations set forth by the advisor and the

4  principal of the Mahanoy Area High School, end of quote.  Did I

5  read that correctly?

6  A.    Yeah.

7  Q.    And the next sentence says, I promise to cooperate and

8  fellow the instructions of the cheerleading coach, period, end

9  of quote.  Did I read that correctly?

10 A.    Yeah.

11 Q.    And you would agree that there's similar language right

12 before your mother's signature, right?

13 A.    Yeah.

14 Q.    This wasn't the first year that you signed documents

15 acknowledging what the rules are, isn't that correct?

16 A.    Yeah.

17 Q.    Please take a look at Exhibit D-5, which is behind the

18 fifth tab.  Do you remember you and your mother signing that

19 for the 2016/2017 school year?

20 A.    I don't remember.

21 Q.    Do you remember signing it at the bottom where we have it

22 redacted?

23 A.    No.

24 Q.    Do you dispute that you and your mother signed this?

25 A.    I don't know what that means.

1  Q.    Do you disagree that you signed it?

2  A.    I don't disagree, but I don't remember it.

3  Q.    Okay.  Fair enough.  And you would agree that about

4  one-fifth of the way down it says Handbook, and do you

5  recognize your mother's --

6          THE COURT:  Why are we dealing with this?  She said

7  she doesn't remember signing it.  She doesn't remember the

8  document.  So why are we dealing the document?

9          MR. LEVIN:  Okay.  I'll move on, your Honor.

10          THE COURT:  Is this an agreed to exhibit?

11          MR. LEVIN:  It hasn't been put in the stipulation.

12          THE COURT:  That's not what I asked.  Is this an

13  agreed to exhibit?

14          MS. TACK-HOOPER:  Your Honor, we have no objection to

15  the --

16          THE COURT:  All right, then fine.  Proceed.  Sorry.

17          MR. LEVIN:  Thank you.

18  BY MR. LEVIN:

19  Q.    Do you recognize your mother's signature next to the

20  section that says Handbook?

21  A.    Yeah.

22  Q.    Do you recog- -- and it's the same signature for all four

23  sections, is that correct?

24  A.    Yeah.

25  Q.    And do you recognize your mother's signature towards the

24

1   bottom, right above the redacted area?

2   A.    Yeah.

3   Q.    And the form refers to a handbook, is that correct?

4   A.    I'm not sure.

5   Q.    Well, about one fifth of the way down do you see where it

6   says Handbook?

7   A.    Yeah.

8   Q.    Okay.  And all the students in the high school receive the

9   student handbook, right?

10  A.    Yes.

11  Q.    And you got the student handbook, right?

12  A.    Yes.

13  Q.    And the student handbook is pretty much the same from year

14  to year, right?

15  A.    Yeah.

16  Q.    Please take a look at Exhibit D-4, it's behind the fourth

17  tab.  Do you recognize that as a page from the student

18  handbook?

19  A.    Yeah.

20  Q.    And that contains rules about personal conduct, right?

21  A.    Yeah.

22  Q.    And in paragraph eight there's a star next to that, do you

23  see that?

24  A.    Yeah.

25  Q.    And do you see where it says, Participation on an athletic

1  team or cheerleading squad in Mahanoy Area School District is a

2  privilege, end of quote, did you see that?

3  A.    Yes.

4  Q.    Do you also see where it says that, quote, Participants

5  must earn the right to represent Mahanoy schools by conducting

6  themselves in such a way that the image of the Mahanoy School

7  District would not be tarnished in any manner, end of quote.

8  Did I read that correctly?

9  A.    Yes.

10  Q.    And the next sentence says, quote, Any participant whose

11  conduct is judged to reflect a discredit upon himself/herself,

12  the team or the Mahanoy schools, whether or not such activities

13  takes place during or outside school hours during the school

14  sport season would be subject to disciplinary action as

15  determined by the coach, end of quote.  Did I read that

16  correctly?

17  A.    Yeah.

18  Q.    Now, as a cheerleader the school district provides school

19  district uniforms, isn't that correct?

20  A.    Yeah.

21  Q.    And those uniforms have school district markings on them,

22  right?

23  A.    Yes.

24  Q.    And the members of the cheerleading squad are required to

25  wear the uniforms to the games and parades that the

1 cheerleading squad is performing in, right?

2 A.    Yes.

3 Q.    Now, before you signed Exhibits D-5 or D-7, did you tell

4 the coaches, any teacher or principal that you didn't

5 understand the rules?

6 A.    No.

7 Q.    Before you snapped a picture of your middle finger and

8 wrote fuck cheer, did you tell anybody that you didn't

9 understand the rules?

10 A.    No.

11 Q.    Before you snapped the picture of your middle finger and

12 wrote fuck cheer did you ask any of the coaches, any teachers

13 or the principal whether you could post such profanity?

14 A.    No.

15 Q.    Please take a look at Exhibit D-9.  Tell me when you have

16 it?

17 A.    I have it.

18 Q.    Is that a picture of what the uniforms look like from the

19 front?

20 A.    No.

21 Q.    Excuse me?

22 A.    No.

23 Q.    These aren't the uniforms?

24 A.    No.  These are the seventh and eighth grade ones.

25 Q.    Okay, I stand corrected then.  Now, getting on varsity

27

1  cheerleading is a competitive process, right?

2  A.    Yeah.

3  Q.    There are tryouts where special judges are brought in to

4  evaluate students' performances, right?

5  A.    Yes.

6  Q.    You tried out on Thursday, May 25, right?

7  A.    Yeah.

8  Q.    You were told you didn't make varsity, but you made junior

9  varsity, right?

10  A.    I was already on junior varsity.

11  Q.    Okay.  You were told that you didn't make varsity, right?

12  A.    Yeah.

13  Q.    You were angry about not making varsity, right?

14  A.    Yeah.

15  Q.    You insisted on seeing the score sheets from the judges,

16  right?

17  A.    I don't remember that.

18  Q.    You were angry that a freshman made varsity but you did

19  not, right?

20  A.    Yeah.

21  Q.    You sent a text to Coach Luchetta questioning why a

22  freshman made the varsity squad and you did not, right?

23  A.    I don't remember that.

24  Q.    When Coach Luchetta told you students did not have to be

25  on JV first in order to be on varsity, you said that was

28

1  stupid, right?

2  A.    I don't know.

3  Q.    Please take a look at Exhibit D-10.  Do you remember those

4  texts as being a text between you and Coach Luchetta?

5  A.    No.

6  Q.    You don't remember this at all?

7  A.    No.

8  Q.    Okay.  In addition to Exhibit D-1, which is the Snap where

9  you're giving the middle finger and you're using the F word

10 several times, you also send another Snap, isn't that correct,

11 about this subject?

12 A.    I don't remember.

13 Q.    Please take a look at what has been marked as Exhibit D-2.

14 Tell me when you have it in front of you.

15 A.    I have it.

16 Q.    Isn't that another Snap that you sent?

17 A.    I don't remember making it.

18 Q.    Okay.  Is it possible you did and you just don't remember?

19 A.    Yeah.

20 Q.    And these Snaps which signify your anger were sent on the

21 Memorial Day weekend, right?

22 A.    I don't know.

23 Q.    How many people had access to these Snaps?  You said you

24 sent it to your friends.  How many were there?

25 A.    About like two-fifty.

1  Q.    Two hundred and fifty?

2  A.    Yeah.

3  Q.    And many of those 250 were students at the Mahanoy Area

4  School District, right?

5  A.    Yeah.

6  Q.    Some of the people who were among the 250 people were on

7  the cheerleading squad, right?

8  A.    Yeah.

9  Q.    And after you were told by Coach Luchetta that you were

10 being removed from the cheerleading squad you went to the

11 principal's office, right?

12 A.    Yes.

13 Q.    And the principal is Mr. Thomas Smith, is that correct?

14 A.    Yes.

15 Q.    You started crying when you got there, right?

16 A.    Yeah.

17 Q.    You admitted to Mr. Smith that you posted the Snap, right?

18 A.    Yes.

19 Q.    And you told him you did it because you were angry, right?

20 A.    Yeah.

21       MR. LEVIN:  I have nothing further, your Honor.  I

22 move for the admission of the exhibits?

23       MS. TACK-HOOPER:  Your Honor, we would object to the

24 admission of D-10, the texts that our client doesn't remember.

25 And D-9, the uniforms that have no relevance in this case.

1          MR. LEVIN:  We're going to have another witness on

2   D-10.  And I agree with respect to -- that there's limited

3   relevance.

4          THE COURT:  Okay, they'll all be admitted but for D-9

5   and D-10.  Redirect?

6          MS. TACK-HOOPER:  Yes, your Honor.  One moment, your

7   Honor, please.

8          (Pause.)

9                    REDIRECT EXAMINATION

10  BY MS. TACK-HOOPER:

11  Q.    Okay.  B████, I've handed you what has been marked as

12  P-1.  Do you recognize that?

13  A.    Yes.

14  Q.    Is that the handbook that the lawyer for the district

15  referred to earlier?

16  A.    Yeah.

17  Q.    And can you tell me how many pages are in that handbook?

18  A.    A lot.

19  Q.    Are they numbered?

20  A.    Yeah.

21  Q.    Sure.  What's the highest page number there?

22  A.    85.

23  Q.    Did you read all 85 of those pages?

24  A.    No.

25  Q.    Do you remember everything that you did read in it?

31

1  A.    No.

2  Q.    All right.  Was there anything in there that said that

3  students have no right to speak freely with their friends on

4  the weekends?

5  A.    No.

6  Q.    And those permission slips that the lawyer for the

7  district showed you, did you sign anything saying you agreed to

8  give up your rights to speak freely with your friends on the

9  weekends?

10  A.    No.

11  Q.    Would you have signed something that said that?

12  A.    No.

13  Q.    The district lawyer asked if you were angry when you made

14  that -- that Snap.  Did you take out your anger at your

15  teammates during -- during tryouts?

16  A.    No.

17  Q.    Did you use the kind of language in your Snapchat at

18  tryouts because you were angry?

19  A.    No.

20  Q.    You didn't swear at the coaches?

21  A.    No.

22  Q.    You didn't swear at your teammates?

23  A.    No.

24  Q.    When you made this post several days later were you trying

25  to upset people?

```
 1  A.    No.
 2  Q.    Okay.  And the district lawyer mentioned that when you
 3  spoke with the school officials about being removed from the
 4  team you were crying?
 5  A.    Yeah.
 6  Q.    Did you apologize for having posted this on Snapchat?
 7  A.    Yeah, multiple times.
 8  Q.    And why were you crying B    ?
 9  A.    Because I was upset that I got kicked off.
10  Q.    Why were you upset?
11  A.    Because I really enjoy cheerleading.
12              MS. TACK-HOOPER:  Nothing further, your Honor.
13              MR. LEVIN:  I have nothing further.
14              THE COURT:  All right.  You may step down.
15              MS. TACK-HOOPER:  We would move into admission the
16  Exhibit P-1, please, your Honor.
17              MR. LEVIN:  I have no objection.
18              THE COURT:  Admitted.
19              MS. TACK-HOOPER:  And the -- as well as D-1 and 3,
20  I'm not sure whether they were included in what you just moved
21  in, but the stipulated exhibits.
22              MR. LEVIN:  They were.
23              THE COURT:  They were.
24              MS. TACK-HOOPER:  Great, thanks your Honor.
25  Plaintiff rests, your Honor.
```

33

1    MR. LEVIN:  Our first witness would be Coach

2    Luchetta.

3    THE DEPUTY CLERK:  Would you raise your right hand.

4    COACH NICOLE LUCHETTA-RUMP,

5    called as a witness on behalf of the Defendant, having been

6    duly sworn or affirmed according to law, testified as follows:

7    THE DEPUTY CLERK:  Please state and spell your name

8    for the record.

9    THE WITNESS:  Nicole, N-I-C-O-L-E, Luchetta,

10   L-U-C-H-E-T-T-A dash Rump, R-U-M-P.

11   DIRECT EXAMINATION

12   BY MR. LEVIN:

13   Q.   Would you state your full name for the record, please?

14   A.   Nicole Luchetta-Rump.

15   Q.   By whom are you employed?

16   A.   The Mahanoy Area School District.

17   Q.   In what capacity or capacities?

18   A.   I'm a secondary mathematics teacher and a cheerleading

19   co-advisor.

20   Q.   And what do you teach?

21   A.   I teach high school mathematics.

22   Q.   And how long have you been a public school teacher?

23   A.   This is my eighth year.

24   Q.   How long have you been a cheerleading coach?

25   A.   This is my third year.

34

1  Q.    Did you have any role in writing the cheerleading rules?

2  A.    The cheerleading rules were adopted from the previous

3  coaches, but April and I revised them to meet our needs.

4  Q.    Did you review the rules with the cheerleaders?

5  A.    We reviewed them during the cheerleading workshops during

6  our tryouts.  In addition to that, the cheerleaders were

7  required to read and sign a form saying that they will abide by

8  the cheerleading rules before starting cheerleading tryouts.

9  Q.    Was B███████ present when you reviewed the rules?

10 A.    Yes.

11 Q.    Are there any pedagogical purposes for the rule?

12 A.    The main purpose of the rules is to not only teach our

13 students that they have to follow rules, and if they don't

14 follow them there's consequences, but in addition to that we

15 want to teach them team-building skills and skills that they

16 will take with them after they graduate.

17 Q.    Did B██████ try out for varsity cheerleading for the

18 2017/18 school year?

19 A.    Yes.

20 Q.    Did she make varsity?

21 A.    No.

22 Q.    How did she react to not making varsity?

23 A.    After the tryouts, after the results were given B██████

24 seemed visibly upset.  She did ask me to see her tryout score.

25 I showed them to her then she handed them back.

35

1  Q.    Did she send you any texts about the subject?

2  A.    Yes.

3  Q.    Please take a look.  On your desk there is a packet of

4  defense exhibits.  Please take a look behind Tab 10 at the

5  document called D-10.  Do you have it in front of you?

6  A.    Yes.

7  Q.    Do you recognize that as several texts between you and

8  whom?

9  A.    Hum, this is between myself and B.L.

10 Q.    That's B████?

11 A.    Yes.

12 Q.    And some of these texts are in gray and one of the texts

13 is in blue.  Do you see that?

14 A.    Yes.

15 Q.    Who sent the texts that are in gray?

16 A.    Hum, B████ sent the ones in gray.

17 Q.    And the redacted word, is that the word B████ in the

18 first one, Hey, it's --

19 A.    Yes.

20 Q.    Okay.  So, B████ said, Hey, it's B████.  Just wondering,

21 do you have to DK a year of JV before you can make varsity?  My

22 mom was wondering.  Is that what she asked you?

23 A.    Yes.

24 Q.    And how did you respond?

25 A.    I respond with No.

36

1  Q.    And how did B███████ respond to your statement?

2  A.    She replied with, That's stupid, but okay.

3  Q.    And then she also stated the rest of the texts that are in

4  gray, is that correct?

5  A.    Correct.

6  Q.    And on what date did she send these texts?

7  A.    This was on Friday, May 26, one day after the tryouts.

8  Q.    Did you subsequently learn about B███████, quote, fuck

9  cheer, end of quote, Snap and her giving the middle finger to

10 whoever was looking at that Snap?

11 A.    Yes.

12 Q.    How did you learn about it?

13 A.    April Gnall.

14 Q.    And what did April do?

15 A.    April had tried to contact the high school principal, but

16 was unable to.  So she dropped this Snap off at my classroom.

17 Q.    When you say this Snap, please take a look at Exhibit D-1.

18 Is that the Snap you're referring to?

19 A.    Yes.

20 Q.    Okay.  Did you learn about that Snap before April gave a

21 copy of it to you?

22 A.    Yes.  I had students approach me throughout the school day

23 saying that there were things being posted on line.  I did not

24 know the details until April shared them with me.

25 Q.    In addition to telling you that there were things posted

1  on-line, did they say anything else about it?  Did they

2  describe it in any way?

3  A.    They just described it as being something that was

4  inappropriate, that shouldn't be posted on-line.

5  Q.    Who made the decision to remove B███ from the squad?

6  A.    Both April and I made the decision with the support of Tom

7  Smith, the high school principal.

8  Q.    And could you explain to the Judge the factors that you

9  took into account?

10 A.    The fact that there was profanity in the Snap and it was

11 directed towards cheerleading.

12 Q.    Do you know what viewpoint, if any, B███ was trying to

13 express when she gave the middle finger to everybody and said,

14 Fuck cheer?

15 A.    I did not.

16 Q.    Was it the profanity and the profane gesture alone that

17 caused the removal?

18 A.    Yes.

19        MR. LEVIN:  I have nothing further.  Move for the

20 admission D-10.

21        MS. TACK-HOOPER:  No objections, your Honor.

22        THE COURT:  Admitted.  Cross-examine.

23        MS. TACK-HOOPER:  Yes, your Honor.

24                     CROSS EXAMINATION

25 BY MS. TACK-HOOPER:

1  Q.    So that text, D-10, that's not part of why B██████ was

2  removed from the cheerleading team, right?

3  A.    The Snapchat?

4  Q.    I'm sorry, no, D-10, the text -- I believe it is 10,

5  right?  Yes.  The text message she sent you asking did if you

6  had to do a year of JV before you could make varsity?

7  A.    No.

8  Q.    You stated that some students told you B█████ had posted

9  something on-line about cheer, right?

10  A.    Yes.

11  Q.    Okay.  You heard B█████ -- let me rephrase that.  I'll

12  represent to you that B█████ testified that Snaps are not

13  posted on-line, they're within an app that you download on your

14  phone.  Are you a Snapchat user?

15  A.    I am not.

16  Q.    Okay.  So you have no personal knowledge about how

17  Snapchat works?

18  A.    Hum, it's under- -- my understanding, it's more like a

19  group type message, where anyone that posts it can see it, but

20  the thing is, also people can take screen shots and share that

21  on-line as well.

22  Q.    So, the way a Snap would end up on line is if somebody

23  took a photo of the Snap and posted it somewhere on-line, is

24  that what you're saying?

25  A.    That's a possibility, yes.

39

1  Q.    Okay.  But you have no reason to think that when you put

2  something in your Snapchat story that there is a website

3  someone can go to to see it?

4  A.    No, you cannot do that.

5  Q.    All right.  You mentioned that the profanity and the

6  obscene gesture were enough to remove B███ from the

7  cheerleading team, right?

8  A.    Correct.

9  Q.    If she had said, Cheer is fucking awesome, would that have

10 violated the cheerleading rules in your opinion?

11 A.    Yes.

12 Q.    Okay.  And if she had said something that didn't involve

13 profanity but was still negative about cheerleading, such as, I

14 don't really like cheerleading that much anymore, would that

15 have violated the rules?

16          MR. LEVIN:  Objection, speculative.

17          THE COURT:  Overruled.

18          THE WITNESS:  It would have violated the rules, but

19 the consequences for that would have been different.

20 BY MS. TACK-HOOPER:

21 Q.    What would the consequences have been?

22 A.    If that were the statement, we would have probably just

23 met with B███ and discussed the issue.

24 Q.    And where in the rules does it explain what things violate

25 the speech -- violate the rule and what the consequence is

40

1  going to be?

2  A.    We don't have specific consequences.  We have that it will

3  be determined by the coaches.

4  Q.    Okay.  What if she had posted, Cheerleaders are at high

5  risk for eating disorders.  Would that have violated the rule

6  about posting negative information regarding cheerleading

7  on-line?

8  A.    No.

9  Q.    No, that's in your opinion not negative information about

10  cheerleading?

11  A.    That would be most likely a statistic that she's posting

12  that she found somewhere.

13  Q.    What if she had criticized the selection process for

14  cheerleaders?

15  A.    Hum, I would refer her to me to talk to me about it.

16  Q.    Would that violate the rule about posting negative

17  information about cheerleading on-line?

18  A.    I don't feel that that's a negative comment, no.

19  Q.    Okay.  What if she had said, Why don't we cheer for the

20  women's sports teams?  Fuck that.  Would that violate the rule?

21  A.    Yes, because there's profanity.

22  Q.    Okay.  What if she had just said, Why don't we cheer for

23  the women's sports teams?  That's crazy?

24  A.    Then that would not violate it because there's no

25  profanity.

41

1  Q.    Okay.  You talked about some of the value that

2  extracurriculars have.  So, they're a privilege, right?

3  A.    Correct.

4  Q.    And schools don't have to offer extracurriculars?

5  A.    Correct.

6  Q.    But schools offer them because it helps advance the

7  school's mission of educating kids, right?

8  A.    Yes.

9  Q.    Okay.  Students get a lot out of extracurriculars, is that

10 right?

11 A.    Yes.

12 Q.    They make kids well-rounded, right?

13 A.    Correct.

14 Q.    Sports promote healthy students, right?

15 A.    Yes.

16 Q.    They teach leadership, right?

17 A.    Correct.

18 Q.    And good sportsmanship, correct?

19 A.    Yes.

20 Q.    And because of all this, colleges usually favor applicants

21 who have participated in extracurriculars, right?

22 A.    Yes.

23 Q.    And If you get kicked off of an extracurricular that's

24 going to impact your future, right?

25 A.    I'm not sure I agree with that.

42

1  Q.    Potentially it could?  That wouldn't be surprising to you,

2  would it?

3  A.    I'm not aware of any colleges that are aware of when you

4  get kicked off the sports team.

5  Q.    Okay.  It would negatively impact a students well-being

6  though most likely, right?

7  A.    Temporarily.

8  Q.    Okay.  And if you -- if a student decided not to

9  participate in an extracurricular because they wanted the right

10 to say whatever they wanted on the weekends with their friends,

11 they wouldn't get the benefit -- all those benefits that you

12 mentioned, right?  Like learning leadership and good

13 sportsmanship, right?

14 A.    Yes.

15 Q.    Okay.  If you could look at D-1.  Do you have that up

16 there, the cheerleading rules?

17            MR. LEVIN:  That's not D-1.

18            MS. TACK-HOOPER:  I'm sorry, it's not?

19            THE COURT:  No.

20            MS. TACK-HOOPER:  Oh, my apologies.

21            MR. LEVIN:  D-3.

22            MS. TACK-HOOPER:  D-3, I apologize.

23 BY MS. TACK-HOOPER:

24 Q.    Do you have D-3, the cheerleading rules?

25 A.    I do.

43

1  Q.    Can you look at the section on the second page that says

2  Sportsmanship and Responsibilities/Fundraising?

3  A.    Yes.

4  Q.    And the last sentence of the first bullet point says, Good

5  sportsmanship will be enforced.  This includes foul -- I'm

6  sorry, I'm going to read the whole bullet point.  The first

7  bullet point says, Please have respect for your school,

8  coaches, teachers, other cheerleaders and teams.  Remember,

9  you're representing your school when at games, fundraisers and

10 other events.  Good sportsmanship will be enforced.  This

11 includes foul language and inappropriate gestures.  Did I read

12 that right?

13 A.    Yes.

14 Q.    Okay.  It only -- it mentions using foul language and

15 inappropriate gestures in a rule about representing your school

16 at games and events, right?

17 A.    Correct.

18 Q.    It doesn't say anything about not being able to use foul

19 language or inappropriate gestures when you're away from

20 school, does it?

21 A.    It does not specifically state that, no.

22       MS. TACK-HOOPER:  Okay.  Nothing further, your Honor.

23                      REDIRECT EXAMINATION

24 BY MR. LEVIN:

25 Q.    Just a couple of things.  No. 1, is plaintiff permanently

44

1  removed from cheerleading or may she come back?

2  A.    We would like her to be permanently removed.

3  Q.    But has she been permanently removed or told that she

4  could --

5  A.    She was told that she has to come back.

6  Q.    Okay.  And that's set to start at the next school year?

7          THE COURT:  Wait a minute, I'm confused.  We would

8  like her to be permanently removed, but she was told that she

9  has to come back.  I don't understand that.

10         MR. LEVIN:  Okay, and I'm going to try to clarify.

11  BY MR. LEVIN:

12  Q.    Does she have the right to re-apply for cheerleading at

13  the start of next school year?

14  A.    Yes.  She could retry out for the next school year.

15  Q.    Is teaching good sportsmanship in your opinion one of the

16  purposes of extracurriculars?

17  A.    Yes.

18  Q.    Is this Snap, giving the finger to everybody who looks at

19  the picture and saying fuck cheer the antithesis of good

20  sportsmanship?

21  A.    No, it is not.

22  Q.    It's the antithesis?

23  A.    It is not good sportsmanship.

24         MR. LEVIN:  Thank you.  Nothing further.

25         MS. TACK-HOOPER:  Nothing, your Honor.

45

1          THE COURT:  All right.  You may step down.

2          MR. LEVIN:  We rest.

3          THE COURT:  Any rebuttal?

4          MS. TACK-HOOPER:  No rebuttal, your Honor.

5          THE COURT:  Okay.

6          MS. TACK-HOOPER:  At this time we would like to move

7   in the stipulations.  I know the exhibits are already in.  I'm

8   not sure if the stipulations themselves are.

9          THE COURT:  Which stipulation?

10          MS. TACK-HOOPER:  We have stipulations of fact that

11   I --

12          THE COURT:  Okay.

13          MS. TACK-HOOPER:  -- that I can pass up, your Honor.

14          THE COURT:  That's fine.

15          MS. TACK-HOOPER:  I might propose a brief break

16   before closing argument, if that's acceptable.

17          THE COURT:  Sure.  Take -- how long do you want?

18          MS. TACK-HOOPER:  Maybe -- would 15 minutes do it?

19          THE COURT:  15 minutes it is.

20          MR. LEVIN:  Could we bring our witnesses back since

21   they're not going to testify today?

22          THE COURT:  There's not going to be anymore

23   testimony.  I have no problem with that.

24          MS. TACK-HOOPER:  Thank you, your Honor.

25          (Whereupon, a recess was taken from 10:24 a.m. to

1  10:41 a.m.)

2         THE COURT:  Okay, are we all set?

3         MS. TACK-HOOPER:  Yes, your Honor.

4         THE COURT:  Okay.

5         MS. TACK-HOOPER:  So, what have we learned today?  We

6  learned that B█████ was venting because she was angry, and she

7  did it on her own time.  She didn't direct her frustration to

8  anyone in particular, and she didn't do it on the field.  She

9  didn't lash out at her coaches, she didn't berate her

10 teammates.  She waited until it was the weekend and she was

11 hanging out with her friends.  And we learned from her coach

12 that the sole reason that she was punished was because she used

13 the F word and gave the middle finger.

14         Her coach testified that she would have been punished

15 if she had said cheerleading was fucking awesome, it was just

16 the profanity and the gesture.  And the coach admitted that

17 nothing in the cheerleading rules prohibits the use of

18 profanity or inappropriate gestures off-campus on the weekends.

19         B█████ wasn't punished because of any disruption

20 caused by the Snap.  She was punished for cursing on her own

21 time.  The district has the burden to justify its punishment of

22 a student for speech, and there is no Third Circuit case that

23 justifies punishing B█████ for using the F word on the weekend.

24         This is a very easy case under the Third Circuit

25 decisions in JS and Layshock.  Those cases mean that the

1 district here could not reasonably forecast substantial

2 material disruption from this Snap because her speech was

3 private, it was shared with her friends, it was made with her

4 own phone.  The photo was taken off campus.  And it was only --

5 wasn't accessible by Monday morning.  It only made its way into

6 school because other students went out of their way to

7 photograph it and bring it in.

8          Those cases also mean that the Fraser exception to

9 the Tinker doctrine doesn't apply to off-campus speech.  It's

10 very clear that using the middle finger or the F word on a

11 weekend off campus is not a basis for punishing B█████ under

12 Fraser.  And of course the facts in both JS and Layshock

13 involved students using profanity outside of school on the

14 internet, and the Third Circuit said the school could not

15 punish them under those circumstances.  We also --

16          THE COURT:  How do you answer the extracurricular

17 activity argument that's being made by the school district?

18          MS. TACK-HOOPER:  Your Honor, it doesn't matter what

19 the punishment is.  What matters is that she was punished for

20 her speech.  Student speech cases are about how punishment of

21 any kind chills students from exercising their free speech

22 rights.  And even Tinker said students have free speech rights

23 on the playing field, that's in the Tinker opinion.

24          And of course there are in the Third Circuit many

25 student speech cases that involve some state action other than

1  expulsion or suspension.  KA versus the Pocono Mountain School

2  District didn't involve a student being suspended or expelled,

3  but the Tinker framework was still the correct one to use.

4  Likewise, Layshock, the student was not just suspended but also

5  band from all extracurriculars, he wasn't allowed to

6  participate in graduation, he was placed in an alternative

7  education program, and the court didn't analyze any of these

8  consequences differently from one another.

9           In JS and BH versus the Easton Area School District,

10  those were two more cases where the students were both

11  suspended and also prohibited from attending a school dance,

12  and those punishments were not analyzed any differently in

13  those cases.  The proper framework here are the student speech

14  cases that are very familiar in the Third Circuit, Tinker, JS

15  and Layshock.

16           The coach's testimony made it very clear that the

17  part of the cheerleading rules that prohibit placing negative

18  information regarding cheerleading on-line are broad,

19  subjective and standardless.

20           As the coach admitted, it's hard to tell what

21  violates that rule and what doesn't.  And it's basically up to

22  the coaches to decide when something has crossed a line and

23  violated that rule and when it hasn't.  The First Amendment

24  does not allow schools to punish students pursuant to rules

25  that vague and overbroad.

49

1    In sum, the plaintiff is clearly likely to succeed on

2  the merits under JS, Layshock and Tinker, and the Court should

3  grant the preliminary injunction.  Thank you, your Honor.

4    MR. LEVIN:  Your Honor, this is not a Tinker case;

5  it's not a Layshock case; it's not a Blue Mountain case; it's

6  not a Pocono Mountain case, because those cases did not involve

7  solely extracurricular activities.  If this was a suspension

8  or --

9    THE COURT:  Can you -- can you have a parent or

10  student waive their First Amendment right because they're

11  engaging in an extracurricular activity, in a policy such as

12  you have in this case?

13    MR. LEVIN:  I believe that actually you can.  And I

14  look to the Acton case, the Supreme Court's case in Acton,

15  where the students were required in order to participate in

16  extracurricular sports to undergo drug and alcohol testing.

17  They were basically told you're giving up your right to decline

18  to be searched in that manner.  And the Supreme Court said that

19  that was perfectly permissible under those circumstances.

20    In fact, as part of the analysis in Acton, the

21  Supreme Court said we have acknowledged that for many purposes

22  school authorities act in loco parentis, with the power and

23  indeed the duty to inculcate habits and manners of civility.

24  Thus, while children assuredly do not shed their constitutional

25  rights at the schoolhouse gait, the nature of those rights is

50

1  what is appropriate for children in school.  And -- end of

2  quote.

3          And in this case the rules include -- the rules taken

4  together are what are generally referred to as good citizenship

5  rules.  And with respect to good citizenship rules in

6  extracurricular activities, the courts have generally upheld

7  the school district's actions with respect to eliminating or

8  prohibiting students from engaging in the extracurricular

9  sports.  This was not an extracurricular matter.  I would agree

10  with the plaintiffs, we cannot expel this student for engaging

11  in the conduct in which she engaged.

12          In addition to that, we don't even have to reach the

13  argument as to whether -- which set of cases the school

14  suspension expulsion cases or the pure extracurricular cases

15  rule.  I don't even think based upon the evidence presented

16  today that this is even a First Amendment case.  Because in a

17  First Amendment you have to engage in expressive conduct, you

18  have to be conveying something.

19          And when the plaintiff was asked a rather simple

20  question, and frankly it was at the suggestion of the Court to

21  rephrase a question to which I objected as to what did she

22  intend, I didn't intend anything.  I was just angry.  It was as

23  if she was stamping her feet.  It was as if she engaged in

24  other conduct that was showing poor sportsmanship.  And part of

25  the --

1          THE COURT:  I don't understand the sportsmanship

2    argument.

3          MR. LEVIN:  Well, the rules --

4          THE COURT:  Let me ask you this question.  If this

5    young lady had made the same statements to five friends or a

6    hundred friends verbally that afternoon, same result?

7          MR. LEVIN:  Well, I could only speculate how that

8    very -- if those friends then told the school district, and the

9    school district believed that that in fact happened, I believe

10   you would have the same result.

11         THE COURT:  So, you think that private speech among

12   friends out of school that gets reported to the school could

13   result in someone getting thrown out of an extracurricular

14   activity?

15         MR. LEVIN:  Correct.

16         THE COURT:  All right.

17         MR. LEVIN:  We don't have to go that far in this

18   case.

19         THE COURT:  Well, isn't this what happened?

20         MR. LEVIN:  No.  In this case she sent it to 250 of

21   her friends.  I'm not sure if that qualifies as, quote, private

22   speech anymore.  I'm not sure that I could recall a time that

23   I've ever spoken to 250 people at the same time.

24         THE COURT:  Let's assume it's public speech.  I mean,

25   private, public, my point being, it's out of school, it's not

52

1  in the performance of an athletic endeavor or the

2  extracurricular endeavor itself.  And it's something that

3  people do.  When they get annoyed they say things -- we've all

4  done that -- that we're maybe not too proud of 15 minutes

5  later.

6          MR. LEVIN:  I agree, your Honor.

7          THE COURT:  All right.

8          MR. LEVIN:  However, there are rules.  She signed

9  documents agreeing to abide by them before she was accepted

10  onto the team.  It is considered to be a privilege, not a

11  right, and she engaged in conduct where she wasn't engaging in

12  expressive conduct; she was just displaying that she was angry.

13          THE COURT:  Why isn't that expressed -- I'm not sure

14  I'm understanding this distinction, that this wasn't expressive

15  conduct.  You mean the middle digit is not expressive conduct?

16          MR. LEVIN:  According to her testimony --

17          THE COURT:  Well, no, no, no, it's according to us.

18  We're here to try to determine what the law is.  I have trouble

19  saying it's not -- I'm not going to toy with you.  I think it's

20  expressive conduct.

21          MR. LEVIN:  Until you say I didn't intend to mean

22  anything.  Because the First Amendment case law is real clear,

23  it's the conveying of ideas.  What idea is she conveying other

24  than she's angry, so she's lashing out, she's giving everybody

25  the finger, 250 people.  There's only about 300 kids in the

53

1  entire school.

2          THE COURT:  She's conveying the idea that she's

3  upset.

4          MR. LEVIN:  She could be conveying a lot of other --

5          THE COURT:  -- not necessarily the content of the

6  speech, is it?

7          MR. LEVIN:  Well, if you're talking about good

8  citizenship rules, it is the content --

9          THE COURT:  All right.  I don't want to belabor --

10         MR. LEVIN:  -- of the speech.

11         THE COURT:  I'm sorry.  Go ahead.

12         MR. LEVIN:  Okay.  The rules are clear.  She agreed,

13 as I indicated before, to abide by them.  Her parents signed

14 the document.  D-4 addresses personal conduct.  It's same prior

15 paragraph is in P-1.  P-1 is this year's version of the

16 handbook.  D-4 was the prior year's version.  It establishes a

17 number of key facts.

18         First it states and makes clear the participation is

19 a privilege.  You have to apply for it.  You have to try out

20 for it.  You have to meet the conditions.  And one of the

21 conditions is you agree that you're not going to be engaging in

22 this kind of conduct.

23         Second.  It provides that the students who

24 participate in extracurricular activities are representatives

25 of the school district and they have to earn the right to be

1  representative of the school district.  She wants to wear the

2  school district's uniforms.  The right to have and wear the

3  uniform is such that the school district should not be

4  tarnished.

5         And the rule makes clear that it applies regardless

6  of whether it's during school, away -- or away from school, as

7  long as it is during the time of the activity and the parties

8  have stipulated that this activity is year long.

9         It reminds school districts children that they're

10  representing the school.  It reminds the children that, quote,

11  good sportsmanship will be enforced.  This includes foul

12  language and inappropriate gestures, end of quote.  No

13  limitation on timelines as to when good sportsmanship will be

14  enforced.  And this conduct, by her own admission, was because

15  of the lack of good sportsmanship.  She didn't like the fact

16  that she didn't get on the varsity.  She was angry and she

17  gives the middle finger to 250 people.  She's acting like a

18  poor sport.

19         Wikipedia, which tends to be the font or fount of all

20  knowledge these days says this about sportsmanship.  Quote,

21  Sportsmanship is an aspiration or ethos that a sport or

22  activity will be enjoyed for its own sake with proper

23  consideration for fairness, ethics, respect and a sense of

24  fellowship with one's competitor.

25         A sore loser refers to one who does not take defeat

1 well; whereas, a good sport means being a good winner as well

2 as being a good loser.  That's what the school district is

3 trying to teach here, good sportsmanship, and there are

4 consequences for it.

5          Two weeks ago I gave a joint presentation at one of

6 the school districts I represent jointly with the union lawyer,

7 and we were speaking about social media.  And the union lawyer,

8 being on the private side, I'm on the public side, recognized

9 that there are First Amendment rights, was much tougher in her

10 remarks and advice for her membership about the kind of conduct

11 to engage in and not to engage in away from school.

