# Exhibit L

2017-2018

# Mahanoy Area High School Cheerleading Rules

*All of the information below is at the coaches' discretions and rules may be subject to change. If there is a situation with extreme circumstances, it will be addressed at that time.*

## ATTENDANCE

- All cheerleaders must attend every practice and workshop. Vacations and absences from school are the only acceptable excuses. Coaches must be given a written notice at least one week in advance for vacations/trips to be considered excused. <u>Non-school related activities and work are not acceptable excuses.</u> (Internships are not excused). Other sporting activities will be accommodated as much as possible. If you are too sick to attend practice/game and were present in school, a doctor's note is required or you will be benched for the next game.
- All games are mandatory. Only acceptable excuses are as above.
- If unable to attend practice or a game you (yourself) must call or text Miss Luchetta or Mrs. Gnall. If a coach is not contacted prior to the practice/game you will be benched for the next game.
- All cheerleaders will ride to and from the games on the bus. If you would like to leave with a parent or guardian, you must fill out the transportation form and hand it in to the office prior to the game. See coaches for such forms.
- Buses are scheduled to leave at a certain time. The bus will not wait. If you are not on the bus at the scheduled time, the bus will leave without you. This will be considered an unexcused absence.

## ACADEMIC POLICY

- All cheerleaders must be academically eligible (you are ineligible if you are failing two or more classes) to participate at games.
- Eligibility reports are usually created every Sunday Evening and will be in effect until the following Sunday when the new report is run.
- If you are academically ineligible for three consecutive weeks, you will be dismissed from the team.

## UNIFORMS

- Uniforms are to be worn at cheerleading functions <u>only</u>.
- Uniforms should be machine washed **weekly** and line dried during regular season.
- All uniforms, including sneakers, must be kept clean at all times
- When going to and from games you must wear your uniform and warm-ups.
- Absolutely NO JEWLERY should be worn at practice or games.
- Any tattoos or piercings should not be visible.



EXHIBIT

D-3

MASD000003

- Artificial nails are not allowed at any time, polish must be removed for games (unless using clear polish).
- Chewing gum is not allowed at practice/games
- Hair must be pulled back at all times. A cheerleading bow must be worn at all games. Headbands or other hair accessories are not allowed. If your hair is too short for a pony tail you must have the sides pulled up off your face.
- All hair color must be natural.

## Sportsmanship and Responsibilities/Fundraising

- Please have respect for your school, coaches, teachers, other cheerleaders and teams. Remember, you are representing your school when at games, fundraisers, and other events. Good sportsmanship will be enforced, this includes foul language and inappropriate gestures.
- All other school rules apply when at sporting events.
- If a cheerleader is benched three times they will be dismissed from the squad.
- Each cheerleader must have a physical completed between June 1st and August 15th in order to be able to participate. If unable to participate this is considered an unexcused absence. Please see the high school nurse for forms and more information.
- Fundraising is mandatory. Each cheerleader must raise at least $60 per year (or pay the boosters this fee) to remain on the squad. If the $60 is not met the cheerleader will not be able to cheer the following year until their debt is paid off. Several fundraiser will take place throughout the year to meet this requirement.

## Technology

- The use of cell phones is prohibited during games and other events.
- There will be no toleration of any negative information regarding cheerleading, cheerleaders, or coaches placed on the internet.

Exhibit M

Lawrence Levy
527 East Market Street
Mahanoy City, Pa 17948
570-728-4031

June 9, 2017

Mahanoy Area School District
1 Golden Bear Drive
Mahanoy City, Pa 17948

Dear Dr. Green\Mr. Smith\Mr. Cray

On June 1, 2017 Brandi Levy was informed by Mrs. Luchetta the Mahanoy Area Junior Varsity coach that she was dismissed from the team due to a snap chat. I respectfully ask that you review this case and overrule the decision of Mrs. Luchetta.

 Further review alleges Brandi took a snap chat picture of herself and a friend and that the snap chat read "fuck cheer, fuck softball, fuck everything".  The snap chat was taken and occurred on a Saturday off campus, not during any school function and not during the sports season as all sporting events have concluded prior to the alleged snap chat. There is no direct indication of The Mahanoy Area School District mentioned in that snap chat. Only the word "cheer" which Mrs. Luchetta can only take by assumption the statement referred to Mahanoy Area Junior Varsity Cheerleading. Therefore, there was no tarnish to the squad, school or substantial disruption in the school or its functions.

While the School District and its officials may have the authority to a certain extent to regulate speech, obscenity, social media activity and behavior on campus and during school sponsored events the School District and its officials do not have the authority to regulate those in an off campus setting unless they prove by evidence that the action of the students opinion or speech which is protected under the First Amendment of the U.S. Constitution Causes substantial disruption to the school and was not just deemed unpleasant by an individual.

