# Lawrence J. Mussoline, Ph.D.
**109 Ellsworth Drive**
**Sinking Spring, PA, 19608**

September 7, 2018

Attorney Michael Levin
Levin legal Group
1301 Masons Mill Business park
1800 Byberry Road
Huntington Valley, PA 19006

    RE:    B.L. a minor, by her father, Lawrence Levy, and by her mother, Betty Lou Levy v Mahanoy Area School District, Civil Action No. 3:17-CV-1734

Dear Attorney Michael Levin:

You have requested that I provide professional opinions regarding:

    1.    the difference between school exclusions and extracurricular exclusions or suspensions;

    2.    recognized practices of school districts to establish conditions of extracurricular participation that are very different than the conditions schools place on children for regular school attendance;

    3.    the Mahanoy Area Cheerleading (Cheer) Rules as to the reasonableness of the rules, the typical nature of Cheerleading extracurricular rules, and the educational purpose of such set of Cheer rules;

    4.    how the conduct in which B.L. displayed impacts the interscholastic nature of sportsmanship and team bonds in a sport like cheerleading;

    5.    how communities view cheer squads in general since they are typically yearlong programs; and

    6.    the impact of a year suspension from cheerleading on collegiate acceptance and scholarship opportunities.

    In order to arrive at my opinions, I have reviewed the materials listed below and relied upon my 38 years of experience as an educator in the Commonwealth of Pennsylvania, my six years' experience as a high school teacher, my varsity and junior varsity coaching experience as well as being an Assistant Athletic Director, my two years as a middle school assistant principal, my two years as a high school assistant principal, my nine years as a high school principal, and 19 years as a superintendent of schools serving three districts of approximately 1,900 students, 6,000 students and finally 13,000 students.

Today, I am superintendent of schools in Haddonfield, New Jersey, a district of approximately 2,500 student in suburban Philadelphia, starting my 39th year in K-12 education.

A significant part of my work over those 38 years as an educator in Pennsylvania has been overseeing extracurricular activity programs. I have served in head coaching positions, assistant coaching positions, an assistant athletic director position, principal in charge of athletics, and superintendent of schools having to review and uphold coaching rules, hiring and firing athletic coaches and athletic directors, as well as having to suspend numerous players from participation in extracurricular activities for rule infractions. In addition, I officiated interscholastic athletic competitions for 25 years including state championship games as a Pennsylvania Interscholastic Athletic Association baseball official.

Additionally, I have taught educational leadership and school law in graduate programs at three Pennsylvania universities, Temple, Wilkes, and Wilson College. My course teaching responsibilities included preparing principals and superintendents for certification and leadership roles in the Commonwealth or Pennsylvania. I taught in the Pennsylvania Leadership Development Program, a Pennsylvania Department of Education program where aspiring Superintendents were taught leadership skills through a series of seminars.

My resume setting forth my educational and experiential background is enclosed.

DOCUMENT REVIEW:

To render an opinion, I have received and reviewed the following:

1. The initial Verified Complaint;
2. Plaintiff's Motion for a Temporary Restraining Order;
3. Plaintiff's Brief in Support of her Motion for a Temporary Restraining Order;
4. Stipulations executed September 30, 2017;
5. Defendants Response to the Motion for a Temporary Restraining Order;
6. The Defendant's Memorandum of Law in Opposition to the Plaintiff's Motion for Preliminary Injunction;
7. Transcript of Hearing on Motion for Preliminary Injunction;
8. Court's Memorandum Decision granting Preliminary Injunction;
9. Court's Order granting Motion for Preliminary Injunction;
10. 152 pages of documents Bates numbered MASD000001 through MASD000152;
11. Defendants Response to Plaintiff's First Set of Interrogations;
12. Defendant's Objections and Responses to Plaintiff's First Set of Interrogations; and
13. Defendant's Responses to Plaintiff's First Request for Production of Documents.

FACTUAL BACKGROUND, ANALYSIS AND OPINION:

1) The Practices of Commonwealth School Districts Establishing Conditions for School Participation and Exclusions from School and Extracurricular Activities.

Let's approach this by stating that participation in state mandated K-12 school educational programs leading to graduation with a diploma is a constitutional property right afforded to all children. Attendance at school is mandated by state statute. Therefore, to exclude a student from attendance at school you have certain statutory guidelines to follow like those dealing with attendance or illness or incarceration etc. Aside from statutory law, there are school rules in place addressing aberrant student behavior in school or on school property like fighting and bullying. These school-created rules are in place because they cause a disruption to the school environment and often endanger oneself or others. Following proper due process requirements like stating rules for proper behavior in something like the student code of conduct and having students and or parents signing off on these rules, schools are allowed to suspend or exclude students from the property right of attending school for certain statutory reasons and certain disruptive or self-injurious rule violations.

Typical school rules deal with attendance in terms of legal and illegal absences, aberrant behavior like cursing in school, fighting, tobacco, drugs, alcohol, vaping, bullying, disrespect, improper language on clothing or revealing clothing, decorum in school and at school events, the improper use of technology on school property, and improper use of the Internet at school or at home when using a school bought and distributed device to name a few.

School related extracurricular activities, on the other hand, are student privileges not mandated by statute. Participation in extracurricular activates like sports, including cheerleading, participation in school clubs, being allowed to drive a car and park on school property, attendance at a school dance, attendance at any school activity like an athletic event or concert, even attendance at a graduation ceremony are not statutory property rights afforded to children attending the Commonwealth's schools. They are privileges. Privileges that could be removed for much less reason than needed to suspend someone from the property right of attending school itself.

