**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

B.L., a minor, by and through her father,  )
LAWRENCE LEVY, and her mother,  )
BETTY LOU LEVY,  )  Civ. No. 3:17-cv-1734-ARC
  )
               Plaintiff,  )  (Hon. A. Richard Caputo)
  )
    v.  )
  )
MAHANOY AREA SCHOOL  )
DISTRICT,  )
  )
              Defendant.  )
_____  )

## REPLY IN SUPPORT OF
## PLAINTIFF B.L.'S MOTION FOR SUMMARY JUDGMENT

Molly Tack-Hooper (PA 307828)
AMERICAN CIVIL LIBERTIES
UNION OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
mtack-hooper@aclupa.org
(215) 592-1513 x 113

Arleigh P. Helfer III (PA 84427)
Theresa E. Loscalzo (PA 52031)
SCHNADER HARRISON
SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103-7286
ahelfer@schnader.com
(215) 751-2000

*Attorneys for Plaintiff B.L., by and through her parents*

February 22, 2019

# **TABLE OF CONTENTS**

Page

INTRODUCTION ......................................................1

I.   THIS COURT IS BOUND BY THE THIRD CIRCUIT'S *FRASER* ANALYSIS IN *J.S.* AND *LAYSHOCK* ............................................2

  A.   There Is No Exception to *J.S.* and *Layshock* for Punishment that Consists Only of Removal from Extracurricular Activities. .......................4

  B.   *J.S.* and *Layshock* Rejected the Notion That Out-of-School Speech "Directed at the School" Should Be Analyzed as On-Campus Speech. ......5

  C.   *J.S.* and *Layshock* Did Not Turn on the Lack of Connection Between the Out-of-School Speech Being Punished and the Extracurricular Activities From Which They Were Removed. ..............................................7

II.   THE DISTRICT CANNOT JUSTIFY B.L.'S PUNISHMENT UNDER *TINKER* WITHOUT ANY EVIDENCE OF SUBSTANTIAL, MATERIAL DISRUPTION ..............................................9

III.   THIS COURT NEED NOT REACH THE QUESTIONS OF VIEWPOINT DISCRIMINATION AND VAGUENESS, BUT THE CHEERLEADING RULES ARE UNCONSTITUTIONALLY VAGUE AND VIEWPOINT DISCRIMINATORY ...................................12

  A.   Viewpoint Discrimination ...............................................13

  B.   Vagueness ..............................................................14

IV.   PLAINTIFF B.L.'S PUNISHMENT IS UNQUESTIONABLY ATTRIBUTABLE TO THE SCHOOL DISTRICT .....................................17

CONCLUSION ......................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*B.H. v. Easton Area Sch. Dist.*,
  725 F.3d 293 (3d Cir. 2013) (en banc) ............................................................11

*Bethel Sch. Dist. No. 403 v. Fraser*,
  478 U.S. 675 (1986)....................................................................*passim*

*City of Canton v. Harris*,
  489 U.S. 378 (1989)........................................................................18

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006)........................................................................11

*Johnson v. Cache Cnty. Sch. Dist.*,
  323 F. Supp. 3d 1301 (D. Utah 2018)..................................................3

*J.S. v. Blue Mt. Sch. Dist.*,
  650 F.3d 915 (3d Cir. 2011) (en banc) ........................................*passim*

*Kowalski v. Berkeley County School*,
  652 F.3d 565 (4th Cir. 2011) ...........................................................6

*Layshock v. Hermitage Sch. Dist.*,
  650 F.3d 205 (3d Cir. 2011) (en banc) ........................................*passim*

*Longoria v. San Benito Consol. Indep. Sch. Dist.*,
  2018 U.S. Dist. LEXIS 186490 (Oct. 31, 2018)..................................20

*Lowery v. Euverard*,
  497 F.3d 584 (6th Cir. 2007) .....................................................10, 11

*Matal v. Tam*,
  137 S. Ct. 1744 (2017)....................................................................13

*Morse v. Frederick*,
  551 U.S. 393 (2007) (Alito, J., concurring).......................................11

*Natale v. Camden Cnty. Corr. Facility*,
  318 F.3d 575 (3d Cir. 2003) ...........................................................18

*Nuxoll ex rel. Nuxoll v. Indian Prairie School Dist. No. 204*,
    523 F.3d 668 (7th Cir. 2008) ...............................................................................13