12          And she showed many examples where adults lose their

13 job, lose their career for conduct that is not too different

14 from what this student displayed.  I would suggest to you that

15 districts had an obligation to teach kids about the

16 consequences of their conduct, to teach kids what the real

17 world is like, and to make sure that the kids do not engage in

18 this kind of conduct when they are adults because it's going to

19 have a lot worse effect and consequence than simply losing one

20 year on a cheerleading squad, when she could come back in

21 eleventh or twelfth grade.

22          And another thing the union lawyer said in that

23 presentation is on-line you should make sure that your friends

24 are your friends, because they're the first ones to rat you

25 out.  And that's exactly what happened in this case.

1          When you engage in bad behavior, not expressive

2  conduct where she's trying to give any message, but she's being

3  a sore loser, like she was stomping her feet and having a hissy

4  fit, you have consequences, and these consequences are the

5  removal of a privilege for a discrete period of time.  Thank

6  you very much.

7          THE COURT:  All right.  Thank you.

8          MS. TACK-HOOPER:  A brief rebuttal your Honor.

9          THE COURT:  Go ahead.

10         MS. TACK-HOOPER:  So, the district has emphasized

11  that B█████ received a lot of rules and signed some forms.  A

12  couple important points though.  The district has admitted that

13  nothing in those rules expressly prohibits students from using

14  profanity on the weekends off-campus.  When you waive your

15  constitutional rights that waiver has to be knowing and

16  voluntary.

17         These rules are so vague and so broad that it's

18  impossible for anyone to read any of these rules, especially a

19  tenth grader, and understand that they are giving up their

20  right to speak freely to their friends on the weekend, one or

21  250 of them.

22         Furthermore, the district doesn't seem to be relying

23  on all of these rules.  The district didn't say that the

24  problem was that saying Fuck cheer hurt her teammates'

25  feelings, they said the problem was the word fuck.  And that if

1 she had said, Cheerleading is fucking awesome, that also would

2 have been a problem.  So, all of these rules are a distraction.

3        And if we need to, your Honor, my colleague Mary

4 Catherine can explain in great detail why -- even if B███ had

5 knowingly given up her right to speak freely on the weekend --

6 it's unconstitutional for the school district to try to

7 condition participation in cheerleading on waiving your First

8 Amendment rights.  So she's here and very knowledgeable about

9 that, if your Honor is interested in hearing a little bit about

10 unconstitutional conditions doctrine.

11        But moving to the student drug testing cases that

12 counsel for the district cited, I would just remind your Honor

13 that the question in Fourth Amendment cases is whether a search

14 is reasonable.  That has absolutely nothing to do with the

15 First Amendment standards here.  And this idea that the school

16 was acting in loco parentis might play some part in the Fourth

17 Amendment cases -- and again, my colleague Mary Catherine can

18 take you through those if you'd like.  But in the First

19 Amendment context, as Justice Alito said in his concurrence in

20 Morse versus Frederick, when schools censor speech they do it

21 as the government, not as parents.  Those cases simply have no

22 applicability here.

23        Finally, your Honor, I would just point out that the

24 school's apparent litigation position has extremely

25 broad-reaching consequences.  The school wants the power not

1  just to punish cheerleaders for disparaging cheer, but to

2  control what students say, what language they use on their own

3  time off-campus.  And it's evident not just in the district's

4  testimony about why they punished her, but also in the breath

5  of the rules they have promulgated to try to control students,

6  particularly athletes and cheerleaders.

7          If the school has the power to kick B███ off the

8  cheerleading team for that Snapchat, then they have the power

9  to control what all students say on their own time, which is a

10  very scary prospect.  Luckily we have the First Amendment.  And

11  in the Third Circuit the student speech doctrine is crystal

12  clear and it does not permit the school to do what they did

13  here.

14          THE COURT:  All right.  Thank you.

15          MS. TACK-HOOPER:  Thank you, your Honor.

16          THE COURT:  All right.  At the moment we still have

17  the temporary restraining order in effect.  It will remain in

18  effect.  We have how many more days, I don't know, but you'll

19  hear from me before that time expires on this preliminary

20  injunction question.  Okay?  Anything further?

21          MS. TACK-HOOPER:  Nothing further, your Honor.

22          MR. LEVIN:  No, your Honor.

23          THE COURT:  All right.  Thank you all.

24          MS. TACK-HOOPER:  Thank you, your Honor.

25              (10:59 a.m., court adjourned.)

59

REPORTER'S CERTIFICATE

1

2

3    I, DIANA L. GILBRIDE, Official Court Reporter for the

4 United States District Court for the Middle District of

5 Pennsylvania, appointed pursuant to the provisions of Title 28,

6 United States Code, Section 753, do hereby certify that the

7 foregoing is a true and correct transcript of the

8 within-mentioned proceedings had in the above-mentioned and

9 numbered cause on the date or dates hereinbefore set forth; and

10 I do further certify that the foregoing transcript has been

11 prepared by me or under my supervision.

12

13

14                              /s/ Diana L. Gilbride
                               Diana L. Gilbride, RMR, FCRR
15                              Official Court Reporter

16 REPORTED BY:

17    DIANA L. GILBRIDE, RPR
      Official Court Reporter
18    United States District Court
      Middle District of Pennsylvania
19    P.O. Box G
      Scranton, PA  18501-0090

20

21       (The foregoing certificate of this transcript does not
   apply to any reproduction of the same by any means unless under
22 the direct control and/or supervision of the certifying
   reporter.)

23

24

25

# Exhibit D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| B.L., a minor, by and through her father, LAWRENCE LEVY, and her mother, BETTY LOU LEVY,      ) ) ) | Civ. No. 3:17-cv-1734-ARC |

B.L., a minor, by and through her father,  )
LAWRENCE LEVY, and her mother,  )
BETTY LOU LEVY,  )    Civ. No. 3:17-cv-1734-ARC
  )
         Plaintiff,  )
  )
    v.  )
  )
MAHANOY AREA SCHOOL  )
DISTRICT;  )
  )
         Defendant.  )
_____  )

## NOTICE OF TAKING DEPOSITION OF
## MAHANOY AREA SCHOOL DISTRICT
## PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)

TO:

    Michael I. Levin, Esq.
    David W. Brown, Esq.
    LEVIN LEGAL GROUP, P.C.
    1800 Byberry Road, Suite 1301
    Huntingdon Valley, PA 19006

    **PLEASE TAKE NOTICE** that the undersigned, on behalf of Plaintiff, will take the

deposition upon oral examination of the Mahanoy Area School District on **Wednesday,**

**June 6, 2018, at 10 a.m.**, at the offices of the Mahanoy Area School District, 1 Golden Bear

Drive, Mahanoy City, PA 17948, pursuant to the provisions of Rule 30(b)(6) of the Federal

Rules of Civil Procedure before an officer authorized by law to administer oaths.  Testimony

shall be recorded by stenographic means.

Pursuant to Federal Rule of Civil Procedure 30(b)(6), you are directed to designate one or more knowledgeable officers, directors, managing agents or other persons to testify on your behalf as to each subject matter listed on Schedule A hereto.  For each person so designated, set forth in your designation the matters on which that person will testify.

The deposition shall continue from day to day until completed.  You are invited to attend and participate.

*/s/ Molly Tack-Hooper*
Molly Tack-Hooper (PA 307828)
Mary Catherine Roper (PA 71107)
AMERICAN CIVIL LIBERTIES UNION OF
PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
Tel: (215) 592-1513 ext. 113
Fax: (215) 592-1343
mtack-hooper@aclupa.org

*Counsel for Plaintiff*

A-2

## **DEFINITIONS**

Unless specifically stated otherwise, the following words have the meanings set forth below:

1.      "Agent" includes anyone acting on behalf of or in the interest of, whether directly or indirectly, openly or covertly, or with or without compensation.

2.      "B.L." shall refer to the Plaintiff, Brandi Levy.

3.      "B.L.'s Punishment" shall refer to the removal of B.L. from the cheerleading squad in June 2017, as described in the Verified Complaint.

4.      "Board" shall refer to the Mahanoy Area School District School Board and its members.

5.      "Cheerleading Rules" shall refer to the 2016–17 Mahanoy Area High School Cheerleading Rules and any prior or subsequent versions thereof.

6.      "Discipline" shall refer to all disciplinary consequences listed in the Discipline Code section of the Mahanoy Area High School Student Handbook, including withdrawal of privileges and temporary or permanent exclusion from athletics or extracurricular activities, as well as any other action taken by the school or district to punish or discipline a student.

7.      "District" shall refer to the Mahanoy Area School District.

8.      "Negative Information Provision" shall refer to the provision of the Cheerleading Rules that reads, "There will be no toleration of any negative information regarding cheerleading, cheerleaders, or coaches placed on the internet," as well as any prior or subsequent versions thereof.

9.      "Officials" of the District or School shall refer to the administration of the District or the Mahanoy Area High School, and to their administrators and administrative staff, teachers,

support staff, and other school employees or volunteers who work with students, including the District superintendent, high school principal, athletic director, and cheerleading and athletic coaches.

10.     "Plaintiff" or "Plaintiffs" shall refer to B.L., her father Lawrence Levy, and her mother Betty Lou Levy, either individually or collectively, and shall be construed in the broadest manner suggested by the context in which the words are used.

11.     "Respect Provision" shall refer to the provision of the Cheerleading Rules that reads, "Please have respect for your school, coaches, teachers, other cheerleaders and teams. Remember, you are representing your school when at games, fundraisers, and other events. Good sportsmanship will be enforced, this includes foul language and inappropriate gestures," as well as any prior or subsequent versions thereof.

12.     "School" shall refer to the Mahanoy Area High School.

13.     "Snap" shall refer to B.L.'s Snapchat post described in the Verified Complaint, which contains the text "Fuck school fuck softball fuck cheer fuck everything."

14.     "You," "Your," and "Defendant" shall refer to the Mahanoy Area School District and any and all agents, officials, and representatives of the District.

15.     The following interpretive rules shall apply:

(a)     The words "any" and "all" shall be construed as "any and all," and in the broadest sense to bring within the scope of the deposition topics all responses that might otherwise be construed to be outside of its scope.

(b)     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the deposition topics all responses that might otherwise be construed to be outside of its scope.

(c)     The words "between" and "among" shall be construed as "between or among," and in the broadest sense to bring within the scope of the deposition topics all responses that might otherwise be construed to be outside of its scope.  By way of illustration, a topic referring to all Communications between A, B, and C shall include all Communications between A and B, B and C, A and C, or among A, B, and C.

(d)     All words used in the singular shall be deemed to include the plural, and vice versa.

(e)     The terms "person" and "entity" shall be construed broadly to include any and all entities and organizations, including corporations, sole proprietorships, partnership, joint owners, associations, companies, governmental bodies or agencies, and joint ventures, as well as natural persons.

(f)     The terms "about," "alluding to," "analyzing," "arising from," "commenting on," "concerning," "connected with," "constituting," "describing," "discussing," "evidencing," "mentioning," "pertaining to," "referring to," "reflecting," "regarding," "related to," "relating co," "responding to," "showing," and "supporting" shall be used interchangeably and construed in the broadest sense to bring within the scope of the deposition topics all responses that might otherwise be construed to be outside of its scope.

(g)     The terms "communicate" and "communication" shall refer to any written or verbal statement from one person or entity to another, whether conveyed orally, in writing, electronically, or by other means and whether received or not, including any such statements between officers, directors, employees or agents of the same entity.

## INSTRUCTIONS

1.      Unless otherwise specified, all topics are to be regarded as concerning past and present incidents, activities, and practices.

2.      In responding to this Deposition Notice, you are required to obtain and furnish all information available to you and any of your representatives, employees, agents, servants, or attorneys and to obtain and furnish all information that is in your control or in the possession or under the control of any of your representatives, employees, agents, servants, or attorneys.

## SCHEDULE A
## 30(B)(6) TOPICS

1.      The Cheerleading Rules, including:

(a)      The drafting and adoption of the Cheerleading Rules.  Witness should be able to testify to details including who authorized and drafted the Cheerleading Rules, when they were authorized and drafted, and the nature and extent of any review by District officials and/or the school board, and whether they were approved by District officials and/or the school board.

(b)      The meaning of the Respect Provision and the Negative Information Provision of the Cheerleading Rules, as well as any other provisions of the Cheerleading Rules that the District contends B.L. violated.  Witness should be able to explain how District officials interpret these provisions of the Cheerleading Rules and what kinds of speech the District contends is punishable under these provisions of the Cheerleading Rules.

(c)      The justification for the Respect Provision and the Negative Information Provision of the Cheerleading Rules, as well as any other provisions of the Cheerleading Rules that the District contends B.L. violated.  Witness should be able to discuss any policy considerations or facts known to school officials that justify these provisions of the Cheerleading

Rules, including the date on which any particular consideration or fact became known to the District and how the District became aware of the consideration or fact.

        (d)    Past application of the Cheerleading Rules to punish students for their in-school or out-of-school speech.  Witness should be able to testify to details including the content of the speech that violated the Cheerleading Rules, the specific provision of the Cheerleading Rules violated, the date of the incident, the age and grade of the student involved, the Discipline imposed, and the names of school officials involved in imposing Discipline.

        2.    How the Respect Provision and the Negative Information Provision of the Cheerleading Rules relate to the "Personal Conduct" rules for athletes and cheerleaders laid out on page 80 of the 2017–18 Mahanoy Area High School Student Handbook for the school, including:

        (a)    whether students participating in other high school athletics through the District are subject to restrictions on their out-of-school speech similar to the restrictions on speech imposed on cheerleaders, and if not, why not;

        (b)    whether Hunter Bloss, a football player featured in the Youtube video at issue in *Loy v. Mahanoy Area School District*, was subjected to discipline as a result of his out-of-school speech, and if not, why not;

        3.    Any disruption to classroom instruction or school activities caused by B.L.'s Snap or any other out-of-school speech by B.L., including her posts on social media. Witness should be able to testify to details including the date of the disruption, nature of the disruption, duration of the disruption, the class or activity disrupted, age and grade of the students involved in the disruption, any action taken in response to the disruption, including any

discipline imposed, and the staff people who observed the disruption or were involved in imposing discipline.

4.        Any past incidents of disruption to classroom instruction or school activities caused by a student's out-of-school speech that caused the District to anticipate that B.L.'s Snap would cause disruption.  Witness should be able to testify to details including the date of the disruption, nature of the disruption, duration of the disruption, the class or activity disrupted, age and grade of the students involved in the disruption, any action taken in response to the disruption, including any discipline imposed, and the staff people who observed the disruption or were involved in imposing discipline.

5.        The justification for B.L.'s Punishment, including:

(a)        Which provisions, if any, of the Cheerleading Rules or Mahanoy Area High School Student Handbook were a basis for B.L.'s Punishment;

(b)        Whether there were any reasons for B.L.'s Punishment other than B.L.'s Snap;

(c)        Whether the District now contends that B.L.'s Punishment was justified by additional facts or applicable School or District rules that were not, at the time, motivating factors in the decision;

(d)        Conversations or communications with Plaintiffs about the justification for B.L.'s Punishment; and

(e)        Conversations or communications among District officials about the justification for B.L.'s Punishment.

6.        School coaches' authority to Discipline students for speech, including pursuant to the Cheerleading Rules, including:

(a)     Whether School coaches receive any training or guidance on the limits or extent of their authority to Discipline students for speech;

(b)     Whether School coaches are supervised in any manner with respect to the imposition of Discipline for a student's speech, including whether School coaches must notify any School or District Officials either before or after they impose Discipline on students for speech; whether School coaches must document the decision to impose Discipline on students for speech; and whether School coaches may be subject to negative sanctions for exceeding their authority to Discipline students for speech.

7.      School and District officials' role in authorizing or ratifying B.L.'s Punishment.  Witness should be able to testify to any communications between District officials, school officials, or school board members about B.L.'s Punishment, including the date of the communication, the nature and substance of the communication, the names of people involved in the communication, and any votes taken or decisions made.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I am this day serving the foregoing discovery request upon the persons and in the manner indicated below:

<u>By email:</u>

Michael I. Levin, Esq.
LEVIN LEGAL GROUP, P.C.
mlevin@levinlegalgroup.com

David W. Brown, Esq.
LEVIN LEGAL GROUP, P.C.
dbrown@levinlegalgroup.com


Dated: May 14, 2018                      */s/ Molly Tack-Hooper*
                                         Molly Tack-Hooper (PA307828)
                                         AMERICAN   CIVIL   LIBERTIES
                                         UNION OF PENNSYLVANIA
                                         P.O. Box 60173
                                         Philadelphia, PA 19102
                                         Tel.: (215) 592-1513 ext. 113
                                         Fax: (215) 592-1343
                                         mtack-hooper@aclupa.org

Exhibit E



Molly Tack-Hooper <mtack-hooper@aclupa.org>

---

## Re: MASD 30b6
1 message

---

**David Brown** <dbrown@levinlegalgroup.com>                    Tue, Oct 9, 2018 at 1:13 PM
To: Molly Tack-Hooper <mtack-hooper@aclupa.org>
Cc: Michael Levin <mlevin@levinlegalgroup.com>, "Helfer III, Arleigh P." <ahelfer@schnader.com>

Molly,

As I stated, the district will be designating the two cheerleading coaches - Ms. Gmail and Ms. Luchetta-Rump - and Superintendent Joie Green.  The specific topics to which they will testify are as follows:

Topic 1 - Luchetta and Gnall
Topic 2 - Green
Topic 3 - Luchetta
Topic 4 - Green
Topic 5 - Luchetta (w/ Green on 5d/5e)
Topic 6 - Green
Topic 7 - Green

I will send you a paper copy of the designation by email later today. Feel free to call me with any questions.

Dave

Sent from my iPhone

On Oct 8, 2018, at 10:04 PM, Molly Tack-Hooper <mtack-hooper@aclupa.org> wrote:

> **Mimecast Secure Message – Highly Sensitive Content**
> Maintain the message's security by replying via the Mimecast Secure Messaging web app, or selecting the 'Send Secure' option in a Mimecast Application.
>
> ---
>
> Just following up on my question about order of the witnesses, and to see whether you'd decided who is covering which topics.  I'd be happy to just have that info in an email.
>
> Thanks much.  Looking forward to seeing you (both?) on Wednesday morning.
>
> Best,
> Molly
>
> **Molly Tack-Hooper** | Staff Attorney
> *Preferred gender pronouns: she, her*
> ACLU of Pennsylvania
> P.O. Box 60173, Philadelphia, PA 19102
> 215.592.1513 x113 | mtack-hooper@aclupa.org
>
> aclupa.org  
>
> 
>
> *Are you a card-carrying member? Click here to support the ACLU.*

On Sun, Oct 7, 2018 at 12:42 PM Molly Tack-Hooper <mtack-hooper@aclupa.org> wrote:

Exhibit F

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

3

4   B.L., A MINOR, BY AND THROUGH   :
    HER FATHER, LAWRENCE LEVY,      : CIVIL NO. 3:17-CV-1734-ARC
5   AND HER MOTHER, BETTY LOU       :
    LEVY,                           :
6              PLAINTIFFS           :
                                    :
7                                   :
          V                         :
8                                   :
    MAHANOY AREA SCHOOL DISTRICT,   :
9                                   :
               DEFENDANT            :
10

11

12

13

14

              DEPOSITION OF:  NICOLE LUCHETTA-RUMP
15
              TAKEN BY:       PLAINTIFFS
16
              BEFORE:         MARIA N. O'DONNELL, RPR
17                            NOTARY PUBLIC

18            DATE:           OCTOBER 10, 2018, 8:51 A.M.

19            PLACE:          MAHANOY AREA SCHOOL DISTRICT
                              ONE GOLDEN BEAR DRIVE
20                            MAHANOY CITY, PENNSYLVANIA

21

22

23

24

25

```
 1

 2        APPEARANCES:

 3            AMERICAN CIVIL LIBERTIES UNION OF PENNSYLVANIA
             BY: MOLLY TACK-HOOPER, ESQUIRE
 4                P.O. BOX 60173
                  PHILADELPHIA, PA 19102
 5                215-592-1513
                  MTACK-HOOPER@ACLUPA.ORG
 6                FOR - PLAINTIFFS

 7            LEVIN LEGAL GROUP
             BY: DAVID W. BURNS, ESQUIRE
 8                1800 BYBERRY ROAD
                  HUNTINGDON VALLEY, PA 19006
 9                215-938-6378
                  DBROWN@LEVINLEGALGROUP.COM
10                FOR - DEFENDANT

11        ALSO PRESENT:
                  LAWRENCE LEVY
12                BETTY LOIU LEVY
                  DR. JOIE GREEN
13                APRIL GNALL

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          WITNESSES

2      NAME                    EXAMINATION

3    NICOLE LUCHETTA-RUMP

4    BY: MS. TACK-HOOPER        4, 72, 73

5    BY: MR. BROWN             71, 73

6

7                          EXHIBITS

8    DEPOSITION EXHIBIT NO.          PRODUCED AND MARKED

9    2. NOTICE OF DEPOSITION              5

10   3. 201-6-2017 CHEERLEADING RULES DOCUMENT    17

11   4. 2009-2010 CHEERLEADING RULES DOCUMENT     18

12   5. OBJECTIONS/RESPONSES TO PLAINTIFFS'

13      INTERROGATORIES                  50

14   6. RULES DOCUMENT                    54

15   7. DOCUMENT                         56

16   8. DOCUMENT                         65

17   9. DOCUMENT DATED 9/27/17           69

18

19

20

21

22

23

24

25
```

```
 1                    STIPULATION

 2             It is hereby stipulated by and between counsel

 3  for the respective parties that sealing, certification and

 4  filing are hereby waived; and that all objections except as to

 5  the form of the question are reserved to the time of trial.

 6

 7             NICOLE LUCHETTA-RUMP, called as a witness,

 8  being duly sworn, testified as follows:

 9                    EXAMINATION

10  BY MS. TACK-HOOPER:

11      Q     Good morning.

12      A     Good morning.

13      Q     My name is Molly Tack-Hooper.  I represent the

14  plaintiffs in this case.

15             Have you ever testified in a deposition before?

16      A     No.

17      Q     I will ask you questions.  If you don't understand

18  my question, please tell me or ask for clarification.  If you

19  answer, I will assume that you have understood the question.

20  Is that fair?

21      A     Yes.

22      Q     We can take a break, so if you need one, just let me

23  know.

24      A     Okay.

25      Q     Today I am taking your deposition in part as a
```

1    designee of the Mahanoy Area School District.  Do you

2    understand what that means?

3         A     No.

4               MS. TACK-HOOPER:  Okay.  I am -- let's mark this

5    P-2.

6               (Notice of deposition produced and marked Deposition

7    Exhibit Number P2.)

8               (Discussion held off the record.)

9    BY MS. TACK-HOOPER:

10        Q     Okay.  I am handing you a document that's been

11   marked as P-2.  It is a 30 (b)(6) notice.  It contains a list

12   of topics starting on page A6.

13              You have been designated to speak for the school

14   district on a number of these topics including topic one, the

15   cheerleading rules, which contains a number of component

16   parts.

17              Have you seen this document before?

18        A     Yes.

19        Q     Okay.  And are you the person who is most

20   knowledgeable along with Coach Gnall about the cheerleading

21   rules?

22        A     Yes.

23        Q     And you have also been designated to testify for the

24   district on topic three on page A7 and A8?

25        A     Yes.

```
1      Q     Are you the person who's most knowledgeable about

2   that topic?

3      A     Yes.

4      Q     You have also been designated to testify for the

5   district about topic five starting on page A8.  And Coach

6   Gnall has also been designated on subparts D and E of five.

7   Are you the --

8            MR. BROWN: Actually I believe that was the

9   Superintendent Green for 5D and E.

10           MS. TACK-HOOPER: Oh, okay.  I am not sure about

11  that.  Is that --

12           MR. BROWN: Yes.

13           MS. TACK-HOOPER: Green.  Okay.

14           MR. BROWN: Right.

15  BY MS. TACK-HOOPER:

16     Q     Okay.  All right.  Are you able to speak for the

17  district on topic five?

18     A     Yes.

19     Q     All right.  If I ask you about anything that you

20  think someone else is more knowledgeable about, will you tell

21  me that?

22     A     Yes.

23     Q     Okay.  Is there any reason why you cannot give

24  truthful testimony today?

25     A     No.
```

1    Q    What did you do to prepare for this deposition

2    today?

3    A    We met yesterday just -- and viewed these documents

4    that were sent to us.

5    Q    Okay.  By these documents, you are gesturing toward

6    the 30 (b)(6) notice, is that correct?

7    A    Yes.  Yes.

8    Q    Did you look at any other documents?

9    A    Not that I am -- I mean there was this one.  I think

10   there was one other notice.  I don't know the title of it, but

11   there is one other notice that we had.

12   Q    Okay.

13   A    It looked similar to that.

14   Q    Okay.  A legal document of some sort?

15   A    Yes.  Yes.

16   Q    Okay.  What is your title?

17   A    I am a high school math teacher as well as a

18   cheerleading advisor.

19   Q    What does cheerleading advisor mean?

20   A    It is basically a cheerleading coach.

21   Q    Okay.

22   A    Last year, I was a co-advisor.  This year I am a

23   head cheerleading advisor since April Gnall resigned last

24   year.

25   Q    Are you paid extra for your work as cheerleading

1    advisor?

2       A    Yes.

3       Q    Okay.  Who do you report to in your capacity as

4    cheerleading advisor?

5       A    I report to the high school principal, the athletic

6    director, and the superintendent as well.

7       Q    How many years have you held some kind of

8    cheerleading title at the district?

9       A    This is my fourth year.

10      Q    And how long have you worked for the district as a

11   teacher?

12      A    This is my ninth year.

13      Q    Did you coach cheerleading before coming to the

14   district?

15      A    I did not.

16      Q    I am going to ask you just generally about

17   cheerleading.  How does someone get on to the cheerleading

18   team?

19      A    They have to try out.

20      Q    And what do the tryouts involve?

21      A    They include a process where they have a two-day

22   workshop.  They come in.  They learn a cheer, a side line,

23   jumps and a dance.  And then they come and perform those.

24   They are scored on a score sheet.  We have outside judges come

25   in to score them, then we take the highest scores for varsity,

1  then the lower scores for JV.

2      Q     And what are those judges looking for?

3      A     Motions, voice.  I have to think what else is on the

4  score sheet.  I think appearance was on there as well.

5      Q     What do you mean by appearance?

6      A     They have to come in without any jewelry on, no nail

7  polish, hair in a pony tail, stuff like that.

8      Q     Why is that?

9      A     The hair up in a pony tail, that -- when they're

10  actually performing, that could be a safety issue; when we're

11  building, jewelry can also be a safety issue.  Then the nail

12  polish is just everyone looks as uniform as one group.

13     Q     Is there any requirement to be on the team other

14  than the tryouts?  Do you have to fill out a written

15  application, for example, anything like that?

16     A     To initially try out, they have to sign -- it's a --

17  basically a waiver.  They have to put their emergency contact

18  information on there as well.  Then they sign a waiver saying

19  they agree to the rules.

20           The rules are given to them at -- the day of the

21  tryouts.  In addition to that, they also have to get a

22  physical which is actually after tryouts.  But if they don't

23  have the physical, they cannot participate, so that is

24  something that PIAA requires.

25     Q     Okay.  You are not screening potential cheerleaders

1   for like character and fitness, for example?

2        A     No.  No.  That's after the fact.  Well, the

3   physicals are any way.

4        Q     Physicals are.  Okay.

5              And cheerleaders don't have to have recommendations

6   to get on the team?

7        A     Not for our school, no.

8        Q     Do you consider their grades at all?

9        A     They must be eligible to try out, which means in

10  order to participate in the sports, they have to be passing

11  all of their classes except for one.  If they're passing --

12  failing two or more classes, they cannot try out.

13       Q     When you select cheerleaders for the team, are the

14  you evaluating their potential leadership abilities in any

15  way?

16       A     Not at the tryout, no.  That would come more into if

17  we were doing captains or something like that.  But at the

18  tryout, I don't honestly -- I don't know them well enough to

19  do such a thing.

20       Q     Okay.  You don't ask teachers about them or have

21  them fill out -- write an essay, anything like that to try

22  evaluate that?

23       A     No.

24             MS. TACK-HOOPER:  Okay.  This is D7.

25  BY MS. TACK-HOOPER:

1      Q      I am handing you a document that's previously been

2   marked D7.  It says application for cheerleading tryouts at

3   the top.  Are you --

4      A      Yes.

5      Q      Are you familiar with this document?

6      A      Yes.

7      Q      The second sentence says I understand that he/she

8   must abide by the rules and regulations set forth by the

9   advisor and the principal of Mahanoy Area High School and be

10  present for all practices and games.  Did I read that right?

11     A      Yes.

12     Q      Does rules and regulations in that sentence refer to

13  the cheerleading rules?

14     A      Yes.

15     Q      The third sentence says I have read the rules and

16  regulations and understand that the violation of any of these

17  rules may lead to temporary or permanent suspension from the

18  squad.  Does that also refer to the cheerleading rules?

19     A      Yes.  The first sentence includes the cheerleading

20  as well as the Mahanoy Area School rules, which are outlined

21  in the handbook.  And then the second one is just solely on

22  the cheerleading rules.

23     Q      Okay.  The form also asks students to list their

24  extracurricular activities?

25     A      Yes.

1    Q    Why?

2    A    This is for me to better set practice schedules

3  because I work around all of these other activities, so I just

4  like to get an idea as what activities I need to schedule my

5  practice around.

6    Q    Okay.  Can cheerleaders participate in other sports?

7    A    We allow them to participate in anything.  But other

8  sports have regulations on whether they cannot do cheerleading

9  in addition to; for example, band front, they do not allow

10  them to do cheerleading and band front at the same time.  They

11  said there is too much of a conflict.  So I do not have any,

12  but others sports activities do have some.

13    Q    Okay.  Now, you testified at the preliminary

14  injunction hearing in this case, correct?

15    A    Yes.

16    Q    And you testified that the rules, the cheerleading

17  rules are explained to students at tryouts.  Is that correct?

18    A    Yes.

19    Q    Did that include telling the cheerleaders at tryouts

20  that they could be punished for their out-of-school speech?

21    A    We went through the entire rule sheet as it is.  I

22  did not stray from what is on the school's -- on the rule

23  sheet.  So it doesn't specifically address out-of-school

24  speech, it just says in general anything negative posted about

25  cheerleaders and school teachers, employees and so on would be

1   punished.

2       Q      Can you describe the differences between the JV and

3   varsity team to me?

4       A      The varsity team and the JV team -- the varsity

5   cheers at more events.  Varsity will cheer at varsity

6   football, varsity basketball.  JV only cheers at JV football

7   games, part of the varsity football games and only JV home

8   basketball games.

9       Q      Okay.  Do either of those teams compete?

10      A      No.

11      Q      Do the JV and varsity teams practice together or

12  separately?

13      A      Over the summer, we practice together.  Then when

14  basketball time comes around, we often stray apart.  So for

15  the most part, we practice together all summer.  Then during

16  the winter times, there are times we practice together.  There

17  is times we practice apart based on what we're teaching.

18      Q      What did you -- do you consider to be the

19  cheerleading season?

20      A      Although there is no sport seasons over the summer,

21  we practice all summer.  Then we continue to practice until

22  the end of basketball season.  So we are working from the

23  beginning of summer, from tryouts, which are usually in May,

24  all of the way through until I would say the end of March of

25  the following year.

1        Q      How often do you practice?

2        A      Over the summer, we practice twice a week.  When we

3    go back to school, I have worked around the girls schedules.

4    That could be once a week, twice a week.  It really depends on

5    their schedules.

6        Q      My understanding is that there was only one practice

7    in September of 2018.  Is that correct?

8        A      That is correct.

9        Q      Why was that?

10       A      Because we were practicing Tuesdays and Thursdays

11   because I like to work around -- I like to keep them

12   consistent, because some of the girls have to give their work

13   schedule and stuff like that.  So I told them Tuesdays and

14   Thursdays will be our days to practice.  Then we have several

15   girls that are on the volleyball team, so their coach will not

16   let them practice on game days.  And he also doesn't like them

17   to really -- I mean if they have practice, we will practice

18   the same day after their practice.  But on game days, he

19   doesn't want cheerleading practice to occur.  I work around

20   their game.  If they don't have a game, then I have practice

21   right after volleyball practice.

22       Q      Do the cheerleading squads cheer for any women

23   sports teams?

24       A      No, not currently.

25       Q      Who makes the decision about which teams to cheer

1  for?

2     A     I am not sure whoever came up with -- who they cheer

3  for, who we don't.  We have just continued on the tradition

4  from prior years as to what they actually cheer for --

5     Q     Do you currently have any male cheerleaders?

6     A     We almost did.  We had one over the summer, but he

7  decided not to do it.

8     Q     Okay.  Do you have any who tried out and didn't make

9  the team?

10    A     No.

11    Q     I noticed that in some of the previous rules it

12  referred to cheerleaders as girls.  So I was trying to figure

13  out if it was an exclusively girls sport or not.

14    A     No.

15    Q     Not exclusively girls?

16    A     No.

17    Q     Just currently girls?

18    A     Currently it is, yes.

19    Q     Okay.

20    A     I think it was two years ago, we did have -- we had

21  a male on for two years.

22    Q     Okay.  I'd like to talk about the cheerleading rules

23  which have previously been marked as Exhibit D3.

24          Okay.  I believe that you testified at the

25  preliminary injunction hearing that you had updated the rules

1   to suit your needs?

2       A    Uh-huh.

3       Q    Is that a yes?

4       A    Yes.

5       Q    Okay.  When was that, your update?

6       A    The very first year April and I coached, from my

7   recollection, we did not change anything except for changing

8   our names, adding our names and our phone numbers into the

9   rule sheet.  So we just wanted to see how that year went, see

10  what we felt needed to be changed.  We did change some minor

11  things.  I know for sure one of them was like uniforms have to

12  be washed weekly and line dried.  So there were just a couple

13  things that we felt we needed to add to that.  I think -- let

14  me see what else.  I believe that I added about the

15  conversation that they had to fill out a transportation form

16  because that is a school policy as well, but that just wasn't

17  in the rule sheet.

18      Q    Okay.

19      A    And then we did, which I can explain later as to

20  why, but we did change the technology policy slightly because

21  it did state that any negative information posted on the

22  internet would be automatic dismissal from the squad.  But

23  instead our high school principal suggested that we put this

24  on top of the rule sheet.  It says all of the information

25  below is at the coaches' discretion, and rules may be subject

1    to change.  So that is one change that was made.

2              MS. TACK-HOOPER: Can we mark this as P-3?

3              (Cheerleading rules 2016-2017 document produced and

4    marked Deposition Exhibit Number P3.)

5    BY MS. TACK-HOOPER:

6        Q    I have handed you what's just been marked as P-3.

7    Is this the 2016-2017 cheerleading rules?

8        A    Uh-huh.

9        Q    The one -- last one that you were looking at was

10   2017-2018?

11       A    Yes.

12       Q    It appears to me the technology portion of the

13   2016-2017 rules is what you just described, is that right?

14       A    I believe these are the same technology section,

15   yes.

16       Q    So you were describing a change that you made in

17   2016 from the prior set of rules, is that right?

18       A    It was after my first year of coaching, it was

19   changed.

20       Q    What was your first year of coaching?

21       A    Oh, dear.

22       Q    If you can't recall, it's okay.

23       A    It would have been four years ago, whatever school

24   year that ends up being.

25             MR. BROWN: So this is your fourth year.  You are

1    saying it was 2015-16?

2              THE WITNESS:  Yes.

3    BY MS. TACK-HOOPER:

4        Q    Okay.  So I have cheerleading rules from 2009, 2010,

5    then the next one I have is 2016, 2017?

6        A    Yes.  I don't have a copy of those.

7        Q    That's fine.  But your recollection is that the

8    2016-2017, and 2017 and 2018 are basically the same as the

9    first two years that you were coaching as well?

10       A    Yes.  They're pretty much the same except for that

11   technology section which we just changed by adding that

12   because there is many different situations to be addressed in

13   that section.

14       Q    Okay.  Just for the record, when you said we changed

15   by adding that, you were gesturing to the language that

16   says --

17       A    The italicized section up here that says all of the

18   information below is at the coaches' discretion, and rules may

19   be subject to change.  If there is a situation with extreme

20   circumstances, it will be addressed at that time.

21       Q    Okay.

22       A    And that was as per recommendation of Tom Smith.

23             MS. TACK-HOOPER:   Okay.  Let's mark this P-4.

24             (Cheerleading rules 2009-2010 document produced and

25   marked Deposition Exhibit Number P4.)

1   BY MS. TACK-HOOPER:

2      Q    Okay.  I am handing you what has been marked as P4,

3  the 2009, 2010 cheerleading rules?

4      A    Yes.

5      Q    So by the time that you were coaching cheerleading,

6  the rules already looked a little bit different from this, is

7  that correct?

8      A    That's correct.

9      Q    Okay.  Have you seen this set of rules before?

10     A    I have not.

11     Q    Okay.  Did anyone review the rules after you edited

12  them?