### Amendment I U.S. Constitution

*Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.*

The standard that was set to determine substantial disruption is in the landmark case of Tinker Vs. Des Moines:

***Tinker v. Des Moines School District***, 393 U.S. 503 (1969) – In *Tinker*, the Court addressed a First Amendment claim brought on behalf of students who wore black armbands to school to publicize their objection to the Vietnam War. The students were sent home and suspended pursuant to a ban on armbands that had been adopted two days before expressly in anticipation of such a show of protest. Writing for the majority, Justice Fortas held that "the wearing of armbands in the circumstances of this case was entirely

1

BL0002

divorced from actually or potentially disruptive conduct by those participating in it," and that the expression was "entitled to comprehensive protection under the First Amendment." In ruling for the students, the Court established a "substantial disruption" standard as the test for justification of State suppression of student speech:

*In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden right would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school," the prohibition cannot be sustained.*

While the alleged statement that was indicated in the snap chat may have caused discomfort or unpleasantness to coach Luchetta, the statement clearly did not cause any substantial disruption in the school or school function.

There are dozens of case law that would support Brandi Levy's First Amendment right as in the below case where the third circuit court found that the school district violated a students first amendment right. The court ruled the district had no authority to punish a student for profane or lewd language during non-school hours.

**J.S. ex rel. Snyder v. Blue Mountain School District**, 650 F.3d 915 (3d Cir. June 13, 2011), cert. denied, --- S. Ct. ---, 2012 WL 117558 (Jan. 17, 2012) – In Snyder, the Third Circuit, sitting en banc, held in a fractured 8-6 decision that a school district violated a student's First Amendment rights when it suspended him for creating a fake MySpace profile about his principal that insinuated the principal was a sex addict and pedophile. Assuming without deciding that Tinker applies to off-campus speech, the court held that the profile did not cause an actual school disruption and there were not "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities" because the profile was "so outrageous that no one took its content seriously." (Five of the eight judges in the majority would have held that the Tinker exception for potentially disruptive speech does not apply to off-campus speech at all.) The court further held that the *Fraser* exception, which permits schools to regulate obscene speech that "had an effect on the school and the educational mission," only applies to on-campus speech. As such, the court ruled the district had no authority to punish a student for profane or lewd language during non-school hours.

**Layshock v. Hermitage School District**, 650 F.3d 205 (3d Cir. June 13, 2011), *cert. denied by Blue Mountain Sch. Dist. v. J.S. ex rel. Snyder*, --- S. Ct. ---, 2012 WL 117558 (Jan. 17, 2012) – In *Layshock*, the Third Circuit, in a unanimous *en banc* opinion, upheld a lower court's ruling that a school district, principal, and other officials had violated a student's First Amendment rights by imposing discipline after he had created a "fake" Internet profile of his principal on MySpace. The fake profile attributed quotes to the principal concerning alleged drug use, criminal behavior, and sexual innuendo. The court held that the school district did not have authority to punish the student for his expression outside of the school even though it was lewd and vulgar, and even though his speech reached inside the school: "*Fraser* does not allow the school district to punish Justin for expressive conduct which occurred outside of the school context."

2

BL0003

*Killion v. Franklin Regional School District* (2001) Pennsylvania high-school student, Zachariah Paul, created a top 10 list on his website that targeted his school's athletic director. Mr. Paul was apparently angry because he was refused a student-parking permit due to new rules impacting the school's track team. The student e-mailed a copy of the list from his home computer to his friends, and several weeks later copies of the list were distributed around the school.

School officials at Franklin Regional High School considered Paul's language to be abusive, lewd, and vulgar and moved to suspend the student. A federal district court, however, ruled in the student's favor, and reasoned that while the website was both derogatory and insulting, the school failed to prove that the website caused a substantial threat to the operation of the school. Furthermore, based on the fact that the list was created off school grounds on the student's personal computer, the Pennsylvania court concluded that Paul's suspension was not valid.

The A.C.L.U. has an extensive 80 page handbook on student rights in public schools. On page 15 titled **Internet and Social Media** reads as follows:

*The First Amendment also protects the free speech rights of internet users, including public school students. A lot of questions haven't been completely answered yet, but the following are some guidelines.*

### *The Basics*
*• School officials are allowed to limit students' internet activity done on school-owned computers.*
*• Generally school officials cannot punish students for what they post online when they are at home or away from school.*
*• School officials cannot stop students from posting to social networking sites, like Facebook, when they are outside of school.*

### *Can school officials punish students for what they say on personal or social networking sites when done off-campus?*

***Generally no***, *but there may be some exceptions. Schools cannot control what you say or post on the internet on your own time using your own computer if you do not physically bring it onto school property. This is true even if you are discussing school. The school may be able to punish you for off-campus speech that disrupts the school, makes a threat against a teacher or another student, or amounts to severe harassment. You would need to do more than just offend a school official to be disciplined.*

There are many more cases within the court system that were found in protecting student's rights. The above mentioned case laws were those of a more severe nature then what we currently have at hand with Brandi. Based on our discussion and relevant case law I request the immediate re-instatement of Brandi to the Mahanoy Area Junior Varsity Cheerleading as the discipline decided upon is unconstitutional.