In my tenure as a high school principal and superintendent of schools we have disallowed participation in these extracurricular activities because of things like: poor grades, poor attendance, altercations with the local police that may have occurred during the summer or after school, breach of any school rule, the use of tobacco on or off school property, the suspected use of alcohol or the known use of alcohol on or off school property as an athlete to name a few. We have not allowed students from other schools to attend dances at our school. We have used a device for estimating blood alcohol content from a breath sample when we suspect someone at an extracurricular event or dance may be intoxicated. On all these instances, we provide notice of expectations through rules that are typically signed off on by parents and/or students and we then apply the rules. As an example, the violation of evening pre-game curfew rules for an athlete could easily result in a game suspension and repeated violations of pre-game curfew rules could easily result in suspension from the team for the duration of the season. The basic premise is simple, extracurricular activates are privileges to be earned rather than rights to be guaranteed.

Examples of typical extracurricular rules are as follows: On game nights students are to be in their home by 9:00 pm as a pre-game curfew (yes, sometimes coaches call or visit homes), the use of tobacco, drugs, or alcohol at home or in school during the season, students are to dress with a shirt and tie or wear a dress or dress slacks when traveling to all away games, uniforms are to be cleaned and pressed, equipment like hockey sticks, shoulder pads, lacrosse helmets, etc. or simply uniforms that are

damaged due to neglect could be the responsibility of the students to pay for replacement equipment. Inappropriate student conduct on and off school grounds when an athlete is addressed in all extracurricular rules. Violations of any of these rules could result in suspension or removal from the extracurricular activity.

Inappropriate conduct could range from disrespect toward the coaches, disrespect toward teammates, disrespect toward the opposing team, disrespect toward officials, disrespect toward school employees, and even disrespect toward the school. Disrespect could include: profanity, aggressive behavior, non-verbal unacceptable behavior, threatening someone physically or verbally, the use of social media to threaten someone, talking back to a coach, cutting practice, discrediting the program after some event to the disdain of the student, cutting practice, fighting, gossip, and in the 21st century the use of social media as a medium of disrespect usually tied to the lack of self-control.

A premise underpinning all extracurricular disrespect rules is the fact that student athletes including cheerleaders have the privilege of wearing the uniform with the school name and school colors and discrediting anyone equates to discrediting the school and the community. Typically, the school and the community are often thought of as being one in the same. Because of the bifurcation of school attendance and extracurricular rules, schools are able to teach critical life skills to students participating in extracurricular activities that they would not be able to teach within the guaranteed property right of the mandatory attendance laws governing k12 schooling. It is through these extracurricular rules that we impart very important life's skills. For example, if B.L. were hired by a private company after graduation from college and she were to post on social media on-line the exact message she posted about the school and cheer squad with respect to her private employer, she would be rightfully disciplined if not fired.

These rules characteristically extend well beyond the school day into the home to ensure proper training, proper preparation, responsibility, resilience, and respect. All critical, non-cognitive life skills needed after graduation from high school to be successful in the job word and in life.

    2) The Reasonableness Of The Mahanoy Area Cheerleading (Cheer) Rules And How They Compare With The Typical Nature Of Cheer Squad Extracurricular Rules In Most Schools, And The Educational Purpose Of Such Set Of Cheer Rules.

The rules enumerated in the Mahanoy Area Cheerleading Rules are very typical compared to most cheer programs across the Commonwealth. The difference may lie in the fact that the Mahanoy Cheer rules are stated much clearer and are more understandable than many. The clarity of the rules that B.L. signed are indisputable. They begin with explaining to parents and student participants the overarching premise of Cheerleading being a privilege and not a right. They clearly state that Cheer squad members participate at the sole discretion of the coach based on her established rules. They go on to explain that the coach's discretion is based on being respectful and being a good representative of the school community. This is a year-round sport. Cheer squad members participate in community parades throughout the calendar year. Not just the school year. In a small community where "people know each other," it's through extracurricular activities that the coach and the school administration have the only opportunity they have to teach proper sportsmanship through well-articulated rules.

    The other positive issue with the Mahanoy Area Cheer rules is the fact the coach explained very clearly that the use of social media to disseminate negative information regarding cheerleading, cheerleaders, or coaches is not tolerated. It's the 21st century and social media is a double edge sward especially with adolescents. It is imperative we teach how to leverage social media properly as a platform for speech. The students and their parents knew this social media rule well ahead of time, well prior to being given a cheerleading uniform and making the squad. B.L. and her parents signed off on these rules knowing that the use of social media for negative purpose would not tolerated. They knew that violating the social media rule would not be tolerated. To me the reason for the suspension from the cheer squad is for improper use of technology and social media and not free speech. In my background, the coach seems to be saying that the young lady violated team rules. Period. Is any more needed when it comes to suspending a student from the privilege of being a member of an extracurricular team? Tying clearly articulated rules violations in an extracurricular activity to free speech property rights is a slippery slope.

    The educational purpose of extracurricular rules is again to prepare young men and women for life beyond high school. The operative question in this situation is: Can you be fired from you job for an aberrant social media post? Like the answer to so many legal questions; it depends. As more and more people are using social media, this area has become a common ground for employees to post information about their jobs, their personal lives, their views and other aspects of their lives that do not pertain to their work. However, in some cases, employers may have grounds to fire employees for their social media conduct and in fact they have. My question here is what are we teaching B.L. about authority, rules and the world of work in the 21st century if these simple rules clearly articulated by the coach aren't upheld?

    3) How the Conduct In Which B.L. Engaged In Impacts The Interscholastic Nature Of Sportsmanship And Team Bonds In A Sport Like Cheerleading.