*Sikirica v. Wettach*,
    811 F.3d 99 (3d Cir. 2016) ...................................................................................17

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969).....................................................................................*passim*

*West Virginia State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943).............................................................................................13

*Wildman ex rel. Wildman v. Marshalltown Sch. Dist.*,
    249 F.3d 768 (8th Cir. 2001) ...............................................................................10

## Constitutional Provisions and Statutes

U.S. Const. amend. I ............................................................................*passim*

42 U.S.C. § 1983..................................................................................18

## Other Authorities

Model Civil Jury Instructions for Civil Rights Claims Under
    Section 1983 (3d Cir. 2018)..................................................................17–18, 20

## **INTRODUCTION**

The bulk of the District's opposition brief is dedicated to advancing novel alternative theories as to why *J.S.* and *Layshock* should not control this case. But this Court is bound not only by the outcomes in *J.S.* and *Layshock*, but also by the Third Circuit's analysis in those cases. The Third Circuit has already determined how *Tinker* and *Fraser* apply to punishment for out-of-school speech, and this Court is bound by the Third Circuit's reading of Supreme Court precedent.

The Court must therefore reject all of the District's proposed new rules that would extend *Fraser*—and limit *J.S.* and *Layshock*—to allow MASD to punish B.L.'s out-of-school speech without meeting the *Tinker* standard. To begin, both J.S. and Layshock were punished not only with suspension from school, but also with removal from extracurricular activities. The Third Circuit decisions in those cases thus apply to both categories of punishment. In addition, the Third Circuit already explicitly rejected the argument that out-of-school speech should be analyzed as in-school speech when it is "directed at a school." The fact that B.L.'s Snap referred to cheerleading thus does not make *J.S.* and *Layshock* inapplicable.

Moreover, as explained at length in Plaintiff's opening brief, *see* ECF 34 at 10–13, the undisputed facts make clear that B.L.'s Snap did not cause substantial, material disruption of any school activity, and that the District did not anticipate

that it would.  The District plainly cannot satisfy its burden to justify B.L.'s punishment under *Tinker*.

Because the District's punishment of B.L. is not authorized by either *Fraser* or *Tinker*, the Court can enter summary judgment for Plaintiff on that basis alone, and need not reach Plaintiff's arguments that the Cheerleading Rules are viewpoint discriminatory and unconstitutionally vague.

Finally, the Court should reject the District's half-hearted attempt at a municipal liability argument.  The District has admitted that it either authorized or approved the Cheerleading Rules.  Because the enforcement of the District's official policy led directly to the violation of B.L.'s rights, the District is liable for that violation.  In addition, every conceivable final decisionmaker for the District either authorized the punishment or ratified it after the fact.

In sum, for the reasons set forth below and in Plaintiff's opening memorandum, the Court should enter summary judgment for Plaintiff B.L. on her First Amendment claim.

## I.  THIS COURT IS BOUND BY THE THIRD CIRCUIT'S *FRASER* ANALYSIS IN *J.S.* AND *LAYSHOCK*

The District relies on a district court decision from Utah for the proposition that this Court was wrong to reject the District's argument that it can punish B.L. for her out-of-school speech under *Bethel School District No. 403 v. Fraser*, 478

U.S. 675 (1986). Def.'s Opp. Br. at 5–6 (citing *Johnson v. Cache Cnty. Sch. Dist.*, 323 F. Supp. 3d 1301 (D. Utah 2018)).

*Johnson* is not as on point as the District claims. The basis for punishment in *Johnson* was the cheerleaders' violation of their coaches' narrow, 24-hour prohibition on publicizing the fact of their selection for the team in order to "provide a small buffer time for students to deal with not making the team." *Johnson*, 323 F. Supp. 3d at 1319. The plaintiff in *Johnson* had posted a video to Snapchat showing herself and her fellow cheerleaders wearing cheer T-shirts they had just received for making the squad, in violation of the prohibition on social media posts publicizing their selection prior to the school assembly the next day. *See id.* at 1309. As the *Johnson* court acknowledged when distinguishing this case, "*B.L.* did not involve a specific situation where students were asked by a coach and school officials not to post a certain message for a limited period of time." *Id.* at 1320.