13     A    That would have been between seasons that they were

14  edited.  So my first year, they were the set of rules that we

15  don't see here.  And then I edited them for the next tryouts,

16  then this set of rules was reviewed.

17     Q    By whom was it reviewed?

18     A    Oh, did anyone look at them?

19     Q    Yes.

20     A    I had Tom Smith, which was our high school principal

21  at the time, I just had him read through them and ask him if

22  he had any suggestions.  So he didn't have to approve them.  I

23  just asked him for suggestions on how to make them better.

24     Q    Okay.  No one had to approve your changes?

25     A    No.

1        Q      Do you know if they ever went to the board in any

2   fashion?

3        A      No, we don't do that here.

4        Q      Okay.  Let's go back to D3, the 2017, 2018

5   cheerleading rules.  Okay?  I'd like to look at the first

6   bullet under sportsmanship and responsibilities/fundraising.

7   It says please have respect for your school, coaches,

8   teachers, other cheerleaders and teams.  Remember you are

9   representing your school when at games, fundraisers and other

10  events.  Good sportsmanship will be enforced.  This includes

11  foul language and inappropriate gestures.  Did I read that

12  correctly?

13       A      Yes.

14       Q      I am going to refer to this as the respect

15  provision; okay?  Is that fair?

16       A      Yes.  Yes.

17       Q      Okay.  The phrase please have respect, is that a

18  suggestion or a request, or is it a rule?

19       A      That's a rule.  These are all rules.

20       Q      Okay.  Is respect expected at all times as opposed

21  to just during cheerleading?

22       A      At all times they're a cheerleader, whether they're

23  in uniform or not.  So they're expected to act accordingly

24  toward their school.

25       Q      Okay.  How do you decide what is respectful and what

1    is not?

2         A     I mean that's a large variety of different

3    situations that you can be put on.  So -- or, you know what I

4    mean.  Like a lot of different situations that can come up.

5    So really it depends on the situation.  At that time the

6    coaches evaluate and see, you know, how we feel, if it's

7    something that is punishable or not.  So it's on a kind of

8    case by case basis when it comes to that.

9         Q     The second sentence there, remember you're

10   representing your school when at games, fundraisers and other

11   events, you agree with me that this does not say you're

12   representing your school even when you are not at games,

13   fundraisers and events?

14        A     Yes.

15        Q     Is it your position that students are in fact

16   representing their school all of the time?

17        A     When they mention cheerleading or wearing anything

18   Mahanoy related, yes.

19        Q     Is that true of cheerleaders or all students?

20        A     Well, I would say cheerleaders or anyone that's on a

21   team.

22        Q     Okay.  If they're not wearing any school

23   paraphernalia, is it fair to say they're not representing the

24   school if it's outside of school hours?

25        A     It depends on the situation.  But I would say if

1    they're not bringing anything school related into the

2    situation, then yes.

3         Q    Okay.  What is good sportsmanship?

4         A    Good sportsmanship is -- I believe that's outlined

5    in the PIAA regulations as well.  But in my opinion, that is

6    also again a wide variety of topics.  But any negativity

7    toward other team and cheerleaders and other schools, all of

8    that is considered bad sportsmanship.  So good sportsmanship,

9    that's hard to define because obviously that's treating other

10   teams properly and other cheerleaders and your school

11   properly.  But it's more what is bad sportsmanship defined as.

12        Q    Okay.  How do you decide if something is bad

13   sportsmanship?

14        A    If it's anything that is posted negatively that

15   would demean a school, a team, a teacher on that team or a

16   coach on a team, anything such as that.

17        Q    Do you read the PIAA regulations when you're trying

18   to decide if something is good sportsmanship or bad

19   sportsmanship?

20        A    I do refer to -- back to them at times, yes.  They

21   are in the school handbook.

22        Q    Oh, okay.  So you don't read anything separate from

23   the handbook and the cheerleading rules?

24        A    No.  I use what is outlined in the handbook.

25        Q    Okay.  Is good sportsmanship required at all times

1    whether or not a cheerleader is at cheer?

2       A    Just as long as they are not referring to anything

3    cheerleading related.  So if cheerleading is involved into it,

4    yes, I expect good sportsmanship to occur.

5       Q    What language is foul?

6       A    Any type of cursing, anything derogatory, anything

7    that would be considered racist or in that type of category.

8       Q    I ask because I know that TV networks have entire

9    departments that do nothing but try to determine if something

10   is outside the bounds of good taste and thus can't go on T.V.

11   or not.  So I was wondering how you decide what is foul

12   language.

13      A    Right.  And we hold them -- since they are

14   teenagers, we hold them to a higher standard.  Because at that

15   age, more types of language is considered inappropriate as to

16   something an adult would watch on television.

17      Q    Okay.  Is saying that's stupid foul language?

18      A    No.  I would say it's inappropriate, but not foul.

19      Q    Okay.  What are inappropriate gestures?

20      A    Things such as giving the middle finger, anything

21   that insinuates something inappropriate.  I don't know how to

22   answer that.  But anything that is sexual in nature, something

23   that is -- that represents something that's inappropriate.

24      Q    Okay.  I'd like to look at the second bullet point

25   under technology.

1      A      Okay.

2      Q      It says there will be no toleration of any negative

3   information regarding cheerleading, cheerleaders or coaches

4   placed on the internet.   I may refer to this as the negative

5   information provision if that's okay with you?

6      A      Yes.

7      Q      Okay.   What is negative information?

8      A      Anything that demeans a school, another cheerleader,

9   another team.

10      Q      Or cheerleading itself, correct?

11      A      Correct.

12      Q      Okay.   Now, at the preliminary injunction hearing,

13   you testified that you did not think that it would be negative

14   information to say cheerleaders are at high risk for eating

15   disorders, correct?

16      A      Correct.

17      Q      Why isn't that negative information regarding

18   cheerleading?

19      A      That would be something that research has posted.

20   This would be fact that someone had found.

21      Q      Okay.

22      A      But I don't feel like that's saying that -- that's

23   just one person's research.   Do you know what I mean?

24      Q      I am -- I think so.   But I am not sure.   So let me

25   make sure I do.   If something is a statement of fact, then it

1  does not count as negative information?

2      A      I am going to be honest, I don't even remember you

3  asking me that question.

4      Q      Okay.

5      A      But I don't -- it's someone from the outside giving

6  their expression on cheerleading, but not a specific team, not

7  my team.  But -- I honestly don't know how to answer that

8  question.

9      Q      Okay.  Okay.

10          Do you -- well, since you don't remember me asking

11  you before, do you -- am I correct that you think that saying

12  cheerleaders are at high risk for eating disorders would not

13  violate the negative information provision?

14      A      Well, that's not a cheerleader stating that, so....

15      Q      Well, let's say a cheerleader stated that.  Let's

16  say B. posted on Snapchat cheerleaders are at high risk for

17  eating disorders?

18      A      She just was repeating something from someone else

19  that she found.  She's -- do you know what I mean?  She's

20  repeating facts that she found on line.

21      Q      And your understanding is that it's not negative

22  information unless you are injecting your own personal views

23  into the statement, is that right?

24      A      Right.  She's not posting negative information

25  toward our cheerleading squad.  She's just posting facts that

 1   are insinuating negative information.

 2        Q     Okay.  Okay.  So generally factual statements would

 3   most likely not violate this rule, is that right?

 4        A     It depends on what type of facts she's posting.

 5        Q     Okay.

 6        A     Or whoever.

 7        Q     Okay.  Can you think of a fact about cheerleading

 8   that go would violate this?  And you can feel free to make up

 9   a fact.  It doesn't need to be true.

10        A     My goodness.  I honestly can't think of something.

11        Q     Okay.  Fair enough.

12              You also testified that posting I don't really like

13   cheerleading that much any more would violate this rule.  Is

14   that correct?

15        A     It would be considered negative.  So it would be

16   something that would be addressed, but not to the extent of

17   removal from the squad.

18        Q     What -- how would you address that?

19        A     That would be a situation where the coaches, whether

20   it was a JV coach, member or myself, would talk to them and

21   ask them, you know, why do you feel this way, is there

22   something that can be done about it.  I don't feel that that

23   is a means for removal.  But it is a situation that should be

24   addressed.

25        Q     Okay.  So you would talk to the student about that

1    statement?

2        A      Yes.

3        Q      What would you say to the student in that

4    discussion?

5        A      I would ask them why they feel that way.  See what

6    the reasons behind it are.  If there is something that can be

7    changed so that they feel more comfortable.  Because this

8    situation has arised before, people have said, you know, I

9    just don't want to do it any more.  And we would ask them why.

10       Q      What is the purpose of having a rule that you can't

11   say something like I don't really like cheerleading that much

12   any more?

13       A      Well, it's not that they can't say it, but it's

14   something that's negative which would need to be addressed.

15       Q      Okay.  Would you agree that the rules are generally

16   supposed to tell people what they can and can't do?

17       A      Yes.

18       Q      Okay.  You also testified that if a cheerleader

19   posted something that criticized the selection process for

20   cheerleading that would not violate the negative information

21   provision, is that correct?

22       A      (Witness nodding).

23       Q      I am sorry, you have to say yes or no.

24       A      Yes.  Sorry.

25       Q      Thank you.

1          What if a student posted criticism of the fact that

2     some cheerleaders had to do JV before making varsity while

3     others didn't, does that violate the negative information

4     provision?

5          A     No.

6          Q     What do you understand the phrase, quote, placed on

7     the internet, close quote, to mean?

8          A     Anything that is -- anything that appears on the

9     internet.  Anything that is submitted to the internet.

10    Because anything that's on the internet can be seen by anyone,

11    whether it is in a group, whether it is posted on someone's

12    Facebook wall, everyone can see that some way or another.

13         Q     What do you mean by everyone can see that?  Thinking

14    specifically some Facebook groups, for example, are closed.

15    Right?

16         A     But nothing is really closed.

17         Q     Okay.

18         A     Everything says that it is private, that it is

19    closed, but it's really not.

20         Q     So what do you -- how would say a private message

21    sent over the internet to a closed group of people, how would

22    that become public to everyone?

23         A     All someone needs to do is take a screen shot and

24    share that, and then everyone sees it.

25         Q     Does the phrase placed on the internet include any

1   communications that travel over the internet, like emails or

2   text messages?

3       A     Well, yes.  But I mean it's very rare that you would

4   see an email or a text message.

5       Q     Doesn't that pose the same risk though, that someone

6   would take a screen shot and share it?

7       A     Yes.  But I am just stating that that is less likely

8   that we would be notified of that.

9       Q     Are you trying to prohibit information that is most

10  likely to be shared with the coaches?  Is that what you're

11  trying to do with the phrase placed on the internet?

12      A     I don't know what you mean by that.

13      Q     You explained that your concern with things being

14  posted on line, even if they're posted privately, is that

15  private communications can still move beyond their intended

16  audience.  Did I understand that correctly?

17      A     Private conversations could move beyond the intended

18  audience.  We're most concerned about public.  But private

19  things would still be addressed, not necessarily disciplined.

20  But as a team, they need to be addressed so that we don't have

21  issues within our team.

22      Q     Okay.

23      A     Does that make sense?

24      Q     I think so.

25            So if someone shared negative information regarding

1    cheerleading, cheerleaders or coaches in a private

2    conversation, would you consider that to possibly violate the

3    rules as well?

4        A    It is posting negative information.  We usually do

5    find out about it.  And we do usually do need to address it to

6    some extent so that we don't have chaos within our squad.  But

7    when things are posted publically, then that's a different

8    situation.

9        Q    How often do you have to deal with fallout from

10   someone saying something negative about cheerleaders or

11   cheerleading?

12       A    Like this typical situation, this was the second

13   time that I have come across this.

14       Q    What do you mean by this?

15       A    A situation where a cheerleader posted something

16   negative on the internet that we had to punish them for it.

17       Q    What was the first time?

18       A    The first time was actually when April's daughter,

19   SG, posted something on the internet.  This was my first year

20   as a coach.

21            We were at a Minersville game, and there were

22   parents making comments about our uniforms.  And then S.

23   posted on the internet something to the effect of, now don't

24   quote me on this, but something to the effect of they're just

25   jealous that they don't look as good in their uniforms as we

1    do.  So then based on how this was worded, it said

2    specifically any negative information no matter what it was,

3    automatic dismissal from the squad.  So she was suspended for

4    the remainder of the regular seasons game which I believe was

5    four basketball games at that time.

6         Q     What are -- what do you mean by regular season

7    games?  Are there non-regular?

8         A     Well, there is scheduled games, then there is play

9    off games.  The rest of the scheduled season games.  And then

10   she was able to return for the playoff games.  So that was how

11   that worked.

12        Q     Okay.

13        A     And then after discussing that with Tom Smith, we

14   felt that this should be more of a situation by situation

15   punishment, not just every single person who posts anything

16   negative should automatically be dismissed.  Because I feel

17   like -- we felt like the situation between what happened

18   between B. and her daughter were completely different, and

19   they should be handled differently.

20        Q     Okay.  So you considered whether to you thought B.

21   should be punished more harshly and removed including the

22   playoff games, correct?

23        A     Because profanity was used in this situation, yes.

24        Q     Okay.  You earlier said something about having to

25   prevent chaos.  I believe you are were referring to sort of

1   being the referee in between negative comments.  Is that

2   correct?

3        A     Yes.

4        Q     Okay.  Are there -- can you describe what you meant

5   by chaos?

6        A     Can I give you an example?

7        Q     Absolutely.

8        A     Okay.  This year now I didn't handle as much as our

9   JV coach.  She's not here.  But we had situations where the

10  girls were texting one another arguing over a song that they

11  wanted to use for a pep rally.  So one of them said something

12  mean to another girl.  I don't even remember exactly what.

13  But she said something mean in this text message.  So although

14  we didn't punish them because it was a private message that we

15  weren't in, but we did, you know, sit them down.  We had to

16  have multiple conversations because we need to put the fire

17  out, so to say, within the team.  Because we don't something

18  like that to continue.  So although it's not something that we

19  can control, it's still something that needs to be addressed

20  so we can have a team-like environment.

21       Q     Is that fairly typical occurrence?

22       A     With teenage girls, yes.

23       Q     Okay.  So just so I am -- I make sure I understand

24  what you -- how you apply this negative information rule.  Do

25  I understand correctly that if something is private, it may

1    cause, to use your word, chaos, you might have to deal with

2    the fallout, but it would not be a violation of this rule, is

3    that correct?

4        A     Right.

5        Q     Okay.  And is there some middle gray area where

6    something is not say a private team text message, but is not

7    public on the internet?

8        A     Well, when things are posted on social media, I

9    consider that public.

10       Q     Okay.

11       A     When things are shared between one another within a

12   single email, or a single the text message, I consider that

13   private.  But when things are sent in groups, like a group

14   message, I consider that public because you are sharing it

15   with an entire group of people.

16       Q     Sorry.  What would a group text message count as?

17       A     There are different situations.  Like there is a

18   group included in.  So if someone posts something negative or

19   profanity within my group, that's punishable because although

20   they're out of school, it's still a cheerleading group.

21   They're posting like F cheer, F school or whatever in this

22   public group, and I am their coach, I am in this group, that

23   would need to be punished.  But if they have some group I have

24   never heard about and they're speaking about it, then there is

25   nothing that I can really do on their private conversations

1   between cheerleader to cheerleader.  Does that make sense?

2       Q       Well, what if someone brings you a screen shot of

3   the text and says this was sent to fifty students in the

4   school in a group text message?  I mean you would have the

5   same amount of information about that scenario as you did

6   about say B's Snap that someone took a photo of, correct?

7       A       In my opinion, a Snap is something that's posted for

8   all to see and not just in a group text.

9       Q       And is that true even if --

10      A       It's similar to like when you post something on your

11  wall on Facebook, everyone sees it.  It's public, although

12  there a large amount of people that will see it and you -- I

13  mean do you know what I mean?

14      Q       I am honestly not sure I do.

15              I know that -- because I know that some social media

16  platforms might have -- you might have a lot of friends, but

17  they're not public.  Right?  So like the coach at an opposing

18  school couldn't read them.  It's just -- it's private.  It's

19  just with a large number of people.

20      A       Yes.

21      Q       And I also know that today younger people text with

22  larger groups of people than say I text with.  So I am trying

23  to understand why those things are different to you, the large

24  group text versus the small group, small closed group social

25  media post.  Is it just that's easier to have a bright line

1   rule, social media violates this and texts don't, or --

2       A       Basically, yes.  I mean to me anything that's posted

3   on social media can be spread throughout the internet.  As for

4   a text, if that situation as you described, she shared it with

5   the entire school, that would be something that I would

6   address to the principal and see how he wanted to address that

7   at that time.  But I personally would not take the lead on

8   disciplining that.  I would take that to my higher up and see

9   how he wanted that to be handled.

10      Q       Okay.  Would it violate the negative information

11  provision, to spread something that somebody else wrote on

12  social media?

13      A       Something someone else wrote negative about --

14      Q       Correct.

15      A       It depends again on the situation.  So if, for

16  example, a cheerleader put something on there about myself or

17  April at the time, I feel like that would be something that

18  would need to be addressed.  But if someone -- if she is

19  sharing someone else's post, it wasn't her that was posting it

20  initially, so I would try and find out the person who

21  initially posted, if they were a cheerleader, and address that

22  issue at that time.

23      Q       Okay.  So say a cheerleader texts another

24  cheerleader something negative about cheerleading and the

25  second cheerleader who received the text takes a screen shot

```
1    and shares it with the rest of the team.  Has the second

2    cheerleader violated the rule, the negative information rule?

3         A    Not as it is written.

4         Q    Okay.

5         A    Because, for example, that's how we found out about

6    it.

7         Q    Okay.

8         A    Someone took a screen shot of it and sent it to

9    April.  I think it was her daughter maybe.  Someone sent it to

10   her.  So would she be in trouble by sending it in, taking a

11   screen shot, sending it to April?  She's sharing it.  So

12   really I mean you couldn't discipline that for her sharing it

13   to April.

14        Q    Why not?

15        A    Because she was trying to inform us as to about what

16   was posted on the internet.

17        Q    Okay.  So the intention matters there?

18        A    Yes.

19        Q    So if the second cheerleader shared it with the rest

20   of the team and said I totally agree with this, LOL, that

21   would be different than if they shared it with the rest of the

22   team and say look what cheerleader one is doing, this is

23   awful?

24        A    I would say yes.  Intention is definitely -- it

25   would be taken into consideration as to how we would deal with
```

1    that situation.

2        Q       Okay.  How long after something is posted would you

3    consider punishing a cheerleader?

4        A       I -- we have usually find out about it within a

5    couple days.

6        Q       Okay.

7        A       Now, if something happened years down the road,

8    would I try and punish them for it; no, because it's not even

9    the same school year, it's not even the same squad.  So if it

10   happened -- if I found out that someone last year posted

11   something, they would have had to have been punished last year

12   because it was last years item to deal with.

13       Q       Okay.  And why?  Why do you draw the line there,

14   like same year?

15       A       I mean I haven't come across the situation.  So I am

16   just trying to reason through it right now.  But just based on

17   the fact that it is something that occurred then, they would

18   have been punished, and then would have had to re-try out.

19   The whole situation would have kind of started all over again.

20   They would have been -- whatever punishment was put forth that

21   following year for what they did, I am -- pretty much would

22   have been wiped out.  They would have gone to re-try out and

23   been fine any way for the following year.

24       Q       Okay.  So new year, clean slate?

25       A       Right.  We always start the new year with a clean

1    slate.

2        Q    Okay.  On that topic, at the preliminary injunction

3    hearing, you testified that you wanted B. to be permanently

4    removed from the team.  What did you mean by that?

5        A    Removed for that school year.  And then she was able

6    to try out, or would have been able to try out the following

7    year.  She would have had to either way because she was on JV.

8    She would have had to try out to try to get a varsity spot any

9    ways.  So either way, she had to try out.

10       Q    Okay.  So you don't ever consider like lifetime ban

11   someone from cheerleading?

12       A    No.

13       Q    Okay.

14       A    Not unless for some reason the school board or

15   someone told me that I had to.  But that's the only situation

16   that would happen.

17       Q    Okay.  And when someone is trying out for

18   cheerleading, do you take into account stuff that happened in

19   past years?

20       A    I do not.

21       Q    Okay.  I want to talk about that italicized language

22   at the top of D3 that you mentioned.  That says all of the

23   information below is at the coaches' discretions, and rules

24   may be subject to change.  If there is a situation with

25   extreme circumstances, it will be addressed at the time.  Have

1    you ever changed the rules?

2        A    I have never actually changed -- this year I have

3    been trying out new rules.  But I haven't actually changed

4    them.  So here's an example.

5        Q    Sure.

6        A    Over the summer, we have no real way to punish

7    cheerleaders for coming late to practice, because usually it

8    would be they come late, then the following game they are

9    benched.  But there is no games over the summer.  So we

10   decided if they're late, then they have to do ten toe touches.

11   I don't know if you know what that is.  They have to do ten

12   jumps.  So although we didn't actually change them in here

13   yet, we were -- we did add that to our list of rules --

14       Q    Got it.

15       A    -- unofficially I guess you could say.

16       Q    Okay.  Are there any other rules that you announced

17   verbally but haven't yet written down?

18       A    There is one where we say, for example, they can't

19   wear their warm ups outside of game day because warm-ups are

20   considered a uniform or something like that.  But there is

21   nothing else that I can think of.

22       Q    Okay.  When you create a new rule, like toe touches

23   for being late in the summer or no warm ups outside of game

24   day, how do you communicate that to the cheerleaders?

25       A    It's usually communicated at practice.  Then

1    sometimes I also reminded them, we do have a group text, so

2    sometimes I remind them of things like that in a group text as

3    well.

4        Q     Okay.  I noticed that the cheerleading rules,

5    several of the rules have specific consequences identified.

6    Like if you are academically ineligible for three consecutive

7    weeks, you will be dismissed from the team.  Or if a

8    cheerleader is benched three times, they'll be dismissed from

9    the squad.  But then other rules don't have specific

10   consequences listed.  What is the range of consequences that

11   you might impose for violations of those rules?

12       A     That could be from simply sitting out a quarter at a

13   game.  Like I said, doing jumps at a practice, all of the way

14   to being suspended temporarily or permanently from the squad

15   for that year.

16       Q     What would a temporary suspension look like?

17       A     That would be like April's daughter, where she's

18   suspended a certain amount of games based on the offense.

19       Q     Do you have any internal guidelines for what gets

20   punished how?

21       A     What do you mean by internal guidelines?

22       Q     When you are trying to decide what punishment to

23   impose, what is it that you are thinking about?  Are you

24   thinking about how you punished other students and trying to

25   sort of compare --

1    A    That's definitely taken into consideration, how much

2    does it effect the team.  Moving forward will it continue to

3    be an issue if we don't address it, to what extent do we need

4    to address it, so on.

5    Q    Okay.  At the preliminary injunction hearing, you

6    testified that the main purpose of the cheerleading rules was

7    so that the cheerleaders would learn to follow rules and learn

8    rules have consequences.  Do I remember that correctly?

9    A    Yes.

10   Q    Okay.  You also testified that rules teach these --

11   rules teach team building skills and other skills that

12   students will take with them when they graduate?

13   A    Right.

14   Q    Is there any other purpose of the cheerleading

15   rules?

16   A    In addition to that, just that we can function as --

17   so that we can function as a team and present ourself

18   accordingly as representatives of our school.

19   Q    Okay.  And I believe that you mentioned earlier that

20   some of the rules are about safety, like tying your hair back?

21   A    Yes.

22   Q    And some of them are about uniformity?

23   A    Yes.

24   Q    Okay.  Any other purpose for any of these?

25        If you want to take a minute and look at them,

1   please do.

2      A      And then as -- the academic policy, we also want to

3   put school first.  So that's very important as well.  So we

4   definitely want our cheerleaders to make sure that their

5   grades are where they need to be first before we worry about

6   the cheerleading aspect.  So that rule is in there as well

7   because again, school is very important.

8      Q      Okay.  What are the other skills other than team

9   building that you want your cheerleaders to take with them

10  when they graduate?

11     A      Just basic understanding that you need to follow

12  rules when you are part of something, whether it is at the

13  workplace, whether it's at -- in a college, that there are

14  different rules that you have to follow in society.

15     Q      I am trying to understand how that connects to

16  punishing students for what they do when they're not at

17  cheerleading.

18     A      I can give you an example.

19     Q      Sure.

20     A      Okay.  My husband works at a distribution center,

21  and someone hacked into his Twitter account.  And they were

22  posting negative things about Auto Zone on the internet.  They

23  were about to fire him for his job because they were saying

24  negative things about Auto Zone on the internet until he was

25  able to prove that it was not him posting these things on

1   line.  So I have heard of that, in addition to people during

2   job applications looking up peoples Facebook pages and using

3   that to hold it against them for their character.  So there

4   are situations where people do look at things on the internet

5   and use that to make their decisions for punishment.

6       Q       So the lesson is, even things that you do on your

7   own time can still effect other people and go beyond your

8   control, is that the lesson?

9       A       Absolute.  Absolutely.

10      Q       Okay.  Do you think there is value in teaching kids

11  that different rules apply to different activities?

12      A       That is true.  They do, and yes.

13      Q       Okay.

14      A       For example, students and cheerleaders are held to

15  different rules.  Students obviously have to follow the

16  handbook rules.  But as cheerleaders, they -- they're

17  representing our entire school and all of our team, so they're

18  held to a higher standard.

19      Q       So that consideration is sort of specific to

20  cheerleaders as opposed to kids on other teams or other

21  extra-curriculars?

22      A       Every coach can make their own set of rules.  So we

23  don't have a uniform set of rules.  So each coach has a

24  different standard as to how they want to set their rules for

25  their team.

1        Q        Yes.  I am just trying to understand if something

2   about the nature of cheerleading justifies some of these rules

3   as opposed to general lessons for -- that all students would

4   benefit from.

5        A        As cheerleaders, they have to be leaders and

6   representatives of their school.  They often have younger kids

7   looking up to them.  So I feel that they really need to put

8   forth a positive representation for their school more so than

9   just your average student.

10       Q        And swearing is incompatible with that positive

11  representation?

12       A        Absolutely.

13       Q        Okay.  So am I right that you don't try to monitor

14  your cheerleaders' behavior when they're not at cheerleading?

15       A        Not intentionally, no.

16       Q        So you rely solely on other students reporting

17  you -- reporting to you things that have happened outside of

18  school?

19       A        Yes.

20       Q        Do you encourage students to report other rules

21  violations to you?

22       A        No.

23       Q        Okay.  Why not?

24       A        I would never specifically say if you see something

25  else someone posts on the negative to tattle on them.  That's

1    just what they're taught when their young.  Don't tattle on

2    someone else.  It's just something that I have never enforced.

3    But if someone does come to me with negative information, I

4    feel that in some capacity, I would have to address it,

5    whether it's just speaking with the person, or if going

6    through the rules and see if it applies to a rule.

7         Q    And is -- as you feel that you would have to address

8    it, only if you think it is going to impact the team?

9         A    For the most part, yes, or the school.

10        Q    Okay.

11        A    Or the well being of any student in the school.

12        Q    So if someone did something the equivalent of

13   tattling, to use your words, say a cheerleader came to you and

14   said another cheerleader stubbed their toe and said shit,

15   would you consider punishing that?

16        A    I would have to have proof that they said it.  But I

17   would definitely talk to them, especially if they're in

18   uniform and explain to them when you are in uniform, you

19   cannot curse.

20             Usually in a situation like that when I am not sure

21   they said it, it's just one single person reporting it, I

22   would address them as a team, I would just say just remember

23   you are in uniform, you have to remember that you make sure

24   you're not using profanities and stuff like that.

25        Q    Okay.

1      A     But I would need to be sure before I actually punish

2   them that they said it.

3      Q     Okay.  What if the incident that was being reported

4   to you was not when they were in uniform, it was say B. at the

5   Cocoa Hut using the F word, not on Snapchat, but to a group of

6   all of cheerleaders, they were hanging out, someone reported

7   that to you, would you consider punishing B. for that?

8      A     Just as long as it's not anything to -- really

9   cheerleading related, then no.  Like, for example --

10     Q     Okay.

11     A     -- if there was a teacher in there, she was like F

12  cheerleading.  Do you know what I mean?  I would, at that

13  time, pull her aside, be like I heard that you said this, is

14  there a reason that you said this.  I just want you to know

15  that people hear what you said.  But she wouldn't necessarily

16  be punished.  But I would address it at that time.

17     Q     So at the preliminary injunction hearing, you

18  testified that it was just the profanity alone and the middle

19  finger that were punishable even if there had been no

20  connection to cheerleading?

21     A     No.  If it was, it had to be connected to

22  cheerleading in order for it to be punishable.

23     Q     Okay.  So when you testified at the preliminary

24  injunction hearing, you were asked, was it the profanity and

25  the profanity gesture alone that caused the removal, you

1    answered yes.

2        A    I think what I thought you meant by that question

3    was there other factors that we took into consideration other

4    than the Snap for her removal from the squat.  But it was the

5    gesture and the Snap linking to cheerleading which was the

6    reason of the removal.

7        Q    Okay.  But even if it had not been negative, I asked

8    you if it had said cheerleading is fucking awesome, if that

9    also violated the rules.  You said yes.

10       A    Yes, because it's profanity linked with

11   cheerleading.

12       Q    Okay.  So if B in the Cocoa Hut says to the

13   cheerleaders, cheerleading is fucking awesome, you would

14   consider punishing that if somebody told you about it?

15       A    I would address it.  Again, it wasn't something that

16   was posted for the public to see.  So that's a different

17   situation.  But it would still be something that would be

18   addressed.

19       Q    Not because it violated the rules, but because you

20   think that you would to deal with the fallout, is that right?

21       A    To an extent.  And because although that's not --

22   it's not actually addressed in here because it wasn't at a

23   game.  It wasn't unsportsmanlike conduct, it wasn't on

24   technology, but it would be something that's -- that I feel

25   would need to be addressed just so that they know that even

1   though you may not think that there are people around that are

2   watching you, people hear what you are saying.

3        Q    Okay.  But if B. had just stubbed her toe in the

4   Cocoa Hut and said fuck to all of the cheerleaders and whoever

5   else was in Cocoa Hut, would that be something that you would

6   feel that you need to address?

7        A    No.

8        Q    Are you concerned that you will end up hearing more

9   reports of rule violations about kids who are unpopular or are

10  having some kind of fight with their teammates than kids who

11  generally get along better with their teammates or happen on a

12  particular day to be getting along better with their

13  teammates?

14            MR. BROWN: Objection to the form.  But if you

15  understand, go ahead and --

16            THE WITNESS:  I don't --

17            MS. TACK-HOOPER:  If you don't understand that, I

18  could unpack it a little bit.

19            MR. BROWN:  I didn't understand it.

20  BY MS. TACK-HOOPER:

21       Q    Fair enough.  Fair enough.

22            So you said that you're not trying to monitor kids'

23  behavior when they're outside of school, you mostly just hear

24  about what students report to you that happens outside of

25  school; correct?

```
 1      A     Yes.

 2      Q     Okay.  It seems to me like that would end up in a

 3   situation where the things that you hear about are not things

 4   that were said by students that everybody agreed with, but

 5   things that were said by someone that their teammates didn't

 6   like.  So that your -- seems to me like you might end up

 7   hearing more about rule violations by kids who at that

 8   particular moment are less popular with their teammates than

 9   others.  Does that seem accurate to you?

10      A     Not necessarily.  I mean they let me know no matter

11   what, so and so has jewelry on, so and so is wearing the wrong

12   shirt, so and so forgot their bloomers.  So it's across the

13   board that I hear things from.  It's not any particular group,

14   anyone being singled out that's unpopular.  It's just across

15   the board.  It's just this is the most popular instance, this

16   is what most people are I guess talking about, the situation

17   with B. and whatnot.  But I get texts from all different girls

18   all times of the day about different situations.

19      Q     Okay.

20      A     So it's no specific group, no specific person that's

21   considered unpopular.  It's just -- it's just how it goes.

22      Q     Okay.  Okay.  All right.  In terms of how you

23   learned about B's Snap, would Coach Gnall be more familiar

24   with that?

25      A     Yes.
```

```
1                 MS. TACK-HOOPER:  Okay.  Okay.  All right.

2            (Objections and responses to Plaintiffs'

3   interrogatories produced and marked Deposition Exhibit Number

4   P5.)

5   BY MS. TACK-HOOPER:

6        Q    I have handed you what has been -- just been marked

7   as Exhibit P-5.  These are defendant's objections and

8   responses to plaintiffs' first set of interrogatories.

9            Have you seen this document before?

10       A    I believe so.

11       Q    Can you please look at No. 3?  It starts at the

12  bottom of page four and goes through page six.

13           Have you read that before?

14           Feel free to take a minute, however long that you

15  need.

16       A    I may have.  It looks familiar.

17       Q    Okay.  Will you take a minute and read it?  I am

18  going to ask you if there is anything inaccurate in it.

19       A    Okay.

20           MS. TACK-HOOPER:  Thank you.

21           MR. BROWN: Off the record.

22           (Discussion held off the record.)

23           MR. BROWN: Are you done?

24           THE WITNESS:  Yes.

25  BY MS. TACK-HOOPER:
```

1    Q    Was there anything inaccurate in there?

2    A    I don't believe so.

3    Q    Okay.  Anything that you feel was missing?

4    A    Not to my knowledge.

5    Q    Okay.  So it says that you and Coach Gnall jointly

6    decided to remove B. from the team, right?

7    A    Yes.

8    Q    Did you need approval from someone else to do that?

9    A    No.

10   Q    Did you tell B's mother that it was ultimately

11   Principal Smith's decision?

12   A    I did not.

13   Q    Why did you decide to discuss it with Principal

14   Smith first?

15   A    Every time we make any type of discipline-related

16   decision, we generally talk to someone above us first just for

17   their advice on how the situation should be handled.  So we

18   did want to go to Tom Smith first to see if it was an

19   appropriate way to handle the situation.  He said he just

20   wanted to see for sure if she posted it, which she told him

21   she did.  And then after we got that confirmation, we, April

22   and I, made the decision that she would be dismissed from the

23   squad.

24   Q    Okay.  You said you would talk to the Principal

25   before making any kind of discipline decision.  What do you

```
 1    consider discipline?  I am assuming that you don't talk to the

 2    Principal before giving somebody toe touches?

 3         A     Right.

 4         Q     Okay.

 5         A     Anything that we feel is extreme.

 6         Q     Such as?

 7         A     Such as removal or suspension from a team or

 8    something like that.

 9         Q     Okay.   I am having trouble thinking of anything

10    else that would be in the category actually.   Is there

11    anything other than suspension or removal from a team that you

12    talked to him about?

13         A     Not -- no, they're the only two main extreme

14    punishments I would say.

15               MS. TACK-HOOPER:   Okay.  All right.  Let's take a

16    break.

17               (Brief recess from 10:03 a.m. to 10:16 a.m.)

18    BY MS. TACK-HOOPER:

19         Q     Okay.  So we were talking about various situations

20    and whether you would punish cheerleaders for swearing outside

21    of school.  And I think we were mostly talking about that in

22    the context of the negative information provision.  But there

23    is, of course, also this respect provision that we looked at

24    that says good sportsmanship will be enforced.  This includes

25    foul language and inappropriate gestures.  Would it violate
```

1    that rule if B. said the F word at the Cocoa Hut in the

2    presence of whoever happened to be in the store at that time?

3         A    No.

4         Q    No.  Why not?

5         A    Because it's not linked to cheerleading.

6         Q    So you interpret the respect provision as I have

7    been calling it to only apply to language and conduct that

8    connects to cheerleading in some way?

9         A    Yes.

10        Q    Okay.  I believe that you also testified at the

11   preliminary injunction hearing that B. was punished for the

12   Snap, and not based on anything else that she had done.  Is

13   that correct?

14        A    Correct.

15        Q    What rules did the Snap violate?

16        A    The PIAA rules along with the cheerleading rules

17   speaking about posting negative information using technology.

18        Q    Okay.  Did it violate the respect provision as well?

19        A    Could you just remind me --

20        Q    Certainly.  This is D3.  The first bullet under

21   sportsmanship and responsibilities/fundraising.

22        A    Yes.

23        Q    It did violate that?

24        A    Yes.

25        Q    When I say the PIAA rules, is there a specific part

1    of the handbook that you're referring to?

2        A    I believe pages 80 and 81 of the handbook.

3        Q    Okay.  This is D4.

4             I am handing you what has previously been marked as

5    D4, page 83 from the handbook.  There is a star by number

6    eight, personal conduct.  Is that the section that you were

7    referring to?

8        A    One of them.

9             MS. TACK-HOOPER:  Okay.  Okay.  P-6.

10            (Rules document produced and marked Deposition

11   Exhibit Number P6.)

12   BY MS. TACK-HOOPER:

13       Q    Okay.  I am handing you P-6 which is an excerpt from

14   the handbook that I believe contains all of the sections on

15   co-curricular activities.