Sincerely,

3

BL0004

Exhibit N

   

← **Joie Katulis Green**  

Your day
Add something to your day



# Joie Katulis Green

48 mutual friends including L David Truskowsky and Dawn May

Works at Scentsy and Mahanoy Area School District

AUG 11 AT 12:47 PM

Larry...tried to send u this text but it came back wrong number. So I am.messaging you here.

Larry...fyi...the board decided to support the cheer coaches and their decision to remove your daughter from the team. However, she is able to try out again next year.





     

BL0009

Exhibit O

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| B.L., a minor, by her father,<br>LAWRENCE LEVY, and her mother,<br>BETTY LOU LEVY | : | |
| | : | Civil Action No. 3:17-cv-1734 |
| Plaintiffs, | : | (The Hon. A. Richard Caputo) |
| v. | : | |
| MAHANOY AREA SCHOOL DISTRICT, | : | |
| Defendant. | : | |

**DEFENDANT'S OBJECTIONS AND RESPONSES
TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

The Defendant Mahanoy Area School District (the "District"), by and through its counsel, the Levin Legal Group, P.C., hereby submits objections and responses to the Plaintiff's First Set of Interrogatories Addressed to Defendant (the "Interrogatories") served by the Plaintiff in this action.

**GENERAL OBJECTIONS**

1.     The Defendant objects to each instruction, definition, and interrogatory to the extent that it purports to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure and the applicable Rules and Orders of the Court.

1

2.     In responding to these Interrogatories, the Defendant has made a reasonable inquiry of those persons likely to possess the information requested. To the extent that the Plaintiff requests that the Defendant go to greater lengths, the Defendant objects to the Interrogatories as overly broad, unduly burdensome, and unreasonable.

3.     The Defendant objects to these Interrogatories, individually and generally, to the extent that they seek information protected by the attorney-client privilege, the attorney-work product doctrine, and/or any other applicable privilege. Should any such disclosure by the Defendant occur, it is inadvertent and shall not constitute a waiver of any privilege.

4.     The Defendant objects to these Interrogatories, individually and generally, to the extent that they seek disclosure of matter that is neither material nor necessary in the prosecution or defense of this action.

5.     The Defendant objects to these Interrogatories, individually and generally, to the extent they seek information protected from disclosure by applicable federal or state law.

6.     The Defendant objects to these Interrogatories, individually and generally, to the extent they seek confidential information that is protected from disclosure.

2

7.    The Defendant objects to these Interrogatories, individually and generally, to the extent that they seek information or documents that are in the public record, equally available to the Plaintiff as to the Defendant, or already in the Plaintiff's possession.

8.    The Defendant objects to the Interrogatories to the extent that they are not properly limited in scope and seek information or documents relating to time periods that are not at issue in this litigation.  Accordingly, the District will provide information dating back to January 1, 2017, except as otherwise noted.

**9.**    The Defendant incorporates by reference every general objection set forth above into each specific response set forth below.  A specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response does not waive any general objection to that request.  Moreover, the Defendant does not waive its right to amend the responses.

## RESPONSES

1.    Explain how you learned about the existence of the Snap or came into possession of the Snap, including who told you about it or gave it to you, which MASD employee, representative, or agent received it or learned about it, when they received or learned about it, and everything they were told about it.

3

**Response:** The District objects to this interrogatory on the grounds that the details regarding how the District learned of the Snap's existence is irrelevant to this action.  Subject to and without waiving this objection, the District states as follows:  Cheerleading Co-Advisor April Gnall was informed by cheerleading team member S.G. in a telephone call on the evening of May 29, 2017, that B.L. had posted the Snap and another offensive Snap, and Sydney described the content of the Snaps.  S.G. had learned about the Snaps when cheerleader D.F. shared them with her while the two were studying together.   On May 30, 2017, April Gnall informed Co-Advisor Nicole Luchetta-Rump about the Snap and provided her with a photograph of the Snap.  Luchetta-Rump was also verbally informed about the Snap on May 30, 2017, by D.F., who said that B.L. had made posts to Snapchat that were "really bad."  D.F. was angry and upset, and asked what would be done about the posts.  Another non-cheerleader student, T.B., informed Luchetta-Rump sometime after May 29, 2017, that B.L. was making negative posts about cheerleading on social media, but she was unable to find examples to show Luchetta-Rump because the posts had apparently been deleted.  (The District does not know if the post referenced was the Snap.)  Another cheerleader, P.B., also told Luchetta-Rump that B.L. was making social media posts complaining about not making the varsity team, and P.B. expressed that she was very upset by the posts.