    Typically, extracurricular and interscholastic athletics are very important edges of the adult/teenage school culture where important life skills such as losing and winning and how we react to both are taught and remembered. The resilience needed in life is much greater that the sporadic emotions of the teenage mind. When things go wrong in life, successful individuals reflect through the situation, think of ways to respond to the malaise they are confronting, and then use rational actionable plans to properly address the negative situation. They just don't knee-jerk a reaction on social media and blast the angry thought to anyone and everyone.

    Through the vehicle of the coach's team rules, the explanation of the team rules to the girls, and having the parents and players sign the rules, the coach was trying to give young adults, who may think irrational about a situation, a way to properly respond. The Mahanoy Cheer coach proactively said "do not use social media to vent and disparage your team, your teammates, or your school." In essence, she was saying don't do this because you represent this small proud community in activities throughout the calendar year. Not unlike the day you will represent your employer in the work world. B.L. did not heed those rules, she chose to do the wrong thing and the team suspension is perfectly within the right of the coach to impose because she simply violated team rules.

    In an intense year-long sport like cheerleading with stressful competitions, all the evening events often back-to-back, the community parades, the bus travel, the time spent together the coach was well

within her right to understand the impact of writing "fuck school fuck softball [,] fuck cheer fuck everything" would have on the team in a small community. The coach most likely thought that time away from the program for a year would allow the negativity to dissipate, allow for the team in a small working-class community to not be distracted, and to quell any further incidents where B.L. may be targeted or ostracized. Again, in my mind the suspension from the team for violation of team rules and the misuse of technology and social media would be all the coach needs to suspend the B.L. from the cheer squad.

4) The Community View of Cheer Squads In General Since They Are Typically Yearlong Programs.

Mahanoy City and the coal regions in general are working class areas where Friday night football games are community attended events. Mahanoy City parades over the course of the calendar year are again community attended. Unlike football played only in the fall, unlike basketball played only in the winter, and unlike lacrosse played only in the spring; cheerleading is a year-long sport. The cheer squad in small communities like Mahanoy Area are not unlike cheer squads at big colleges like Penn State where they are the center of attention. The mascot, the Golden Bear I believe, who is typically an alternating cheerleader attends community functions like the opening of the little league baseball season and walks in various events and parades with the cheer squad. Cheerleading in areas like Mahanoy City are community ambassadors. Without question. Would a community ambassador improperly use social media the way B.L. has blatantly ignoring the stated team rules? My thoughts are no.

In relationship to this suspension, and in accordance with what I have stated throughout this opinion letter, the coach is imparting critical life skills in an arena that is not legally viewed as a property right guaranteed or afforded to all children. Conversely, it is privilege for students to participate. Imparting a variety of life lessons to cheerleading participants and keeping respect and decorum at the forefront of cheerleading rules is a perfect example of teaching life skills that sometimes can't be taught in the regular classroom and school environment. The community expects rules to be honored. The community expects the rules are to be spelled out clearly ahead of time so that participants know the expectations going into the endeavor. The community expects that students and citizens alike to follow the rules of the sport, the work place, the school, and the community. Therefore, the expectations of the Cheer coach and the rules she clearly articulated are not only typical throughout the interscholastic sport but expected in communities like Mahanoy City all over the Commonwealth. In my opining, imposing a suspension to B.L. for a year's hiatus from the Cheer program was well within the right of the coach given the fact B.L clearly violated the team rules.

5) Commentary on witness testimony that suspension from the Cheer squad caused future harm to B.L in terms of college scholarships.

In my over 30 years of work in interscholastic athletics a key fact about college cheer recruiting is as follows: Colleges don't recruit for cheerleading as zealously as they do for many other sports, but some schools do offer scholarships or smaller perks for cheerleaders. Typically, scholarships for cheerleading are not handed out like football and basketball scholarships which are given prior to entering college. The one thing that makes cheerleading different from most other Division 1 college sports is that cheerleaders are selected based on a try-out. In other sports, athletes are typically recruited by college coaches while they are still in high school, and scholarship recipients often sign a "Letter of

Intent" without having to attend a try-out for their college team. Cheerleaders, on the other hand, must be evaluated during a try-out. It's after the tryout that they may be offered a scholarship.

There are money making recruiting agencies like the National Scouting Report (NSR) and the College Cheerleading Recruiting (CCR) group. Both companies offer prospective cheerleaders camps and workshops where athletes are video recorded and supposedly assisted to gain college entrance. In a transparent statement, the CCR groups explained up front this statement: "All over the world thousands of prospective cheerleaders compete at the high school level. Only a small percentage of these participants are lucky enough to go through the college recruiting process and eventually earn a scholarship to an NCAA, NAIA, or a Junior College institution."

There is also the critical aspect of stunts and gymnastics in collegiate cheerleading programs. I did not read if B.L. was trained in gymnastics and specifically in lifts and stunts that are regularly required of a collegiate cheer squad member. In order to determine if B.L. was irreparably harmed by being suspended for a year from the Mahanoy Cheer squad, one must determine if B.L. even possesses the skill set required to participate in cheerleading beyond high school.

In my opinion, a suspension for a year from a high school cheer squad for breaking team rules will have little or no impact what-so-ever on B.L.'s chance of participating in cheerleading in college. The fact is, if and when B.L is accepted into a post-secondary institution and she tries out for the Cheer squad there and is subsequently selected based on her performance compared with the other try-out participants, this junior year suspension incident would never be known by the college coach. B.L would have simply made the squad based solely on the tryout and nothing more or less.