The much more significant problem with the District's reliance on *Johnson* is that *Johnson* is ineffective in light of the Third Circuit's authoritative *Fraser* and *Tinker* analysis in the binding *en banc* decisions in *J.S.* and *Layshock*.

The District's novel theory as to why *J.S.* and *Layshock* do not require the Court to grant summary judgment for the Plaintiff is unconvincing and entirely unsupported by Third Circuit precedent. The District argues that *J.S.* and *Layshock*

do not apply to students punished with suspension from extracurricular activities when (1) the suspension from extracurricular activities is unaccompanied by a school suspension, (2) the punishment is for off-campus speech that is "directed at the school," or[1] (3) the off-campus speech specifically references the extracurricular activity.  Each of these arguments fails.

### A.  There Is No Exception to **J.S.** and **Layshock** *for Punishment that Consists Only of Removal from Extracurricular Activities.*

*Layshock* and *J.S.* did not hold, as the District misleadingly suggests, that "*Fraser* does not apply to off-campus speech where there is a suspension or expulsion from school."  Def.'s Opp. Br. 4.  In both cases, the plaintiffs had not only been suspended, but had also been punished by being excluded from other extracurricular activities at the school.  Justin Layshock's punishment consisted of a ten-day out-of-school suspension, placement in an alternative education program for the remainder of the school year, being banned from all extracurricular activities, including the Academic Games and foreign language tutoring, and not being allowed to participate in his graduation ceremony.  *Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 210 (3d Cir. 2011) (en banc).  J.S. was punished with a

---

[1]    It is not clear whether the District thinks any one of these circumstances is sufficient to distinguish a case from *J.S.* and *Layshock* or whether all three circumstances are necessary to warrant departure from *J.S.* and *Layshock*.  Because the District styles them as separate arguments, each with its own section of the District's brief, we will address them separately, but note that they do not fare any better in combination than they do individually.

ten-day, out-of-school suspension and exclusion from school dances.  *J.S. v. Blue Mt. Sch. Dist.*, 650 F.3d 915, 922 (3d Cir. 2011) (en banc).  In neither case did the Third Circuit hold—or even suggest—that the constitutionality of each of these punishments should be analyzed separately.  Indeed, the Court *did not* analyze the constitutionality of removing the plaintiffs from extracurricular or "voluntary" activities separately from the constitutionality of suspending them from class—rather, it held that the punishment (all of it) was unconstitutional in both cases.  *See Layshock*, 650 F.3d at 219 (holding that "the District is not empowered to punish his out of school expressive conduct under the circumstances here"); *J.S.*, 650 F.3d at 933 ("[W]e conclude that the *Fraser* decision did not give the School District the authority to punish J.S. for her off-campus speech.")

> ### B.    **J.S. and Layshock *Rejected the Notion That Out-of-School Speech "Directed at the School" Should Be Analyzed as On-Campus Speech.***

The Third Circuit also explicitly rejected the District's theory that off-campus speech should be analyzed like on-campus speech when it is "directed at the school."  Def.'s Opp. Br. 6–8; *see Layshock*, 650 F.3d at 216–19 (rejecting school district's argument that it could punish Layshock under *Fraser* because Layshock's speech "was aimed at the School District community and the Principal" and it was thus "reasonably foreseeable" that it would come to the attention of the district); *J.S.*, 650 F.3d at 933 (3d Cir. 2011) ("[T]o apply the

*Fraser* standard to justify the School District's punishment of J.S.'s speech would

be to adopt a rule that allows school officials to punish any speech by a student that

takes place anywhere, at any time, as long as it is <u>about</u> the school or a school

official, is brought to the attention of a school official, and is deemed 'offensive'

by the prevailing authority. . . . [W]e conclude that the *Fraser* decision did not give

the School District the authority to punish J.S. for her off-campus speech.")

(emphasis in original).

The District ignores this obvious flaw in its argument, relying instead on

*Kowalski v. Berkeley County School*, 652 F.3d 565 (4th Cir. 2011).  But any

persuasive power that *Kowalski* may once have held evaporated when the Third

Circuit decided *J.S.* and *Layshock* in 2013.  This Court does not have the option to

choose to follow *Kowalski* instead of *J.S.* and *Layshock* as the District urges.