16            Is this the section of the handbook you are

17   referring to?

18       A    Let me just take a second to look through it.

19       Q    Please do.

20       A    Yes.  This is the section that I was speaking about.

21       Q    Which particular parts in there other than the

22   personal conduct rule that we looked at?

23       A    Yes.  I believe that's repeated in here.  I believe

24   most of it is contained in numbers thirteen and fourteen.

25       Q    Okay.  So the personal conduct section says any

1    participant whose conduct is judged to reflect a discredit

2    upon himself/herself, the team or Mahanoy schools, whether or

3    not such activities takes place during or outside school hours

4    during the school sports season would be subject to

5    disciplinary action as determined by the co-coach.

6              Is that what you're referring to as the basis for

7    B's punishment?

8        A    That in combination with our cheerleading rules as

9    well as thirteen and fourteen, so it's a combination of the

10   several different ones.

11       Q    Okay.  How did the Snap reflect a discredit upon

12   herself, the team or the Mahanoy schools?

13       A    It gave our squad a negative image that our

14   cheerleaders would post profanity on line on social media.

15       Q    And would this be true whether or not she had

16   mentioned cheer?

17       A    By mentioning cheer is what made it inappropriate

18   linking it to our school.

19       Q    So if it had just said fuck school, fuck softball,

20   would you have punished her?

21       A    That would be a softball and school issue.  It would

22   be in their hands at that point.

23       Q    Okay.  And is it your understanding that the school

24   could punish her for that in some way?

25       A    I don't believe that they have anything that they

1    could -- any rules set forth that they can do that.

2        Q    Okay.

3        A    Softball maybe, but not the school.

4        Q    Okay.  So you mentioned section fourteen in there.

5    Can you look at paragraph fourteen?  It contains a list of

6    bullet points listing different causes for removal from a

7    team.  Correct?

8        A    Yes.

9        Q    Were any of those bullet points a basis for removing

10   B. from the team?

11       A    No.  But it does say that it is not limited to the

12   following.

13              MS. TACK-HOOPER:  Okay.  This will be P-7.

14              (Document produced and marked Deposition Exhibit

15   Number P7.)

16   BY MS. TACK-HOOPER:

17       Q    I have just handed you Exhibit P7, policy 218 on

18   student discipline.

19              Is this policy separate from the handbook?  Are you

20   familiar with this policy?

21       A    I am not, no.

22       Q    Okay.  So this policy was not part of your decision

23   to punish B.?

24       A    Let me just read it quick.

25       Q    Certainly.

1    A    Although this may be integrated into it, this was

2  not used to make my decision, but this may be somehow

3  mentioned in there.

4    Q    When you say in there, what do you mean?

5    A    In the handbook.

6    Q    Okay.  No. 2 in this policy under off campus

7  activities states that the code of student conduct applies to

8  campus activities if the student is a member of an

9  extracurricular activity and has been notified that particular

10  off campus conduct could result in exclusion from such

11  activities.  How was B. notified that her Snap could result in

12  exclusion from the cheer team?

13    A    Before or after it took place?

14    Q    Before.

15    A    We did not go into detail about every situation in

16  our rules.  So that was covered under the technology section

17  along with, I am not sure what you call that, the negative

18  provision.

19          MR. BROWN: The respect.

20  BY MS. TACK-HOOPER:

21    Q    The respect provision?

22    A    I am sorry?

23    Q    No problem.

24          Was your decision to punish B. based on any other

25  rules or policies that we haven't looked at yet today?

1        A       No.

2        Q       Okay.  Sitting here today, can you think of any

3    additional justifications for punishing B. that you didn't

4    rely on at the time but have subsequently thought of?

5        A       Nothing that we haven't already discussed.

6        Q       Okay.  When you made the decision to punish B., what

7    was your understanding of who had been negatively impacted by

8    the Snap?

9        A       The decision wasn't made based on who was negatively

10   impacted, it just was made based on the fact that there was

11   negativity put out there that could impact students in the

12   school.

13       Q       Okay.  In your view, was the impact -- well, did B's

14   Snap have any impact on students that you were aware of?

15       A       To an extent, yes.

16       Q       What?  And what was that impact?

17       A       I had several students come up to me throughout the

18   day while I was teaching saying to me did I see it, what was I

19   going to do about it, saying that it was inappropriate.   And

20   these were cheerleaders and non-cheerleaders that did approach

21   me.

22       Q       And was -- you earlier described a lot of students

23   telling you about things that other students had done?

24       A       Yes.

25       Q       Was this different from the usual back and forth

1    that you hear about every day from the cheerleaders?

2       A    At the time, I didn't understand the extent of it,

3    so I thought it was just something minor.  So at the time, I

4    didn't treat it with as much severity when they approached me

5    in class.

6            So at the initial time, the very first time the

7    student approached me before I saw it, before April came to

8    me, I did not understand the severity of the situation.

9       Q    And what was it that you didn't understand?

10      A    I didn't see the post.  They were just telling me

11   there was a post.  They were asking me if I saw it.

12      Q    And you felt differently after you saw the Snap?

13      A    After I understand the contents of it, yes.

14      Q    Okay.  And why did you feel differently about it

15   once you saw the Snap?

16      A    Because I didn't realize it included profanity.  I

17   didn't see the gesture at the time.

18      Q    Okay.  So just the idea that she had posted

19   something negative about cheerleading didn't seem like a big

20   deal to you, but the profanity and gesture made it more

21   serious in your mind?

22      A    Yes.  Absolutely.

23      Q    Okay.  In your view, did the Snap actually disrupt

24   any school activities of any kind?

25      A    Other than taking class time away from my students

1   briefly, I cannot think of anything other than that.

2        Q     And that was because they were telling you about the

3   Snap?

4        A     Yes.  There were several different students that

5   approached me at different times throughout the day, yes.

6        Q     Is it fair to say that reporting the Snap to you

7   disrupted class more than the Snap itself?

8        A     Well, the Snap itself is why they reported, because

9   they were upset about it.  But I guess you can say that, that

10  the reporting is what took time away from class.

11       Q     On a daily basis, how much time do you spend with

12  your students just hearing about things that they were upset

13  about?  Is that something that happens on a daily basis?

14       A     Not so much.  Maybe after school, but not during the

15  day.

16       Q     Okay.  So in your view, if there was disruption, it

17  was the class time that the students spent telling you about

18  the Snap, correct?

19       A     Yes.

20       Q     Was there any other -- anything else that was

21  disrupted?

22       A     It was continuous over several days that they were

23  approaching me about the Snap.  So it did take away

24  essentially in my algebra class, the one that D. was in.  That

25  one was disrupted quite a bit for just a couple days after it

1   happened.  But then we continuously told them that we could

2   not discuss it, then it settled down.

3        Q    Okay.  And who is D.?

4        A    D.F.  She was a varsity cheerleader at the time.

5        Q    Okay.  And what did those conversations during

6   class, how did they go?

7        A    They were more like have you seen it, what is

8   happening.  And just like -- April and I just kept addressing

9   the situation the same way, we can't talk about it, we can't

10  talk about it, I am not sure what you want me to say.

11       Q    Okay.  And so how long was this conversation each

12  day?

13       A    Five, ten minutes.

14       Q    How do you fill five to ten minutes with I can't

15  talk about it?

16       A    They would just keep going on and on and on.  I just

17  kept repeating that there is nothing that I can do, nothing

18  that I can tell you right now.  But they were visibly upset,

19  like can't you do anything, what are you going to do, have you

20  seen it.

21       Q    Okay.  And did the fact that some students were

22  visibly upset by this influence your decision about how to

23  punish B. at all?

24       A    No.

25       Q    Okay.  Have you previously experienced disruption of

1    class or any school activities because of something a student

2    said outside of school?

3         A    No.

4         Q    Have you previously experienced disruption of class

5    or school activities because a student swore outside of

6    school?

7         A    No.

8         Q    Did you have any reason to think that this

9    particular incident would disrupt class or school activities

10   other than the fact that kids kept asking you about it?

11        A    No.

12        Q    After you removed B. from the team, did you tell the

13   team why she had been removed?

14        A    No.

15        Q    What did you say to the team about why she wasn't

16   there?

17        A    We did not say anything to them.

18        Q    Okay.  Did you continue to get questions about the

19   Snap?

20        A    Yes.

21        Q    And you just did not answer them?

22        A    We just told them that we could not talk about it.

23        Q    Okay.  After the court ordered B. back on the team,

24   how did her return to the team effect cheerleaders?

25        A    They were upset about it.  They felt that it was

1   unfair that she was being returned to the team.

2       Q    And when you say they, who specifically are you

3   referring to who felt that way?

4       A    I had several students approach me.  But it seemed

5   collectively as a team, the majority of them were upset.

6       Q    So who specifically approached you?

7       A    Must I answer that question?

8       Q    Yes.

9       A    Okay.

10      Q    I am sorry.

11      A    I just know that they did not want me to mention

12  their name, and that's why I am hesitant on mentioning it, one

13  of them.

14          MS. TACK-HOOPER: If you want to go off the record

15  for a second, we can chat about that.  Let's go off the

16  record.

17          (Discussion held off the record.)

18  BY MS. TACK-HOOPER:

19      Q    Okay.  So you do not have to tell me who

20  specifically approached you in light of your lawyer's

21  statements.  You can just tell me how many people told you

22  that they were upset and whether they were on variety or JV.

23          MS. TACK-HOOPER: We're back on the record.  Your

24  lawyer has represented to me that the district is not going to

25  rely on the testimony of any students in this matter so --

1          MR. BROWN: Other than the plaintiff.

2    BY MS. TACK-HOOPER:

3        Q    Other than the plaintiff.  So in light of that, of

4    that representation, you do not have to name the specific

5    students who spoke with you.  If you could tell me just how

6    many students spoke with you and whether they were on varsity

7    or JV cheerleading, that's fine.

8        A    Okay.  At least four that I can think of, four

9    specific cheerleaders that approached me about being upset

10   about her return to the squad on JV.

11       Q    Okay.  And you also testified that it was your

12   impression that the whole squad was upset.  Was that because

13   of what these students told you about how other people felt?

14       A    It was just their reaction in general.

15       Q    To what, to B's presence?

16       A    Yes.

17       Q    Okay.  And what is your understanding of why they

18   were upset that she was back?

19       A    My understanding was that they were upset that she

20   violated the rule.  They understood, although we did not tell

21   them, they knew what she posted.  And they were upset that she

22   was able to post such a thing, but not be punished for it.

23       Q    Okay.

24       A    In addition, do you want me to tell you about the

25   varsity members as well?

1      Q      Oh, yes.  Please.  I am sorry.  I thought that you

2    said they were only on JV?

3      A      Yes.  There was four on JV.  I believe that year we

4    had eight girls including B. on the squad.  So that would have

5    been four out of the eight that approached me.  And then on

6    varsity, there was at least four girls who approached me.

7      Q      Okay.  Out of how many people on varsity?

8      A      Varsity I believe was eleven or twelve that year.

9      Q      Okay.  Now, B's on varsity now?

10     A      Yes.

11     Q      Correct?

12            Does there still seem to be any lingering resentment

13   toward B.?

14     A      There is still anger, yes.

15            MS. TACK-HOOPER:  Okay.  Let's mark this P-8.

16            (Document produced and marked Deposition Exhibit

17   Number P8.)

18   BY MS. TACK-HOOPER:

19     Q      I am handing you B8.  It appears to be an image of a

20   text message with your name on it.

21            Is this a text that you received?

22     A      Yes.

23     Q      Who was it from?

24     A      I have to look back in my records to see.

25     Q      Okay.  I assume the redacted name is B., is that

1    correct?

2         A      Yes.   It's -- it appears they misspelled it.

3         Q      Okay.   Is this text significant in any way in your

4    view?

5         A      They sent me this text because they were upset that

6    she was returning, yes.

7         Q      Okay.   Do you recall whether this was a student or

8    an adult texting you?

9         A      This was a cheerleader.

10        Q      Okay.

11        A      It was one of the cheerleaders that I discussed had

12   contacted me.

13        Q      Okay.   Okay.   Did you respond to this text?

14        A      I don't believe so.

15        Q      Okay.   How did you handle people telling you that

16   they were upset that B. was back on the squad?

17        A      I just told them that wasn't our decision, and that

18   they must treat her as anyone as if she was never removed from

19   the squad.

20        Q      Okay.   In the district's responses to

21   interrogatories, which are P-5, if you want to look at them,

22   otherwise, I can just read you the portion that I am referring

23   to.

24        A      Okay.

25        Q      At the top of page eleven, the district says other

1    than the operative matter involving BL, the district is not

2    aware of any incident since August 2016 in which punishment

3    was considered for a student in response to off campus speech

4    pursuant to the MAHS cheerleading rules or the code of conduct

5    for an athletic team or extracurricular activity.   Does that

6    seem accurate to you?

7         A    I am sorry, where is that?

8         Q    The top of page eleven.

9              In other words, the district has said it's not aware

10   of any incidents since August 2016 in which punishment was

11   considered for a student in response to off campus speech.

12        A    There haven't been anything after August, except I

13   believe that S. was prior to that.

14        Q    And no incidents other than those two since you have

15   been a cheerleading coach that you're aware of?

16        A    Not that I am aware of.

17        Q    Okay.  Were there any incidents at any time in your

18   four years as a cheerleading advisor in which you considered

19   punishment for other forms of disrespect?

20        A    No.  We have not come across situations like that.

21        Q    Okay.  What about other off campus personal conduct,

22   anything that you can think of?

23        A    No.

24        Q    Okay.  I want to talk very briefly about B. as a

25   cheerleader.  As you know, she was upset that she didn't make

```
1    JV, and that that was part of the reason she posted that Snap.

2    Why -- do you recall why she didn't make -- I am sorry,

3    varsity.  Do you recall why she didn't make varsity that year?

4         A     Her score was too low.

5         Q     Okay.  Has B. violated any other rules since

6    returning to the team or since the court order in this case

7    that you're aware of?

8         A     Just missing practices.

9         Q     Okay.  Are you currently considering any other

10   punishment for B.?

11        A     Based on what?

12        Q     Anything.  I don't --

13        A     Based on the missed practice or --

14        Q     Sure.  Yes.  Are you considering anything based on

15   --

16        A     Any rule violations will be dealt with at the time.

17   So if you miss practice, then that will be addressed at the

18   time.

19        Q     Do you -- when you are deciding how and whether to

20   punish someone, are you looking at some sort of cumulative

21   conduct?  So if somebody, you know, uses a cell phone during a

22   game and is late to a practice, and says something mean about

23   cheerleading, do you ever -- would you ever consider punishing

24   someone for a bunch of things that might not on their own be

25   significant, but together seem significant to you?
```

1       A       No.

2       Q       This has previously been marked as D2.

3               Is this -- what is this?  Do you know what this is?

4       A       I believe this was a Snapchat that April received.

5       Q       All right.

6       A       Because you can take a Snap, like a picture of the

7   floor or something, and then write text on it.  I believe

8   that's also a Snap.

9       Q       It says love how me and, redacted, get told we need

10  a year of JV before we make varsity, but that doesn't matter

11  to anyone else.  And then there is an upside down smiley face.

12  Does that violate any rules if it's a Snap that says that?

13      A       No.

14              MS. TACK-HOOPER: Okay.  All right.  This will be

15  P-9.

16              (Document dated 9/27/17 produced and marked

17  Deposition Exhibit Number P9.)

18  BY MS. TACK-HOOPER:

19      Q       You have Exhibit P9, which is an email thread.

20              If you would like to take a moment to read it, that

21  probably makes sense.

22              You can just read the portion from you on page one.

23      A       Okay.

24      Q       Okay.  It says in addition to this incident,

25  numerous students expressed that she was giving blank a hard

```
 1   time for making varsity squad as an incoming freshman.  This

 2   is also against our rules.

 3            What does it mean to give someone a hard time?

 4       A    From what I understand is she was being told that

 5   she didn't deserve to be on the squad because she was a

 6   freshman.

 7       Q    Okay.  And what rule did that violate?

 8       A    Just not being respectful toward your teammates.

 9       Q    Okay.  Did you investigate whether that in fact

10   happened?

11       A    I did not find any further information on that.

12       Q    Okay.  And you have not punished B. for that

13   incident?

14       A    I have not, no.

15       Q    Okay.  This is D10.

16            Was this a text message -- was this your text

17   message?

18       A    Yes.

19       Q    With B.?

20       A    Yes.

21       Q    And she asks if you have to do a year of JV before

22   you could make varsity, and you said say no.  She responded

23   that's stupid.  Does saying that's stupid about that rule

24   violate any rules?

25       A    No.
```

1    Q      Is there anything that I did not ask you about today

2    that you think is important in this case?

3    A      I don't believe so.

4           MS. TACK-HOOPER: Okay.  I am all set.  Do you have

5    anything?

6           MR. BROWN: I do have just a couple of questions.

7    BY MR. BROWN:

8    Q      Miss Luchetta, you recall there was a discussion

9    today about what would and what would not be a violation of

10   the negative information provision, the one dealing with the

11   internet?

12   A      Yes.

13   Q      And you were given a series of hypotheticals of what

14   might be a violation and what isn't a violation.  Do you

15   recall that discussion?

16   A      Yes.

17   Q      The Snap that B. posted that included the fuck cheer

18   statement, did you have any doubt that that was a violation of

19   the negative information provision?

20   A      I had no doubt that was definitely a violation.

21   Q      Just one.  I think this is just clarifying.  You

22   were discussing just a few minutes ago that some of the

23   cheerleaders were upset after finding out about B's post.  Is

24   that correct?

25   A      That's correct.

```
 1        Q      You were asked a question if something were

 2   lingering, you said there is still anger.  I want to clarify.

 3   You said there is still anger on the part of whom to whom?

 4        A      The cheerleaders are still upset.

 5        Q      They're still upset with B. and the fact that she's

 6   on the team after what she did?

 7        A      Yes.

 8               MR. BROWN:  Okay.  I just wanted to clarify that.

 9   That's all that I have.

10

11   BY MS. TACK-HOOPER:

12        Q      Just one follow-up question.

13               You said that the Snap was definitely a violation.

14   Did you consider the fact that the Snap didn't mention the

15   school or any person or the district when you were deciding

16   whether it violated the rule?

17        A      It was based on the fact that it mentioned

18   cheerleading specifically.

19        Q      Okay.  Did it matter to you that B. was not wearing

20   her uniform or any school paraphernalia at all?

21        A      I feel that since she mentioned cheerleading, that

22   was about the same as wearing your cheerleading uniform.

23               MS. TACK-HOOPER:  Okay.  Nothing further.

24               MR. BROWN:  Actually then, I will have one more, I

25   am afraid.
```

1                MS. TACK-HOOPER: Sorry.

2

3    BY MR. BROWN:

4        Q    Was there ever discussion with B. by you or anyone

5    else at the district that you're aware of as to why she made

6    that post including the phrase fuck cheer?

7        A    I believe she spoke with Tom Smith about it.  And I

8    -- when I spoke with her mom on the phone, she said it was

9    that she was upset over not making the varsity squad.

10       Q    So your understanding was that her statement was

11   related to the Mahanoy cheerleading team, and not just

12   cheerleading in general?

13       A    Yes.  Yes.

14

15   BY MS. TACK-HOOPER:

16       Q    If she had told you that she was watching a

17   cheerleading competition on T.V. and decided she hated

18   cheerleading and that's why she did it, would you have decided

19   differently whether to punish her?

20       A    I don't see how that is related.

21       Q    What do you mean by that?

22       A    I don't understand how someone -- that situation

23   would occur.  I feel like that's unrealistic.

24       Q    So it was probably an unclear hypothetical.  I am

25   sorry.

1              You can imagine how somebody could be a cheerleader

2    in the district and say fuck cheer, but not be talking about

3    her own team, or you think that's impossible?

4        A    I feel it's because she was talking about our

5    cheerleading and our team.

6              I haven't considered that situation.  That would be

7    -- have to be something that I would have to think about.

8        Q    Okay.  And my question is if you found out that in

9    fact it wasn't at all about varsity, it was about something

10   unrelated to your team and the district, would that have

11   effected your decision?

12       A    I feel like that's inapplicable because we do

13   already know that it is linked to our team.

14       Q    Okay.  Well, I am asking you a hypothetical.  So I

15   understand that you know that it was, she was mad about not

16   making varsity.  I am just -- I am trying to understand

17   whether somebody's intent changes whether their speech

18   violates the rule or not?

19             MR. BROWN: I will object to the hypothetical, but

20   you can answer.

21             THE WITNESS:  That would be up to discussion for me

22   and the other coaches and the Principal.  I honestly don't

23   know what my decision would be before discussing it with them.

24   BY MS. TACK-HOOPER:

25       Q    Okay.  In general, would you say that you mostly

1    have to discuss a particular situation with other people in

2    order to know whether it violated the rule or not?

3        A    Not necessarily.  But when you coach with other

4    staff, we would -- I would take their opinions into

5    consideration as well as my own.  I would come to a consensus

6    as to what we feel is a violation as to -- and what we don't.

7        Q    Okay.

8        A    At that time April was my co-advisor.  We would

9    discuss it and come to a consensus about it.

10       Q    Okay.  Have you ever had any disagreement with other

11   people that you have discussed the rules about what the rules

12   mean?

13       A    Not at this time.  Not to this time, no.

14            MS. TACK-HOOPER:  Okay.  That's all I have.

15            MR. BROWN: I did not have anything further.

16            (Whereupon, the deposition was concluded at

17   11:00 a.m.)

18

19

20

21

22

23

24

25

```
 1    COUNTY OF DAUPHIN            :

 2                                 : SS

 3    COMMONWEALTH OF PENNSYLVANIA :

 4              I, Maria N. O'Donnell, a Notary Public, authorized

 5    to administer oaths within and for the Commonwealth of

 6    Pennsylvania, do hereby certify that the foregoing is the

 7    testimony of NICOLE LUCHETTA-RUMP.

 8              I further certify that before the taking of said

 9    deposition, the witness was duly sworn; that the questions and

10    answers were taken down stenographically by the said

11    Reporter-Notary Public, and afterwards reduced to typewriting

12    under the direction of the said Reporter.

13              I further certify the said deposition was taken at

14    the time and place specified in the caption sheet hereof.

15              I further certify that I am not a relative or

16    employee or attorney or counsel to any of the parties, or a

17    relative or employee of such attorney or counsel, or

18    financially interested directly or indirectly in this action.

19              I further certify the said deposition constitutes a

20    true record of the testimony given by the said witness.

21              In WITNESS WHEREOF, I have hereunto set my hand this

22    18TH day of OCTOBER, 2018.

23                                _____
                                        Maria N. O'Donnell, RPR
24                                      Notary Public

25
```

1    I have read the foregoing transcript of

2   my deposition given on October 10, 2018, and

3   it is true, correct and complete, to the best

4   of my knowledge, recollection and belief,

5   except for the corrections noted hereon

6   and/or list of corrections, if any, attached

7   on a separate sheet herewith.

8

9

10

11

12        _____

13        NICOLE LUCHETTA-RUMP

14

15

16

17        Subscribed and sworn to

18        before me this _____ day

19        of _____, 2018.

20

21

22        _____

23        Notary Public

24

25

Exhibit G

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2

 3

 4   B.L., A MINOR, BY AND THROUGH  :
     HER FATHER, LAWRENCE LEVY,     : CIVIL NO. 3:17-CV-1734-ARC
 5   AND HER MOTHER, BETTY LOU      :
     LEVY,                          :
 6              PLAINTIFFS          :
                                    :
 7                                  :
            V                       :
 8                                  :
     MAHANOY AREA SCHOOL DISTRICT,  :
 9                                  :
                DEFENDANT           :
10

11

12

13

14
                    DEPOSITION OF:  APRIL GNALL
15

16              TAKEN BY:       PLAINTIFFS

17

18              BEFORE:        MARIA N. O'DONNELL, RPR

19                             NOTARY PUBLIC

20

21              DATE:          OCTOBER 10, 2018, 11:00 A.M.

22

23              PLACE:         MAHANOY AREA SCHOOL DISTRICT

24                             ONE GOLDEN BEAR DRIVE

25                             MAHANOY CITY, PENNSYLVANIA
```

1

2

3

4        APPEARANCES:

5

6            AMERICAN CIVIL LIBERTIES UNION OF PENNSYLVANIA

7            BY: MOLLY TACK-HOOPER, ESQUIRE

8                P.O. BOX 60173

9                PHILADELPHIA, PA 19102

10               215-592-1513

11               MTACK-HOOPER@ACLUPA.ORG

12               FOR - PLAINTIFFS

13

14           LEVIN LEGAL GROUP

15           BY: DAVID W. BURNS, ESQUIRE

16               1800 BYBERRY ROAD

17               HUNTINGDON VALLEY, PA 19006

18               215-938-6378

19               DBROWN@LEVINLEGALGROUP.COM

20               FOR - DEFENDANT

21

22           ALSO PRESENT:

23               LAWRENCE LEVY

24               BETTY LOIU LEVY

25               DR. JOIE GREEN

```
1                        WITNESSES

2      NAME                  EXAMINATION

3   APRIL GNALL

4   BY: MS. TACK-HOOPER           3
```

1                        STIPULATION

2              It is hereby stipulated by and between counsel

3    for the respective parties that sealing, certification and

4    filing are hereby waived; and that all objections except as to

5    the form of the question are reserved to the time of trial.

6

7              APRIL GNALL, called as a witness, being duly

8    sworn, testified as follows:

9                        EXAMINATION

10   BY MS. TACK-HOOPER:

11       Q     Could you please state your name for the record?

12       A     April Gnall.

13       Q     Do you go by Mrs. Gnall?

14       A     Yes.

15       Q     Ms.?

16       A     Mrs.

17       Q     Have you ever testified in a deposition before?

18       A     No, I did not.

19       Q     I will just ask you to let me know if you don't

20   understand a question, and I will rephrase it.  And if you do

21   answer a question, I will assume that you have understood it.

22   Is that fair?

23       A     Yes.

24             MS. TACK-HOOPER:  Could we go off the record?

25             (Discussion held off the record.)

1   BY MS. TACK-HOOPER:

2       Q     Back on the record.

3             So you have been designated to testify for the

4   district with Ms. Luchetta-Rump on the first topic in P2,

5   which is about the cheerleading rules on page A6.

6             Do you want to take a moment and read topic one, or

7   have you read it recently?

8       A     Okay.  Okay.

9       Q     You read it?

10      A     Yes.

11      Q     And are you the person most knowledgeable along with

12  Miss Luchetta-Rump about the cheerleading rules?

13      A     Yes.

14            MS. TACK-HOOPER:  Okay.

15            MR. BROWN: Speak up a little louder for the court

16  reporter.

17            THE WITNESS:  Yes.  I am sorry.

18  BY MS. TACK-HOOPER:

19      Q     Okay.  Is there any reason why you cannot give

20  truthful testimony today?

21      A     No.

22      Q     So you were here during Ms. Luchettas-Rump's

23  testimony.  Did you agree with her testimony?

24      A     Yes.

25      Q     Was there anything that she said that you disagreed

1    with?

2        A    No.

3        Q    Is there anything that she said that you felt was

4    incomplete?

5        A    No.

6        Q    Okay.  What is your title?

7        A    Currently now just third grade teacher.

8        Q    Okay.  And last year, you were cheerleading advisor

9    of some sort, is that correct?

10       A    Yes.

11       Q    What was your title?

12       A    Co-advisor with Nicole.

13       Q    Okay.  And at that time, were you paid extra for

14   your work as cheerleading co-advisor?

15       A    Yes.

16       Q    Okay.  How long -- how many years have you spent as

17   a cheerleading coach of some kind?

18       A    This time around, three years.  And approximately

19   back in '93, '94, I want to say three or four years.

20       Q    Okay.

21       A    It was a long time ago.

22       Q    And how long have you been an educator?

23       A    Since 1990.

24       Q    Okay.  Ms. Luchetta-Rump said that she thought that

25   you were -- would be more knowledgeable than she would about

1  how you learned about the existence of the Snap.  So I want to

2  ask you some questions about that.

3        Let's look at P-5, which is the district's responses

4  to interrogatories.  If you could look at the answer -- if you

5  could look at the answer to number one.

6        MR. BROWN: It's a couple pages in.

7  BY MS. TACK-HOOPER:

8    Q    Yes.  Did you have a chance to read the response to

9  one?

10   A    Yes.  Yes.

11   Q    Is that accurate?

12   A    Yes.

13   Q    Okay.  B. says that she created the Snap on

14  Saturday, May 27, 2017 at the Cocoa Hut.  Do you have any

15  reason to doubt any of those details?

16   A    No.

17   Q    Okay.  Was the cheerleading season over at that

18  point?

19   A    I don't really think our season ever is over because

20  we literally go from tryouts.  We roll into practices for the

21  summer.  We go into football season.  We go into basketball

22  season which goes into wrestling season.  We get that slight

23  little break before we start holding practices for tryouts

24  again.  So personally I feel like our season is on going.

25   Q    Okay.  So practices start right after tryouts?

1    A    Pretty much for the summer.

2    Q    Okay.

3    A    And we have the parade.  The Memorial Day Parade was

4  right after tryouts.  So the girls have to go to the parade as

5  well.  That is part of our requirement.

6    Q    Are students told whether they made varsity the same

7  day as tryouts?

8    A    Yes.

9    Q    Okay.  I want to talk a little bit about Snapchat.

10  So I am not a Snapchat user, I confess.  But my understanding

11  is that unlike other social media platforms where there is a

12  web site that you can go to, Snapchat is just an app.  And the

13  essential feature of Snapchat is that the posts are self

14  deleting.  Is that consistent with what you understand about

15  Snapchat?

16    A    To be honest with you, I don't know enough about

17  Snapchat --

18    Q    Okay.

19    A    -- to be perfectly honest.

20    Q    Okay.  So B. testified that this -- the particular

21  Snap at issue in this case had been posted to her story, which

22  meant that the people she was friends with on Snapchat could

23  look at it within 24 hours after she posted it, and after that

24  it disappeared.  So my question is, do you know how it came to

25  be preserved longer than that 24-hour period?

1    A    I am assuming that you can screen shot from

2 Snapchat.  I am --

3    Q    But you don't know how the screen shot or photo was

4 were taken, anything like that?

5    A    I know DF who was a varsity member shared the

6 information with S.

7    Q    Okay.  Do you know who brought it to school?  I mean

8 B. didn't take a photo and bring it to school.  So safe to

9 assume one of the other cheerleaders brought the photo or

10 screen shot to school to show you?

11    A    I am in the elementary.  I am in my own world over

12 there.  What happens over here, Nicole, because she's in high

13 school, generally hears more than I do with being in third

14 grade.

15    Q    Okay.

16    A    I don't know how it came to school.  I just know how

17 I received the information.

18    Q    And that was -- how did you receive the information?

19    A    I received a phone call from S. stating that D. told

20 her that the Snap was on Snapchat, it was inappropriate.  And

21 after the phone hung up, they were sent to me.

22    Q    Okay.  So what was your understanding at that time

23 of who had seen the Snapchat?

24    A    I sort of felt like everyone obviously that was in

25 the friends list.  And as you can see, my daughter was not on

1    the friends list and still had the opportunity to see it.  So

2    it could have been double the amount of people, I don't know.

3        Q    Okay.  I am handing you Exhibit D2.  Do you know

4    what this is?

5        A    It was the second Snap that I received.

6        Q    Okay.  And where did you receive it?

7        A    At home that night.

8        Q    From your daughter?

9        A    Yes.

10       Q    Okay.  Do you have any information about how the

11   screen shot or photo was taken?

12       A    As far as I know, it was shared with S. and S.

13   forwarded it to me.

14       Q    I am honestly not sure that I have any other

15   questions for you.

16            Is there anything -- were there any topics this

17   morning that I asked Miss Luchetta-Rump about that you feel

18   that you were more knowledgeable to speak on that we haven't

19   just covered?

20       A    No.  As co-advisors, that's what we were.  We

21   co-advised.  And we --

22       Q    Okay.

23       A    -- literally discussed everything.  So....

24       Q    Okay.  And you -- I asked her some hypothetical

25   questions to try to understand what the cheerleading rules

1    mean.   You agreed with her responses to those hypotheticals?

2        A      Yes.

3               MS. TACK-HOOPER:   Okay.   I have nothing else.

4               MR. BROWN: I do not have anything.

5               (Whereupon, the deposition was concluded at 11:11

6    a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   COUNTY OF DAUPHIN        :

2                             : SS

3   COMMONWEALTH OF PENNSYLVANIA :

4         I, Maria N. O'Donnell, a Notary Public, authorized

5   to administer oaths within and for the Commonwealth of

6   Pennsylvania, do hereby certify that the foregoing is the

7   testimony of APRIL GNALL.

8         I further certify that before the taking of said

9   deposition, the witness was duly sworn; that the questions and

10   answers were taken down stenographically by the said

11   Reporter-Notary Public, and afterwards reduced to typewriting

12   under the direction of the said Reporter.

13         I further certify the said deposition was taken at

14   the time and place specified in the caption sheet hereof.

15         I further certify that I am not a relative or

16   employee or attorney or counsel to any of the parties, or a

17   relative or employee of such attorney or counsel, or

18   financially interested directly or indirectly in this action.

19         I further certify the said deposition constitutes a

20   true record of the testimony given by the said witness.

21         In WITNESS WHEREOF, I have hereunto set my hand this

22   18TH day of OCTOBER, 2018.

23   _____

24        Maria N. O'Donnell, RPR
           Notary Public

25

1    I have read the foregoing transcript of

2   my deposition given on October 10, 2018, and

3   it is true, correct and complete, to the best

4   of my knowledge, recollection and belief,

5   except for the corrections noted hereon

6   and/or list of corrections, if any, attached

7   on a separate sheet herewith.

8

9

10

11

12          _____

13          APRIL GNALL

14

15

16

17          Subscribed and sworn to

18          before me this _____ day

19          of _____, 2018.

20

21

22     _____

23          Notary Public

24

25

1        E R R A T A   S H E E T

2      I, APRIL GNALL, do hereby certify that I

3    have read the foregoing transcript of my testimony, and

4    further certify that it is a true and accurate record

5    of my testimony (with the exception of the corrections

6    listed below).

7    PAGE  LINE            CORRECTION

8    ____  ____    _____

9    ____  ____    _____

10   ____  ____    _____

11   ____  ____    _____

12   ____  ____    _____

13   ____  ____    _____

14   ____  ____    _____

15   ____  ____    _____

16   ____  ____    _____

17   ____  ____    _____

18   ____  ____    _____

19   ____  ____    _____

20   ____  ____    _____

21   ____  ____    _____

22   ____  ____    _____

23   ____  ____    _____

24

25   _____          _____
     Date                APRIL GNALL



# Exhibit H

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2


 3

 4   B.L., A MINOR, BY AND THROUGH   :
     HER FATHER, LAWRENCE LEVY,      : CIVIL NO. 3:17-CV-1734-ARC
 5   AND HER MOTHER, BETTY LOU       :
     LEVY,                           :
 6              PLAINTIFFS           :
                                     :
 7                                   :
         V                           :
 8                                   :
     MAHANOY AREA SCHOOL DISTRICT,   :
 9                                   :
                DEFENDANT            :
10

11

12

13

14
                DEPOSITION OF:  DR. JOIE GREEN
15

16              TAKEN BY:     PLAINTIFFS

17

18              BEFORE:       MARIA N. O'DONNELL, RPR

19                            NOTARY PUBLIC

20

21              DATE:         OCTOBER 10, 2018, 11:12 A.M.

22

23              PLACE:        MAHANOY AREA SCHOOL DISTRICT

24                            ONE GOLDEN BEAR DRIVE

25                            MAHANOY CITY, PENNSYLVANIA
```

1

2

3

4

5    APPEARANCES:

6

7        AMERICAN CIVIL LIBERTIES UNION OF PENNSYLVANIA

8        BY: MOLLY TACK-HOOPER, ESQUIRE

9            P.O. BOX 60173

10           PHILADELPHIA, PA 19102

11           215-592-1513

12           MTACK-HOOPER@ACLUPA.ORG

13           FOR - PLAINTIFFS

14

15       LEVIN LEGAL GROUP

16       BY: DAVID W. BURNS, ESQUIRE

17           1800 BYBERRY ROAD

18           HUNTINGDON VALLEY, PA 19006

19           215-938-6378

20           DBROWN@LEVINLEGALGROUP.COM

21           FOR - DEFENDANT

22

23       ALSO PRESENT:

24           LAWRENCE LEVY

25           BETTY LOIU LEVY

```
 1                         WITNESSES

 2     NAME                 EXAMINATION

 3   DR. JOIE GREEN

 4   BY MS. TACK-HOOPER          4, 30

 5   BY: MR. BROWN              29

 6

 7                          EXHIBITS

 8   DEPOSITION EXHIBIT NO.           PRODUCED AND MARKED

 9   10. Request for Admission              7

10   11. Document (Facebook messages)      11

11   12-14. Policy manual documents        18

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         STIPULATION
 2              It is hereby stipulated by and between counsel
 3    for the respective parties that sealing, certification and
 4    filing are hereby waived; and that all objections except as to
 5    the form of the question are reserved to the time of trial.
 6
 7              JOIE GREEN, called as a witness, being duly
 8    sworn, testified as follows:
 9                         EXAMINATION
10    BY MS. TACK-HOOPER:
11        Q    Okay.  Have you ever given a deposition before?
12        A    Yes.
13        Q    How many times?
14        A    A lot.  I don't know.
15        Q    Were those all in your capacity as superintendent of
16    the school district?
17        A    Yes.  Yes.
18        Q    Okay.  Do you understand that you have been
19    designated to testify for the district today on several
20    topics?
21        A    Yes.
22        Q    And do you have Exhibit P-2 there?
23        A    Yes.
24        Q    The deposition notice?
25             You have been designated on topics two, four, six
```

1    and seven.