2.     Identify every form of discipline or punishment that you levied

against B.L. relating to the Snap.

**Response:  As punishment for violation the MAHS Cheerleading Rules and the District's Discipline Code, B.L. was suspended from the Mahanoy Area High School cheerleading team for the 2017-2018 school year.  B.L. was reinstated to the team in October 2017 following the entry of the temporary injunction in this litigation.**


3.     Identify all MASD employees, representatives, or agents involved in

deciding to punish B.L. for posting the Snap or involved in upholding the decision

to punish B.L., identify the extent of such person's involvement in deciding to

4

punish B.L. or in implementing such punishment, identify when such involvement of decisions occurred, and identify all of the reasons and bases (including, *e.g.*, school conduct codes) for each such person's decision and related actions.

**Response:** **After viewing the Snap, cheerleading co-advisors April Gnall and Nicole Luchetta-Rump discussed the situation on May 30, 2017 and agreed that B.L. should be removed from the junior varsity cheerleading team for violating team rules. However, they decided to discuss the matter first with then-Principal Thomas Smith. On May 31, 2017, Luchetta-Rump showed pictures of B.L.'s posts to Smith and explained that B.L. had apparently posted the Snap as a result of failing to make the varsity cheerleading team. She also said that she and Gnall were planning to remove B.L. from the team. Smith told Luchetta-Rump that he supported their decision, but he would need to investigate if B.L. had actually posted the Snap.**

**On June 1, 2017, B.L. was called down to the office. Luchetta-Rump showed B.L. a photo of the Snap, told her that posting the Snap was unacceptable, and that she would be dismissed from the team. On June 29, 2017, B.L. and her parents asked the Mahanoy Area School District's Board of School Directors (the "School Board") to overturn B.L.'s removal. The School Board took no action on the matter.**

**The Mahanoy Area High School Cheerleading Rules state, "There will be no toleration of any negative information regarding cheerleading, cheerleaders, or coaches placed on the internet."**

**School Board Policy 218 states that the Code of Student Conduct applies to off-campus activities, *inter alia*, "if the student is a member of an extracurricular activity and has been notified that particular off-campus conduct could result in exclusion from such activities."**

**The Handbook entry on "Co-Curricular Activities" states: "PERSONAL CONDUCT: Participation on an athletic team or cheerleading squad in the Mahanoy Area School District is a privilege and the participants must earn the right to represent Mahanoy Schools by conducting themselves in such a way that the image of the Mahanoy School District would not be tarnished in any manner. Any participant whose conduct is judged to reflect a discredit**

upon himself/herself, the team, or the Mahanoy Schools, whether or not such activity takes place during or outside school hours during the sports season, will be subject to disciplinary action as determined by the coach, the athletic director and/ or the school principal."

The entry goes on to state, "REMOVAL FROM A TEAM: Removal from a team will be made by the coach of the sport, athletic director, or school administrator.   The athletic director and/or principal will confer with the coach before any removal action is taken.   Causes for removal from a team may include, but not be limited to the following:

- Use of alcohol, illegal use or possession of drugs not prescribed for the individual by a physician.
- Violations of the Mahanoy Schools Code of Student Conduct and Discipline which are significant.
- Repeated violations of school athletic or team policies.
- Personal misconduct that involves police or court action wither during or outside school hours and sessions of the sport season.
- Verbal or physical attack upon an opponent, contest official, teacher, fan, coach, or any other person.
- Continued acts of unsportsmanlike conducts."

4.     Identify all communications between any MASD employee, representative, or agent and any other person relating to any decision to punish B.L. for the Snap, including who participated in the communication, when the communication occurred, the form of the communication, and what was discussed.

Response:   The District objects to this Interrogatory on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence.  The District also objects to the extent that the communications in question involved any of the plaintiffs since that information would already be in the plaintiffs' possession.  The District further objects to the extent that this interrogatory seeks information protected by the attorney-client privilege.  Subject to and without waiving these objections, the District states that the following nonprivileged communications occurred:

6

On May 30, 2017, Gnall called Luchetta-Rump and informed her about the posts by B.L.  They tentatively agreed that B.L. should be removed from the cheerleading team, but agreed that they should first discuss the situation with Principal Smith and provided him a copy of the Snap.

On May 31, 2017, after receiving photographs of the Snaps from Gnall, Luchetta-Rump met with Smith.  She showed him pictures of B.L.'s posts, and explained that B.L. had apparently posted the Snap as a result of failing to make the varsity cheerleading team.  She also said that she and Gnall were planning to remove B.L. from the team.  Smith told Luchetta-Rump that he supported their decision but needed to investigate if Levy actually posted the Snap.