(A) Opinions

(1) Having been a practitioner in public sector educational administration in Pennsylvania for more than three decades, I am familiar with the distinction between the property right of all Pennsylvania children to attend school in the Commonwealth and I am familiar with the privilege afforded to school students through extracurricular programming in Pennsylvania. I am also familiar with the collegiate recruitment process forming the nexus between high school and college programs. It is my opinion that the yearlong suspension from Cheerleading imposed by the coach for failure to follow stated teams ruled is reasonable and would not inhibit B.L from participating in collegiate cheerleading programs in the future.

(2) The material that I reviewed and evaluated as identified in this letter are sufficient to form the opinions that I have stated in this letter.

(3) All opinions expressed in this letter are expressed to a reasonable degree of professional certainty.

(4) I reserve the right to supplement this letter based on additional information.

(B) Additional Information Required by F.R.C.P. 26(a)(2)(B).

In accordance with the applicable Federal Rules of Civil Procedure as you have provided them to me, in addition to the information already provided above and in my curriculum vitae attached hereto, please be advised that I have not testified as an expert in any other trial or deposition in the previous two years. In this case, I am being paid by the School District or its insurance carrier at an hour rate of $150/hr. This includes the time spent reviewing the documents and material identified above, the time devoted to drafting this expert report, and any time that may be required to travel to and attend any deposition and/or trial.

Thank you for the privilege of being able to serve the School District. If you have any questions or need further information, please let me know

Sincerely,
Lawrence J. Mussoline, Ph.D.

Attorney Michael Levin
August 27, 2018
Page 9
DR. MUSSOLINE'S CURRICULUM VITA

## EDUCATION

Ph.D. - The Pennsylvania State University, Educational Administration, 1998.
M.Ed. - Shippensburg University, Educational Administration, 1983
B.S.   - Bloomsburg University, Secondary Education, Comprehensive Social Studies, 1979

## EMPLOYMENT IN EDUCATION

*7/2018 - Pres*  Haddonfield Borough School District (Suburban Community - 2,500 students)
Superintendent of Schools

*2009 - 6/2017*  Downingtown Area School District (Suburban Community - 13,500 students)
Superintendent of Schools

*2005 - 2009*  Wilson School District (Suburban Community - 5,800 students)
Superintendent of Schools

*1998 - 2005*  Pine Grove Area School District (Rural Community - 1,800 students)
Superintendent of Schools

*1986 - 1998*  Central Dauphin School District (Suburban Community - 11,000 students)
Central Dauphin High School Principal - (1989- 98)
East Senior High School Asst. Principal - (1987-89)
Swatara Junior High School Asst. Principal - (1986-87)

1996 - 1997  Pennsylvania State University @ University Park
Graduate Assistant: Pennsylvania School Study Council & Pennsylvania Leadership Development Center. Responsibilities: Writing, editing and design of *Perspectives* newsletter, research for member superintendents, school arbitration records, PLDC superintendent leadership training coordination, and assisting in Educational Leadership Program activities.

*1980 - 1986*  Middletown Area High School (Suburban Community - 3,000 students)
Social studies teacher (world cultures), athletic administrator, class/club advisor, and varsity/jv coaching

1979 - 1980  Bishop Hafey High School, Hazleton, PA (Small City - 1,500 students)
Social studies (psychology/sociology US history, geography) and English teacher, club advisor, varsity coaching

## DISSERTATION / PUBLICATIONS

- Mussoline, L. J. (2001). Agreeing to disagree: Effective board relationships in the Pine Grove Area School District. PSBA Bulletin, Vol. 65 #5, 14-16.

Attorney Michael Levin
August 27, 2018
Page 10

- Mussoline, L. J. & Shouse, R. C. (2001). School restructuring as a policy agenda: Why one size may not fit all. Sociology of Education, 1, 44-58.
- Shouse, R. C. & Mussoline, L. J. (2000). High risk, low return: The achievement effects of restructuring in disadvantaged schools. Social Psychology of Education, 3, 245-259.
- Mussoline, L. J. (1998). School restructuring and student achievement: Measuring the impact of academic press, communality and socioeconomic status. Unpublished doctoral dissertation, Penn State University.

TRUSTWORTHINESS / VISION /INNOVATION

*Downingtown Area School District*
- Through an entry plan, collaboratively created the Theory of Action guiding Downingtown's core instructional program around building-level data teams, technology integration, and differentiated instruction to teach to and reach all learners in our classrooms.
- Created the vision for an innovative magnet high school, the Downingtown SETM Academy, around 21st century learning, mass customization, creative scheduling, inquiry based Instruction, the IB Programme and upper-class STEM pathways tied to a STEM career internship experience. This magnet 3rd high school creatively saved taxpayers over $100 million as opposed to building a third comprehensive high school campus.
- Created the vision for a 6th grade center around project-based learning and a 1:1 IPad initiative again saving taxpayers over $40 million by building an elementary school instead of a 3rd middle school.
- Created a nationally distinguished blended and cyber learning program over a five years' period that was the subject of a Harvard Business School Case Study on innovative leadership in today schools.
- The blended learning program was also the subject of an Ed Week Technology Counts 2016 piece.
- Using an innovative collaborative budget cutting process, led the Downingtown Board to reduce the overall expenditure budget by $2 million in 2010-11 as well as producing zero-increase budgets over the last 5 years. During my tenure In Downingtown the district went from the 7th to the 4th lowest millage rate among Chester County's twelve school districts.
- Oversaw the creation of the first long range capital spending plan in DASD to improve education and infrastructure throughout the district. Again without increasing taxes over the last five years.
- Under my tenure in Downingtown, the District became the only District in Pennsylvania to attain AAA Bond ratings from both Moody's and Standard and Poor's becoming only the 21st school district in the nation to receive both AAA ratings.
- Starting at DASD in 2009, our total budget was $183,860,000 supporting 11,828 students compared with neighboring West Chester Area School District whose budget then was $198,721,124 supporting 11,684 students. DASD had 144 more students & WCASD had budgeted $14 million above DASD's 2009 budget. Departing DASD in the 2016-17 school year, Downingtown's overall budget was $211,117,000 supporting 12,668 students while West Chester's budget rose to $237,424,795 supporting 11,589 students. DASD grew 1,079 students over that of West Chester during my tenure as superintendent while West Chester's budget increased $26.3 million above Downingtown's.
- In a large organization like DASD there was a need to digitally detox from the persistent encroachment of 21st century communication on all school employees. We created Turn Off (your cell phones) and Tune In (to your families) holidays where we completely turn off the email server over a