The only way in which *Kowalski* differs from *J.S.* and *Layshock* —and

therefore could arguably be distinguishable from them—is that the out-of-school

speech in *Kowalski* was a "hate website" directed at a specific student, implicating

school officials' duty to protect students "as the trustees of the student body's well-

being."  *Kowalski*, 652 F.3d at 573.  But B.L.'s conduct is closer to that of J.S. and

Layshock than Kowalski.  B.L.'s allegedly offensive Snap was not about, or aimed

at, any specific person.  And it certainly did not constitute harassment that would implicate the District's obligation to protect another student.[2]

### C.    J.S. *and* Layshock *Did Not Turn on the Lack of Connection Between the Out-of-School Speech Being Punished and the Extracurricular Activities From Which They Were Removed.*

The District makes one final, unavailing attempt to distinguish *J.S.* and *Layshock*.  The District argues that the First Amendment prohibited suspending J.S. and Layshock from their extracurricular activities but does not likewise prohibit MASD's removal of B.L. from cheerleading because B.L.'s speech referred to cheerleading, and J.S.'s and Layshock's speech did not refer to the extracurricular activities they were removed from.  Def.'s Opp. Br. 15–16.

However, absolutely nothing in *J.S.* or *Layshock* suggests that the Court's holding was based on the lack of connection between the speech being punished and the activities they were banned from.

Moreover, at stake here is not only MASD's power to punish B.L. for criticizing cheerleading pursuant to the provision of the Cheerleading Rules prohibiting "negative information regarding cheerleading, cheerleaders, or coaches," but also its power to punish her pursuant to the much broader "respect"

---

[2]    Notably, the District cites no evidence in support of its claim that "B.L. knew that her posts could reasonably be expected to impact the school environment" and "knew, or should have known, that her post would generate dialogue among her MAHS classmates."  Def.'s Opp. Br. 7.  In addition to B.L.'s knowledge being legally irrelevant in light of *J.S.* and *Layshock*, there is no factual basis for such a finding.

provision.  The "respect" provision—which the District ignores almost entirely—states:

> Please have respect for your school, coaches, teachers, other cheerleaders and teams.  Remember, you are representing your school when at games, fundraisers, and other events.  Good sportsmanship will be enforced, this includes foul language and inappropriate gestures.

Pl.'s Stmt. Undisputed Facts ¶ 19.  Nothing in this provision limits its enforcement to only disrespectful speech *about cheerleading*.  On its face, it commands cheerleaders to have respect not only for coaches, cheerleaders, and other teams, but also for the school and teachers.  Indeed, the District went out of its way in its Opposition to Plaintiff's Statement of Undisputed Facts to note that the District takes the position that the Cheerleading Rules at issue in this case allow it to punish negative speech not just about cheerleaders and cheer coaches, but also about "school teachers, employees and so on."  Def.'s Answer to Pl.'s Stmt. Undisputed Facts, ECF 52, ¶ 18.  Because the District has claimed the power to remove cheerleaders from the squad for out-of-school speech not just about cheer, but about the school generally, narrowing *J.S.* and *Layshock* as the District proposes would not save the Cheerleading Rules from unconstitutionality.

## II.   THE DISTRICT CANNOT JUSTIFY B.L.'S PUNISHMENT UNDER *TINKER* WITHOUT ANY EVIDENCE OF SUBSTANTIAL, MATERIAL DISRUPTION

The District appears to concede that the *Tinker* standard applies to

disruptions of athletics and other voluntary, non-curricular school activities, and

not just disruptions of classroom instruction.  *See* Def.'s Opp. Br. 2 ("Furthermore,

several courts have held that the substantial disruption exception in *Tinker* applies

to potential disruption of team cohesion in scholastic sports."); *id.* 9 ("[C]ourts

have held that the *Tinker* substantial disruption exception applies not only to

general disruptions on school campuses, but also to potential disruptions to athletic

teams from insubordinate students.").

The District is correct that it must satisfy the *Tinker* "substantial, material

disruption" standard in order to punish speech that interferes with extracurricular

activities.[3]  Indeed, *Tinker* was explicit about its application "on the playing field":

> A student's rights . . . do not embrace merely the
> classroom hours.  When he is in the cafeteria, or on the
> playing field, or on the campus during the authorized
> hours, he may express his opinions, even on controversial
> subjects like the conflict in Vietnam, if he does so
> without "materially and substantially interfere[ing] with
> the requirements of appropriate discipline in the

---

[3]      As we explained in our opening brief, it is an open question whether schools
may punish out-of-school speech even upon a showing of substantial, material
disruption. *See* ECF 34 at 1 & n.1.  But assuming punishment of out-of-school
speech is ever justified, it is quite clear that the school would have to satisfy
*Tinker*.

operation of the school" and without colliding with the
rights of others.