2         A     Okay.

3         Q     Are you the person most knowledgeable to testify

4    about those topics?

5               Feel free to read them.

6         A     Yes.

7         Q     Is there any reason why you cannot give truthful

8    testimony today?

9         A     No.

10        Q     What did you do to prepare for this deposition?

11        A     I reviewed this -- I reviewed this, what is it?

12        Q     Deposition notice?

13        A     Yes.  Thank you.  Thank you.  I reviewed the

14   deposition notice yesterday.

15        Q     Okay.  Did you speak with anyone about your

16   testimony today other than your attorney?

17        A     No.

18        Q     Okay.  What is your title?

19        A     I am the superintendent at the school district.

20        Q     And what are your job duties?

21        A     Are you sure you want to get out of here by lunch

22   time?

23        Q     Is there a two-sentence version of describing what

24   you do?

25        A     I am just basically responsible for all of the

 1  students, staff and tax payer -- well, tax payers of the

 2  community.  So just probably the main person that is

 3  responsible for everything.

 4      Q    Okay.  How many years have you been superintendent

 5  of the district?

 6      A    Superintendent here since 2010.  So eight years.

 7      Q    And what position did you hold previous to that?

 8      A    I was a middle school principal here from 2004 to

 9  2010.  And then before that, I was a teacher for about fifteen

10  years.

11      Q    Okay.  Could you please look at Exhibit P-3, the

12  district's interrogatory responses.  They should be somewhere

13  in the stack.

14      A    I put them in order for myself.

15      Q    Okay.

16      A    Okay.

17          MR. BROWN: I think it is P-5.

18  BY MS. TACK-HOOPER:

19      Q    I am sorry, it is P-5.  My mistake.

20      A    Okay.

21      Q    You signed a verification at the back of this

22  document, is that correct?

23      A    Yes.

24      Q    Did you review those responses before they were

25  submitted?

1      A     Yes.

2      Q     And they're accurate?

3      A     Yes.

4            MS. TACK-HOOPER:  Okay.  Let's mark this P-10.

5            (Defendant's responses to plaintiffs' request for

6      admission produced and marked Deposition Exhibit No. P10.)

7      BY MS. TACK-HOOPER:

8      Q     You have in front of you Exhibit P10, the district's

9      responses to plaintiffs' first request for admissions.

10           At the back of this document, you have signed a

11     verification.  Did you review this document before it was

12     submitted?

13     A     Yes.

14     Q     And are the responses in here accurate?

15     A     Yes.

16     Q     Okay.  Were Ms. Luchetta-Rump and Ms. Gnall

17     authorized by the school to remove B. from the cheerleading

18     team as punishment for her Snap?

19     A     I wouldn't say authorized by the school district.

20     Normally what happens is the coaches of various co-curricular

21     activities have their own rules that they follow, and it's up

22     to them to determine what is appropriate for their team and

23     what isn't appropriate for their team.  So I wouldn't say that

24     the district authorized them to do that.  There was no board

25     approval saying that -- a board ratification saying, you know,

1  you have to, you know, remove B., none of that.  So it's

2  basically up to the coaches themselves to determine what the

3  appropriate punishments agree with what.  That word punishment

4  is for the child that doesn't follow their rules.

5      Q    So you were here for Miss Luchetta-Rump's testimony

6  earlier today, right?

7      A    Yes.

8      Q    We talked about several parts of the handbook that

9  refer to coaches adopting their own rules for their teams.

10 Correct?

11     A    Yes.

12     Q    Okay.  So coaches are allowed to make their own

13 rules for their teams?

14     A    Correct.

15     Q    Are there any limits on what kind of rules coaches

16 can make for their teams?

17     A    Well, they have to follow the PIAA rules, obviously

18 that is required.  They have to follow the ineligibility list

19 rules as far as grading.  But other than that, they can -- you

20 know, they have guidelines.  The guideline would be the

21 student handbook, the PIAA.  Then they go from there to make

22 their rules.

23     Q    Have you reviewed the cheerleading rules for the

24 district?

25     A    Not before this incident.  I have never reviewed any

```
 1    rules for any sports before this incident.

 2       Q    Okay.  What is your understanding of who reviewed

 3    rule -- who reviewed the cheerleading rules?

 4       A    When?

 5       Q    Before they were put into effect.

 6       A    It's my understanding that the cheerleading coaches

 7    put their own rules into effect themselves.

 8       Q    Okay.

 9       A    It's not reviewed by the principal unless they have

10    a question about something or something has changed from year

11    to year and they have a question they want to run by the

12    principal, but it is never reviewed with me.

13       Q    Okay.  Let's look at the cheerleading rules.  They

14    are Exhibit D3.

15            Have you had an opportunity to read these rules at

16    some point?

17       A    Yes.

18       Q    Is there anything in these rules that goes beyond

19    what coaches are allowed to do?

20       A    No.

21       Q    You heard the coaches testify about what various

22    provisions of these rules mean.  Did their explanation of how

23    they apply these rules exceed what they're allowed to do in

24    your opinion?

25       A    No.
```

1    Q     Would you say that the coaches had the power to

2    remove B. from the cheerleading team without approval from

3    anyone else?

4    A     Yes.

5    Q     After B. was punished, her parents had several

6    conversations with district officials asking for

7    reconsideration.  Are you aware of this?

8    A     Yes.

9    Q     The high school principal at the time, Mr. Smith,

10   stood by their decision.  Correct?

11   A     Yes.

12   Q     You stood by their decision, correct?

13   A     Yes.

14   Q     Athletic Director Cray stood their by their

15   decision?

16   A     Yes.

17   Q     On June 29th, 2017, Mr. Levy went to the board

18   meeting to discuss this incident.  Were you aware of that?

19   A     Yes.

20   Q     Did the board discuss Brandi's punishment at that

21   meeting?

22   A     With Mr. Levy, yes.  Her punishment, did you ask?

23   Q     Yes.

24   A     No.  After the meeting was over, he -- they had

25   stated that they were going to take it into consideration.

1    Q    Okay.  If you look at the interrogatory responses,

2  which are P-5, response No. 3 says that the board took no

3  action on the matter?

4    A    Right.  The board did not take any action.  They did

5  not.

6         MR. BROWN: Did you say that was No. 3?

7         THE WITNESS:  She said No. 3.

8  BY MS. TACK-HOOPER:

9    Q    Did I get the number wrong?  I will find it.  Yes,

10  it's at the end of the second paragraph in response to No. 3.

11  The school board took no action on the matter?

12    A    Right.

13    Q    What does that mean?

14    A    They did not have a public meeting about it, a

15  public vote about it.  They didn't ratify anything.  They

16  didn't -- they just didn't have any -- normally like at a

17  school board meeting, we do motions and approvals, they didn't

18  do that for this situation.

19         MS. TACK-HOOPER:  Okay.  P-11.

20         (Document, Facebook messages, produced and marked

21  Deposition Exhibit Number P11.)

22  BY MS. TACK-HOOPER:

23    Q    You have what's been marked as P11.  Is this a

24  Facebook message between you and Mr. Levy?

25    A    Yes.  Messenger message, yes.

1    Q    Okay.

2    A    I don't know if it was messaged through Facebook.

3    It might have been a text message.  I am not sure.

4    Q    Okay.  It was some communication with Mr. Levy?

5    A    Correct.

6    Q    On August 11, correct?

7    A    Yes.

8    Q    And you state in there that the school board decided

9    to stand by the coaches.  Correct?

10   A    Yes.

11   Q    Was there -- did the board consider the issue of B's

12   punishment a second time after the June 29th meeting?

13   A    I don't know -- I was trying to remember what

14   happened.  I don't know if they had discussed supporting the

15   coaches that meeting, or if it was the meeting after that, the

16   July meeting, because I don't understand why it took until

17   August 11th to message Larry to tell him that.

18   Q    Okay.

19   A    I am not sure what happened there.  I don't know if

20   there was a discussion about it.  I am not sure.  But they had

21   told me to notify him and let him know that they were going to

22   support the coaches.

23   Q    Okay.

24   A    So that's what I did.

25   Q    Okay.  Was there any kind of formal vote?

1    A    No.

2    Q    Okay.  Is there any reason in your view why the

3  coaches decision to remove B. from the cheerleading squad as

4  punishment for her Snap should not be attributed to the

5  district?

6    A    What?  I --

7         MR. BROWN: Object to the form.

8         THE WITNESS:  I don't understand what you mean.

9  BY MS. TACK-HOOPER:

10   Q    Sure.  When the coaches decided to punish B., that

11 is something that coaches are allowed to do, correct?

12   A    Yes.

13   Q    They were acting as coaches in the way that all of

14 your coaches act, correct?

15   A    Yes.

16   Q    Okay.  The rules in the handbook say that they get

17 to set rules regarding students' out of school conduct and can

18 punish students for violating those rules, correct?

19   A    Yes.

20   Q    The coaches did everything the way that you would

21 expect them to handle the situation?

22   A    Yes.

23   Q    Okay.  They weren't going rogue in this situation?

24   A    No.

25   Q    Okay.  All right.  And the district ultimately

```
 1   decided that the punishment was appropriate, correct?

 2            MR. BROWN: Objection to the form as far as what you

 3   mean by district.

 4   BY MS. TACK-HOOPER:

 5       Q    Okay.  The school board ultimately decided that the

 6   punishment was appropriate, correct?

 7       A    The school board decided that they were going to

 8   support the coaches' decisions.

 9       Q    Okay.

10       A    They said that they can't -- that they shouldn't get

11   involved in extracurricular activities.  That they need -- the

12   coaches need to be able to hold their people accountable for

13   what they do and don't do.

14       Q    Sure.

15       A    So it shouldn't be a board -- it shouldn't -- it

16   shouldn't be at the board level.

17       Q    Right.  So coaches should be allowed to make these

18   decisions without having to go through the school board or

19   other administrators, correct?

20       A    Coaches should be able to monitor their, I shouldn't

21   say student, but that's what they are, monitor them the way

22   they see fit for their activity.

23       Q    Okay.  Are there any -- is there any training that

24   coaches receive about the limits of their authority to punish

25   students?
```

1    A     The training that are required for all coaches are

2    through PIAA.  And our -- all of our coaches are required to

3    do those trainings.  As far as if there is one for discipline,

4    I am not sure.

5    Q     Okay.  Did -- do school coaches have to notify

6    anyone else at the school or the district either before or

7    after they punish students?

8    A     They don't have to put -- we're such a small school,

9    that the majority of them do.

10   Q     Okay.

11   A     They'll notify the principal or the athletic

12   director.

13   Q     Okay.  Are you aware of any coaches ever having been

14   reprimanded or disciplined for disciplining students

15   improperly?

16   A     Not that I am aware of, no.

17   Q     Okay.  I'd like to -- we talked this morning about

18   the cheerleading rules that the coaches made and also the

19   student handbook.  How do the cheerleading rules relate to the

20   rules in the handbook?

21   A     So the handbook has part of the -- all of the PIAA

22   requirements in it.  And so they have to kind of -- one is the

23   back hand of the other one.  Do you understand what I am

24   saying?  So they use both of those to determine what would be

25   the best appropriate rules for their teams.  So I know like --

1  that the PIAA part of the handbook has to go across the board

2  for everybody.  You know, it's the rule for PIAA.  They can't

3  play in a football game if they're averages aren't at a

4  certain point, if they're failing a subject like Nicole had

5  said.

6       Q    Right.

7       A    So it goes hand in hand.  So they have that as a

8  guide to determine what their rules would be.

9       Q    Okay.  Were there any parts of the handbook that we

10 did not discuss this morning that you think someone should

11 read in order to understand coaches power to punish their

12 players?

13           Feel free to go through the exhibits.

14      A    Just that the important part is the -- is page 78

15 through 80, 81 is all of the PIAA information.  That's taken

16 right from there.  So where it says interscholastic athletic

17 procedures on the bottom of page 78 all of the way through

18 page 81 before the words student counsel, that's everything

19 that explains the suspension from a team, their attendance,

20 their personal conduct, so on.  But other than that, no.

21      Q    Okay.  Just for the record, that was Exhibit P6?

22      A    P6, yes.

23      Q    Okay.  We also looked at another policy, policy 218,

24 which was marked as P-7.  Do you -- can you find that one?

25      A    Yes.

1      Q     What is this policy?

2      A     This is a policy for student discipline.

3      Q     What is the policy?  It says at the top book policy

4   manual.  What is the policy manual?

5      A     There is a policy manual that is required for all

6   school districts.  And each of them -- we do ours through the

7   Pennsylvania School Boards Association.  And this is the

8   section 200 of the policy.  It is policy 218, which is called

9   student discipline.

10     Q     This is the PSEA's standard policy on student

11  discipline?

12     A     No.  PSBA, Pennsylvania School Board Association.

13     Q     I am sorry, PSBA.  Sorry.

14     A     They recommend a policy to the districts.  And then

15  we I guess you could say tweak it to how our district is.  And

16  then our board votes on the policies two times in one month,

17  two consecutive months, then it becomes a policy.

18           We send it back to PSBA, then they approve it.  And

19  we post it on our web site.

20     Q     Okay.  And is this a policy that you train

21  cheerleading coaches on?

22     A     I don't train.  No, I don't train cheerleading

23  coaches on policy, no.

24     Q     Do you expect your coaches to be familiar with all

25  of the districts's policies?

1    A    That's a tough question because it's two fold.  I

2  expect the coaches to follow what is in the handbook as far as

3  what they need to do and what they shouldn't be doing.

4         The policy itself, there is procedures that are made

5  for each policy.  So the policy is the big thing, the big

6  picture.  Then there is procedures that we can create based on

7  the policy.  And those procedures would be the coaches' rules,

8  PIAA procedures, all of those things.  So do they follow the

9  policy, they have to realistically -- I shouldn't say they

10  have to, they need to look at the policy and determine what

11  their rules are and procedures are from that point.

12         So once the procedures are established, I would

13  expect them to follow the procedures based on the policy.  I

14  hope that makes sense.

15    Q    I think so.  But I am going to show you some more

16  policies.

17    A    Okay.

18         MS. TACK-HOOPER:  Twelve, thirteen and fourteen.

19         (Policy manual documents produced and marked

20  Deposition Exhibit Numbers 12, 13, and 14.)

21  BY MS. TACK-HOOPER:

22    Q    I have just handed you three more policies, Exhibits

23  P12, P13 and P14.  They are policies 122, 123 and 220.

24         Do these policies also constrain the types of rules

25  that coaches are allowed to set?

1      A      Constrain?

2      Q      Yes.  So are these policies that coaches would need

3  to read before writing say their cheerleading rules so that

4  they --

5      A      Not necessarily.  What I mean yes and no.  So if --

6  if the procedures -- if the policy is updated, then yes.  But

7  this -- these policies are from 2007, 2012, 2012, and 2007.

8  So the rules and procedures are probably already in effect for

9  these things.  So, for example, cheerleading, like we saw, had

10  rules from back in the stone age, and then they moved up.  So

11  as the policies were changed, they basically went off of -- as

12  the rules were changed, it was based on most likely the

13  policies.  So -- or their procedures might have changed

14  because of something that happened.  Like, for example, Nicole

15  had said that the one rule had changed because there was no --

16  there was no Snapchat back then.  You know, so they had to add

17  some type of thing.  So things change as they move forward.

18      Q      Sure.

19      A      Basically are they supposed to follow the policy?

20  Yes.  But also they need to up -- like these policies I can

21  tell you currently right now are being updated.  So we're in

22  the process right now of updating every single one of our

23  policies with PSBA.  So it's kind of a hard question to

24  answer.

25      Q      Let me ask it this way.  Are the cheerleading rules

1  consistent with all of these policies in your view?

2      A      I don't know.  I didn't really sit down and go

3  through to make sure that they are.

4      Q      Okay.  Do you want to take a moment and look at

5  these -- these are four policies that your lawyer has produced

6  in this litigation.  Are they policies that you're familiar

7  with?

8      A      Yes.

9      Q      Okay.  Do you want to take a few minutes and just

10  look at them again?

11     A      Yes, if you don't mind.

12     Q      Please take your time.

13     A      Could you read me your question again?

14     Q      Sure.  In your view, are the cheerleading rules

15  consistent with these district policies?

16     A      I would say yes.

17     Q      Okay.  So you agree that coaches have the power to

18  remove students from sports or extra-curriculars because of

19  their out-of-school speech?

20     A      Depending on the situation.

21     Q      What does that mean?

22     A      Depending on what the issue is.  If -- what is their

23  out-of-school speech?  If it's related, directly related to

24  the school district, harms the school, harms any kind of

25  verbal written or something that is going to hurt the school

 1  district, then yes; if it's not, then no.

 2      Q    Okay.  So would coaches have the power to adopt a

 3  rule that says that you can't swear outside of school because

 4  swearing reflects badly on the district?

 5      A    That's a tough one too.  I think that if they said

 6  -- they were swearing against the organization and that was in

 7  their rules, then that would be an issue.  But if they were

 8  just swearing, I don't think that's an issue.  It's an

 9  individual case basis.

10      Q    Okay.

11      A    You know, just like the SG thing was different than

12  B's.  You know, one did something wrong on social media.  We

13  addressed it.  That punishment was different.  B. did

14  something wrong on social media, that punishment was

15  different.  So like it depends on the situation itself.

16      Q    Okay.

17      A    And based on what they have in their rules.

18      Q    Okay.  But there is nothing about B's punishment

19  that you think went too far and went beyond what coaches

20  should be allowed to do, is that right?

21      A    Do you mean -- well, if -- no.  I think that is

22  right.

23      Q    Okay.  We talked a lot about -- this morning about

24  the nature of Snapchat and the fact that it is different from

25  other social media platforms.  In many ways it shares many

1  qualities with say like a large group text.  In your view,

2  your coaches have the power to say you can't say disparaging

3  things about the school or about our sport to a large group of

4  people, even if it is not public on line?

5       MR. BROWN: I object to the form.  But if you

6  understand the question, you can answer.

7       THE WITNESS:  If it's public on line, and it is a

8  derogatory remark towards their team and that is a rule of

9  theirs, then yes, they have the option to discipline them.

10  BY MS. TACK-HOOPER:

11   Q    Okay.  I am talking about a situation that's not

12  public on line.  It's a closed group of some sort, either a

13  closed social media group or like a large group chat.

14   A    If they find out about it, they have the right to

15  discipline the child.  If they find out that it is in fact a

16  post, because obviously it wasn't private because everybody

17  else found out about it.

18   Q    Okay.  So in your view, coaches have the power to

19  punish speech that comes into the school in some way even if

20  it wasn't like open to everyone in the public, is that your

21  view?

22   A    No.  I am saying if -- if the speech effects the --

23  that specific team or group, then yes.  An if it's their rule,

24  then yes.

25   Q    Right.

1   A      They have the right to punish those children.

2   Q      Okay.  So someone could say something outside of

3   school to one other person that could effect a team.  You

4   agree with that, right?

5   A      Uh-huh.

6   Q      And that one other person they sent it to could tell

7   fifty other people, right?

8   A      Uh-huh.

9   Q      I am trying to figure out if that is something that

10  you think that the school could punish, or if there is some

11  kind of line drawn that the district does --

12  A      I look at it, my own personal view is if you are

13  talking -- if I am talking to you by myself and I am saying to

14  you cheerleading sucks, it's different than posting it on a

15  public forum for everyone to see to get all of the

16  cheerleaders worked up and upset.  It happened both times.  So

17  like you need to discipline that person because it effected

18  the team itself.  If it didn't effect the team, or if it was

19  just a conversation between you and I and no one else knew

20  about it and I was mad at you one day and went up to the coach

21  and said, hey, did you know that so and so said this to me,

22  there is really nothing that you can do about that.  To me

23  there is a difference between freedom and speech and throwing

24  a public -- out into a public forum of bashing of your group

25  when you know that that is a rule that you're not able to do.

1    Q    Understood.  I am trying to understand though if you

2    think your coaches would be allowed to adopt a rule that says

3    if you say to one person outside of school something negative

4    about our sport and I hear about it, I am going to punish you.

5    Would that be allowed?

6    A    I don't know how to answer that.

7    Q    Okay.  Okay.  Has the student handbook changed in

8    the past few years in any way that is relevant to this case?

9    A    I don't believe so.

10    Q    Okay.  Okay.  One of your attorneys said at the

11    preliminary injunction hearing that it's pretty much the same

12    from year to year.  Is that an accurate statement in your

13    view?

14    A    Yes.  If a policy updates or procedures update, then

15    they're put in there.  But the majority of it is the same.

16    Q    Okay.  What is the most specific written statement

17    that the district has that says that cheerleaders can be

18    punished for saying fuck cheer off campus?

19    A    What is the most specific statement?

20    Q    Yes.  So we have looked at a lot of policies, parts

21    of the handbook that talked generally about personal conduct

22    outside of school, I am just wondering --

23    A    There is no one specific answer to that.  There is

24    the -- there is a lot of things that would say a cheerleading

25    coach could punish for speech that's outside based on the

1   rules in the handbook, based on the rules that they establish,

2   based on the procedures that they establish from the policies,

3   all of that gives them that authority to do that.

4       Q     Okay.  Do other sports teams have rules like the

5   cheerleading rules that restrict athletes' speech when they're

6   not at school or doing school activities?

7       A     I wouldn't know that, because they don't get their

8   rules approved by me.  I do know that some of the sports

9   though have those types of things.  But as far as all of them,

10  I don't know.

11      Q     Okay.  Let's look at P-2, the 30 (b)(6) deposition

12  notice with the topics.  So the second topic, it's on page A7,

13  is one that you were designated on.

14      A     Okay.

15      Q     Subsection A says whether students participating in

16  other high school athletics through the district are subject

17  to restrictions on their out-of-school speech similar to the

18  restrictions on speech imposed on cheerleaders, and if not,

19  why not.  Is that a topic you are able to speak about?

20      A     I can tell you that they -- whether students

21  participate -- I can tell you that if the coach has that rule,

22  they will put -- implement that rule.

23          There has not been an issue like this until now.  So

24  I don't know of any that have an issue with disciplining the

25  students for speech.

1    Q    Is there anyone in the district who would be more

2    familiar with these rules?  Like I think that you mentioned

3    that coaches sometimes will show their rules to the athletic

4    director or the principal.

5    A    I can -- maybe the principal that was here prior to

6    this, Mr. Smith, but I don't think he's going to be able to

7    help you.  Because the only time they would go to them for the

8    rules would be if there was a situation where they needed to

9    throw somebody off a team.

10   Q    Okay.  All right.  And the topic B under two on that

11   same document --

12   A    Yes.

13   Q    Whether HB, a football player, featured in the Utube

14   video at issue is Loy versus Mahanoy Area School District was

15   subjected to discipline as a result of his out-of-school

16   speech, and if not, why not.  Is that something that you're

17   able to talk about?

18   A    Yes.

19   Q    Okay.

20   A    So HB was not a football player when the Utube video

21   for Loy and the Mahanoy Area School District was going on.  He

22   wasn't on the team.  So he wasn't subjected to discipline.

23   Q    Is that because it wasn't football season, or he

24   hadn't made the team?

25   A    It says was he featured in Utube video and was

1  subjected to discipline, he wasn't.

2      Q    No.  I am sorry.  You said he wasn't a football

3  player.  I am asking you if that's because -- so the video, as

4  I understand it from the other lawsuit, was dated February 7,

5  2017.  Is that part of the football season?

6          MR. BROWN: Wait.  If you can, I think what you are

7  asking, I am just trying to mediate here.

8          MS. TACK-HOOPER:  Please, yes.

9          MR. BROWN: You are asking whether it was -- he was a

10 football player, but it was out of season, or was he already

11 off of the football team, is that --

12         MS. TACK-HOOPER:  Yes, that's right.

13         THE WITNESS:  No.  He played football his freshman

14 year for approximately a couple -- maybe a couple weeks and

15 quit.

16 BY MS. TACK-HOOPER:

17     Q    I see.  Okay.

18     A    He never went back out again.  And he's a senior

19 this year.  So he wasn't even on the football team at all

20 during this lawsuit.

21     Q    Okay.  Okay.

22     A    So it's like it's --

23         MR. BROWN: I think we're saying --

24         MS. TACK-HOOPER: Sure.

25         MR. BROWN: -- it wasn't because it was out of

1    season, he was not on the team any more?

2            THE WITNESS:  No.  He was not on the team.  He was

3    on the team for a few weeks and quit.

4            MS. TACK-HOOPER:  Got it.

5            THE WITNESS:  Then never went back on the team

6    again.

7            MR. BROWN: The video occurred after.

8            THE WITNESS:  Right.  The video occurred --

9    BY MS. TACK-HOOPER:

10   Q     Are you aware of any -- so I know that you said that

11   you're not familiar with every teams rules.  Do you have any

12   reason to believe that any other team has rules that would

13   allow the team to kick a student off for their out-of-school

14   speech?

15   A     Do I have any knowledge of that, no.

16   Q     Yes.  Okay.

17          Okay.  Would there be any reason for cheerleaders to

18   be subject to more restrictions on their out-of-school speech

19   than students in other sports?

20   A     No.

21   Q     Okay.  Okay.  You were also designated to speak for

22   the district on topic four, which is about past incidents of

23   disruption caused by out-of-school speech.  Is that a topic

24   that you are able to speak about?

25   A     Yes.

1    Q    Okay.  Were there any past incidents of disruption

2  that would lead someone to believe that B's Snap might disrupt

3  classroom instruction or other school activities?

4    A    You lost me.  Can you say that again?

5    Q    Sure.  Sure.

6    A    I am trying to follow what you are saying.

7    Q    What other incidents are you aware of involving

8  disruption caused by a student's out-of-school speech?

9    A    None.

10   Q    None in the district?

11   A    No.

12        MS. TACK-HOOPER:  Okay.  That is all I have.

13        Do you have anything?

14  BY MR. BROWN:

15   Q    I just have one question.

16        We have been discussing the authority to remove B.

17  from the cheerleading team.  Do you believe there is a

18  difference in removing a student from an extracurricular

19  activity, whether it's the sport of cheerleading versus

20  removing a student from their classes by suspension or

21  expulsion?

22   A    Yes.  Absolutely.  We don't -- that's a part of the

23  reason why the -- we separate the extracurricular from the

24  academic.  So we didn't punish B., say you are suspended from

25  school for, you know, ten days for posting this on Facebook.

1    It would be completely up to the coach to determine what they

2    wanted to do based on what was stated.  So yes, there is a

3    difference between suspending for extracurricular activities

4    and suspended for academic activities.

5         MR. BROWN:   Okay.  That's all I have.

6    BY MS. TACK-HOOPER:

7         Q    One follow-up.

8         A    Okay.

9         Q    In the lawsuit, one of the allegations in the

10   complaint was that you had told someone that you couldn't

11   punish the student involved in making the Utube video because

12   of some case law that says that you can't punish -- you can't

13   expel or suspend students for their out-of-school speech.  Was

14   that accurate?

15        A    No, it wasn't.

16        Q    Okay.  So you did not make those comments to anyone?

17        A    No.  It was out of context.

18        Q    What was the context?

19        A    The context was -- I think this is a confidential

20   case, I am not supposed to speak about.

21        MR. BROWN: You said that you didn't make the

22   comment?

23        THE WITNESS:  This case was closed.  And I was told

24   I am not allowed to speak about it.

25   BY MS. TACK-HOOPER:

1    Q    Sure.  I am going to -- let's put that outside of

2  that context.  Let me just ask you about -- since your lawyer

3  asked you about the difference between what you can punish

4  students for when you are expelling or suspending them versus

5  what you can punish them for extracurriculars.  All I want to

6  know is, is it your view that you cannot punish students --

7  you cannot suspend or expel students for out-of-school speech?

8    A    No.

9    Q    Is that your -- that's not your understanding?

10   A    No.

11   Q    Okay.  In what circumstances do you think that you

12  can suspend or expel a student for speech?

13   A    I wouldn't say suspend or expel a student.  I would

14  say from their extracurricular activity, they could be

15  suspended or expelled, but not from the school.

16   Q    Okay.

17   A    I hope I am not making you confused.

18   Q    No.  I was just trying to understand what your view

19  was of the difference between those two things.

20        So you're a -- just to make sure I understand it.

21  Your view is that the district can remove students from sports

22  or extracurriculars for speech or conduct that the school

23  would not be able to suspend or expel them from school for, is

24  that right?

25   A    Right.  Right.  Well, it would -- I don't know how

1   to answer that.  It would depend on the situation.  We would

2   obviously look at if the person stated something that was

3   derogatory toward their athletic group.

4        Q    Right.

5        A    The athletic gets involved in that.  If a person

6   posts, which happens all of the time, people post things on

7   Facebook that are, you know, wrong toward a teacher or

8   something like that --

9        Q    Okay.

10       A    -- we would follow what the law is, the procedure

11  is, contact the solicitor and find out what do we need to do

12  in this type of situation.

13       Q    Okay.

14       A    We have not had that situation other than the Loy

15  case which was blown out of proportion and dropped.  So I

16  can't --

17            MR. BROWN: Yes.

18            MS. TACK-HOOPER:  Fine.  Yes.

19            MR. BROWN: We don't need to discuss the Loy case any

20  more.

21            THE WITNESS:  That's what I am saying, this is a

22  unique situation for our district.

23            MS. TACK-HOOPER:  Okay.  I have no other questions.

24            MR. BROWN: I do not either.  Thank you very much.

25            (Whereupon, the deposition was concluded at

1    12:00 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    COUNTY OF DAUPHIN            :

 2                                 : SS

 3    COMMONWEALTH OF PENNSYLVANIA :

 4              I, Maria N. O'Donnell, a Notary Public, authorized

 5    to administer oaths within and for the Commonwealth of

 6    Pennsylvania, do hereby certify that the foregoing is the

 7    testimony of DR. JOIE GREEN.

 8              I further certify that before the taking of said

 9    deposition, the witness was duly sworn; that the questions and

10    answers were taken down stenographically by the said

11    Reporter-Notary Public, and afterwards reduced to typewriting

12    under the direction of the said Reporter.

13              I further certify the said deposition was taken at

14    the time and place specified in the caption sheet hereof.

15              I further certify that I am not a relative or

16    employee or attorney or counsel to any of the parties, or a

17    relative or employee of such attorney or counsel, or

18    financially interested directly or indirectly in this action.

19              I further certify the said deposition constitutes a

20    true record of the testimony given by the said witness.

21              In WITNESS WHEREOF, I have hereunto set my hand this

22    18TH day of OCTOBER, 2018.

23                                 _____
                                          Maria N. O'Donnell, RPR
24                                        Notary Public