On June 1, 2017, B.L. was called to meet with Luchetta-Rump, who showed her the photograph and explained that she was being removed from the cheerleading team.  B.L. apologized and asked to speak to her mother.  B.L. called her mother, who then asked to speak to Luchetta-Rump.  Mrs. Levy asked if Luchetta-Rump knew why B.L. posted the Snap.  Luchetta-Rump responded that she believed it was because B.L. was upset over not making the varsity team.  Mrs. Levy agreed and asked if the coaches might change their mind and allow B.L. to remain on the team.  Luchetta-Rump explained that B.L. had not represented the school in an appropriate manner.  B.L. then asked to speak with Principal Smith.

When B.L. went in to meet with Smith, Luchetta-Rump returned to her classroom.  Later that day, she informed Gnall that she had told B.L. she was being removed from the team.  Meanwhile, when Smith met with B.L., he asked if she had posted something on social media against the cheerleading squad in a negative manner and she stated, "Yes."  Smith showed her the Snap and asked if she posted it, and she answered, "Yes."  Smith asked her why she had posted the Snap, and B.L. said she was angry she did not make the varsity squad.  B.L. asked Smith if there was anything she could do to get back on the junior varsity cheerleading team.  Smith said that he was not going to overturn the coaches' decision, and that B.L. would have to speak to the coaches about the matter.

Also on June 1, Smith received a telephone call from Betty Lou Levy asking him to call Larry Levy to set up a conference to discuss the issue.  Smith told Mrs. Levy that her husband should first talk to the cheerleading coaches.

7

Smith then called Luchetta-Rump, explained the situation, and gave her Mr. Levy's telephone number.

Smith e-mailed Superintendent Joie Green and Athletic Director Kieran Cray at 8:53 a.m. on June 1.  In the e-mail, he described the meeting with B.L. and the phone call from Mrs. Levy.

On June 9, 2017, Mr. Levy delivered a letter to Green, Smith, and Cray requesting that they "review this case and overrule the decision of Mrs. Luchetta."

On June 14, 2017, Luchetta-Rump, Gnall, Green, and Cray met with Mr. Levy and B.L. in the high school conference room.  Mr. Levy claimed that B.L.'s First Amendment rights had been violated, and he referenced several court cases on the issue.  Gnall, Green and Cray explained that it is a privilege to be a cheerleader and that because B.L. had tarnished the reputation of the school and the cheerleaders, that privilege was being taken away.  Mr. Levy requested a meeting with the board.  Also on June 14, Mr. Levy submitted a "Right to Know" request to the District regarding the Snap incident.  On June 26, the District hand-delivered documents responsive to the Right to Know request to the Levy's home.  Mrs. Levy signed a letter acknowledging receipt of the documents.

On or about June 27, 2017, Mr. Levy went to the business office of School Board member Daniel Lynch and asked Lynch if he was aware of the situation with B.L.  Mr. Levy provided Lynch with a copy of his June 9 letter to the District and asked Lynch how the School Board might react to his appearance at the upcoming School Board meeting.  Lynch informed Levy that the School Board would take the matter under consideration.

On June 29, 2017, Mr. Levy addressed the School Board at a regularly scheduled monthly meeting to ask that B.L. be returned to the cheerleading team.

On September 19, 2017, Levy visited Lynch at his office on an unrelated matter, but then began to discuss the situation with B.L.  Lynch told Levy that because he was threatening to bring a lawsuit against the District that it would be inappropriate to discuss the matter.  Although Levy pressed Lynch to discuss the matter further, Lynch declined.

**On August 11, 2017, Green sent a text to Mr. Levy stating, in pertinent part, "Larry…fyi…the board decided to support the cheer coaches and their decision to remove your daughter from the team.  However, she is able to try out again next year."**

5.    Did any students communicate with MASD employees, representative, or agents about the Snap?  If yes, how many students, identify the students, and state when and to whom they communicated about the Snap, and describe the content of the communication about the Snap.

**Response:  The District objects to this interrogatory on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. The District further objects on the grounds that the interrogatory is overbroad.**

6.    Did any MASD employees, representative, or agent initiate any conversation or communication with any student other than B.L. about the Snap? If yes, describe each such conversation or communication, identify the student or students and MASD employees, representatives, or agents between whom each such communication or conversation took place, describe the content of each such conversation or communication, and state when the conversation or communication took place.