Attorney Michael Levin
August 27, 2018
Page 11

short duration holiday to allow teachers and admin team members to get away from the immediacy of communication.
- Restructured the district wellness Council and established school-based wellness Council's in all 16 schools. Created a community-based wellness Council called wellness Woodstock engaging all facets of the community around student health and wellness.
- Led the Board through an action plan to redistrict attendance boundaries during the 2012-13 year.
- Created secure vestibules with a buzzer system for entrance into all 16 schools, coordinated summer Safety Summit Meetings with first responders from all 6 municipalities comprising the Downingtown school district to insure student and staff safety over the course of the school year, crested the first Chief Security Officer position to coordinate and standardize safety protocols within the District, the 8th largest school system in the Commonwealth, and upgrade surveillance equipment on all 16 campuses to insure safety and protect assets.
- Steered Downingtown to accepting its first National Blue Ribbon School recognition in 2016: Pickering Valley Elementary School.
- Wrote recommendations that won one Downingtown principal a National NASSP Digital Principal of the Year Award in 2016 and another a Pennsylvania State Principal of the Year Award in 2013.
- Oversaw Downingtown improve to the highest number of National Merit Commended and Semi-Finalist Winners in history.
- Newsweek ranked DASD high schools in their America's Best High School issue every year from 2011-16.
- The Washington Post ranked the Downingtown STEM Academy as the #1 Most Challenging High School Program in Pennsylvania and included both Downingtown East and West HS's as top academic programs making Downingtown the only multi high school district in Pennsylvania to have all three high school programs included in The Post's 2015, 2016, and 2017 issues. The STEM Academy was ranked 119 nationally out of 2,369 American public and private high schools ranked in the 2017 ranking.
- The US News & World Report listed the Downingtown STEM Academy program in their 2014, 15, 16, and 2017 issues of America's Best High Schools. East and West High Schools both made the 2015 & 2017 issue.
- Between 2013 and 2015 the Downingtown STEM Academy was the number one ranked HS program in Pennsylvania based on the PDE state ranking. It was listed in the top 10 in 2016 and 2017.
- The Downingtown Area School District made the College Board AP Honor Roll in 2012, 2013 and 2015.
- My first year leading DASD in 2009 the District was ranked 31st in the state by the Pittsburgh Business Journal. By the 2014 DASD was ranked as 22nd best district in the Commonwealth out of 500 districts.
- PDE ranked all Pennsylvania school districts based on performance profile student achievement in 2014. DASD was ranked the 8th best school district in the commonwealth out of 500 Districts.
- In July 2016 DASD was named a District of Distinction by The District Administrator Magazine for its innovative blended educational programming.
- Member on the Joint Pennsylvania State Government Commission Advisory Committee co-authoring a report for the general assembly entitled: Report of the Advisory Committee on Zero Tolerance School Discipline Policies.

Attorney Michael Levin
August 27, 2018
Page 12

- Through a series of intentional communications and actions related to both digital blended learning and information on our strong elementary curricular program we took back 72 students from charter and cyber charter schools saving the district over $800K at the start of the 2016-17 school year.
- Created the first 1:1 laptop initiative at the STEM Academy magnet HS in 2011. Then created a full 1:1 Ipad initiative for grades 6-8 starting at the 6th grade center, and finally moved to a full 1:1 laptop initiative at East and West HS during the 2016-17 school year all driven by the Schoology LMS.

*Wilson School District*
- Collaboratively created a district vision for Wilson SD guiding all actions of the Board & the admin team.
- Coordinated a partnership with Market Street Sports Group to market Wilson's athletic facilities bringing added revenue into the district.
- Increased student achievement on PSSA testing at Pine Grove, Wilson, & Downingtown.
- Created an education foundation at Wilson for strategic philanthropy and state corporate tax credit participation & coordinated the first fundraising campaign grossing $27,000 during the 1st year of existence. Enhanced the direction of the Downingtown Educational Foundation from 2009-2017.
- Directed the creation of a virtual summer school academy at Wilson that was outsourced to other schools.
- Provided the vision for teaching Mandarin Chinese as a high school world language offering and orchestrated the cost effective sharing of that program through virtual means to neighboring schools.
- Created the vision for redistricting elementary and secondary feeder patterns and for creating a master feasibility study plan for Wilson School District.
- Successfully explained two referendum questions to Wilson constituency dealing with Act 1.
- Coordinated the vision for a master construction plan based on educational programming that includes a 1000 student junior high school (ground breaking 12/08), a six classroom high school addition (completed 8/08), an athletic field renovation project (completion 9/09), and operations building construction.
- Created a strike plan for Wilson during my first three months of employment (2005).
- Created communication methods to correspond with all constituent groups: community, faculty, & board.