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512–13 (1969).

But the District cannot meet the *Tinker* standard in this case. Falling short of

its burden on summary judgment, the District identifies no record evidence that

would support a finding that the District anticipated that B.L.'s Snap would cause

substantial, material disruption, or that it actually did cause such disruption.

Indeed, the District cites ***no evidence at all*** in support of its *Tinker* argument. As

explained in Plaintiff's opening brief, the District cannot justify its punishment of

B.L. under *Tinker* on this record. *See* ECF 34 at 10–13.

The District attempts to liken this case to others in which players were

punished for actively organizing their teammates to mount an insurrection against

the coach. *See* Def.'s Opp. Br. 9–12; *Lowery v. Euverard*, 497 F.3d 584 (6th Cir.

2007) (punishment of football players for circulating a petition saying they hated

the head coach and did not want to play for him); *Wildman ex rel. Wildman v.

Marshalltown Sch. Dist.*, 249 F.3d 768 (8th Cir. 2001) (punishment of basketball

player for not apologizing for writing letter to teammates complaining about not

getting more playing time and proposing that the players give the coach "some of

the bullshit he has given us").

While Plaintiff does not concede that either *Lowery* or *Wildman* was rightly

decided, and they certainly are not binding on this Court, these cases bear no

10

resemblance to the instant case.  Notably absent from the District's argument is a citation to any evidence that would support a finding that B.L.'s conduct amounted to an "attack[] on [the cheer coaches'] authority" that "would effectively strip them of their ability to lead."  Def.'s Opp. at 12 (citing *Lowery*, 497 F.3d at 596–600). To the contrary, the coaches testified that they had no reason to anticipate that B.L.'s Snap would cause disruption.  Pl.'s Stmt. Undisputed Facts ¶ 62.

Nor are students who participate in cheerleading for a few hours a week (at most) analogous to the District's employees, as the District suggests.  When the government is acting as an employer, it generally has the same right to fire employees for the content of their speech as any other at-will employer; the First Amendment is only implicated when a government employee is punished for speaking as a citizen on a matter of public concern.  *See Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).  In contrast, "[w]hen public school authorities regulate student speech, they act as agents of the State[.]"  *Morse v. Frederick*, 551 U.S. 393, 424 (2007) (Alito, J., concurring).[4]

The District bears the burden to justify B.L.'s punishment under *Tinker*. *E.g.*, *B.H. v. Easton Area Sch. Dist.*, 725 F.3d 293, 321 (3d Cir. 2013) (en banc);

---

[4]     In addition, the *Lowery* court's statement, cited by the District, that the government can restrict speech whenever it is "managing programs that citizens participate in voluntarily" is inconsistent with contemporary unconstitutional conditions doctrine, which is explained in Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment.  *See* ECF 49 at 23–24.

*J.S.*, 650 F.3d at 926 (en banc).  It is notable that the District has not even attempted to carry its burden.  In light of the District's complete failure, the Court must enter summary judgment for Plaintiff B.L.

### III.   THIS COURT NEED NOT REACH THE QUESTIONS OF VIEWPOINT DISCRIMINATION AND VAGUENESS, BUT THE CHEERLEADING RULES ARE UNCONSTITUTIONALLY VAGUE AND VIEWPOINT DISCRIMINATORY

In her opening memorandum, Plaintiff explained that, when a school attempts to regulate the conduct of students outside of school, ordinary First Amendment principles should apply, not the relaxed First Amendment rules that permit somewhat greater control over students in school.  *See* ECF 34 at 14–19.

The Court does not have to reach the Plaintiff's viewpoint discrimination and vagueness arguments because it is clear that the District's punishment of B.L. was not justified under either *Tinker* or *Fraser* and was therefore unconstitutional. The Court can unquestionably enter summary judgment for B.L. based solely on the *Tinker* and *Fraser* analysis contained in the Third Circuit's *en banc* decisions in *J.S.* and *Layshock*.

However, even assuming that the relaxed standards applicable to schools' punishment of students' in-school speech are appropriate here, the Cheerleading Rules are plainly both viewpoint discriminatory and unconstitutionally vague.