25
```

1    I have read the foregoing transcript of

2   my deposition given on October 10, 2018, and

3   it is true, correct and complete, to the best

4   of my knowledge, recollection and belief,

5   except for the corrections noted hereon

6   and/or list of corrections, if any, attached

7   on a separate sheet herewith.

8

9

10

11

12          _____

13          DR. JOIE GREEN

14

15

16

17          Subscribed and sworn to

18          before me this _____ day

19          of _____, 2018.

20

21

22   _____

23   Notary Public

24

25

1               E R R A T A   S H E E T

2      I, DR. JOIE GREEN, do hereby certify that I

3    have read the foregoing transcript of my testimony, and

4    further certify that it is a true and accurate record

5    of my testimony (with the exception of the corrections

6    listed below).

7    PAGE  LINE            CORRECTION

8    ____  ____   _____

9    ____  ____   _____

10   ____  ____   _____

11   ____  ____   _____

12   ____  ____   _____

13   ____  ____   _____

14   ____  ____   _____

15   ____  ____   _____

16   ____  ____   _____

17   ____  ____   _____

18   ____  ____   _____

19   ____  ____   _____

20   ____  ____   _____

21   ____  ____   _____

22   ____  ____   _____

23   ____  ____   _____

24

25   _____        _____
     Date              DR. JOIE GREEN





Exhibit I

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT

OF PENNSYLVANIA

* * * * * * * *

B.L., a minor, by   *

her father,         *

LAWRENCE LEVY,      *   Case No.

and her mother,     *   3:17-CV-1734

BETTY LOU LEVY,     *

    Plaintiffs     *

    vs.            *

MAHANOY AREA        *

SCHOOL DISTRICT,    *

    Defendant       *

* * * * * * * *

DEPOSITION OF

B.L.

October 24, 2018

Any reproduction of this transcript is

prohibited without authorization by

the certifying agency.

2

1                    D E P O S I T I O N

2                         O F

3      B.L., taken on behalf of the Defendant

4      herein, pursuant to the Rules of Civil

5      Procedure, taken before me, the

6      undersigned, Samantha Bruer, a Court

7      Reporter and Notary Public in and for

8      the Commonwealth of Pennsylvania, at

9      Mahanoy Area School District, One

10     Golden Bear Drive, Mahanoy City,

11     Pennsylvania, on Wednesday, October

12     24, 2018 beginning at 9:16 a.m.

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1              A P P E A R A N C E S

2

3    ARLEIGH P. HELFER, III, ESQUIRE

4    Schnader, Harrison, Segal & Lewis, LLP

5    1600 Market Street

6    Suite 3600

7    Philadelphia, PA  19103

8         COUNSEL FOR PLAINTIFFS

9

10   MICHAEL I. LEVIN, ESQUIRE

11   Levin Legal Group, P.C.

12   1800 Byberry Road

13   Suite 1301

14   Huntingdon Valley, PA  19006

15        COUNSEL FOR DEFENDANT

16

17   ALSO PRESENT:

18   DR. JOI L. GREEN, SUPERINTENDENT

19

20

21

22

23

24

25

4

1                       I N D E X

2

3    WITNESS: B.L.

4    EXAMINATION

5        By Attorney Levin              7 - 95

6    DISCUSSION AMONG PARTIES        95 - 96

7    CERTIFICATE                          97

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                    E X H I B I T   P A G E

2

3                                              P A G E

4    N U M B E R    D E S C R I P T I O N        I D E N T I F I E D

5    Defendant's Exhibits:

6    1            Snapchat Picture         15

7    3            Cheerleading Rules       50

8    4            Student Handbook Page    47

9    11           Complaint                83

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

<u>O B J E C T I O N   P A G E</u>

<u>A T T O R N E Y</u>                                      <u>P A G E</u>

Helfer                48,  49,  54,  55,  57,  58,

                      58,  59,  59,  62,  62,  64,

                      64,  65,  67,  70,  73,  79,

                      85,  86,  87,  90,  90,  90,

                                91,  92,  92,  93

7

1                    S T I P U L A T I O N

2     ---------------------------------------

3     (It is hereby stipulated and agreed by

4     and between counsel for the respective

5     parties that reading, signing,

6     sealing, certification and filing are

7     not waived.)

8     ---------------------------------------

9                    P R O C E E D I N G S

10    ---------------------------------------

11                         B.L.,

12    CALLED AS A WITNESS IN THE FOLLOWING

13    PROCEEDING, AND HAVING FIRST BEEN DULY

14    SWORN, TESTIFIED AND SAID AS FOLLOWS:

15                         - - -

16                    EXAMINATION

17                         - - -

18    BY ATTORNEY LEVIN:

19    Q.      You're going to learn a lot

20    from this case.  This is called a

21    deposition.

22            Have you ever given a

23    deposition before?

24    A.      No.

25    Q.      Okay.

8

1          One of the things that you're
2     going to learn is you have to give
3     verbal responses.  So if you nod your
4     head yes or no, I'm going to remind
5     you to say yes or no, which may be
6     appropriate.
7          Is that okay with you?
8     A.     Yes.
9     Q.     Another thing you'll learn is
10    that utterances like uh-huh and uh-uh,
11    don't go well in the transcript.  So
12    if you make such utterances like we
13    all do, I'll remind you to say yes or
14    no.
15         Is that okay?
16    A.     Yeah.
17    Q.     And thirdly, only one person
18    should be talking at a time so the
19    court reporter can take down
20    everything they say.  So please be
21    patient.  Wait for me to finish my
22    question before you give your next
23    --- your answer.  And I'll be patient
24    and wait for you to finish your answer
25    before I ask my next question.

9

1          If your lawyer says anything,

2    just stop talking so the court

3    reporter can take it down.

4          Okay?

5    A.     Okay.

6    Q.     All right.

7          Could you state your full name

8    for the record, please?

9    A.     B.L. (states name).

10   Q.     And keep your voice up because

11   at my age I need loud voices.

12          Okay?

13   A.     Okay.

14   Q.     And where do you reside?

15   What's your address?

16   A.     ████  ████  ██████  ██████.

17   Q.     Where?

18   A.     Mahanoy City.

19   Q.     And who do you live there with?

20   A.     My parents.

21   Q.     Anybody else?

22   A.     My brother and sister.

23   Q.     And your brother's name is?

24   A.     A.J.

25   Q.     I didn't hear that.

10

1    A.    A.J.

2    Q.    And how does he spell that?

3    A.    Like his full name?

4    Q.    Yeah.

5    A.    His full name is (spells name).

6    Q.    And your sister's name is?

7    A.    Courtney Levy.

8    Q.    And how old is A.J.?

9    A.    Thirteen (13).

10   Q.    And how old is Courtney?

11   A.    Twenty-two (22), I think.

12   Q.    And does A.J. go to school?

13   A.    Yes.

14   Q.    Where?

15   A.    Mahanoy.

16   Q.    And is he in elementary?

17   A.    Middle school.

18   Q.    Middle school.

19   A.    Or like the high school.

20         He's in eighth grade.

21   Q.    And Courtney I assume,

22   graduated?

23   A.    Yes.

24   Q.    I represent the Mahanoy Area

25   School District in this case.  That

11

1    means the school district's my client.

2         If you don't hear any questions

3    I ask, let me know and I'll be happy

4    to repeat it.  If you don't understand

5    a question, let me know that and I'll

6    be happy to rephrase it.  If you

7    answer a question, I'll assume that

8    you both heard it and that you

9    understood it.

10        Okay?

11   A.    Okay.

12   Q.    The --- we're not here to make

13   you feel uncomfortable in any way so

14   if you just want to take a break for

15   any reason at all, let us know that.

16   And we'll be happy to take a break.

17        And I understand from your

18   Counsel, that you have to leave today

19   at 10:30.

20        Is that correct?

21   A.    Yes.

22   Q.    And why do you have to leave?

23   A.    I have cross country districts.

24   And we have to eat lunch at 10:30.

25   Q.    Okay.

12

1          Now, you testified at the

2    preliminary adjunction hearing about a

3    year ago, a little bit more than a

4    year ago.

5          Do you remember that?

6    A.     Yes.

7    Q.     And if I recall correctly, you

8    testified that you had two

9    extracurricular activities,

10   cheerleading and softball.

11         Do you still play softball?

12   A.     No.

13   Q.     When did you stop softball?

14   A.     About maybe, two, three years

15   ago.

16   Q.     So you didn't try out for the

17   softball team in, I think the --- for

18   the Spring of 2017?

19   A.     I don't remember.

20   Q.     Well, this school year is the

21   2018-2019 school year.

22         Right?

23   A.     We're in now.

24   Q.     Excuse me.

25   A.     So then no, I didn't.

13

1    Q.    What grade are you in this

2    year?

3    A.    Eleventh (11th).

4    Q.    So in the 2017-18 school year,

5    you were in tenth.

6          Right?

7    A.    Yes.

8    Q.    Okay.

9          When does softball play?  When

10   is their season?

11   A.    It'll like, start around

12   June-ish.  Like the practices will be

13   in June.

14   Q.    And when are the games?

15   A.    They would be in like July,

16   August.

17   Q.    So the high school softball

18   team plays during the summer when

19   school is not in session.

20         Is that correct?

21   A.    I wasn't on the high school

22   softball team.

23   Q.    Were you on the junior middle

24   school softball team?

25   A.    No.

14

1       I was on the one downtown.

2   Q.      So the softball team to which

3   you referred in your testimony, that

4   is not a school district softball

5   team.

6       Is that correct?

7   A.      Yes.

8   Q.      And when you say in town, was

9   it sponsored by Mahanoy City or by an

10  organization in Mahanoy City?

11      Do you know?

12  A.      I'm not sure.

13  Q.      When is the last time that you

14  played softball for that team?

15  A.      I don't remember.

16  Q.      Was it when you were in ninth

17  grade?  When you were in eighth grade?

18  Can you help us understand when you

19  last played?

20  A.      I --- I really don't remember.

21  Q.      The Snap --- in front of you is

22  a three ring binder.  It has what we

23  call exhibits.  Each exhibit is

24  separated by a tab.  And Exhibit D-1,

25  that's the Snap that brings us all

15

1    together this morning; right?

2           Is that correct?

3                   - - -

4              (Whereupon, Defendant

5              Exhibit 1, Snapchat

6              Picture, was marked for

7              identification.)

8                   - - -

9              THE WITNESS:

10             Yes.

11   BY ATTORNEY LEVIN:

12   Q.    Okay.

13         And that's you in the glasses.

14   You're --- you --- not in the glasses.

15   I can't ---.

16   A.    I'm not in the glasses.

17   Q.    Not in glasses.

18         And in that Snap it says among

19   other things, quote, fuck softball,

20   end of quote.

21         Do you see that?

22   A.    Yes.

23   Q.    Okay.

24         Now this Snap you took and sent

25   in May of 2017.

16

1         Right?

2   A.    Yes.

3   Q.    So you were in ninth grade.

4         Right?

5   A.    I think, yeah.

6   Q.    Okay.

7         And did you try out for

8   softball when you were in ninth grade

9   before this Snap was taken?

10  A.    I don't know.

11        I don't remember.

12  Q.    Why did you say, quote, fuck

13  softball, end of quote, in this Snap?

14        Do you remember?

15  A.    No, I don't remember.

16  Q.    Okay.

17        Do you have any physical or

18  mental impairment that would prevent

19  you from hearing any questions that

20  I'm asking?

21  A.    No.

22  Q.    Do you have any physical or

23  mental impairment that would prevent

24  you from understanding any questions I

25  ask?

17

1   A.     No.

2   Q.     Do you have any physical or

3   mental impression that would prevent

4   you from giving truthful answers?

5   A.     No.

6   Q.     Are you taking any medication

7   that would prevent you from hearing or

8   understanding any questions?

9   A.     No.

10  Q.     Are you taking any medications

11  that would prevent you from giving

12  truthful answers?

13  A.     No.

14  Q.     What's your date of birth?

15  A.     ███████ .

16  Q.     Did you look at any documents

17  in order to prepare for your

18  deposition today?

19  A.     No.

20  Q.     Other than your lawyer, did you

21  talk to anyone to prepare for this

22  deposition today?

23  A.     No.

24  Q.     Have you ever been suspended or

25  expelled from school?

18

1    A.      No.

2    Q.      Have you ever been disciplined

3    in school, like detention or something

4    less than suspension or expulsion?

5    A.      Yes.

6    Q.      And how many times?

7    A.      Two, I think.

8    Q.      And what kind of discipline was

9    imposed?

10   A.      It was detentions.

11   Q.      And what grade were you in when

12   you had the detentions?

13   A.      The first one was in ninth

14   grade I think, and then the second one

15   was in tenth.

16   Q.      And what were you given

17   detention for in ninth grade?

18   A.      For being on my phone.

19   Q.      During school?

20   A.      Yeah.

21   Q.      Okay.

22           And who imposed the detention?

23   A.      Mrs. Pollack.

24   Q.      How do you spell her name?

25   A.      P-O-L-L-A-C-K.

19

1    Q.    And is she a teacher?

2    A.    Yes.

3    Q.    And what kind of detention did

4    she impose?

5    A.    What do you mean?

6    Q.    What did you have to do for

7    detention?

8    A.    Oh, we just like --- like we

9    brought our own work, that like, we

10   had to do.

11   Q.    And did you have to come in at

12   a different time?

13   A.    After school.

14   Q.    Okay.

15         So it was an after school

16   detention.

17         Approximately how long did you

18   have to serve in detention for that?

19   A.    I was there for --- from 2:30

20   to 4:30-ish.

21   Q.    And in tenth grade, what were

22   you given detention for?

23   A.    Plagiarism.

24   Q.    And what class did you engage

25   in a plagiarism?

20

1    A.     Mrs. Pollack.

2    Q.     Same teacher?

3    A.     Yes.

4    Q.     And what does she teach?

5    A.     I don't know what the name of

6    her class was.  I think it was social

7    studies.

8    Q.     Okay.

9           And what type of detention?

10   Was it the same thing after school

11   detention?

12   A.     Yes.

13   Q.     Same couple of hours?

14   A.     Yes.

15   Q.     And what did you have to do in

16   the detention that you served for

17   tenth grade?

18   A.     We just brought our own work

19   and did it there.

20   Q.     And the cross country team,

21   when did you start being in cross

22   country?

23   A.     At the beginning of the school

24   year.

25   Q.     This school year?

21

1    A.    Yes.

2    Q.    So in 11th grade?

3    A.    Yes.

4    Q.    Is that a varsity or junior

5    varsity that you're on?

6    A.    Varsity.

7    Q.    And is --- some school

8    districts separate them by the boys

9    cross country and girls cross country.

10    Does the school district do

11    that?

12    A.    Yes.

13    Q.    And so you are on girls cross

14    country varsity.

15    Is that correct?

16    A.    Yes.

17    Q.    And what do you run?  Is there

18    a specific race like in track and

19    field?

20    A.    Meets and invitationals.

21    Q.    And this cross country team is

22    sponsored by the school district?

23    A.    Yes.

24    Q.    And where are you going at

25    approximately 10:30 this morning?

22

1    Where's it being held?

2    A.     Bethlehem.

3    Q.     And is that a regional event or

4    are you just competing against one

5    other school district?

6    A.     It's regional.

7    Q.     Do they have things like

8    starters and substitutes on cross

9    country or does everybody run every

10   race?  How's that work?

11   A.     Everybody runs every race until

12   you get to like leagues.

13   Q.     Okay.

14          And what races do you

15   anticipate are going to be held today?

16   A.     It's going to be like boys and

17   girls varsity races.

18   Q.     Was --- is it a course?

19   A.     Yes.

20   Q.     And how long is the course?

21   A.     Three miles.

22   Q.     And so it's just one race,

23   three-mile race?

24   A.     Yes.

25   Q.     And how many girls are on the

23

1    varsity team?

2    A.    There's seven of us, I think.

3    Q.    And how many boys are on the

4    boys varsity team?  Do you know?

5    A.    I don't know.

6    Q.    Do you ever have any combined

7    meets with the boys, other than what

8    you described today?

9    A.    Boys run at like --- like, five

10   minutes before the girls do.  So we

11   don't run together.

12   Q.    So the same course.  Boys leave

13   early and the girls ---

14   A.    Yes.

15   Q.    --- leave five minutes later?

16   A.    Yes.

17   Q.    Okay.

18         Do you travel on the same bus

19   together?

20   A.    Yes.

21   Q.    Are there any other

22   extracurricular activities that you

23   take part in other than cheerleading

24   and cross country this year?

25   A.    No.

24

1    Q.      Are there any other
2    extracurricular activities that you
3    took part in last year when you were
4    in tenth grade, other than
5    cheerleading?
6    A.      I don't think so.
7    Q.      You testified that you were in
8    Honor Society.
9            Are you in Honor Society still?
10   A.      Not National Honor Society.
11           I was in National Junior Honor
12   Society in middle school.
13   Q.      And when did you get accepted
14   to National Junior Honor Society?
15   A.      I think it was seventh grade.
16   Q.      And do you know what you had to
17   do to get on National Junior Honor
18   Society?
19   A.      I think you had to have a
20   certain, like average, a certain grade
21   point average.
22   Q.      Is that all?
23   A.      Yes.
24   Q.      Okay.
25           And do you know what that grade

25

1   point average was in seventh grade

2   that you had to have?

3   A.    I don't remember.

4   Q.    Do you remember whether they

5   looked at your sixth grade --- your

6   sixth grade grades and marks to

7   determine whether you qualified in

8   seventh grade or did they look at

9   seventh grade marks?

10  A.    I think it was maybe your sixth

11  grade --- I'm not sure.

12  Q.    And what did you have to do, if

13  anything, to be in National Junior

14  Honor Society?

15  A.    I'm pretty sure you had to do

16  community service hours.

17  Q.    And did you do community

18  service hours?

19  A.    Yes.

20  Q.    And what did you do with

21  community service in?

22  A.    I worked BINGO for a firehouse.

23  Q.    I didn't hear that.

24       BINGO for a firehouse did you

25  say?

26

1      A.      Yeah.

2      Q.      Okay.

3              And which firehouse?

4      A.      The West End.

5      Q.      And how many hours did you have

6      to do community service?

7      A.      I think it was six.

8      Q.      And did you do those six hours

9      when you were in seventh grade?

10     A.      Yes.

11     Q.      Did you do anything in eighth

12     grade for National Junior Honor

13     Society?

14     A.      I think you had to do the

15     community service hours again.

16     Q.      Were you in National Junior

17     Honor Society in eighth grade?

18     A.      Yes.

19     Q.      And was that based, to your

20     knowledge, on your grades from seventh

21     grade?

22     A.      I would assume.

23     Q.      And in eighth grade, did you

24     have to do anything more in order to

25     get into National Junior Honor Society

27

1    other than have certain grades?

2    A.      No.

3            I think once you made it, you

4    had to do community service again.

5    Q.      Okay.

6            And how about ninth grade?

7    Same thing?

8    A.      Ninth and tenth grade we didn't

9    have, like a society.

10   Q.      All right.  So ---?

11   A.      Eleventh (11th) and 12th grade

12   was National Honor Society.

13   Q.      So seventh and eighth grade you

14   were in National Junior Honor Society.

15   Ninth and tenth grade there was no

16   Junior Honor Society or National Honor

17   Society.

18           Is that correct?

19   A.      Yes.

20   Q.      And 11th and 12th grade, there

21   is National Honor Society?

22   A.      Yes.

23   Q.      Are you in National Honor

24   Society now that you're in 11th grade?

25   A.      No.

28

1    Q.      Why not?

2    A.      I don't know.  They don't tell

3    us why.

4    Q.      Okay.

5            Do you know what the conditions

6    are in order to get into National

7    Honor Society?

8    A.      No.

9    Q.      How are your grades this year?

10   A.      They're good.

11   Q.      And what are your major

12   subjects?

13           You're looking at me like I

14   don't know what I'm talking about.  So

15   let me explain.

16           When I was a kid long ago, they

17   had major subjects and minor subjects.

18   Gym and health were considered minor,

19   for example.  History, English,

20   Science, were considered majors.  And

21   the major subjects, you went to every

22   day of the week.

23           So the way you're looking at

24   me, it sounds like they don't do

25   majors and minors anymore?

29

1    A.      No.

2            We have the same classes out,

3    like all week.

4    Q.      Okay.

5    A.      All year around.

6    Q.      And what are your classes this

7    year?  What are your subjects?

8    A.      History, accounting, chemistry,

9    Spanish III, Honors English, algebra

10   III and the YES program.

11   Q.      The what, program?

12   A.      The YES program.

13   Q.      And what's the YES program?

14   A.      I'm not sure.

15           We had to take it this year.

16   Q.      Did it start yet?

17   A.      Yes.

18           It started at the beginning of

19   the year.

20   Q.      Well, why aren't you sure what

21   the YES program is if it started?

22   A.      I think we just, like, look at

23   careers and stuff.  And then, like it

24   gets us ready for our senior year of

25   high school.

30

1    Q.    Okay.

2          It's still early in the school

3    year.  Have you gotten a report card

4    yet?

5    A.    No.

6    Q.    Probably early in November or

7    so?  The first report period?

8    A.    The marking period ends on

9    Tuesday.

10   Q.    Okay.

11         And then what is it, a week or

12   two later you'll get your report

13   cards?

14   A.    I think we get it that week.

15   Q.    Okay.

16         What do you think you're going

17   to get in history?

18   A.    Like high 90's.

19   Q.    Is that an A?  Or don't they do

20   A, B, C or D?

21   A.    They don't do A, B, C.

22   Q.    Accounting, what do you think

23   you're going to get?

24   A.    High 90's.

25   Q.    Chemistry, what do you think

31

1    you're going to get?

2    A.    Low 90's.

3    Q.    Spanish, what do you think

4    you're going to get?

5    A.    High 90's.

6    Q.    Honors English, what do you

7    think you're going to get?

8    A.    High 80's.

9    Q.    Algebra, what do you think

10   you're going to get?

11   A.    High 80's.

12   Q.    And do they even give you a

13   grade for YES program?

14   A.    Yeah.

15   Q.    And what do you think you'll

16   get there?

17   A.    High 90's.

18   Q.    Okay.

19         Last year when you were in

20   tenth grade, what subjects did you

21   take in tenth grade?

22   A.    I don't ---.  It was math,

23   English, history, intro to accounting.

24   Q.    I didn't hear that?

25   A.    Intro to accounting.

32

1   Q.      Okay.

2   A.      Biology, computer apps and gym

3   --- and Spanish.  I think that's what

4   I had.

5   Q.      And what was your grade, your

6   final grade in Spanish, do you

7   remember?

8   A.      I don't remember.  It was like

9   high 90's.  I don't know the

10   exact ---.

11   Q.      Math, what was your final

12   grade?

13   A.      Low 90's maybe.

14   Q.      English, what was your final

15   grade?

16   A.      I don't know.

17   Q.      History, what was your final

18   grade?

19   A.      Maybe low 90's.

20   Q.      Intro to accounting, what was

21   your final grade?

22   A.      High 90's.

23   Q.      Biology, what was your final

24   grade?

25   A.      Low 90's, I guess.

33

1   Q.      Computer apps, what was your

2   final grade?

3   A.      High 90's.

4   Q.      And gym, what was your final

5   grade?

6   A.      100.

7   Q.      Can we agree that the school

8   district's termination of you from the

9   cheerleading squad, did not interfere

10  with your academic performance?

11  A.      I would assume not.

12  Q.      Now the --- this picture, which

13  has been marked as D-1, why did you

14  send that via Snap?

15  A.      I was mad.

16  Q.      What were you mad about?

17  A.      A lot of stuff.

18  Q.      And what are those things that

19  you were mad about?

20  A.      I don't remember.

21          I don't remember about softball

22  or at school.

23  Q.      You don't remember any of the

24  details?

25  A.      No.

34

1    Q.      Whose idea was it to take that
2    picture on Snap and send it out?
3    A.      Mine, I guess.
4    Q.      Okay.
5            And who's the other girl in
6    glasses, what is her name?
7    A.      D.
8    Q.      I didn't hear that.
9    A.      D.
10   Q.      And how long have you and D.
11   been friends?
12   A.      Since we were born.
13   Q.      And does she go to school here?
14   A.      Yes.
15   Q.      And is she in the same grade?
16   A.      Yes.
17   Q.      Is she in any extracurricular
18   activities this year?
19   A.      Cheer.
20   Q.      Was she --- was D. in cheer
21   last year, the 2017-18 school year?
22   A.      No.
23   Q.      And does cheer have both
24   varsity and junior varsity?
25   A.      Yes.

35

1    Q.    Is D. on the varsity team or

2    the junior varsity?

3    A.    Varsity.

4    Q.    And does the cheerleading squad

5    still require people to try out?

6    A.    Yes.

7    Q.    So D. tried out in the spring

8    of --- when you and D. were in tenth

9    grade?

10    A.    It was like May of last school

11    year school year.  So yes.

12    Q.    So the tryouts are generally in

13    May of the preceding year.  So if you

14    want to be in cheerleading in 11th

15    grade, you try out in May of 10th

16    grade.

17    Right?

18    A.    Yes.

19    Q.    Okay.

20    And when --- who were the

21    judges when you tried out in May of

22    2018?

23    A.    We didn't know their names.

24    Q.    How many judges were there?

25    A.    Around like six or seven.

36

1    Q.    And you don't know who any of

2    those six or seven people were?

3    A.    No.

4          We don't get told their names.

5    Q.    Are the coaches judges for the

6    tryouts?

7    A.    No.

8    Q.    Are the coaches in the ---?

9    Well, where are the tryouts conducted?

10   A.    Their held in the gym, but we

11   all go in the locker room until, like

12   our specific number is called.

13   Q.    All right.

14         Were the coaches in the locker

15   room during the tryouts?

16   A.    No.  They were in the gym.

17   Q.    So the coaches are in the gym

18   during the tryouts, but as far as you

19   know, they aren't --- do not

20   participate in judging.

21         Is that correct?

22   A.    Yes.

23   Q.    Did you believe that you were

24   treated fairly in the tryouts during

25   May of 2018?

37

1    A.    Yes.

2    Q.    Have you applied to any

3    colleges yet or is it too early for

4    you?

5    A.    Too early.

6    Q.    So you have neither been

7    accepted nor rejected by any colleges.

8         Is that correct?

9    A.    Yes.

10   Q.    Were your grades last year

11   similar to what they were when you

12   were in tenth grade?

13   A.    Wait.  What?

14   Q.    Excuse me.  I misspoke.

15        Are your grades last year

16   similar to what they were in ninth

17   grade?

18   A.    I think.

19   Q.    Have you had any jobs since

20   being in high school?

21   A.    I had a babysitting job.

22   Q.    When?

23   A.    Over the summer.

24   Q.    Of what year?

25   A.    2018.

38

1    Q.    Any other job since being in

2    high school other than the babysitting

3    job you had in the summer of 2018?

4    A.    No.

5    Q.    Tell me about cheerleading in

6    the sense does --- as to whether it

7    has a regular season or is it an all

8    year around activity?

9    A.    Well, it --- we would cheer for

10   football, basketball and wrestling,

11   but after wrestling was over, it was

12   like, done, until the next year.

13   Q.    And approximately when is the

14   football season?

15   A.    The beginning of the year.

16   Q.    Until when?

17   A.    The end of October.

18   Q.    Does it go into November and

19   like, Thanksgiving?

20   A.    Not Thanksgiving.

21         I think it would go into

22   November if we make it to playoffs or

23   anything.

24   Q.    All right.

25         And do you know whether your

39

1    team made it into the playoffs or will

2    make it into the playoffs this year?

3    A.    I'm not sure.

4    Q.    Basketball, when is that

5    season?

6    A.    December.

7    Q.    Until?

8    A.    Like it starts in December

9    until like, the beginning of February.

10   Q.    And does it go into March if

11   the team makes it into the playoffs?

12         Do you know?

13   A.    I don't think so.

14   Q.    And wrestling, when is that

15   season?

16   A.    I think it starts in January.

17   Q.    And how long does it go?

18   A.    Some --- like a month.  Like,

19   it would end the end of February, I

20   would assume.

21   Q.    Wrestling is an indoor sport.

22         Right?

23   A.    Yes.

24   Q.    And where are the wrestling

25   meets?  Are they in --- when they're

40

1   home meets, are they here in the high

2   school?

3   A.      Yeah.  They're in the high

4   school gym.

5   Q.      Do the cheerleaders take part

6   in any community parades?

7   A.      Yes.

8   Q.      And what parades does cheer

9   take part in?

10  A.      Homecoming parade and I think

11  the other one would be the Memorial

12  Day.

13  Q.      And who sponsors the Memorial

14  Day Parade?

15          Do you know?

16  A.      I don't know.

17  Q.      Is that a city event, Mahanoy

18  City?

19  A.      I think.  I don't know.

20  Q.      All right.

21          Any other parades other than

22  homecoming and Memorial Day?

23  A.      Not anymore that I remember.

24  Q.      Halloween?

25  A.      No.

41

1   Q.    Do you have Halloween Parades

2   up here?

3   A.    There is, but we don't, like

4   cheer in it.

5   Q.    Okay.

6         In addition to the two parades,

7   are there any other community events

8   that the cheerleading squad goes to?

9   A.    I don't think so.

10  Q.    When is practice during the

11  football season, for the cheerleading

12  squad?

13  A.    Well, she schedules them like

14  whenever she has free time, Mrs.

15  Luchetta does.  But normally, it would

16  be held on a Tuesday or a Thursday.

17  Q.    So do you normally have two

18  practices a week during football

19  season?

20  A.    When we can.  It's hard to

21  during school because of volleyball.

22  Like it gets in the way.

23  Q.    What ball?

24        I didn't hear you.

25  A.    Volleyball.

42

1    Q.      Okay.

2    A.      And it gets in the way.  So

3    she'll just like, reschedule them.

4    Q.      So the general rule is two

5    times a week, unless there's a

6    conflict somewhere.  And then it will

7    get rescheduled for some other time.

8            Is that accurate?

9    A.      Normally, yes.

10   Q.      How about basketball season?

11   Same thing?

12   A.      I think.

13   Q.      How about wrestling season,

14   which overlaps from what you've told

15   me, with basketball; right?

16   A.      We would learn stuff for

17   wrestling at like practices during

18   basketball season.

19   Q.      Okay.

20   A.      Like we do the same cheers.

21   Q.      And well how about practices?

22   Do --- do they try to have two a week?

23   A.      I would assume they would try

24   to.

25   Q.      And once wrestling is over, are

43

1    there any further practices the rest

2    of the year?

3    A.      No.  I don't think so.

4    Q.      What is done to prepare for the

5    Memorial Day Parade if anything?

6            Is anything done to prepare for

7    the Memorial Day Parade?

8    A.      No.  'Cause during the parade,

9    normally we just do a --- like we go

10   with the band and either we'll do a

11   dance or we'll just do like, certain

12   moves.

13   Q.      When you say certain moves,

14   what do you mean?

15   A.      We'll do like a pattern.

16   They'll go like, each and every other

17   person would like go up or something,

18   and then the other one would go down.

19   And that's basically what we would do.

20   Q.      Okay.

21           So you don't need much more

22   practice for that?

23   A.      No.

24   Q.      Okay.

25           How about during the summers?

44

1    Are there any activities that the

2    cheerleading squad takes part in?

3    A.      Cheer camp, but that's it.

4    Q.      And what is cheer camp?

5    A.      Varsity would go to a certain

6    school and just learn cheers.

7    Q.      And which school do you go to?

8    A.      I think this year was the first

9    year that we didn't.  We went to

10   Shenandoah's School.

11   Q.      And is that a required

12   activity, that you go to the cheer

13   camp?

14   A.      It's not.  Like if you have

15   something other --- like something

16   else to do, you can do that I guess.

17   Q.      And when is the cross country

18   season?  When does it start and end?

19   A.      Practices start in the summer,

20   I think.

21   Q.      And when does the season end?

22   A.      I'm not sure.

23           Around like, maybe like the

24   beginning of June --- or November.

25   Q.      Okay.

45

1          So you're still in the midst of
2    the season and it's not come to an end
3    yet?
4    A.     Yes.
5    Q.     Okay.
6          And you think it ends some time
7    next month?
8    A.     Maybe.  I don't know.
9    Q.     Does cheerleading ever engage
10   in any activities on a Saturday,
11   unless Memorial --- well, Memorial Day
12   would be on Monday?
13   A.     I don't think so.
14   Q.     Homecoming, Friday night
15   usually?
16   A.     Yeah.
17   Q.     Does cheerleading engage in any
18   activities on a Sunday?
19   A.     No.
20   Q.     Where was the picture in
21   Exhibit D-1 taken?
22   A.     The Cocoa Hut.
23   Q.     And where's that located?
24   A.     In Mahanoy City.
25   Q.     And how do you actually get the

46

1    picture onto Snap?

2         Can you tell me the process?

3    A.    You would just like, take it

4    like --- there's like a button and you

5    just take the photo.

6    Q.    So do you have to go into the

7    Snap application?

8    A.    Yes.

9    Q.    And when you go into the Snap

10   application, the camera function of

11   the cell phone works.

12        Is that correct?

13   A.    Yes.

14   Q.    And there's a button on the

15   screen that you just push?

16   A.    Yes.

17   Q.    Okay.

18        And how do you get the words

19   that appear on that picture into the

20   Snap?

21   A.    You type it.

22   Q.    Okay.

23        So there's a place in the app

24   for words to be added to the picture.

25        Is that correct?

47

1      A.      Yes.

2      Q.      Okay.

3              Who typed the words?  You or

4      your friend?

5      A.      I think I did.

6      Q.      Please take a look at Exhibit

7      D-4.

8                          - - -

9                      (Whereupon, Defendant

10                     Exhibit 4, Student

11                     Handbook Page, was

12                     marked for

13                     identification.)

14                         - - -

15     BY ATTORNEY LEVIN:

16     Q.      It's behind tab four.

17             Am I correct that the school

18     district distributes student handbooks

19     every year?

20     A.      Yes.

21     Q.      And am I correct that the

22     student handbooks contain rules of

23     conduct?

24     A.      I guess.

25     Q.      Do you get that handbook every

48

1   year, since you've been in high

2   school?

3   A.      Yes.

4   Q.      And do you remember seeing this

5   page from the handbook last year?

6                   ATTORNEY HELFER:

7                   Object to form.

8                   Could you be more

9           specific about what time during

10          the year?

11                  ATTORNEY LEVIN:

12                  I'll be happy to ask her

13          that.

14                  THE WITNESS

15                  I don't remember.

16   BY ATTORNEY LEVIN:

17   Q.      You don't remember one way or

18   the other?

19   A.      I don't know.

20   Q.      They usually distribute the

21   handbooks at the beginning of the

22   school year.

23           Is that correct?

24   A.      Yes.

25   Q.      And as far as you remember, you

49

1    would have gotten a handbook at the

2    beginning of ninth grade.

3           Right?

4    A.    Yes.

5    Q.    And as far as you remember, you

6    would have gotten a handbook at the

7    beginning of tenth grade.

8           Right?

9    A.    Yes.

10   Q.    And as far as you remember, you

11   got another handbook this year.

12          Right?

13   A.    Yes.

14   Q.    And the handbooks, with respect

15   to the rules for behavior, basically

16   contain the same rules every year.

17          Right?

18   A.    I guess.

19   Q.    You don't remember there being

20   any differences; do you?

21   A.    No.

22                    ATTORNEY HELFER:

23                    Object to form.

24   BY ATTORNEY LEVIN:

25   Q.    Do you ever remember reading

50

1    this paragraph that is numbered eight,

2    personal conduct, before looking at it

3    just now?

4    A.    No.

5    Q.    Please take a look at Exhibit

6    D-3, which is behind tab three.

7                         - - -

8                    (Whereupon, Defendant

9                    Exhibit 3, Cheerleading

10                   Rules, was marked for

11                   identification.)

12                        - - -

13   BY ATTORNEY LEVIN:

14   Q.    Those are cheerleading rules.

15         Do you remember getting them?

16   A.    I don't remember.

17   Q.    Are you denying that you ever

18   got those before?

19   A.    No.  I don't remember them.

20   Q.    Okay.

21         Is it possible you got them and

22   you just don't remember?

23   A.    Yes.

24   Q.    Did you ever read them before?

25   Do you know?

51

1    A.      I don't remember.

2    Q.      The rules contain attendance

3    rules.  Take a look and read it.  And

4    then tell me when you're finished

5    reading.  I have some questions for

6    you.

7                        - - -

8    (WHEREUPON, WITNESS COMPLIES.)

9                        - - -

10   BY ATTORNEY LEVIN:

11   Q.      Did you have a chance to read

12   them?

13   A.      Yes.

14   Q.      Do you understand them?

15   A.      Yes.

16   Q.      Do you think they're

17   reasonable?

18   A.      Yes.

19   Q.      Take a look at the academic

20   policy rules.  Read them to yourself

21   and tell me when you're finished.

22                        - - -

23   (WHEREUPON, WITNESS COMPLIES.)

24                        - - -

25                   THE WITNESS:

52

1        I'm done.

2   BY ATTORNEY LEVIN:

3   Q.      Did you have a chance to read

4   them?

5   A.      Yes.

6   Q.      Did you understand them?

7   A.      Yes.

8   Q.      Do you think they're reasonable

9   and appropriate?

10  A.      Yes.

11  Q.      Do you know if cheerleading

12  falls under the PIAA rules?

13  A.      I'm not sure.

14  Q.      Do you know what PIAA is?

15  A.      No.

16  Q.      Did you ever hear of

17  Pennsylvania Interscholastic Athletic

18  Association?

19  A.      I think that's what, like the

20  sports are in.

21  Q.      Okay.

22  A.      Like football and basketball.

23  Q.      But you've never heard that

24  they have any jurisdiction over

25  cheerleading?

53

1      A.      No.

2      Q.      Okay.

3              Take a look at the ---.  Read

4      the rules under uniforms.  Tell me

5      when you're finished then.  And then

6      go onto the second page of the

7      exhibit.

8                              ---

9      (WHEREUPON, WITNESS COMPLIES.)

10                             ---

11     BY ATTORNEY LEVIN:

12     Q.      Did you read the rules

13     pertaining to uniforms?

14     A.      Yes.

15     Q.      Did you understand them?

16     A.      Yes.

17     Q.      Do you think they're reasonable

18     and appropriate?

19     A.      Yes.

20     Q.      Please take a look at the rules

21     under sportsmanship and

22     responsibility, slash, fundraising.

23     And tell me when you've finished

24     reading.

25                             ---

54

1    (WHEREUPON, WITNESS COMPLIES.)

2                    - - -

3    BY ATTORNEY LEVIN:

4    Q.    Did you finish reading?

5    A.    Yes.

6    Q.    Do you understand what the

7    rules say?

8    A.    Yes.

9    Q.    Do you think those rules are

10   reasonable and appropriate?

11              ATTORNEY HELFER:

12              I'm going to object to

13         form, but you can answer.

14   BY ATTORNEY LEVIN:

15   Q.    Do you think those rules are

16   reasonable and appropriate?

17   A.    I guess.  Yes.

18   Q.    And the last set of rules are

19   under the heading of technology.

20   Please read those and I'll ask you

21   some questions when you finish

22   reading.

23                   - - -

24   (WHEREUPON, WITNESS COMPLIES.)

25                   - - -

55

1    BY ATTORNEY LEVIN:

2    Q.     Did you have a chance to read

3    those rules?

4    A.     Yes.

5    Q.     Did you understand them?

6    A.     Somewhat.

7    Q.     Excuse me?

8    A.     Somewhat.

9    Q.     Okay.

10          Do you think those rules are

11   reasonable and appropriate?

12               ATTORNEY HELFER:

13               I'll object to form

14        again, but you can answer.

15               THE WITNESS:

16               I guess.

17   BY ATTORNEY LEVIN:

18   Q.     On the second page of that ---.

19               ---

20   (WHEREUPON, THERE WAS A BRIEF

21   INTERRUPTION IN THE PROCEEDINGS.)

22               ---

23               ATTORNEY LEVIN:

24               Let the record reflect

25        that the superintendent just

56

1          came into the deposition.

2                  Do you know everybody?

3                  DR. GREEN:

4                  Yes.  Well, I don't

5          know ---.

6                  ATTORNEY HELFER:

7                  Arleigh Helfer.

8                  DR. GREEN:

9                  Hi.  Mrs. Green.

10                 ATTORNEY LEVIN:

11                 He's representing the

12         Plaintiffs, along with the

13         ACLU.  He's from a different

14         firm.

15                 DR. GREEN:

16                 Okay.

17                 ATTORNEY LEVIN:

18                 Okay.

19     BY ATTORNEY LEVIN:

20     Q.    Under the sportsmanship rules,

21     the first bullet point says, please

22     have respect for your school, coaches,

23     teachers, other cheerleaders and

24     teams, end of quote.

25             Did I read that sentence

57

1    correctly?

2    A.    Yes.

3    Q.    Do you understand what that

4    says?

5    A.    I guess.

6    Q.    Do you think that's reasonable

7    and appropriate?

8    A.    I guess.

9    Q.    The next sentence says,

10   remember you are respecting your

11   school --- representing your school

12   when at games, fundraisers and other

13   events.

14         Did I read that correctly?

15   A.    Yes.

16   Q.    Do you understand that rule?

17   A.    Yes.

18   Q.    Do you think that that's

19   accurate?

20                  ATTORNEY HELFER:

21                  I'll object to form.

22                  You can answer.

23                  THE WITNESS:

24                  I guess.

25   BY ATTORNEY LEVIN:

58

1    Q.    Then the next sentence says,

2    quote, good sportsmanship will be

3    enforced.  This includes foul language

4    and inappropriate gestures, end of

5    quote.

6          Did I read that sentence

7    correctly?

8    A.    Yes.

9    Q.    Do you understand what that

10   says?

11   A.    Yes.

12   Q.    Do you think that's reasonable

13   and appropriate?

14                  ATTORNEY HELFER:

15                  And I'll object to form.

16                  You can answer.

17                  THE WITNESS:

18                  I guess.

19   BY ATTORNEY LEVIN:

20   Q.    Now, you would agree that the

21   word fuck is in violation of that

22   sentence; right?

23                  ATTORNEY HELFER:

24                  I'll object to form.

25                  THE WITNESS:

59

1           I guess, when you're
2        representing your school.
3  BY ATTORNEY LEVIN:
4  Q.    And you would agree that giving
5  the middle finger is an inappropriate
6  gesture?
7       Is that correct?
8            ATTORNEY HELFER:
9            And I'll object to form
10       again, but you can answer.
11           THE WITNESS:
12           Yes.
13  BY ATTORNEY LEVIN:
14  Q.    Do you think it's a proper and
15  laudable goal for schools --- for
16  public schools, to teach students to
17  have respect for others?
18  A.    Yes.
19  Q.    Do you agree that it's a proper
20  and laudable goal for school districts
21  to hold students accountable for not
22  following applicable rules?
23           ATTORNEY HELFER:
24           I'm going to object to
25       form.  Assumes the rules are

60

1      valid.

2   BY ATTORNEY LEVIN:

3   Q.      Would you agree with that?

4   A.      I guess.

5   Q.      Do you agree the cheerleaders

6   are representing their teams like the

7   rule states?

8   A.      When you're at games and all,

9   yes.

10  Q.      Do you live in the Mahanoy Area

11  School District?

12  A.      Like, do I live ---?

13  Q.      You gave an address.

14  A.      Yes.

15  Q.      It is within the boundaries of

16  the Mahanoy Area School District?

17  A.      Yes.

18  Q.      All right.

19          And can we agree that the

20  Mahanoy Area School District is a

21  small school district?

22  A.      Yes.

23  Q.      Would you agree that in

24  Mahanoy, it seems like everybody knows

25  everybody else?

61

1    A.      Yes.

2    Q.      Is that a yes?

3    A.      Yes.

4    Q.      Try to keep your voice up.

5    Okay?

6            And can we agree that in

7    Mahanoy, it's one of those places

8    where many people in the community

9    know the kids from the different teams

10   and squads, including the cheerleading

11   squad?

12   A.      I would assume.

13   Q.      Go back to Exhibit D-4 that you

14   looked at before.  It's behind tab

15   four.  The same rules that you see

16   here for personal conduct, that's

17   under the handbook this year.

18           Isn't that correct?

19                ATTORNEY HELFER:

20                Do you have a copy of

21           the handbook from this year?  I

22           don't have a copy?

23                ATTORNEY LEVIN:

24                I have a copy of a page.

25   BY ATTORNEY LEVIN:

62

1    Q.    But do you remember or don't

2    you know?

3                    ATTORNEY HELFER:

4                    I'll object to form.

5                    The documents speak for

6           themselves.  Asked and

7           answered.  She's already

8           testified she doesn't remember

9           reading it.

10   BY ATTORNEY LEVIN:

11   Q.    Do you know if the handbook

12   this year is the same as last year, in

13   --- with respect to this paragraph?

14   A.    I don't know.

15   Q.    The first sentence on the

16   paragraph dealing with personal

17   conduct says, participation on an

18   athletic team or cheerleading squad in

19   the Mahanoy Area School District is a

20   privilege.  The sentence continues on

21   but I'm going to stop there.

22          Do you agree with that or

23   disagree?

24                    ATTORNEY HELFER:

25                    I'm going to object to

63

1      form.

2  BY ATTORNEY LEVIN:

3  Q.     Do you agree or disagree?

4  A.     I don't ---.

5              ATTORNEY HELFER:

6              Do you understand what

7      it means?

8              THE WITNESS:

9              No.

10  BY ATTORNEY LEVIN:

11  Q.     You don't know what the word

12  privilege means?

13  A.     I don't understand it.

14  Q.     Do you agree with me that

15  students don't have the automatic

16  right to be on the cheerleading team?

17  A.     I guess.

18  Q.     Do you agree with me that

19  students have to meet certain

20  conditions in order to get on the

21  cheerleading team?

22  A.     Yes.

23  Q.     Do you agree with me the school

24  district has no duty to have a

25  cheerleading squad?

64

1          ATTORNEY HELFER:

2          I'm going to object to

3    the form.  I mean, if you know.

4          THE WITNESS:

5          I don't.

6          ATTORNEY HELFER:

7          I mean, do you

8    understand what he means by

9    duty?

10          ATTORNEY LEVIN:

11          Counsel, with all due

12    respect, you're allowed to put

13    on a form objection.  You're

14    not allowed to coach your

15    witness like that.

16          ATTORNEY HELFER:

17          Okay.

18          Well, I'll object to the

19    degree that you're using terms

20    with legal implications.  She's

21    not here to testify to the

22    legal meaning of things.  She

23    may not understand those.  So I

24    do expect the questions to be

25    fair.

65

ATTORNEY LEVIN:

1

2          Well, I'm entitled to

3     know what she knows and what

4     she doesn't.

5          ATTORNEY HELFER:

6          Oh, you do --- you

7     certainly are.

8          ATTORNEY LEVIN:

9          And you don't have to

10    tell her when she doesn't know

11    something.

12         ATTORNEY HELFER:

13         Okay.

14         Well, with all ---.

15    BY ATTORNEY LEVIN:

16    Q.    Do you have any knowledge ---?

17         ATTORNEY HELFER:

18         She's --- she is a

19    teenager and I will object if

20    you are going to ask her

21    questions in which you're using

22    legal terms without explaining

23    or defining those legal terms

24    for her.

25         ATTORNEY LEVIN:

66

1          Not a proper objection.

2    BY ATTORNEY LEVIN:

3    Q.     Do you know if the school

4    district has a duty to have a

5    cheerleading squad?

6    A.     I don't know.

7    Q.     Do you know if the school

8    district has the right to attach

9    whatever conditions it wants with

10   respect to it's cheerleading squad?

11   A.     I guess.  I don't know.

12   Q.     Do you agree with me that

13   cheerleading can be dangerous,

14   depending upon the stunts that the

15   team does?

16   A.     Yes.

17   Q.     Is it correct that cheerleaders

18   have to depend on other cheerleaders

19   to catch them for some of the

20   exercises?

21   A.     Yes.

22   Q.     Can you explain that?  Give us

23   some examples?

24   A.     Like if anyone was up and they

25   fall backwards, they have to like,

67

1    depend on the person in the back to

2    catch them.

3    Q.    Are there any other stunts that

4    your cheerleading squad does where

5    teammates have to depend on the others

6    to do what they're supposed to be

7    doing?

8    A.    All of them.

9                ATTORNEY HELFER:

10               Object to form.

11   BY ATTORNEY LEVIN:

12   Q.    Excuse me?

13   A.    All of them.  Like all of the

14   stunts, you have to depend on each

15   other.

16   Q.    Do the stunts have names?

17   A.    Some of them.

18   Q.    What are some of the names that

19   you remember?

20   A.    Like up at an extension.

21   Q.    I didn't hear that.

22         Extension?

23   A.    Yes.

24   Q.    And what's an extension?

25   A.    Well, I don't know how to

68

1    explain it.  You would like, go up and

2    in people's hands, I guess.  I don't

3    know how to explain it.

4    Q.     All right.

5           Give me another name of another

6    stunt?

7    A.     A lib.

8    Q.     I didn't hear that.

9    A.     A lib.

10   Q.     L-I-B?

11   A.     L-I --- yeah, I think.  I

12   guess.  I don't know.

13   Q.     Okay.

14          And what's a lib?

15   A.     You would basically do the same

16   thing as an extension, but with only

17   one foot instead of both.

18   Q.     Are there any other names of

19   any of the stunts?

20   A.     I don't know.

21          A flip we could do.

22   Q.     And what's a flip?

23   A.     You just like flip --- I don't

24   know how to explain it.

25   Q.     All right.

69

1          Any other names of any other

2    stunts?

3    A.     I don't think so.

4    Q.     And then there are some stunts

5    that the team does that don't have

6    names.

7          Is that correct?

8    A.     I guess.  That's --- what I

9    said was basically all we do.

10   Q.     You only do extensions, libs

11   and flips, as far as stunts go?

12   A.     And preps, which is like a

13   lower extension.

14   Q.     All right.

15         Any others?

16   A.     Not --- no.

17   Q.     All right.

18         And if any of the kids don't do

19   what they're supposed to do, somebody

20   could get injured.

21         Is that correct?

22   A.     Yes.

23   Q.     Would you agree with me that

24   one of the purposes of cheerleading is

25   to teach teambuilding?

70

1    A.      Yes.

2    Q.      When you were told that you

3    were being removed from the

4    cheerleading squad last year, did you

5    have to go to the doctor as the

6    result?

7                    ATTORNEY HELFER:

8                    Object to form.

9                    THE WITNESS:

10                   No.

11   BY ATTORNEY LEVIN:

12   Q.      Did you need any therapy or

13   other treatment as a result of being

14   removed from the cheerleading squad?

15   A.      No.

16   Q.      Have you incurred any expenses

17   for any medical services as a result

18   of being removed from the cheerleading

19   squad?

20   A.      No.

21   Q.      How did the other cheerleaders

22   treat you when you returned to the

23   cheerleading squad after the judge

24   granted the preliminary injunction?

25   A.      They were --- they acted how

71

1    they would act any other time.  Like,

2    they were friendly and fine.

3    Q.    Nobody mistreated you.

4          Is that correct?

5    A.    Not to me.

6          Like, they said stuff.

7    Q.    But not to you?

8          Is that correct?  You have give

9    a verbal response.

10   A.    Yes.

11   Q.    And you know that because other

12   people told you that?

13   A.    Yes.

14   Q.    You never heard it directly.

15         Is that correct?

16   A.    Yes.

17   Q.    Anybody bully you after you

18   returned to the team?

19   A.    No one said anything to me

20   about it.

21   Q.    Excuse me?  I didn't hear you?

22   A.    No one said anything to me

23   about it.

24   Q.    Any problems from any of the

25   coaches when you were put back on the

72

1    team?

2    A.      No.

3    Q.      Who told you that you were

4    being removed from the cheerleading

5    squad?

6    A.      Mrs. Luchetta.

7    Q.      And where were you and she when

8    she told you that?

9    A.      She called me to her room.

10   Q.      And is that where you were?

11   A.      Yes.

12   Q.      Which room was that?  Do you

13   remember?

14   A.      It was her old math room.

15   Q.      When you say her old math room,

16   you mean her former math room?

17   A.      I guess.  I don't know.

18   Q.      Did she change classrooms?

19   A.      Yeah.  A lot of ---.

20   Q.      Excuse me.  Let me turn this

21   off.

22   A.      A lot of teachers did.

23           A lot of the teachers did.

24   Q.      And is there anybody else who

25   overheard what she was telling you

73

1    when she told you you were being

2    removed?

3                    ATTORNEY HELFER:

4                    Object to form.

5                    THE WITNESS:

6                    No one else was in the

7              hallway --- or the classroom,

8              but there were people in the

9              hallway.

10   BY ATTORNEY LEVIN:

11   Q.    Okay.

12         Do you know if anybody

13   overheard what she was telling you?

14   A.    No.

15   Q.    What exactly did she tell you?

16   A.    She just showed me the picture.

17   And then said that it was

18   disrespectful towards her and that I

19   was kicked off.

20   Q.    All right.

21         And how did you respond if at

22   all?

23   A.    I cried.

24   Q.    Anything else?

25         Did you say anything?

74

1    A.      I don't remember.

2    Q.      All right.

3            And did she say anything else

4    after she said you were kicked off?

5    A.      I don't ---.  I don't know.

6    Q.      How long did you ---?  I assume

7    you were standing there when she told

8    you this or were you sitting?

9    A.      Standing.

10   Q.      How long did you stand there

11   before you left?

12   A.      A few minutes.  And then I went

13   to the office.

14   Q.      And who did you talk to?

15   A.      I called my mom and explained

16   it to my mom on the phone.

17   Q.      Did you use the school phone or

18   your cell phone?

19   A.      School phone.

20   Q.      And was anybody with you when

21   you were calling your mom from the

22   office?

23   A.      Mrs. Luchetta walked into the

24   office.

25   Q.      What --- during the time that

75

1    you left Mrs. Luchetta's room and

2    walking to the office before you got

3    to the office, did you and Mrs.

4    Luchetta say anything to each other?

5    A.     I don't remember.

6    Q.     When you got into the office

7    and before you picked up the phone,

8    did you and Mrs. Luchetta say anything

9    to each other?

10   A.     I don't think so.

11   Q.     When did Mrs. Luchetta leave

12   you?  Was she ---?

13   A.     After she talked to my mom.

14   Q.     Okay.

15          So she talked to your mom as

16   well?

17   A.     Yes.

18   Q.     Did you call or did Mrs.

19   Luchetta call your mom?

20   A.     I called my mom.

21   Q.     And how did Mrs. Luchetta get

22   on the phone?

23   A.     My mom asked to speak with her.

24   Q.     And put --- gave Mrs. Luchetta

25   the phone.

76

1    Is that correct?

2    A.    Yes.

3    Q.    What did you hear Mrs. Luchetta

4    say when she was on the phone with

5    your mom?

6    A.    I don't remember.

7    Q.    How long was the conversation

8    between Mrs. Luchetta and your mom on

9    the phone?

10   A.    I'm not sure.

11   Q.    And where in the office was the

12   call made from?

13   A.    It was like somewhere in one of

14   the like, separate rooms.

15   Q.    Is there ---?  I'm sorry.  I

16   didn't mean to interrupt.

17   A.    I don't know which room

18   specifically.

19   Q.    Was anybody else in the room

20   other than you and Mrs. Luchetta?

21   A.    There --- like right outside of

22   the door was the --- like the people

23   who work in the office.

24   Q.    But in the room itself, nobody

25   else?  Just you and Mrs. Luchetta?

77

1    A.      Yes.

2    Q.      All right.

3            And when Mrs. Luchetta finished

4    talking to your mom, then what

5    happened?

6    A.      Then I think I went to the

7    principal's office.

8            I don't remember.

9    Q.      And where did Mrs. Luchetta go?

10   Do you know?

11   A.      I don't know.

12   Q.      You parted ways at that point?

13   A.      I think.

14   Q.      And when you went to the

15   principal's office, did you talk to

16   anybody?

17   A.      Mr. Smith.

18   Q.      And Mr. Smith is who?

19   A.      The old principal.

20   Q.      And what did you say to Mr.

21   Smith?

22   A.      I think I asked him if there

23   was anything that I could do to be put

24   back on.  And he said that he can't go

25   against the coach's decisions.

78

1    Q.    Was anybody else present when

2    you were talking to Mr. Smith about

3    this?

4    A.    No.

5    Q.    And what else was said between

6    you and Mr. Smith at that point?

7    A.    He told me that I would have

8    been able to get disciplined because I

9    said school in there.

10         I think that's it.

11   Q.    All right.

12         How long was that conversation

13   between you and Mr. Smith?

14   A.    I don't remember.

15   Q.    Did you personally talk to Mr.

16   Smith at any other time about this

17   incident in any way?

18   A.    No.

19   Q.    Did you ever talk to Coach

20   Luchetta about the incident, other

21   than what you've already described the

22   morning that she told you you were

23   being removed from the team?

24   A.    No.

25   Q.    Did you ever talk to any other

79

1    school district administrator about

2    being removed from the team other than

3    the principal?

4    A.    No.

5                    ATTORNEY HELFER:

6                    I'll object to form.

7    BY ATTORNEY LEVIN:

8    Q.    No?

9    A.    No.

10   Q.    Now when you were removed from

11   the team for the 2017-18 school year,

12   you knew that you were allowed to try

13   out again for the 2018-19 school year.

14         Right?

15   A.    Yes.

16   Q.    In ninth grade, were you

17   involved in cheerleading?

18   A.    Yes.

19   Q.    Was it a school district team,

20   or a community team or what?

21   A.    The school's team.

22   Q.    Okay.

23         And was it junior varsity or

24   varsity?

25   A.    Junior varsity.

80

1    Q.    And to get onto junior varsity,

2    do you have to try out for that?

3    A.    Yes.

4    Q.    In eighth grade, were you on

5    any cheerleading team or squad?

6    A.    No.

7    Q.    In seventh grade, were you in

8    any cheerleading team or squad?

9    A.    No.

10    Q.    In sixth grade, were you in any

11    cheerleading team or squad?

12    A.    Yes.

13    Q.    And was this a school district

14    team, or a community team or something

15    else?

16    A.    That was the school's team.

17    Q.    Okay.

18    And what school were you in in

19    sixth grade?

20    A.    Mahanoy Middle School.

21    Q.    And it was a middle school

22    cheerleading team.

23    Is that correct?

24    A.    Yes.

25    Q.    And what activities did the

81

1    team cheer for?

2    A.      Football.

3    Q.      The high school team or was

4    there middle school football team?

5    A.      There is a fifth and sixth

6    grade team.

7                        - - -

8    (WHEREUPON, THERE WAS A BRIEF

9    INTERRUPTION IN THE PROCEEDINGS.)

10                       - - -

11                   ATTORNEY LEVIN:

12                   I thought I turned this

13        off.

14   BY ATTORNEY LEVIN:

15   Q.      And when was the middle school

16   football season?  Do you remember?

17   A.      I think it was the same --- I

18   think it's the same as the high school

19   season.

20   Q.      All right.

21           And are there any other

22   cheerleading activities in sixth-grade

23   cheerleading, other than cheering for

24   the football team during their season?

25   A.      I don't remember.

82

1   Q.     Did you go to the Memorial Day

2   Parade when you were in the sixth

3   grade team?

4   A.     I don't remember.

5   Q.     In fifth grade, were you on any

6   cheerleading teams?

7   A.     Yes.

8   Q.     Which one?

9   A.     The Mahanoy Area.  Like, the

10  same one.

11  Q.     Same one.

12         Is that the first year you were

13  ever in cheerleading?

14  A.     Yes.

15  Q.     Why did you stop cheerleading

16  after sixth grade, until you resumed

17  it again in ninth grade?

18  A.     I tried out my sixth grade year

19  and I didn't make it.  So I just

20  thought I wasn't going to make it, the

21  seventh grade team --- or 'cause I

22  tried out in sixth grade, at the end

23  of sixth grade.

24  Q.     For seventh grade?

25  A.     Yes.

83

1    Q.    And you didn't make it?

2    A.    Yeah.

3    Q.    Okay.

4          And did you try out at the end

5    of seventh grade for eighth grade?

6    A.    No.

7    Q.    Why not?

8    A.    Because I didn't think I was

9    going to make it.

10   Q.    And then at the end of eighth

11   grade, you tried out for the ninth

12   grade JV.

13         Is that correct?

14   A.    Yes.

15   Q.    Why did you think that you

16   might make it at that point?

17   A.    'Cause there was a different

18   coach and it was like different

19   judging.

20   Q.    Please take a look at Exhibit

21   D-11, behind tab 11.

22                        - - -

23              (Whereupon, Defendant

24              Exhibit 11, Complaint,

25              was marked for

84

1          identification.)

2              - - -

3    BY ATTORNEY LEVIN:

4    Q.    I'll represent to you that

5    that's a copy of the complaint that

6    was filed in this case.

7         Did you read this before it was

8    filed?

9    A.    I don't remember.

10   Q.    Do you know if it contains any

11   mistakes or errors?

12   A.    I don't know.

13   Q.    Please take a look at paragraph

14   26 of the complaint.

15        That says on or about Saturday,

16   May 28 you posted a Snap.

17        Do you see that?

18   A.    Yes.

19   Q.    I'm confused because when I

20   checked the calendar, the 28th is a

21   Sunday.

22        Do you remember if it was a

23   Saturday or a Sunday that you posted

24   the Snap?

25   A.    I don't know.

85

1    Q.    So you don't know if you posted

2    the Snap on the 27th or the 28th?

3          Is that correct?

4    A.    Yes.

5    Q.    Now in the Snap --- and if you

6    want to take a look at D-1 again.  You

7    said, quote, fuck school, end of

8    quote.

9          Right?

10   A.    Yes.

11   Q.    Were you referring to the

12   Mahanoy High School?

13   A.    I was just referring to school

14   in general.

15   Q.    Well, does it refer to any

16   school other than the Mahanoy School,

17   High School?

18                ATTORNEY HELFER:

19                Objection.  Asked and

20        answered.

21                THE WITNESS:

22                Not ---.

23   BY ATTORNEY LEVIN:

24   Q.    Excuse me?

25   A.    Not specifically.

86

1    Q.    And softball, you were

2    referring to the school's softball

3    team because you didn't get the

4    position you wanted.

5          Right?

6                ATTORNEY HELFER:

7                Objection to form.

8    A.    Not ---.

9                ATTORNEY HELFER:

10               Was it the school

11         softball team?

12               THE WITNESS:

13               It wasn't our softball

14         team.  It wasn't the school's

15         softball team.

16    BY ATTORNEY LEVIN:

17    Q.    Okay.

18          Cheer was the school's

19    cheerleading squad.

20          Right?

21    A.    I was just saying it in

22    general.  Like, I wasn't specifically

23    saying anything ---.

24    Q.    Were you referring to any other

25    cheerleading other than the

87

1    school ---?

2                     ATTORNEY HELFER:

3                     Objection.  She was

4         still answering.

5    BY ATTORNEY LEVIN:

6    Q.     I'm sorry, I thought ---.

7    A.     I said it because I was mad.

8    Q.     You were mad at ---?

9    A.     Because I didn't get ---.  I

10   didn't make it onto varsity.

11   Q.     And you didn't make it on the

12   varsity by the school district.

13          Right?

14   A.     Yes.

15   Q.     So you were mad at not getting

16   on the school district's varsity team,

17   so you said fuck cheer.

18          Right?

19   A.     Yes.

20   Q.     Would you agree that it would

21   be reasonable for a person reading

22   your Snap to think that you were

23   referring to the school district's

24   cheerleading squad when you said fuck

25   cheer?

88

1    A.      I guess.

2    Q.      Do you think it would be

3    reasonable for someone reading your

4    Snap, and knowing where you went to

5    school, that you were referring to the

6    high school when you said fuck school?

7    A.      I guess.

8    Q.      Please take a look at paragraph

9    63 of your complaint.

10            In that complaint, in that

11   paragraph it is alleged, quote, among

12   other benefits, students who

13   participate in extracurricular

14   activities are less likely to abuse

15   alcohol or drugs than students who do

16   not participate in extracurricular

17   activities.

18            Do you know anything about that

19   subject?

20   A.      No.

21   Q.      Paragraph 61, it's alleged

22   that, quote, being removed from the

23   squad impairs your opportunities to

24   gain admission to top colleges.

25            Do you see that?

89

1    A.     Yes.

2    Q.     Do you have any knowledge as to

3    the basis for that statement?

4    A.     No.

5    Q.     Please take a look at paragraph

6    62, where it's alleged sustained

7    participation in extracurricular

8    activities also has significant

9    benefits for student well-being.

10          Do you have any basis for that

11   statement?

12   A.     No.

13   Q.     I added page numbers on the

14   lower-right hand corner to make it

15   easier to identify pages.  Could you

16   go to page 12?  In paragraph E, it is

17   alleged that you're seeking damages in

18   amount to be determined by a trial.

19          What damages are you seeking?

20   Do you know?

21   A.     I don't know.

22   Q.     Do you think it's fair to keep

23   someone off of extracurricular

24   activities if they're struggling in

25   school?

90

1          ATTORNEY HELFER:

2               Object to the form.

3          THE WITNESS:

4               If they're eligible, I

5      guess.

6  BY ATTORNEY LEVIN:

7  Q.    Well, if they're struggling so

8  that they don't meet the academic

9  requirements, do you think it's fair

10 to keep them off?

11 A.    I guess.

12          ATTORNEY HELFER:

13               I'm going to object to

14      form.  You're asking for an

15      opinion not fact.

16 BY ATTORNEY LEVIN:

17 Q.    And why is it that you think

18 that's fair to keep them off if

19 they're struggling in school?

20          ATTORNEY HELFER:

21               Object to form.

22          THE WITNESS:

23               They have to stay off if

24      they're ineligible.  Like, if

25      they're failing two classes,

91

1          they get benched for it.

2          So ---.

3    BY ATTORNEY LEVIN:

4    Q.     The uniforms, who pays for them

5    for cheerleading?  Do you know?

6    A.     I don't know.

7    Q.     Do the --- does the school

8    district provide it to you?

9    A.     I guess.

10   Q.     Do you think that teaching

11   students that there are consequences

12   for crude and profane communications

13   on social media is a proper role for

14   school districts?

15                ATTORNEY HELFER:

16                I'm going to object to

17         the form.  It's calling for an

18         opinion.

19                THE WITNESS:

20                I don't know.

21   BY ATTORNEY LEVIN:

22   Q.     Do you know how your conduct

23   affected the other members of the

24   cheerleader squad last year?

25                ATTORNEY HELFER:

92

1          Object to form.

2          THE WITNESS:

3          None of them ever said

4     anything to me about it.

5     BY ATTORNEY LEVIN:

6     Q.    So is the answer you don't know

7     what affect it had on them?

8     A.    Yeah.  I don't know.

9     Q.    Do you know how it affected any

10    of the other cheerleaders that you

11    were allowed back on the cheerleading

12    squad?

13          ATTORNEY HELFER:

14          I'm going to object as

15     asked and answered.

16          THE WITNESS:

17          People were mad about it

18     I guess.

19    BY ATTORNEY LEVIN:

20    Q.    Okay.

21          And how do you know they were

22    mad about it?

23    A.    'Cause they said stuff and

24    other people heard it.

25    Q.    Did they say stuff to you?  Or

93

1    did other people tell you they said

2    stuff?

3                    ATTORNEY HELFER:

4                    Object to form.

5                    THE WITNESS:

6                    They didn't say anything

7           directly to me.

8    BY ATTORNEY LEVIN:

9    Q.      All right.

10           So anything you know about them

11   being mad is because somebody else

12   told you?

13   A.      Yes.

14   Q.      And did the people who told you

15   what other cheerleaders were saying or

16   were mad, did they tell you what they

17   were saying?

18   A.      I got told what one of them

19   said.

20   Q.      And who is the person who

21   allegedly said what you're going to

22   tell me about?

23   A.      P.B.

24   Q.      Okay.

25           And what did P.B. allegedly

94

1    say?

2    A.    All she said was that ---

3    because I didn't know one of the

4    cheers, so I stood out for it.  And

5    she said that if I'm just going to

6    keep doing that, then I shouldn't have

7    came back on.

8    Q.    You mean, if you stay out of

9    participating in a cheer that you

10   don't know about, you shouldn't have

11   come back on.

12         Is that your understanding?

13   A.    Yes.

14   Q.    And who told you that P.B. said

15   that?

16   A.    M., I think.

17   Q.    And is M. on the team?

18   A.    Yes.

19   Q.    And when did M. tell you that?

20   A.    I think it was like a few

21   minutes after she said it.

22   Q.    And do you remember the date

23   that this took place?

24   A.    No.

25   Q.    Did you complain to anybody

95

1    about what M. told you P. said?

2    A.      No.  I just went up and told my

3    mom.

4    Q.      And was this at a practice or

5    was this an event or what?

6    A.      A football game.

7    Q.      Do you remember which game it

8    was?

9    A.      No.

10   Q.      Do you remember who the other

11   team was?

12   A.      I don't remember.

13   Q.      Do you remember if it was a

14   home game or an away game?

15   A.      Home, I think.

16   Q.      And do you know if your mom did

17   anything when you told her that?

18   A.      I don't know.

19                   ATTORNEY HELFER:

20                   Just with regard to the

21           clock, it's 10:28.  So she's

22           going to have to leave in a

23           couple minutes.

24                   ATTORNEY LEVIN:

25                   All right.

96

1           Let me put on the record
2       that I'm not yet finished with
3       my questioning.  B.L. has a
4       game to go to.  So we agreed
5       that she would be able to leave
6       and we will reschedule the
7       continuation of her deposition
8       at a mutual convenient time.
9               Is that agreeable?
10          ATTORNEY HELFER:
11              Yes.  That's agreeable.
12          ATTORNEY LEVIN:
13              Okay.
14              Thank you very much.
15          *  *  *  *  *  *  *
16      DEPOSITION CONCLUDED AT 10:29 A.M.
17              *  *  *  *  *  *  *
18
19
20
21
22
23
24
25

97