**Response:  The District objects to this interrogatory on the grounds that the interrogatory seeks information that is irrelevant, and the interrogatory is not reasonably calculated to lead to the discovery of admissible evidence.  The District further objects on the grounds that the interrogatory is overbroad.**

**The District also objects to the extent that the interrogatory seeks information protected by the work product doctrine.  Subject to and without waiving these objections, the District states as follows:  The District is unaware of any communications about the Snap initiated by District employees, representatives, or agents with students.**

7.   From August 2016 to the present, identify any codes of conduct for MAHS students for extracurricular activities analogous to that found in the MAHS Cheerleading Rules.

**Response:  The District objects to this interrogatory on the grounds that the interrogatory seeks information that is irrelevant, and the interrogatory is not reasonably calculated to lead to the discovery of admissible evidence.  The District also objects on the grounds that the meaning of the term "analogous" in this interrogatory is vague.**

8.   From August 2016 to the present, identify any incidents in which you considered punishment for a student under the MAHS Cheerleading Rules, or an analogous code of conduct applicable to extracurricular activities identified in response to the previous interrogatory, for off-campus speech, including for posts to Social Media Sites, and describe what punishment, if any, MASD implemented against the student involved.  If any such student did not receive punishment, explain why not.

**Response:  The District objects to this interrogatory on the grounds that the interrogatory seeks information that is irrelevant, and the interrogatory is not reasonably calculated to lead to the discovery of admissible evidence.  The District further objects on the grounds that the meaning of the term "analogous" in this interrogatory is vague.  Subject to and without waiving**

10

these objections, the District states as follows:   Other than the operative matter involving B.L., the District is not aware of any incidents since August 2016 in which punishment was considered for a student in response to off-campus speech pursuant to the MAHS Cheerleading Rules or the code of conduct for any athletic team or extracurricular activity.   The District reserves the right to amend this response if it subsequently learns of any such incident.

9.     Identify all grounds supporting your contention in Affirmative Defense No. 2 in your Answer that "There is no *respondeat superior* liability of the Mahanoy Area School District for the actions of its employees."

**Response:**  The District objects to this interrogatory on the grounds that it seeks the legal reasoning and theories of the District's contentions.   The Defendant is not required to prepare the Plaintiff's case.

Date:  April 19, 2018

_____
Michael I. Levin, Esq.
David W. Brown, Esq.
LEVIN LEGAL GROUP, P.C.
1800 Byberry Road, Suite 1301
Huntingdon Valley, PA 19006
Phone:  (215) 938-6378
mlevin@levinlegalgroup.com
dbrown@levinlegalgroup.com

*Attorneys for Defendant*

11

## **VERIFICATION**

I, Dr. Joie Green, am the Superintendent of the Mahanoy Area School District ("MASD"), and am authorized to make this Verification on behalf of MASD. I have reviewed the foregoing Defendant's Objections and Responses To Plaintiff's First Set of Interrogatories (the "Responses"), and I hereby verify that the statements of fact contained therein are true and correct to the best of my knowledge, information, and belief. With respect to any legal matters stated in the Responses, I am relying upon legal counsel. I understand that by signing this Verification, I am subject to the penalties of 18 Pa. C.S. § 4904 relating to unsworn falsification to authorities.

Date: _4/17/18_

_Joie L Green, EdD ._
Dr. Joie Green, Superintendent

1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of April, 2018, a true and correct copy of the foregoing Defendant's Objections and Responses to Plaintiff's First Set of Interrogatories was served on counsel for the Plaintiff via electronic mail pursuant to agreement of the following e-mail addresses:

**Molly Tack-Hooper**
mtack-hooper@aclupa.org

**Mary Catherine Roper**
mroper@aclupa.org

**Arleigh Helfer III**
*ahelfer@schnader.com*

**Terry Loscalzo**
*TLoscalzo@schnader.com*

*Attorneys for Plaintiff*

David W. Brown

1

Exhibit P

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| B.L., a minor, by her father,<br>LAWRENCE LEVY, and her mother,<br>BETTY LOU LEVY | : <br> : <br> :   Civil Action No. 3:17-cv-1734 |
| Plaintiffs,<br>v. | :<br> :   (The Hon. A. Richard Caputo)<br> :<br> : |
| MAHANOY AREA SCHOOL DISTRICT,<br>Defendant. | :<br> :<br> : |

## DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST
## REQUESTS FOR ADMISSION

The Defendant, Mahanoy Area School District (the "District"), by and through the Levin Legal Group, P.C., hereby provide its objections and responses to the Plaintiff's First Requests for Admissions (the "Requests") served by the Plaintiff:

1.      Other than creating the offending Snap, B.L. has never violated any of the Cheerleading Rules to the knowledge of the District.