*Pine Grove Area School District*
- Led both Pine Grove & Wilson Boards in closing two elementary schools and in the creation of a lockbox tax collection system.
- Catalyzed the established the Pine Grove Area Educational Foundation under federal 501 (c) (3) status.
- Coordinated the budget and installation of computers, Internet access, distance learning, e-mail, and software enhancements providing for voice, data, and video capabilities for all in Pine Grove.
- Coordinated the funding and construction of an all-weather track and HS HVAC project at Pine Grove.
- Created a summer enrichment program and extended day/year tutoring program @ Pine Grove.
- Assisted in negotiating four successful teacher contracts, three Act 93 administrative agreements, and two AFSME support staff agreements for Pine Grove.

- Worked in partnership with PGAEA to create K-12 parent conference days and after school curriculum learning communities within the school calendar.
- Created construct-based job descriptions and evaluations for administrative and AFSME employees.
- Promoted the development of parent-school connections at Wilson, Pine Grove and at Central Dauphin through collaborative project-team work, on-line grading access, homework hotline, & K-12 conferences.
- Led community-based groups at Wilson & Pine Grove through strategic planning bringing coherence to this plan within the organization by guiding administrative goals and Board agendas with strategic goals.
- Instituted a college awareness program at Pine Grove whereby fourth, eighth, and eleventh grade children spend a day on a college campus.

*Central Dauphin High School*
- Active facilitator and presenter in the Duquesne University/PSU sponsored Pennsylvania Leadership Development Center's Superintendent Leadership Development Program (1998-pres).
- Responsible for attendance, discipline, supervision, evaluation, scheduling, staff development, budget, and the extra-curricular program for a comprehensive suburban high school housing 1700 students and 115 faculty members while at Central Dauphin.
- Served on many Middle Atlantic States school evaluation teams, the last as Assistant Chairperson.
- Member of the Pennsylvania Association of Secondary School Principals (PASSP) serving as representative to the Pennsylvania Department of Education Project SAVE, AIDS Curriculum Task Force for five years and past State Curriculum Committee Chairperson while serving as high school principal.


CURRICULUM & STAFF DEVELOPMENT / ACCOUNTABILITY

*Downingtown Area School District*
- Through an Entry Plan and a Re-Entry Plan surveying all stakeholder groups, the board and I established vision planks guiding strategic planning and yearly goal setting in Downingtown.
- Created a curriculum leader and comprehensive professional development model in Downingtown that enables district teachers to continually improve through teacher-led professional learning communities.
- Established protocols for district and building level student data analysis used to inform instruction.
- Moved DASD toward a common core transition through teacher-led cultural change and curriculum, instructional, data analysis, and assessment content alteration.
- Recipient of the Pennsylvania Association of School Administrators State Award for Instructional Leadership in 2014.
- Recipient of the Pennsylvania State University College of Education Alumni Society 2013 Leadership and Service Award for outstanding achievement, distinction, leadership and service in Education.

Attorney Michael Levin
August 27, 2018
Page 14

- Between 2008-09 and 2015-16 my administration reduced the number of paper copies made in DASD by 400,000 yearly as a result of moving to digital learning platforms and consolidating building printing.

*Wilson School District*
- Coordinated a partnership with the University of Pittsburgh's Institute for Learning and Wilson School District teachers and administrators to establish imbedded professional learning communities.
- Coordinated data teams on the district and school level to inform instruction through data analysis.
- Introduced Chinese as a world language option for Wilson students in grades 7-12.
- Restructured Wilson's math, social studies, world language, science, & language arts curriculum to align with proposed graduate competency exams, PSSA testing, and the global market place.
- Created on-line PD courses at Wilson & had all administrators take an on-line course.
- Established a professional development program tied to technology usage in classrooms as well as achieving a CFF grant from the Commonwealth infusing technology into the school while at Wilson.
- Established a partnership with NASA at Goddard Space Center for Wilson K-12 science teachers.
- Wrote and was awarded the grant for our principals to acquire Act 45 credit in 2008. Wilson was one of only three school districts out of 500 in the Commonwealth of Pennsylvania to be awarded this grant.
- Personally conduct building learning-walks along with the principal and teachers to improve instruction.
- Initiated processes that enabled Wilson Junior High Schools to become middle level educational centers.
- Instruct our admin team throughout the year in a leadership academy program and through book studies.

*Pine Grove Area School District*
- Coordinated the analysis and eventual change of the district-wide grading system through a community project team in, 1998/99.
- Pine Grove Area PSSA test scores in grades 5, 6, 8, 9, and 11 are increasing steadily in all areas, 1998-04.
- Pine Grove Area School District received state PSSA improvement monetary awards: 1999, 2001, and 2002.
- Collaboratively altered the Pine Grove Area High School curriculum to include seven AP courses, an innovative character education program, a career pathways concept, and a new math sequence.
- Created a standards-based curriculum-writing model and organized the faculty into facilitator/grade-level strands for vertical and horizontal curriculum articulation, 1998-pres.
- Organized staff development programs that included book study groups, cognitive research workshops, nested learning communities, action research groups, training in the John Collins writing program, internet in the math classroom, technology integration, school safety, and special education law.
- In August of 2005 the Pine Grove Area School District was recognized by the Commonwealth of Pennsylvania and by Standard and Poor's as one of 61 schools district in Pennsylvania narrowing the achievement gap for economically disadvantaged children.

- Keynote speaker at the 2002 and 2006 Bloomsburg University PSSA Mathematics Conference - topic: System-Wide Outside-In Mathematics Professional Development Program: K-8.
- Presenter at the 2002 Pennsylvania Association for Educational Communications and Technology Conference - topic: Promises and Challenges of District-Wide Professional Development with Technology.
- Designed a clinical supervision program for principals consisting of narrative observations and video post-conference feedback.
- Coordinated administrator & school board retreat sessions on action & strategic planning and teamwork.