### A.    *Viewpoint Discrimination*

The District's only response to Plaintiff's argument that the "respect" and "negative information" provisions are patently viewpoint discriminatory—and thus unconstitutional, even in schools—is a citation to *Nuxoll ex rel. Nuxoll v. Indian Prairie School District No. 204*, 523 F.3d 668 (7th Cir. 2008). *Nuxoll* is not the law of this circuit. Moreover, it is unlikely that it is even good law in the Seventh Circuit today in light of the Supreme Court's recent explanation of why anti-disparagement rules—like the prohibition on "derogatory" speech at issue in *Nuxoll*—are facially viewpoint discriminatory, even if officials attempt to enforce them "in an even-handed way" as the school did in *Nuxoll*. *See Matal v. Tam*, 137 S. Ct. 1744 (2017). Rules that prohibit "disrespect" or "negative information" are viewpoint discriminatory for the same reasons that rules prohibiting "disparagement" are viewpoint discriminatory. *See* Mem. Law Supp. Pl.'s Mot. for Summ. J., ECF 34, at 15–16. To be sure, as the Court observed many decades ago, "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

13

Moreover, even if *Nuxoll* were binding on this Court, it in no way stands for the proposition that schools can censor derogatory statements ***outside of school*** in order "to promote civil discourse," as the District claims.  Def.'s Opp. Br. 18. Even *Nuxoll* thus would not justify MASD's punishment of B.L. for her Snap pursuant to the "respect" and "negative information" provisions.

### B.   *Vagueness*

Nothing in the "respect" and "negative information" provisions explicitly states that they can be used to punish speech that occurs outside of school and outside of cheerleading practice or events.  Thus, one of two things must be true: either the rules do not actually justify the District's punishment of B.L.'s out-of-school speech, or the plain language of the provisions is so vague and standardless that it allows for the District's extremely broad interpretation.

In *J.S. v. Blue Mountain School District*, the Third Circuit ruled that the student handbook and a policy governing the acceptable use of school computers that the school had invoked to punish J.S.'s out-of-school speech were not unconstitutionally vague because they in fact quite clearly ***did not*** apply to J.S.'s conduct.  *J.S.*, 650 F.3d at 936.  Here, though, MASD has disclaimed this possibility by consistently maintaining that these rules do indeed apply to B.L.'s Snap and repeatedly arguing that B.L. and her parents had "notice" that she could be punished for speech such as the Snap.

14

But if the "respect" and "negative information" provisions are indeed susceptible to the interpretation that MASD has given them, then they are unconstitutionally vague even under the relaxed vagueness standard applicable in schools.  The District concedes that school rules can still be unconstitutionally vague when the vagueness is "especially problematic."  Def.'s Opp. Br. at 19–20 (quoting *Synpiewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 267 (3d Cir. 2002)).  That is no doubt the case here.

Apart from the fact that the phrase "negative information" is undefined and its meaning wildly unclear, even after the cheer coaches explained what they think it means,[5] the District reads its prohibition on "negative information placed on the internet" as encompassing far more than just speech posted on websites.  Snapchat is not a website; there is no webpage one can navigate to in order to view a Snapchat user's Snaps.[6]  But MASD claims that Snaps are nonetheless "placed on the internet" because they are "travel over the internet, like emails or text messages."  Pl.'s Stmt. Undisputed Facts ¶ 30; *see also* Def.'s Answer to Pl.'s Stmt. Undisputed Facts ¶ 40 ("The District denies that Snapchat posts 'do not

---

[5]     *See generally* Mem. Law Supp. Pl.'s Mot. for Summ. J, ECF 34, at 17–19.

[6]     The District's reference to Snapchat as a "site" (Def.'s Br. Opp. 1) is incorrect, and inconsistent with the District's own responses to Plaintiff's Statement of Undisputed Facts.  *See* Pl.'s Stmt. Undisputed Facts ¶ 40; Def.'s Answer ¶ 40 (admitting that "a user cannot navigate to an Internet web site to view someone's Snaps.").

appear on the internet,' as the messages are delivered to recipients via the Internet.").  When a prohibition on "negative" speech "placed on the internet" can be used to punish any "negative" speech communicated by electronic means, the lack of a definition is "especially problematic."