```
1    COMMONWEALTH OF PENNSYLVANIA   )

2    COUNTY OF LUZERNE                )

3                  CERTIFICATE

4          I, Samantha Bruer, a Notary Public in

5    and for the Commonwealth of Pennsylvania, do

6    hereby certify:

7          That the witness, B.L., whose

8    testimony appears in the foregoing deposition,

9    was duly sworn by me on 10-24-18 and that the

10   transcribed deposition of said witness is a

11   true record of the testimony given by said

12   witness;

13         That the proceeding is herein recorded

14   fully and accurately;

15         That I am neither attorney nor counsel

16   for, nor related to any of the parties to the

17   action in which these depositions were taken,

18   and further that I am not a relative of any

19   attorney or counsel employed by the parties

20   hereto, or financially interested in this

21   action.

22   Dated the 26th day of November, 2018

23

24

25                        Samantha Bruer
```

COMMONWEALTH OF PENNSY
NOTARIAL SEAL
SAMANTHA BRUER, Notary
Wilkes-Barre, Luzerne Coun
My Commission Expires April

Court Reporter

Exhibit J

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT

OF PENNSYLVANIA

* * * * * * * *

B.L., a minor,          *

by and through her      *

father, LAWRENCE        *

LEVY and her            *

mother BETTY LOU        *

LEVY,                   *

     Plaintiffs          *   Case No.

     vs.                 *   3:17-CV-1734

MAHANOY AREA            *

SCHOOL DISTRICT,        *

     Defendant            *

       * * * * * * * *

DEPOSITION OF

B.L.

November 21, 2018

Any reproduction of this transcript is

prohibited without authorization by

the certifying agency.

```
 1                    D E P O S I T I O N

 2                         O F

 3    B.L., taken on behalf of the Defendant

 4    herein, pursuant to the Rules of Civil

 5    Procedure, taken before me, the

 6    undersigned, Samantha Bruer, a Court

 7    Reporter and Notary Public in and for

 8    the Commonwealth of Pennsylvania, at

 9    the offices of the Mahanoy Area School

10    District, 1 Golden Bear Drive, Mahanoy

11    City, Pennsylvania, on Wednesday,

12    November 21, 2018, beginning at

13    9:02 a.m.

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1               A P P E A R A N C E S

2

3    ARLEIGH P. HELFER, III, ESQUIRE

4    Schnader, Harrison, Segal & Lewis, LLP

5    1600 Market Street

6    Suite 3600

7    Philadelphia, PA   19103

8        COUNSEL FOR PLAINTIFFS

9

10   MICHAEL I. LEVIN, ESQUIRE

11   Levin Legal Group, P.C.

12   1301 Masons Mill Business Park

13   1800 Byberry Road

14   Suite 1301

15   Huntingdon Valley, PA   19006

16       COUNSEL FOR DEFENDANT

17

18

19

20

21

22

23

24

25

4

1                         I N D E X

2

3    WITNESS: B.L.

4    EXAMINATION

5       By Attorney Levin              7  -  4 2

6    EXAMINATION

7       By Attorney Helfer                   4 3

8    CERTIFICATE                              4 4

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                        E X H I B I T   P A G E

2

3                                           P A G E

4    N U M B E R          D E S C R I P T I O N        I D E N T I F I E D

5    D e f e n d a n t ' s :

6    E x h i b i t   1 4   2 0 1 8   S t u d e n t

7                        H a n d b o o k ,

8                        P a g e s   6 1 - 6 2              9

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1                    OBJECTION PAGE

2

3      ATTORNEY                                    PAGE

4      Helfer        10,  10,  11,  12,  13,  13,  14

5                    15,  16,  17,  18,  19,  20,  20

6                    21,  21,  22,  22,  26,  27,  28

7                    29,  30,  30,  31,  31,  32,  32

8                    32,  33,  33,  34,  35,  35,  36

9                         37,  38,  39,  40,  40

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1          S T I P U L A T I O N

2    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3    (It is hereby stipulated and agreed by

4    and between counsel for the respective

5    parties that reading, signing,

6    sealing, certification and filing are

7    waived.)

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

9          P R O C E E D I N G S

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

11              B.L.,

12   CALLED AS A WITNESS IN THE FOLLOWING

13   PROCEEDING, AND HAVING FIRST BEEN DULY

14   SWORN, TESTIFIED AND SAID AS FOLLOWS:

15              - - -

16          EXAMINATION

17              - - -

18   BY ATTORNEY LEVIN:

19   Q.     Good morning, B.  Thank you for

20   coming again this morning.  Sorry to

21   inconvenience you.  I gave you

22   instructions at the beginning the last

23   time I took your deposition several

24   weeks ago.  Would you like me to

25   repeat those instructions or do you

Sargent's Court Reporting Service, Inc.
(814) 536-8908

8

1    think you remember?

2    A.     I think I remember.

3    Q.     Okay.

4           Good.  In front of you is the

5    same exhibit book that we handed you

6    last time.  I want to open it up to

7    behind tab four.

8           Okay?

9           Do you recognize that as one of

10   the pages from the student handbook?

11   A.     Yes.

12   Q.     Okay.

13          That's Exhibit D-4.

14          Right?

15   A.     Yes.

16   Q.     That's what it's been marked.

17   Did you read the paragraph dealing

18   with personal conduct when you got the

19   book or at any time after you got the

20   handbook?

21   A.     No.

22   Q.     I'm going to show you what I

23   have marked as D-14, which I'll

24   represent to you is this year's

25   version of the handbook.

9

1                         - - -

2                     (Whereupon, Defendant's

3                     Exhibit 14, 2018

4                     Student Handbook, pages

5                     61-62, was marked for

6                     identification.)

7                         - - -

8    BY ATTORNEY LEVIN:

9    Q.      And do you see on the top of

10   the --- let me repeat my description.

11          This is two pages from this

12   year's handbook.  It's not the whole

13   handbook, and the two pages that are

14   copies are pages 61 and 62 of the

15   handbook.  Did you get the handbook

16   again this school year?

17   A.      Yes.

18   Q.      And do you see that there in

19   paragraph 8 is a paragraph dealing

20   with personal conduct?

21   A.      Yes.

22   Q.      Okay.

23          And you understood when you got

24   the handbook that students were

25   required to comply with the rules

10

1   contained in the handbooks.

2        Right?

3   A.    Yes.

4   Q.    Okay.

5        Did you ever object to the

6   rules contained in the handbook other

7   than filing this litigation?

8              ATTORNEY HELFER:

9              I'll object to form, but

10       you can answer.

11             THE WITNESS:

12             No.

13  BY ATTORNEY LEVIN:

14  Q.    Okay.

15       Did you ever ask anybody for

16  any clarification as to what the rules

17  meant?

18             ATTORNEY HELFER:

19             I'm going to object to

20       form again.  You can answer.

21             THE WITNESS:

22             No.

23  BY ATTORNEY LEVIN:

24  Q.    Did you ever speak out against

25  any of the rules in the handbook,

11

1    either last year or this year?

2                    ATTORNEY HELFER:

3                    I'm going to object to

4           form again.  You can answer.

5                    THE WITNESS:

6                    No.

7    BY ATTORNEY LEVIN:

8    Q.     Please take a look at Exhibit

9    D-3 that's behind tab three.  Can we

10   agree that these are the cheerleading

11   rules that were given to the

12   cheerleaders last school year?

13   A.     Yes.

14   Q.     And were similar rules given to

15   the cheerleaders this year?

16   A.     I don't remember.

17   Q.     Okay.

18          And did you object to anybody

19   when you got these rules about

20   anything in the rules?

21   A.     No.

22   Q.     Did you indicate to anybody

23   that you didn't understand what the

24   rules said?

25   A.     No.

12

1    Q.    Did you file any complaints

2    with anybody in the school district

3    about the rules?

4    A.    No.

5                    ATTORNEY HELFER:

6                    I'm going to object to

7            form, but you can answer.

8    BY ATTORNEY LEVIN:

9    Q.    Please take a look at Exhibit

10   D-18 --- or excuse me, D-12, I'm

11   sorry.

12   A.    Okay.

13   Q.    Okay.

14          Do you recognize that as a

15   permission form that you and your

16   parents signed at the beginning of

17   this school year?

18   A.    Yes.

19   Q.    Okay.

20          And you remember that your

21   parents initialed it where we have the

22   redactions?

23   A.    Yes.

24   Q.    Okay.

25          Did you question anybody about

13

1  the meaning of anything that's stated

2  on this permission form?

3  A.    No.

4  Q.    Can we agree that cheerleading

5  is a team activity?

6           ATTORNEY HELFER:

7           I'm going to object as

8       asked and answered.

9           THE WITNESS:

10          Yes.

11 BY ATTORNEY LEVIN:

12 Q.    And can we agree that your

13 decision to participate on

14 cheerleading is totally voluntary on

15 your part?

16 A.    Yes.

17          ATTORNEY HELFER:

18          I'll object to form, you

19      can answer.

20 BY ATTORNEY LEVIN:

21 Q.    There are no requirements for

22 you to participate in any

23 extracurricular activities in order to

24 graduate, are there?

25          ATTORNEY HELFER:

14

1          Object to form, you can

2      answer.

3              THE WITNESS:

4              No.

5  BY ATTORNEY LEVIN:

6  Q.      And no one forced you or made

7  you join cheerleading.

8          Is that correct?

9  A.      Yes.

10 Q.      Where were you when you signed

11 the permission form?

12 A.      I'm not sure, probably at my

13 house.

14 Q.      And was anybody from the school

15 district with you when you signed the

16 permission form?

17 A.      No.

18 Q.      Were your parents with you when

19 you signed the permission form?