**<u>Response:</u> Denied. In addition to creating *and posting* the offending Snap, B.L. sent a text message to cheerleading coach Nicole Luchetta-Rump asking if cheerleaders needed to spend a year on the junior varsity team before being eligible for the varsity team. When Luchetta-Rump answered "No," B.L. responding by texting, "That's stupid." B.L. later posted a Snap stating, "Love how me and paige get told we need a year of jv before we make varsity but that's [sic] doesn't matter to anyone else?" Both of these incidents violated the Cheerleading Rules provisions to "have respect for your school, coaches, teachers, other cheerleaders and teams," and the Snap also violated the rule stating, "There will be no toleration of any negative information regarding cheerleading, cheerleaders, or coaches placed on the internet."**

2.     Mr. Kieran Cray, the District athletic director, either authorized the cheerleading coaches to punish B.L. for the Snap or subsequently ratified their decision to punish B.L. for the Snap.

**Response:   The District denies that Athletic Director Kieran Cray ever authorized the cheerleading coaches to punish B.L.  The District further denies that Cray ratified the decision to punish B.L.**

3.     Mr. Thomas Smith, the high school principal, either authorized the cheerleading coaches to punish B.L. for the Snap or subsequently ratified their decision to punish B.L. for the Snap.

**Response:   The District denies that Principal Thomas Smith ever authorized the cheerleading coaches to punish B.L.  The District further denies that Smith ratified the decision to punish B.L.  By way of further explanation, the District states that Mr. Smith merely stated that he would not prevent the cheerleading coaches from removing B.L. from the cheerleading team.**

4.     Dr. Joie Green, the District Superintendent, either authorized the cheerleading coaches to punish B.L. for the Snap or subsequently ratified their decision to punish B.L. for the Snap.

**Response:   The District denies that Superintendent Dr. Joie Green ever authorized the cheerleading coaches to punish B.L.  The District further denies that Green ratified the decision to punish B.L.**

5.     The District School Board either authorized the cheerleading coaches to punish B.L. for the Snap or subsequently ratified their decision to punish B.L. for the Snap.

**Response:  The District denies that the Mahanoy Area School District's Board of School Directors (the "School Board") ever authorized the cheerleading coaches to punish B.L. The District further denies that the School Board ratified the decision to punish B.L.**

2

6.     The high school principal and Superintendent were aware of the YouTube video referred to in the amended complaint in *Loy v. Mahanoy Area Sch. Dist.*, No. 3:17-CV-01428 (M.D. Pa.) at the time they upheld B.L.'s punishment.

**Response:   The District objects on the grounds that the request incorrectly assumes that Superintendent Green upheld B.L.'s punishment.   The District further objects on the grounds that this request is not reasonably calculated to lead to the discovery of admissible evidence.   Subject to and without waiving these objections, the District admits that Principal Smith and Dr. Green were aware of the existence of the YouTube video referenced in the amended complaint in *Loy v. Mahanoy Area School District* by May 2017.**

7.     The YouTube video referred to in the amended complaint in *Loy v. Mahanoy Area Sch. Dist.*, No. 3:17-CV-01428 (M.D. Pa.) features at least one District student who participated in athletics or extracurricular activities.

**Response:   The District objects on the grounds that this request is not reasonably calculated to lead to the discovery of admissible evidence.   The District also objects on the grounds that the terms "athletics" and "extracurricular activities" is vague, making it impossible for the District to determine whether any student in the video may have participated in those activities.   Furthermore, the District objects on the grounds that the request is not limited in scope, and the District is unable to determine whether any of the students ever participated in "athletics" or "extracurricular activities."   Subject to and without waiving these objections, the District lacks sufficient knowledge to either admit or deny whether any of the students in the video participated in athletics or extracurricular activities at the time that the District learned of the existence of the video.**

8.     No student was removed from athletics or extracurricular activities for making the YouTube video referred to in the amended complaint in *Loy v. Mahanoy Area Sch. Dist.*, No. 3:17-CV-01428 (M.D. Pa.).

**Response:   The District objects on the grounds that this request is not reasonably calculated to lead to the discovery of admissible evidence.   The**

District further objects on the grounds that the terms "athletics" and "extracurricular activities" is vague, making it impossible for the District to determine whether any student in the video may have participated in those activities.  Subject to and without waiving these objections, the District admits that none of the students in the video were disciplined for making the video by removal from athletics or extracurricular activities.  However, as noted in Response No. 7, the District lacks knowledge of whether any of the students in the video participated in athletics or extracurricular activities at the time that the District learned of the existence of the video.

Date:  April 19, 2018

Michael I. Levin (Pa. I.D. 21232)
David W. Brown  (Pa. I.D. 201553)
LEVIN LEGAL GROUP, P.C.
1301 Masons Mill Business Park
1800 Byberry Road
Huntingdon Valley, PA 19006
Phone: (215) 938-6378
mlevin@levinlegalgroup.com
dbrown@levinlegalgroup.com

*Attorneys for Defendant*

## **VERIFICATION**

I, Dr. Joie Green, am the Superintendent of the Mahanoy Area School District ("MASD"), and am authorized to make this Verification on behalf of MASD. I have reviewed the foregoing Defendant's Responses to Plaintiff's First Requests For Admission (the "Responses"), and I hereby verify that the statements of fact contained therein are true and correct to the best of my knowledge, information, and belief.   With respect to any legal matters stated in the Pleading, I am relying upon legal counsel.  I understand that by signing this Verification, I am subject to the penalties of 18 Pa. C.S. § 4904 relating to unsworn falsification to authorities.