*Central Dauphin High School*
- Awarded $25,000 in Pennsylvania testing improvement grant money for increasing test scores at CDHS.
- Member of the Differentiated Supervision Staff Development (DSSD) Task Force, which created an innovative teacher supervision program at Central Dauphin, 1986 – 1994.
- Chairman of the school-based Professional Performance Standards Committee responsible for the design of a model for effective teaching performance standards in CDSD, 1991-1993.
- Created and taught the Grub And Study Program (GASP) which encouraged the use of study skills by students and faculty through an academic challenge exercise at Central Dauphin, 1987-1998.
- Conducted faculty in-service programs on study skills, learning styles, and standards in the schools.
- Coordinated the creation of a text-based appraisal system of a new math series at Central Dauphin, 1997.

SERVICE / VISIBILITY

*Downingtown Area School District*
- Serve on the Exton Regional Chamber of Commerce Board of Directors, 2009-2011.
- Appointed to the Lincoln University Board of Visitors by President Jennings, 2012-2014.
- Serve on the Pennsylvania State University, U Park, College of Education Advisory Board, 2008-Pres
- Serve on the Pennsylvania State University - Great Valley Campus Education Advisory Board, 2010-2014.
- Serve on the West Chester University Center for Healthy Schools Board, 2010-2017.
- Serve on the 21st Century Cyber Charter School Board of Education, 2015–Pres.
- Served as the CCIU Rep to PA Association of School Administrators Board of Governors, 2009-Pres.

*Wilson School District*
- Keynote speaker at Berks County Bar Association Naturalization Ceremony, September 2007.
- Serve on the Pennsylvania State University - Berks Campus Education Advisory Committee (2006-pres).
- Serve as regional coordinator of PASA's Superintendent Mentor Program (2008-2009).

Attorney Michael Levin
August 27, 2018
Page 16

- Serve as facilitator to the Lehigh University School Study Council Education Leaders Forum (2005-2010)
- Member of West Reading-Wyomissing Rotary Club (2006-2009).
- Serve on the Berks County Hawk Mountain Boy Scouts of America Executive Board (2006-2010).
- Coordinated the successful passage of an atypical ballot referendum question allowing Wilson to collect an Emergency Municipal Service tax by conducting 20 community informational meetings between March and May of 2007.
- Created podcasts of the State of the District report at Wilson to be found at www.wilsonsd.org.
- Created year-opening and year-end videos of our staff and students at Wilson also found at www.wilsonsd.org.
- Created a periodic television shows highlighting programs and people within the Wilson School District.
- Created public service radio announcements during American Education Week welcoming parents into the Wilson schools.
- Honored by Lehigh University & the National School Study Council with the 2007 Cooperative Service Award.

*Pine Grove Area School District*
- Honored as the 2001 Bloomsburg University Young Alumnus of the Year.
- Delivered the commencement address at Penn State University-Schuylkill Campus, December 2003.
- Invited to serve on the Education Advisory Board of Central Pennsylvania's public television station, WITF.
- Officer in the Lehigh University Superintendents' School Study Council, Vice President, 2003/05.
- Invited to assist Lehigh University in the selection the Dean and Associate Dean for the College of Education.
- Serve Schuylkill County Intermediate Unite #29 as PASA Board of Governors Representative, 1998-2005.
- Guest Teacher Program Leader, and assisted in coordinating the first countywide superintendents' study council, 1998-pres.
- Active member of community and church related fraternal organizations, 1998-pres.
- Serve as master of ceremonies and guest speaker for a variety of school and community functions in Reading, Harrisburg, Hazleton, and throughout Schuylkill County.
- Keynote Speaker: Schuylkill County Anti-Defamation League Youth Conference (2003), Pine Grove Area 70-Year Class Reunion (2003), Schuylkill County Challenges of Adolescents Conference (2003).

Central Dauphin High School & Prior
- Organized and coordinated a school-wide community service project at Central Dauphin High School to assist the Four Diamonds Children's Cancer Research Fund. From 1994 to 1998 we raised over $100,000 for the Hershey Medical Center's cancer research facility. This program continues today at CD.
- Hershey Youth League girls' softball coach, 1995-2000.
- Summer youth league baseball coaching, 1977-1981.

- Appointed by PA and National American Legion officials as tournament Umpire-in-Chief, 1995-1998.
- Umpired baseball on the scholastic, collegiate, professional, and international Olympic levels, 1975-1998.
- Named "Umpire of the Century" in the Harrisburg area by the Harrisburg *Patriot News* in December 1999.
- Responsible for game management as well as bidding, purchasing, accounting, updating, reconditioning, distributing, collecting and storing all athletic dept. equipment for the Middletown School District.
- Chaperoned a group of 24 high school students to France for 10 days, 1985.
- Founder and organizing officer of a fraternity at Bloomsburg University.
- Recipient of the United Way Gold Award in 1975.
- President of Hazleton High School senior class, 1975.