In addition, the District has interpreted the command in the "respect" provision to "[p]lease have respect for your school, coaches, teachers, other cheerleaders and teams" to prohibit criticism of cheerleading at all times, regardless of whether or not the speech occurs "at games, fundraisers, and other events."  Pl.'s Stmt. Undisputed Facts ¶ 21.[7]  A rule that authorizes punishment of students for "disrespect" anywhere, any time is the very definition of "especially problematic" vagueness.

In sum, if the "respect" and "negative information" provisions of the Cheerleading Rules actually apply to B.L.'s speech, as the District claims, then their vagueness is indeed "especially problematic," as it means there is virtually no time or place where B.L. can ever safely express feelings of dissatisfaction with cheer without risking punishment by the school.

---

[7]     Defendant does not dispute this fact.  *See* Def.'s Answer to Pl.'s Stmt. Undisputed Facts ¶ 21.  Defendant's claim that "By way of further explanation, Luchetta-Rump testified that the 'respect provision' only applies out of school when a cheerleader references cheerleading or is wearing Mahanoy Area High School-related clothing" is false.  *See id*.  The cited testimony was about the second sentence of the "respect" provision—that cheerleaders are representing the District when at games, fundraisers, and events—and not about the applicability of the provision as a whole.

16

## IV.   PLAINTIFF B.L.'S PUNISHMENT IS UNQUESTIONABLY ATTRIBUTABLE TO THE SCHOOL DISTRICT

The District's final hail-Mary argument is that the District neither authorized the coaches to enforce the Cheerleading Rules against B.L. nor ratified their decision to do so, and therefore B.L.'s punishment cannot be attributed to the District.  *See* Def.'s Opp. Br. 20–23.

Remarkably, the District cites ***no evidence*** in support of its argument that the District should not face liability for removing B.L. from the cheerleading team.

The District's municipal liability argument is breathtaking in its disingenuousness, as the rest of the District's legal theory hinges on its contention that rules like the Cheerleading Rules are well understood by players, parents, and coaches, and that coaches' ability to enforce these rules is essential to the District's ability to preserve order on its athletic teams.  Indeed, the District even hired an "expert" in an attempt to prove that punishing students for their out-of-school speech pursuant to team rules like the Cheerleading Rules is both commonplace and vital to the District's pedagogical interests.  A school district is liable when a constitutional violation is caused by a practice that is "so widespread and well-settled that it constitutes a standard operating procedure."  *See* Model Civ. Jury

Instructions, § 4.6.6 (3d Cir. 2018).[8]  Thus, under the District's own theory of the case, the District is liable for B.L.'s punishment under a "custom" theory of municipal liability.

Moreover, the District admitted in its answer to the complaint that the Cheerleading Rules "were approved or ratified by the District administration."  *See* Compl. ¶ 18; Answer ¶ 18.  The District never sought to amend its answer.  This admission is binding on it.  *E.g.*, *Sikirica v. Wettach*, 811 F.3d 99, 109 (3d Cir. 2016) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 470 n.6 (2013)).

Because the District has admitted that the Cheerleading Rules are an official policy of the District, the violation of B.L.'s First Amendment rights caused by their enforcement is attributable to the District.  It is well settled that, when a constitutional violation results from an official policy of a local government unit such as a school district, the government is liable under 42 U.S.C. § 1983.  *E.g.*, *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583–84 (3d Cir. 2003); *City of Canton v. Harris*, 489 U.S. 378, 379 (1989).

In addition to this key admission and the District's own claims of custom, the undisputed facts make plain that B.L.'s punishment was either authorized or

---

[8]     The Third Circuit's Model Civil Jury Instructions pertinent to non-employment 42 U.S.C. § 1983 claims are available at https://www.ca3.uscourts.gov/model-civil-jury-table-contents-and-instructions.

ratified by every conceivable final decision-maker for the District, including the

cheerleading advisors, the athletic director, the high school principal, the

Superintendent, and the school board:

- The District authorizes coaches to draft rules for student athletes, including rules regarding students' out-of-school conduct, and to punish students for violations of those rules.  Pl.'s Stmt. Undisputed Facts ¶ 13.
- The cheerleading advisors issued the Cheerleading Rules at issue in this case pursuant to this authority.  *Id.* ¶ 14.
- The District views the Cheerleading Rules at issue in this case as being consistent with District policies.  *Id.* ¶ 15.
- The cheerleading coaches are authorized to make punishment decisions on their own.  *Id.* ¶ 53.
- The cheerleading coaches nonetheless consulted with the high school principal to get his advice on how to handle B.L.'s Snap.  *Id.* ¶ 52.
- The coaches' decision to remove B.L. from the cheerleading squad as punishment for the Snap was made with the support of the high school principal.  *Id.* ¶ 54.
- The District Superintendent, testifying as a 30(b)(6) witness for the District, testified that the coaches did not exceed the authority they had been given by the District in punishing B.L.  *Id.* ¶ 64.
- Indeed, the District testified that coaches have even greater authority than they exercised in this case, and can remove students from sports or extracurricular activities for saying disparaging things even privately, if the coaches find out about it.  *Id.* ¶ 65.
- After B.L. was removed from the team, she and her parents made repeated requests that the District reconsider B.L.'s punishment, initiating multiple conversations about the issue with the cheerleading coaches, the athletic director, the high school principal, the superintendent, and the school board. Compl. ¶ 41; Answer ¶ 41.
- B.L. asked the high school principal if there was anything she could do to get back onto the cheerleading squad, and he told her that he could not overrule the coaches' decisions.  Pl.'s Stmt. Undisputed Facts ¶ 69.
- On June 9, 2017, B.L.'s father wrote to the District Superintendent, the high school principal, and the District athletic director to appeal B.L.'s dismissal

from the team, explaining that the Snap had been posted on a weekend, off campus, and not during any school or district sporting event, and that it was accessible only to B.L.'s friends, and arguing that the First Amendment forbade punishment under such circumstances. *Id.* ¶ 70.

- On June 29, 2017, B.L.'s father attended a school board meeting in order to ask the board to reinstate B.L. to the cheerleading squad. At that board meeting, Mr. Levy again emphasized the facts and argued that her punishment violated the First Amendment. *Id.* ¶ 71.

- After the Board meeting, the District Superintendent informed Mr. Levy that "the board decided to support the cheer coaches and their decision to remove your daughter from the team." *Id.* ¶ 72.

- On September 1, 2017, counsel for B.L. and her parents wrote to the Superintendent and the District Solicitor, arguing that the First Amendment prohibited the District from punishing B.L. for her out-of-school speech, and requesting that B.L. be reinstated to the team immediately. *Id.* ¶ 74.

*See generally* Model Civ. Jury Instructions, §§ 4.6.1, 4.6.3, 4.6.4, 4.6.5 (explaining law governing municipal liability).[9]

Even viewed in the light most favorable to the District, there is quite simply no record evidence that would support the conclusion that the District did not authorize or ratify B.L.'s punishment. The undisputed evidence makes quite clear that B.L.'s punishment is attributable to the District as a matter of law. Because B.L.'s punishment violated the First Amendment, Plaintiff is entitled to summary judgment against the District.

---

[9]     This record distinguishes this case from *Longoria v. San Benito Consolidated Independent School District*, 2018 U.S. Dist. LEXIS 186490 (Oct. 31, 2018), on which the District relies. *See* Def.'s Opp. Br. 22–23. In *Longoria*, the court found that the school district did not have either actual or constructive knowledge of the rules contained in the cheer squad's constitution. *See id.* *13 n.16.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff requests that the Court enter summary judgment in Plaintiff B.L.'s favor, against Defendant Mahanoy Area School District.

Respectfully submitted,

Dated: February 22, 2019          */s/ Molly Tack-Hooper*
Molly Tack-Hooper (PA 307828)
AMERICAN CIVIL LIBERTIES UNION OF
PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
mtack-hooper@aclupa.org
(215) 592-1513 x 113
Fax: (215) 592-1343

Arleigh P. Helfer III (PA 84427)
Theresa E. Loscalzo (PA 52031)
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA  19103-7286
ahelfer@schnader.com
(215) 751-2000
Fax: (215) 751-2205

*Attorneys for Plaintiff, B.L.*

21

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULES</u>

I certify that this brief complies with the length requirements of Local Rule 7.8(b), in that it does not exceed 5,000 words, exclusive of tables and certifications.  According to the word count feature of Microsoft Word 2016, the body of this brief contains 4,983 words.

Dated:  February 22, 2019                     <u>*/s/ Molly Tack-Hooper*</u>
                                              Molly Tack-Hooper