20 A.      I'd assume.

21 Q.      Did anybody at the school

22 district force you to sign the

23 permission form?

24 A.      No.

25 Q.      Can we agree that the school

15

1    district's decision to fund

2    cheerleading is totally voluntary by

3    the school district?

4                    ATTORNEY HELFER:

5                    I'm going to object to

6          form.  I have no idea how she

7          could know that.

8                    ATTORNEY LEVIN:

9                    Do you know or ---?

10                   THE WITNESS:

11                   I don't know, no.

12   BY ATTORNEY LEVIN:

13   Q.    Are you aware of any

14   requirement that requires the school

15   district to fund cheerleading if it

16   decides that it doesn't want to

17   provide a cheerleading opportunity?

18   A.    I don't know.

19   Q.    Please take a look at Exhibit

20   D-3 --- excuse me, we already went

21   over that.  And these rules contain

22   attendance rules.

23         Right?  D-3, are you looking at

24   D ---?

25   A.    Yes.

16

1    Q.    Okay.

2         Is there anything about the

3    attendance rules that you don't

4    understand?

5                   ATTORNEY HELFER:

6              If you need to take some

7         time to read them, go ahead.

8                   THE WITNESS:

9              I understand them.

10   BY ATTORNEY LEVIN:

11   Q.    Do you think the attendance

12   rules are reasonable and appropriate?

13                  ATTORNEY HELFER:

14             I'm going to object to

15        the form.  You're asking for a

16        legal conclusion from a ---

17        from a student.

18                  ATTORNEY LEVIN:

19             Well, I'm not asking for

20        anything involving legality,

21        I'm asking a normal, regular

22        interpretation of the words

23        reasonable and appropriate.  Do

24        you think the attendance rules

25        are reasonable and appropriate?

17

1            ATTORNEY HELFER:

2               I'm going to object to

3   the form again.  You're asking

4   for an opinion from a lay

5   witness.

6            ATTORNEY LEVIN:

7               Do you think they're

8   reasonable and appropriate?

9            ATTORNEY HELFER:

10             Object to form.

11            THE WITNESS:

12             Yes.

13  BY ATTORNEY LEVIN:

14  Q.    Okay.

15           Is there anything you don't

16  understand about the attendance rules?

17  A.    No.

18  Q.    Do you know if cheerleading

19  falls under the PIAA rules?

20  A.    I don't know.

21  Q.    Did you see the academic rules?

22  Do you think that they're reasonable

23  and appropriate?

24            ATTORNEY HELFER:

25             Object to the form.  It

18

1        calls for a legal opinion.

2              THE WITNESS:

3              Yes.

4    BY ATTORNEY LEVIN:

5    Q.    Do you think the rules about

6    uniforms are reasonable and

7    appropriate?

8              ATTORNEY HELFER:

9              I'd make the same

10        objection to form, calling for

11        a legal opinion.

12              THE WITNESS:

13              Yes.

14    BY ATTORNEY LEVIN:

15    Q.    Do you think the rules about

16    sportsmanship, responsibility and

17    fundraising are reasonable and

18    appropriate?

19              ATTORNEY HELFER:

20              Object to form, calling

21        for a legal opinion.

22              THE WITNESS:

23              I guess, yeah.

24    BY ATTORNEY LEVIN:

25    Q.    Do you think the rules about

19

1  technology are reasonable and

2  appropriate?

3                    ATTORNEY HELFER:

4                    Same objection.

5                    THE WITNESS:

6                    I guess.

7  BY ATTORNEY LEVIN:

8  Q.     On the second page of the rules

9  under the sportsmanship section, the

10  rule states, quote, please have

11  respect for your school, coaches,

12  teachers, other cheerleaders and

13  teams. Remember, you are representing

14  your school when at games, fundraisers

15  and other events. Good sportsmanship

16  will be enforced. This includes foul

17  language and any inappropriate

18  gestures.

19           Did I read that correctly?

20  A.     Yes.

21  Q.     Do you agree that it's a

22  reasonable and appropriate rule for

23  cheerleaders to have respect for

24  school, coaches, teachers and other

25  cheerleaders and teams?

20

1          ATTORNEY HELFER:

2          I'm going to make the

3     same objection, you can answer.

4          THE WITNESS:

5          I guess.

6 BY ATTORNEY LEVIN:

7 Q.    And you know what that means.

8     Right?  You're not confused

9 about what that means, are you?

10          ATTORNEY HELFER:

11          I'm going to object to

12     form.  What what means?

13          ATTORNEY LEVIN:

14          The rules that I just

15     read.

16          THE WITNESS:

17          I understand them.

18          ATTORNEY HELFER:

19          Same objection.

20          ATTORNEY LEVIN:

21          Okay.

22          Got it?  Did you get ---

23          COURT REPORTER:

24          Yes.

25          ATTORNEY LEVIN:

21

1              --- she said she

2        understands them?

3  BY ATTORNEY LEVIN:

4  Q.     Okay.

5         And do you agree that it is a

6  proper and laudable goal for public

7  schools to teach students to have

8  respect for others?

9              ATTORNEY HELFER:

10             Object to form.

11             THE WITNESS:

12             Yes.

13 BY ATTORNEY LEVIN:

14 Q.     Do you agree that it's a proper

15 and laudable goal for school districts

16 to hold students accountable for not

17 following applicable rules?

18             ATTORNEY HELFER:

19             I'm going to object to

20        form.  Are you talking about

21        valid rules or invalid rules?

22             ATTORNEY LEVIN:

23             You're allowed to answer

24        the question.

25             THE WITNESS:

22

1                     Yes.

2    BY ATTORNEY LEVIN:

3    Q.     Do you agree the cheerleaders

4    are representing their teams like the

5    rule states?

6                     ATTORNEY HELFER:

7                     Object to the form.

8                     THE WITNESS:

9                     Yes.

10   BY ATTORNEY LEVIN:

11   Q.     Please take a look at Exhibit

12   D-11.  Can we agree that that's the

13   complaint that you filed in this case?

14   A.     Yes.

15   Q.     Please take a look at paragraph

16   26 of the complaint.  And if I asked

17   you this at the last time, I'm sorry.

18   It says on Saturday, May 28th, you

19   posted this snap.  May 28th is a

20   Sunday.

21          Do you remember now whether you

22   posted it on Saturday or Sunday?

23                     ATTORNEY HELFER:

24                     I will object as asked

25          and answered.

23

1          THE WITNESS:

2             I don't remember.

3  BY ATTORNEY LEVIN:

4  Q.     And did you go and double-check

5  after we had the last deposition as to

6  whether it was a Saturday or Sunday?

7  A.     No.

8  Q.     On page six --- excuse me,

9  paragraph 63 of the complaint, when

10  you get there, read it to yourself and

11  then I'll ask you a question when

12  you're finished.

13  A.     I'm done.

14  Q.     Okay.

15         You --- do you know where they

16  got that information that students who

17  participate in extracurricular

18  activities are less likely to abuse

19  alcohol or drugs?

20  A.     I don't know.

21  Q.     Please take a look at 61, where

22  it is alleged that being removed from

23  the squad impairs B.L. --- that's you,

24  right ---

25  A.     Yes.

24

1 Q. --- opportunities to gain

2 admission to top colleges.  What's the

3 basis for that allegation?

4   Do you know?

5 A. I don't know.

6 Q. You're a senior --- I mean,

7 you're in 11th grade.

8   Right?

9 A. Yes.

10 Q. Okay.

11   So you haven't started applying

12 for college yet.

13   Is that correct?

14 A. Yes.

15 Q. Have you taken the SATs yet?

16 A. No.

17 Q. Where do you currently think

18 you'd like to go to college?

19 A. Bloomsburg.

20 Q. And do you know anything about

21 Bloomsburg's cheerleading

22 opportunities?

23 A. No.

24 Q. Have you looked at Bloomsburg's

25 cheerleading opportunities to even

25

1    know if they have a cheerleading

2    squad?

3    A.    No.

4    Q.    Do you know anything about how

5    Bloomsburg views cheerleading in terms

6    of its enrollment and acceptance

7    process?

8    A.    I don't know.

9    Q.    Have you researched any

10   colleges or universities to determine

11   what role, if any, your activity of

12   cheerleading has with getting into

13   those schools and colleges?

14   A.    No.

15   Q.    Has anybody told you from any

16   college or university that you would

17   qualify for any scholarships by virtue

18   of your activities on cheerleading?

19   A.    No.

20   Q.    Paragraph 62 alleges that,

21   quote, sustained participation in

22   extracurricular activities also has

23   significant benefits for student

24   wellbeing, end of quote.

25        Did I read that correctly?

26

1    A.    Yes.

2    Q.    Can you tell me what benefit

3    your participation in cheerleading has

4    had on your well-being?

5                ATTORNEY HELFER:

6                I'm going to object to

7         form.

8                THE WITNESS:

9                I don't know.

10   BY ATTORNEY LEVIN:

11   Q.    Okay.

12         Please turn to page 12 of the

13   transcript, and you'll notice that

14   there are page numbers at the bottom

15   of each page.  I added those page

16   numbers for ease of reference.

17         Are you on page 12?

18   A.    Yes.

19                ATTORNEY HELFER:

20                And just for

21         clarification of the record,

22         you referred to transcript.  I

23         think you were still referring

24         to the complaint?

25                ATTORNEY LEVIN:

27

1              Oh, if I misspoke, thank

2        you for pointing that out.   I

3        am still referring to the

4        complaint.

5    BY ATTORNEY LEVIN:

6    Q.      In paragraph E on that page,

7    you're asking the Court to, quote,

8    award plaintiff damages in an amount

9    determined at trial, end of quote.

10             Did I read that correctly?

11   A.      Yes.

12   Q.      Do you know what damages you

13   are seeking?

14   A.      No.

15   Q.      Do you agree that participation

16   in extracurricular activities is a

17   privilege and not a right?

18                ATTORNEY HELFER:

19             I'm going to object to

20        the form.

21                THE WITNESS:

22             I guess.

23   BY ATTORNEY LEVIN:

24   Q.      That's consistent with your

25   understanding?

28

1   A.      Yes.

2   Q.      And do you agree that students

3   can be excluded from extracurricular

4   activities simply because they're not

5   good enough to participate?

6                   ATTORNEY HELFER:

7                   I'll object to form.

8                   THE WITNESS:

9                   I don't know.

10  BY ATTORNEY LEVIN:

11  Q.      Well, you would agree that with

12  cheerleading, if you don't meet the

13  standards for the tryouts, you don't

14  get to participate.

15          Right?

16  A.      Yes.

17  Q.      And you're aware that similar

18  rules apply with respect to other

19  teams.

20          Right?

21  A.      Yes.

22  Q.      I think you said that you were

23  on another team.

24          Right?

25  A.      Cross country.

29

1    Q.      Cross country.  And do you have

2    to try out for that and meet certain

3    standards?

4    A.      No.

5    Q.      Okay.

6            So everybody gets to be on

7    cross country regardless of their

8    capabilities?

9    A.      Yes.

10   Q.      Okay.

11           Do you know which sports in the

12   school district require tryouts and a

13   certain minimum level of proficiency

14   in order to get on the team and which

15   ones don't?

16                   ATTORNEY HELFER:

17                   I'm going to object to

18           form.

19                   THE WITNESS:

20                   I'm not sure.

21   BY ATTORNEY LEVIN:

22   Q.      Do you agree that there are

23   certain extracurricular activities in

24   the school district where students can

25   be excluded if their grades are not

30

1    good enough?

2    A.    Yes.

3    Q.    Do you think it's fair to keep

4    someone off of an extracurricular

5    activity if they're struggling in

6    school with their grades?

7                    ATTORNEY HELFER:

8                    I'd object to the form.

9            It's calling for an opinion.

10           You can answer.

11                   THE WITNESS:

12                   Yes.

13   BY ATTORNEY LEVIN:

14   Q.    Do you think a school district

15   should have any right as to how it

16   allows students which --- to wear

17   uniforms that the school buys and pays

18   for?

19                   ATTORNEY HELFER:

20                   Object to the form.

21                   THE WITNESS:

22                   Yes.

23   BY ATTORNEY LEVIN:

24   Q.    Do you think that teaching

25   students that there are consequences

31

1   for crude and profane communications

2   on social media is a proper role for

3   school districts?

4                   ATTORNEY HELFER:

5                   I'm going to object to

6       the form.

7                   THE WITNESS:

8                   I guess.

9   BY ATTORNEY LEVIN:

10  Q.      Which takes more time, the

11  cheerleading or the cross country, do

12  you know?  What's your best estimate?

13  A.      I'm not ---.

14                  ATTORNEY HELFER:

15                  I'm going to object.

16      Are you asking in terms of her

17      time or ---?

18                  ATTORNEY LEVIN:

19                  Oh, yeah, in terms

20      of ---.

21                  THE WITNESS:

22                  Cheer probably was.

23  BY ATTORNEY LEVIN:

24  Q.      Okay.

25          Is it close, do you think?

32

1    A.    I'm not sure.

2    Q.    Does the cheerleading squad

3    ever perform outside of the Mahanoy

4    School District, in other words, at

5    away games?

6             ATTORNEY HELFER:

7             I'm going to object as

8        asked and answered.

9             THE WITNESS:

10            Yes.

11    BY ATTORNEY LEVIN:

12    Q.    And how does the squad get to

13    away games?

14             ATTORNEY HELFER:

15            Same objection.

16             THE WITNESS:

17            Take a bus.

18    BY ATTORNEY LEVIN:

19    Q.    Is it on the same bus as the

20    football team, for example, or is it a

21    different bus?

22    A.    No.

23             ATTORNEY HELFER:

24            Same objection.

25             THE WITNESS:

33

1           It's a different bus.

2    BY ATTORNEY LEVIN:

3    Q.     Are there any other students on

4    the bus other than the cheerleaders?

5               ATTORNEY HELFER:

6               Same objection.

7               THE WITNESS:

8               Yes.

9    BY ATTORNEY LEVIN:

10   Q.     And who else is on the bus

11   other than the cheerleaders?

12              ATTORNEY HELFER:

13              Same objection.

14              THE WITNESS:

15              The band front.

16   BY ATTORNEY LEVIN:

17   Q.     Do you know anything about an

18   organization called the National

19   Scouting Report, NSR for short?

20   A.     I don't know.

21   Q.     Have you or your parents been

22   contacted by NSR about your

23   cheerleading?

24              ATTORNEY HELFER:

25              I'm going to object.   I

34

1          think she already answered that
2          she doesn't know what the
3          organization is.
4                    THE WITNESS:
5                    I don't know.
6     BY ATTORNEY LEVIN:
7     Q.     Do you know anything about an
8     organization called the College
9     Cheerleading Recording (sic) Group ---
10    Recruiting Group?
11    A.     No.
12    Q.     Have you ever been contacted by
13    any group called the cheerleading ---
14    College Cheerleading Recording (sic)
15    Group?
16                   ATTORNEY HELFER:
17                   Same objection.
18                   THE WITNESS:
19                   No.
20    BY ATTORNEY LEVIN:
21    Q.     Do you know what skillset
22    colleges and universities look for in
23    order to select a student for their
24    cheerleading squad?
25    A.     I don't know.

35

1    Q.    Do you have any evidence if

2    colleges or universities would know

3    that you were removed from the junior

4    varsity cheerleading squad last year?

5    A.    I'm not sure.

6    Q.    Does that mean you know of no

7    evidence that they get that

8    information?

9                    ATTORNEY HELFER:

10                    I'm going to object to

11         form.

12                    THE WITNESS:

13                    I --- I guess they can.

14         I don't know.

15   BY ATTORNEY LEVIN:

16   Q.    You don't know? Do you know

17   what weight, if any, colleges and

18   universities give to participation in

19   junior varsity cheerleading in tenth

20   grade?

21   A.    I don't --- I don't know.

22   Q.    Okay.

23                    You obviously know who Ms.

24   Luchetta is.

25                    Right?

36

1 A. Yes.

2 Q. And you were in attendance at

3 the preliminary injunction hearing in

4 this case on October 2, 2017.

5  Is that correct?

6 A. Yes.

7 Q. You heard Ms. Luchetta testify

8 at that hearing.

9  Is that correct?

10 A. Yes.

11 Q. Ms. Luchetta testified that the

12 main purpose of the rules is not only

13 to teach students that they have to

14 follow the rules, and if they don't

15 follow the rules, there's

16 consequences. But in addition, that

17 the school wants to teach them team

18 building skills.

19  Do you remember her testimony

20 about that?

21   ATTORNEY HELFER:

22   Object to form.

23   THE WITNESS:

24   I don't remember.

25 BY ATTORNEY LEVIN:

37

1   Q.      Do you have any evidence to the

2   contrary, to contradict her testimony

3   as I've just summarized it for you?

4   A.      I guess not.

5   Q.      Please take a look at Exhibit

6   D-13.  Can we agree that that's a

7   permission form that your parents and

8   your sister signed this year?

9   A.      I don't --- my sister?

10  Q.      You have a sister or a brother.

11  I forget what you told me.

12  A.      I have a brother.

13  Q.      Okay.

14          Didn't your brother sign this

15  form?

16  A.      I guess.

17                  ATTORNEY HELFER:

18                  Object to form.

19  BY ATTORNEY LEVIN:

20  Q.      This indicates that the

21  homeroom teacher is Gettig.

22          Do you see that?

23  A.      Yes.

24  Q.      Is that your understanding

25  that's your brother's homeroom

38

1    teacher?

2    A.     I guess.   I don't know what his

3    homeroom is.

4    Q.     Do you have any notes or

5    records about anything that occurred

6    with cheerleading last year?

7    A.     I don't know.

8    Q.     Well, did you prepare any

9    notes?  Did you keep any journals?  Do

10   you have ---

11   A.     No.

12   Q.     --- a calendar where you put

13   notes down about anything that

14   happened at cheerleading last year?

15              ATTORNEY HELFER:

16              I'm going to object to

17        form.  You can answer.

18              THE WITNESS:

19              No.

20   BY ATTORNEY LEVIN:

21   Q.     Do you have any notes, records

22   of things that happened at

23   cheerleading this year?

24   A.     No.

25              ATTORNEY HELFER:

39

1    Can we take a quick
2    break?  Do you want a tissue?
3    - - -
4    (WHEREUPON, AN OFF RECORD DISCUSSION
5    WAS HELD.)
6    - - -
7    BY ATTORNEY LEVIN:
8    Q.    Please take a look at Exhibit
9    D-7.  That's an application that you
10   signed back in 2017.
11   Is that correct?
12   A.    Yes.
13   Q.    Did you read the application
14   before you signed it?
15   A.    I don't remember.
16   Q.    On that form, towards the
17   bottom, it asks you to list your
18   extracurricular activities.  The first
19   one says Interact Club.
20   What is that?
21   ATTORNEY HELFER:
22   Object as asked and
23   answered, but you can answer.
24   THE WITNESS;
25   Interact Club is like

40

1           Meals on Wheels.  Like we

2           deliver meals to the elderly.

3    BY ATTORNEY LEVIN:

4    Q.      Okay.

5           Did you object to anything that

6    was stated on this application at any

7    time?

8                   ATTORNEY HELFER:

9                   Objection to form.

10                  THE WITNESS:

11                  I don't remember.

12   BY ATTORNEY LEVIN:

13   Q.      Did you file any complaints

14   with anybody about what was stated on

15   this form?

16                  ATTOENY HELFER:

17                  Object to form, you can

18          answer.

19                  THE WITNESS:

20                  I don't think so.

21   BY ATTORNEY LEVIN:

22   Q.      What do you want from this

23   lawsuit?

24   A.      I don't know.

25                  ATTORNEY LEVIN:

41

1           Were you able to hear

2       that?

3           COURT REPORTER:

4           She said I don't know.

5           Correct?

6           ATTORNEY LEVIN:

7           Yes.  Try to keep your

8       voice up.

9   BY ATTORNEY LEVIN:

10  Q.     When you returned to

11  cheerleading after the Judge granted

12  the preliminary injunction in this

13  case --- the same two coaches as

14  before.

15          Is that correct?

16  A.     Yes.

17  Q.     How did the coaches treat you

18  when you returned to the cheerleading

19  squad?

20  A.     Fine, I guess.

21  Q.     Can we agree that both of the

22  coaches are also teachers in the

23  district?

24  A.     Yes.

25  Q.     Did you have either of the

42

1    coaches as a teacher?

2    A.      Mrs. Luchetta.

3    Q.      And what subject did she teach

4    you?

5    A.      Geometry.

6    Q.      And did you have her last

7    school year, the 2017-18 school year,

8    or do you have her this school year

9    the '17 --- '18-'19 school year?

10   Excuse me.

11   A.      Last school year.

12   Q.      Okay.

13           And how did she treat you as a

14   teacher last school year?

15   A.      Fine.

16                   ATTORNEY LEVIN:

17                   I have nothing further.

18                   ATTORNEY HELFER:

19                   Okay.

20                   ATTORNEY LEVIN:

21                   That's your reward for

22           being short, succinct and

23           responsive.  I assume you have

24           no questions?

25                   ATTORNEY HELFER:

43

1            I only have one

2        question.

3              - - -

4        EXAMINATION

5              - - -

6  BY ATTORNEY HELFER:

7  Q.    To use opposing Counsel's

8  terminology of reasonable and

9  appropriate, do you believe it's

10  reasonable and appropriate for a

11  school district to force students to

12  comply with rules that violate the

13  student's constitutional rights?

14  A.    No.

15            ATTORNEY HELFER:

16            Okay.   That's all.

17        Okay.   Thank you.

18            ATTORNEY LEVIN:

19            Thank you.

20            *  *  *  *  *  *  *  *

21     DEPOSITION CONCLUDED AT 9:30 A.M.

22            *  *  *  *  *  *  *  *

23

24

25

44

1    COMMONWEALTH OF PENNSYLVANIA   )

2    COUNTY OF LUZERNE              )

3                   CERTIFICATE

4          I, Samantha Bruer, a Notary Public in

5    and for the Commonwealth of Pennsylvania, do

6    hereby certify:

7          That the witness, B.L., whose

8    testimony appears in the foregoing deposition,

9    was duly sworn by me on 11-21-18 and that the

10   transcribed deposition of said witness is a

11   true record of the testimony given by said

12   witness;

13         That the proceeding is herein recorded

14   fully and accurately;

15         That I am neither attorney nor counsel

16   for, nor related to any of the parties to the

17   action in which these depositions were taken,

18   and further that I am not a relative of any

19   attorney or counsel employed by the parties

20   hereto, or financially interested in this

21   action.

22   Dated the 7th day of December, 2018

23   COMMONWEALTH OF PENNSYLVANIA
        NOTARIAL SEAL
24   SAMANTHA BRUER, Notary Public
     Wilkes-Barre, Luzerne County, PA                Court Reporter
25   My Commission Expires April 15, 2019
                                                     Samantha Bruer

**A**

a.m 2:14
43:21
able 41:1
abuse 23:18
academic
17:21
acceptance
25:6
accountable
21:16
accurately
44:14
action 44:17
44:21
activities
13:23
23:18
25:18,22
27:16 28:4
29:23
39:18
activity
13:5 25:11
30:5
added 26:15
addition
36:16
admission
24:2
agency 1:25
ago 7:24
agree 11:10
13:4,12
14:25
19:21 21:5
21:14 22:3
22:12
27:15 28:2
28:11
29:22 37:6
41:21
agreed 7:3
ahead 16:7
alcohol
23:19
allegation
24:3
alleged
23:22

alleges
25:20
allowed
21:23
allows 30:16
amount 27:8
answer 10:10
10:20 11:4
12:7 13:19
14:2 20:3
21:23
30:10
38:17
39:23
40:18
answered
13:8 22:25
32:8 34:1
39:23
anybody
10:15
11:18,22
12:2,25
14:14,21
25:15
40:14
appears 44:8
applicable
21:17
application
39:9,13
40:6
apply 28:18
applying
24:11
appropriate
16:12,23
16:25 17:8
17:23 18:7
18:18 19:2
19:22 43:9
43:10
Area 1:13
2:10
ARLEIGH 3:3
asked 13:8
22:16,24
32:8 39:22
asking 16:15
16:19,21

17:3 27:7
31:16
asks 39:17
assume 14:20
42:23
attendance
15:22 16:3
16:11,24
17:16 36:2
ATTOENY
40:16
attorney 4:5
4:7 6:3
7:18 9:8
10:8,13,18
10:23 11:2
11:7 12:5
12:8 13:6
13:11,17
13:20,25
14:5 15:4
15:8,12
16:5,10,13
16:18 17:1
17:6,9,13
17:24 18:4
18:8,14,19
18:24 19:3
19:7 20:1
20:6,10,13
20:18,20
20:25 21:3
21:9,13,18
21:22 22:2
22:6,10,23
23:3 26:5
26:10,19
26:25 27:5
27:18,23
28:6,10
29:16,21
30:7,13,19
30:23 31:4
31:9,14,18
31:23 32:6
32:11,14
32:18,23
33:2,5,9
33:12,16
33:24 34:6

34:16,20
35:9,15
36:21,25
37:17,19
38:15,20
38:25 39:7
39:21 40:3
40:8,12,21
40:25 41:6
41:9 42:16
42:18,20
42:25 43:6
43:15,18
44:15,19
authoriz...
1:24
award 27:8
aware 15:13
28:17

**B**

B 7:19
B.L 1:5,19
2:4 4:3
7:11 23:23
44:7
back 39:10
band 33:15
basis 24:3
Bear 2:11
beginning
2:13 7:22
12:16
behalf 2:4
believe 43:9
benefit 26:2
benefits
25:23
best 31:12
BETTY 1:9
Bloomsburg
24:19 25:5
Bloomsbu...
24:21,24
book 8:5,19
bottom 26:14
39:17
break 39:2
brother
37:10,12

37:14
brother's
37:25
Bruer 2:7
44:4,25
building
36:18
bus 32:17,19
32:21 33:1
33:4,10
Business
3:12
buys 30:17
Byberry 3:13

**C**

C 3:1 7:9
calendar
38:12
called 7:12
33:18 34:8
34:13
calling
18:10,20
30:9
calls 18:1
capabili...
29:8
case 1:11
22:13 36:4
41:13
certain 29:2
29:13,23
CERTIFICATE
4:8 44:3
certific...
7:6
certify 44:6
certifying
1:25
Cheer 31:22
cheerlea...
11:12,15
19:12,23
19:25 22:3
33:4,11
cheerlea...
11:10 13:4
13:14 14:7
15:2,15,17

| | | | |
|---|---|---|---|
| **first** 7:13 39:18 | **G** | 35:13 37:4 37:16 38:2 41:20 | 43:6,15 |
| **follow** 36:14 36:15 | G 7:9 | | **hereto** 44:20 |
| **following** 7:12 21:17 | **gain** 24:1 | **H** | **hold** 21:16 |
| **FOLLOWS** 7:14 | **games** 19:14 32:5,13 | **handbook** 5:7 | **homeroom** 37:21,25 38:3 |
| **football** 32:20 | **Geometry** 42:5 | 8:10,20,25 9:4,12,13 | **house** 14:13 |
| **force** 14:22 43:11 | **gestures** 19:18 | 9:15,15,24 10:6,25 | **Huntingdon** 3:15 |
| **forced** 14:6 | **Gettig** 37:21 | **handbooks** 10:1 | |
| **foregoing** 44:8 | **getting** 25:12 | **handed** 8:5 | **I** |
| **forget** 37:11 | **give** 35:18 | **happened** 38:14,22 | **I'd** 14:20 18:9 30:8 |
| **form** 10:9,20 11:4 12:7 | **given** 11:11 11:14 44:11 | **Harrison** 3:4 | **I'll** 8:23 10:9 13:18 23:11 28:7 |
| 12:15 13:2 13:18 14:1 | **go** 16:7 23:4 24:18 | **haven't** 24:11 | **I'm** 8:22 10:19 11:3 |
| 14:11,16 14:19,23 | **goal** 21:6,15 | **hear** 41:1 | 12:6,10 13:7 14:12 |
| 15:6 16:15 17:3,10,25 | **going** 8:22 10:19 11:3 | **heard** 36:7 | 15:5 16:14 16:19,21 |
| 18:10,20 20:12 | 12:6 13:7 15:5 16:14 | **hearing** 36:3 36:8 | 17:2 20:2 20:11 |
| 21:10,20 22:7 26:7 | 17:2 20:2 20:11 | **HELD** 39:5 | 21:19 22:17 |
| 27:20 28:7 29:18 30:8 | 21:19 26:6 27:19 | **Helfer** 3:3 4:7 6:4 | 23:13 26:6 27:19 |
| 30:20 31:6 35:11 | 29:17 31:5 31:15 32:7 | 10:8,18 11:2 12:5 | 29:17,20 31:5,13,15 |
| 36:22 37:7 37:15,18 | 33:25 35:10 38:16 | 13:6,17,25 15:4 16:5 | 32:1,7 33:25 35:5 |
| 38:17 39:16 40:9 | **Golden** 2:11 | 16:13 17:1 17:9,24 | 35:10 38:16 |
| 40:15,17 | **good** 7:19 8:4 19:15 | 18:8,19 19:3 20:1 | **I've** 37:3 |
| **foul** 19:16 | 28:5 30:1 | 20:10,18 21:9,18 | **idea** 15:6 |
| **four** 8:7 | **grade** 24:7 35:20 | 22:6,23 26:5,19 | **identifi...** 9:6 |
| **front** 8:4 33:15 | **grades** 29:25 30:6 | 27:18 28:6 29:16 30:7 | **IDENTIFIED** 5:4 |
| **fully** 44:14 | **graduate** 13:24 | 30:19 31:4 31:14 32:6 | **III** 3:3 |
| **fund** 15:1,15 | **granted** 41:11 | 32:14,23 33:5,12,24 | **impairs** 23:23 |
| **fundraisers** 19:14 | **group** 3:11 34:9,10,13 | 34:16 35:9 36:21 | **inapprop...** 19:17 |
| **fundraising** 18:17 | 34:15 | 37:17 38:15,25 | **includes** 19:16 |
| **further** 42:17 44:18 | **guess** 18:23 19:6 20:5 | 39:21 40:8 40:16 | **inconven...** 7:21 |
| | 27:22 31:8 | 42:18,25 | **indicate** |

| | |
|---|---|
| 11:22 | |
| **indicates** 37:20 | |
| **information** 23:16 35:8 | |
| **initialed** 12:21 | |
| **injunction** 36:3 41:12 | |
| **instruct...** 7:22,25 | |
| **Interact** 39:19,25 | |
| **interested** 44:20 | |
| **interpre...** 16:22 | |
| **invalid** 21:21 | |
| **involving** 16:20 | |
| **it's** 8:16 9:12 19:21 21:14 30:3 30:9 33:1 43:9 | |

| **J** |
|---|
| **join** 14:7 |
| **journals** 38:9 |
| **Judge** 41:11 |
| **junior** 35:3 35:19 |

| **K** |
|---|
| **keep** 30:3 38:9 41:7 |
| **know** 15:7,9 15:11,18 17:18,20 20:7 23:15 23:20 24:4 24:5,20 25:1,4,8 26:9 27:12 28:9 29:11 31:12 33:17,20 34:2,5,7 |

37:7
**personal**
8:18 9:20
**Philadel...**
3:7
**PIAA** 17:19
**plaintiff**
27:8
**Plaintiffs**
1:11 3:8
**please** 11:8
12:9 15:19
19:10
22:11,15
23:21
26:12 37:5
39:8
**pointing**
27:2
**posted** 22:19
22:22
**preliminary**
36:3 41:12
**prepare** 38:8
**privilege**
27:14
**probably**
14:12
31:22
**Procedure**
2:6
**proceeding**
7:13 44:13
**process** 25:7
**profane** 31:1
**proficiency**
29:13
**prohibited**
1:24
**proper** 21:6
21:14 31:2
**provide**
15:17
**public** 2:8
21:6 44:4
**purpose**
36:12
**pursuant** 2:5
**put** 38:12

**Q**
**qualify**
25:17
**question**
12:25
21:24
23:11 43:2
**questions**
42:24
**quick** 39:1
**quote** 19:10
25:21,24
27:7,9

**R**
**R** 3:1 7:9
**read** 8:17
16:7 19:19
20:15
23:10
25:25
27:10
39:13
**reading** 7:5
**reasonable**
16:12,23
16:25 17:8
17:22 18:6
18:17 19:1
19:22 43:8
43:10
**recognize**
8:9 12:14
**record** 26:21
39:4 44:11
**recorded**
44:13
**Recording**
34:9,14
**records** 38:5
38:21
**Recruiting**
34:10
**redactions**
12:22
**reference**
26:16
**referred**
26:22
**referring**

26:23 27:3
**regardless**
29:7
**regular**
16:21
**related**
44:16
**relative**
44:18
**remember** 8:1
8:2 11:16
12:20
19:13
22:21 23:2
36:19,24
39:15
40:11
**removed**
23:22 35:3
**repeat** 7:25
9:10
**Report** 33:19
**Reporter** 2:8
20:23 41:3
**represent**
8:24
**represen...**
19:13 22:4
**reproduc...**
1:23
**require**
29:12
**required**
9:25
**requirement**
15:14
**requirem...**
13:21
**requires**
15:14
**researched**
25:9
**respect**
19:11,23
21:8 28:18
**respective**
7:4
**responsi...**
18:16
**responsive**

42:23
**returned**
41:10,18
**reward** 42:21
**right** 8:14
10:2 15:23
20:8 23:24
24:8 27:17
28:15,20
28:24
30:15
35:25
**rights** 43:13
**Road** 3:13
**role** 25:11
31:2
**rule** 19:10
19:22 22:5
**rules** 2:5
9:25 10:6
10:16,25
11:11,14
11:19,20
11:24 12:3
15:21,22
16:3,12,24
17:16,19
17:21 18:5
18:15,25
19:8 20:14
21:17,21
21:21
28:18
36:12,14
36:15
43:12

**S**
**S** 3:1 7:1,9
**Samantha** 2:7
44:4,25
**SATs** 24:15
**Saturday**
22:18,22
23:6
**says** 22:18
39:19
**Schnader** 3:4
**scholars...**
25:17

**school** 1:14
2:10 9:16
11:12 12:2
12:17
14:14,21
14:25 15:3
15:14
19:11,14
19:24
21:15
29:12,24
30:6,14,17
31:3 32:4
36:17 42:7
42:7,8,9
42:11,14
43:11
**schools** 21:7
25:13
**Scouting**
33:19
**sealing** 7:6
**second** 19:8
**section** 19:9
**see** 9:9,18
17:21
37:22
**seeking**
27:13
**Segal** 3:4
**select** 34:23
**senior** 24:6
**short** 33:19
42:22
**show** 8:22
**sic** 34:9,14
**sign** 14:22
37:14
**signed** 12:16
14:10,15
14:19 37:8
39:10,14
**significant**
25:23
**signing** 7:5
**similar**
11:14
28:17
**simply** 28:4
**sister** 37:8

38:18
39:24
40:10,19
44:7,10,12
**words** 16:22
32:4

**X**

**X** 4:1

**Y**

**yeah** 18:23
31:19
**year** 9:16
11:1,1,12
11:15
12:17 35:4
37:8 38:6
38:14,23
42:7,7,8,9
42:11,14
**year's** 8:24
9:12
**you'd** 24:18
**you'll** 26:13
**you're** 16:15
17:3 20:8
21:23
23:12 24:6
24:7 27:7
28:17

**Z**

**0**

**1**

**1** 2:11
**10** 6:4,4
**11** 6:4
**11-21-18**
44:9
**11th** 24:7
**12** 6:4 26:12
26:17
**13** 6:4,4
**1301** 3:12,14
**14** 5:6 6:4
9:3
**15** 6:5

**16** 6:5
**1600** 3:5
**17** 6:5 42:9
**18** 6:5
**18-'19** 42:9
**1800** 3:13
**19** 6:5
**19006** 3:15
**19103** 3:7

**2**

**2** 36:4
**20** 6:5,5
**2017** 36:4
39:10
**2017-18** 42:7
**2018** 1:20
2:13 5:6
9:3 44:22
**21** 1:20 2:13
6:6,6
**22** 6:6,6
**26** 6:6 22:16
**27** 6:6
**28** 6:6
**28th** 22:18
22:19
**29** 6:7

**3**

**3:17-CV-...**
1:12
**30** 6:7,7
**31** 6:7,7
**32** 6:7,7,8
**33** 6:8,8
**34** 6:8
**35** 6:8,8
**36** 6:8
**3600** 3:6
**37** 6:9
**38** 6:9
**39** 6:9

**4**

**40** 6:9,9
**42** 4:5
**43** 4:7
**44** 4:8

**5**

**6**

**61** 9:14
23:21
**61-62** 5:8
9:5
**62** 9:14
25:20
**63** 23:9

**7**

**7** 4:5
**7th** 44:22

**8**

**8** 9:19

**9**

**9** 5:8
**9:02** 2:14
**9:30** 43:21

1

1                      INITIAL PAGE

2

3   <u>Actual Name</u>     ,                            <u>Initials Used</u>

4   Brandy Levy                                B.L., B.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25