Date: ___4/17/18___              ___Joie L. Green, EdD.___
                                          Dr. Joie Green, Superintendent

1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of April, 2018, a true and correct copy of the foregoing Defendant's Response To Plaintiff's First Requests For Admission was served on counsel for the Plaintiff via electronic mail pursuant to agreement of the following e-mail addresses:

**Molly Tack-Hooper**
mtack-hooper@aclupa.org

**Mary Catherine Roper**
mroper@aclupa.org

**Arleigh Helfer III**
*ahelfer@schnader.com*

**Terry Loscalzo**
*TLoscalzo@schnader.com*

*Attorneys for Plaintiff*

_____
David W. Brown

1

Exhibit Q

The New York Times

Bits
Business, Innovation, Technology, Society

# Why I Use Snapchat: It's Fast, Ugly and Ephemeral

**By Nick Bilton**    January 27, 2014 1:00 pm

"Question: Do you use Snapchat?" a friend asked me in a text message last week. "I can't find anyone that actually uses it."

As I began to type a reply, admitting that I actually do use the service, which lets your messages disappear after they are viewed for up to 10 seconds, the friend followed up with another text: "Well, not true, my kids use it all the time."

As an adult, you might be hard-pressed to find a human being who actually uses Snapchat, and if you do, you might be even more confused by what that person actually uses it for.

We live in a world where there are quite literally thousands of ways to talk to people from our smartphones. Text messages, direct messages on Twitter, and group chat applications like WhatsApp, GroupMe, Line, WeChat, Tango and Kik. If you'd prefer to communicate primarily with photos — which is Snapchat's specialty — there's Facebook Messenger and Instagram. And if you're a glutton for punishment, you can even use email.

A seasoned Internet user might look at people who use Snapchat in the same way they would judge someone who chooses to drink a bottle of Boones from a table full of French red wines from the 1960s.

So why Snapchat?

One of the simple and obvious answers is that Snapchat is intentionally ephemeral. Images are seen once for one to 10 seconds and then disappear forever in a digital magic trick. (Though not entirely. They do survive on a Snapchat server.)

But that's not all. This feature is great, but other people offer competing applications that can accomplish similar things.

For Snapchat, the service can do a lot more than just make images disappear.

If you go back to that second text message my friend sent, you can see the more important answer. "My kids use it all the time." The two crucial words here are "kids" and "time."

Children are incredibly impatient — especially in an age where downloading a song, watching a video or looking something up happens as quickly as their fingers can tap a smartphone screen. This is where Snapchat excels.

When you open the app, the phone's camera is already turned on. So you're right in message-sending mode and can take a photo or video in seconds. You choose whom you're going to send it to afterward.

Other social applications have you press additional buttons before you can take a picture or type a few words. With Twitter, for example, you open the app, go to the top right to press the Direct Message button, then press the camera button, all to simply reach the point where Snapchat already starts. Most other apps, including Facebook and Instagram, require a similar laborious process.

Completing a few extra steps might sound trivial, but if you're a teenager, those three actions are painful beyond reproach.

Deciding to whom you're going to send the messages on Snapchat is also quick and zippy. You don't type someone's name, you simply tag and select them from a list of people, then hit send. The app even figures out who your B.F.F.'s are (best friends forever, for the adult readers) and puts their names at the top of your contacts list. One less step; one more second saved.

That, of course, might leave you with the question of why I, an adult, use Snapchat.

This is partly because I know that the images can be thrown away, which leads to another important aspect of Snapchat. The app and service are really, really ugly. The user interface and design looks like the cross between a weird Japanese animation and a 1980s sitcom. As a result, I feel as if the pictures I take or the messages I send can be ugly, too.

Ugly gives the person using the app the feeling that whatever you do can be thrown away.

In comparison, when I'm composing something on another app, there's a level of permanence that makes me check every word, dot every i and check every filter before sending, all because I know the image could last longer than 10 seconds. I call it the anxiety of permanence.

And when you can throw things away, you can have more fun. Which children like to do. And some adults, too. This also affords a feeling of something being personal: for a few people, not for everyone.

While I don't take selfies on Twitter, Instagram, Facebook or Google Plus, I do on Snapchat. My messages can be goofy and light in a way that I'm more wary of on other services. And most important, I can do it very, very quickly.

---

© 2017 The New York Times Company