## LEADERSHIP IN EDUCATION

- At my last board meeting the Downingtown Area School Board unanimously approved naming the Knowledge Commons (formally-library) at the Downingtown STEM Academy after me. That became one of only three district facilities named after a DASD Superintendent.
- Awarded the 2017 Citizen of the Year Award by the Chester County Chamber of Business and Industry.
- State and National Conference presenter: 2017 (District Management Council) blended learning; 2017, PDE State SAS and Data Conferences on blended Learning; 2016 (NCET) on blended learning; 2016 (PASA/PSBA State Conference) blended learning; 2014 (DALI) Rosetta Stone elementary initiative; 2015 (Rosetta Stone National Corporate Meting) Keynote; 2014 (NASSP) STEM Academy program; 2013 (NSBA) on creating collaborative problem solving "Dialogue Teams; 2012 & 2013 (ASHA & NSBA) wellness council initiatives recognized nationally; 2012 (PASA/PSBA) STEM Academy program; 2011 (Norwin STEM Summit Keynote) on STEM Academy program; 2010 (U of Pittsburgh Study Council) STEM Academy program creation.
- Led the Downingtown School District Wellness Initiative where the District was recognized nationally by the Centers for Disease Control & Prevention in their 2015 publication, *"Putting Local School Wellness Policies into Action: Stories from School Districts and Schools."*
- Keynote speaker at the May 2017 Building Healthy Schools Conference sponsored by PDE, the Center for Healthy Schools, and the PSU ProWellness Group on Downingtown's Whole Child Wellness program.
- Guest speaker Harvard University Business School (Professor John Kim) on the Case Study Professor Kim write on Downingtown's innovative blended educational program options. Topic: Innovation in Education.
- The Harvard Case Study on blended learning was highlighted in the Spring, 2017, Vol. 21, of the District Management Journal, a publication of the District Management Group in Boston.
- Appointed by the Chester County Intermediate to the 21st Century Cyber Charter School Board of Education (2015-Pres)
- Created the first Chinese (Hebei Province) Educational partnership with Downingtown Area School District to create opportunities for over 36 teachers to date to travel to China and work with Chinese teachers and children in the summer (2010-Pres). We have also hosted Chinese students, teachers, and administrators periodically since 2010.

- Coordinated the first Denmark exchange partnership in 2014 involving Downingtown's two comprehensive high schools visiting and attending school at the Marie Kruses Gymnasium in Amsterdam and the Danes doing the same at Downingtown's schools over the course of a school year.
- Restructured the entire board governance structure to illuminate excess of meetings and to streamline would work for better efficiency and effectiveness.
- Along with the board governance chair, created yearly offsite retreats for the board to better strategically plan and annually goal set.
- Began the Battle of the Brains DASD Academic Team Competition in 2011 where all three high school academic teams competed for the coveted District trophy. In 2014 and 2015 Downingtown East HS won the Pa State Academic Team Championship.
- Appointed to the Pennsylvania Inspired Leadership (PIL) Eastern Region Advisory Board (2005-2010).
- Conference presenter for the Mid-Atlantic Consortium of Educational Foundations (2008-2011).
- Selected as a PDE trainer in the state-wide PIL initiative working in the LEAD Program throughout the Commonwealth teaching leadership development strategies to school superintendents: (2005-2012).
- Chosen for the National Center for Quality Leadership's 2007 Chief School Administrators' Seminar.
- Selected as one of twenty superintendents nationally to participate in a pilot program through AASA's Center for System Leadership™ called "*Leading Change – Transformation in Public Education*," June 2007.
- Invited to present at the PASA New Superintendent's Academy on the superintendent entry planning process in 1999 & developing a strong administrative team culture of learning and innovation in 2008-09.
- Invited to present at the PASA New Superintendent's Academy on Communication in the Superintendentcy, 2009-Present.
- Appointed to PASCD Influence Committee working with state legislators on education policy issues. Drafted testimony presented to the Senate Education Committee on recommendations to PA testing.
- Invited by PSBA to present (with Board President) at a Summer Leadership Conference in Johnstown and at the Board President/Superintendent Conference in Hershey on the Board /Superintendent relationship.
- Presented at a PASCD forum on Celebrating PA's Accountability Block Grant Program, 2004.
- Presented as part of a PASCD/PEARA forum on NCLB at their state conference, 2004.
- Presented at PASCD/PAECT state conference on a technology integration staff development model, 2002.
- Presenter at the PASSP State Convention, 1995. Topic - 'School Wide Motivation: The Principals' Role.'
- Represented PASA at the 2000 Pennsylvania Attorney General's School Safety Conference and have worked with the Executive Director on a variety of projects for PASA since 1998.
- Selected by Drexel University to participate in the team assigned to create a doctoral program in educational administration beginning in the 2009-10 academic year.
- Guest taught select graduate Educational Administration classes and undergraduate education classes at the Pennsylvania State University and Lehigh University, 1996 - pres.
- Appointed adjunct professor at Wilkes University to teach graduate level school law, educational issues, and educational leadership/principalship (2002-2009).

- Selected to assist Wilkes University in developing a common school law syllabus.
- Appointed adjunct professor at Temple University-Harrisburg to teach a graduate level collaborative action research course (2002-2005).
- Appointed adjunct professor at Wilson College during the fall, 2000 to teach a student teaching seminar.
- Assisted in developing the first seminar class for student teachers at Temple University-Harrisburg in the fall of 2002 as well as supervised student teachers for Temple University.
- Consultant for Bloomsburg Area School District and Whitehall School District where I have worked with their teachers and administrators on accountability and data-driven analysis.
- Selected to participate in the first Pennsylvania Technology Leadership Academy through PDE, 2000.
- Served on the planning team to structure the PASCD annual conference, 1996.
- Entertained and interacted with Japanese and Chinese educators as HS principal in 1993 and 1997.
- Highlighted in public television's *Apprise* magazine for an innovative school-based initiative, 1992.
- Recipient of the Central Dauphin School District Distinguished Service Award, 1994.
- Attended many national and state level educational conferences hosted by the College Board National Forum, AASA, PASA, ASCD, PASCD, NASSP, NSDC, ASHS, NSBA, NSDC, DALI, The District Management Group, Communities of Hope Foundation, and PASSP, 1986-pres.
- Active membership in the District Management Council (Boston), the Philadelphia Suburban Superintendent Study Council, and the District Administrator Superintendent Leadership group.