## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| B.L., a minor, by and through her father, LAWRENCE LEVY, and her mother, BETTY LOU LEVY, | NO. 3:17-CV-01734 |
| Plaintiff, | (JUDGE CAPUTO) |
| v. | |
| MAHANOY AREA SCHOOL DISTRICT, | |
| Defendant. | |

## **MEMORANDUM**

This case raises the question of whether a public school can lawfully remove a student from an extracurricular activity for her profanity, transmitted off school grounds on a Saturday to fellow students. Plaintiff B.L., a student at Mahanoy Area High School, was dismissed from the cheerleading squad for uttering "fuck school, fuck softball, fuck cheer, fuck everything" off school grounds on a Saturday. I hold that B.L.'s words were constitutionally protected by the First Amendment.

Indeed, I granted B.L.'s motion for a preliminary injunction for this reason and suggested that holding otherwise would "allow school children to serve as Thought Police—reporting every profanity uttered—for the District." *B.L. by Levy v. Mahanoy Area Sch. Dist.*, 289 F. Supp. 3d 607, 613 (M.D. Pa. 2017). The District now proffers one Dr. Mussoline as an expert, and moves for summary judgment on the ground that the undisputed evidence gathered since the preliminary injunction hearing proves the District did not violate B.L.'s rights. B.L. cross-moves for summary judgment, arguing just the opposite; B.L. also moves to oust Dr. Mussoline. All three motions are presently before me. Because the undisputed evidence shows the District violated B.L.'s rights, her motion for summary judgment will be granted. The District's motion will accordingly be denied, and B.L.'s motion to exclude the expert report and testimony of Dr. Mussoline will be denied as moot.

## I. Background

Both sides agree on the facts. The Mahanoy Area School District is located in Mahanoy City, a small borough in Schuylkill County, Pennsylvania. (Doc. 40 at ¶ 5 (Defendant's Statement of Undisputed Facts)). B.L. is a junior at Mahanoy Area High School, which is a part of the District. (*Id.* ¶ 2).

In her freshman year, B.L. joined the junior varsity cheerleading squad led by Coaches Nicole Luchetta-Rump (a math teacher at the High School) and April Gnall (a third-grade teacher in the District). (*Id.* ¶¶ 6-9). The squad held tryouts for the next school year in May of B.L.'s freshman year. (*Id.* ¶ 12). Before she could try out, however, B.L. was required to agree to a number of rules that would apply to her if she made the squad again. (*Id.* ¶¶ 16-23). These rules—the "Cheerleading Rules" or "Rules"—state: "Please have respect for your school, coaches, teachers, other cheerleaders and teams. Remember you are representing your school when at games, fundraisers, and other events. Good sportsmanship will be enforced, this includes foul language and inappropriate gestures." (*Id.* ¶ 19 (the "Respect Provision")). The Rules also warn: "There will be no toleration of any negative information regarding cheerleading, cheerleaders, or coaches placed on the internet." (*Id.* ¶ 23 (the "Negative Information Rule")). Coaches Luchetta-Rump and Gnall adopted these Rules from their predecessor, and did not need the District's permission to adopt or enforce them. (*Id.* ¶¶ 15, 24, 45).

B.L. and her mother reviewed the Rules prior to tryouts, and signed a document acknowledging B.L. would be bound by them. (*Id.* ¶ 18). Unfortunately for B.L., tryouts did not go so well—she was placed on the junior varsity squad again for her sophomore year. (*Id.* ¶ 34). And, to add insult to injury, an incoming freshman made the varsity squad. (*Id.* ¶ 35).

In frustration, B.L. took to Snapchat that Saturday. (*See id.* ¶¶ 37, 40). (Snapchat is a social media application for smartphones that allows users to send private text, photo, and video messages to other users—but these messages are limited in duration, cannot be accessed from the web, and can only be viewed temporarily, *see B.L. by Levy v. Mahanoy*

*Area Sch. Dist.*, 289 F. Supp. 3d 607, 610 n.1 (M.D. Pa. 2017)). Posing in street clothes with a friend, middle fingers raised, B.L. took a "selfie" at the Cocoa Hut, a local store and student stomping ground. (*See id.* ¶¶ 37-40). On top of the photo, B.L. added the following text: "fuck school fuck softball fuck cheer fuck everything." (*Id.*). B.L. then posted the captioned photo—the "Snap"—on her private Snapchat account, where it could have been viewed briefly by about two-hundred and fifty (250) of her friends. (*Id.* ¶¶ 37-42). She posted a follow-up Snap just after, reading: "Love how me and [my friend] get told we need a year of jv before we make varsity but that[] doesn't matter to anyone else?" (*Id.* ¶ 41). Many of B.L.'s friends on Snapchat are students at District schools; some are fellow cheerleaders. (*Id.* ¶¶ 42-43).

One of those cheerleaders, Coach Gnall's daughter, came across the Snaps, took screen shots of them (as they were not publicly viewable), and brought them to the coaches' attention. (*Id.* ¶ 43). Meanwhile, with the weekend now over, word of B.L.'s Snaps spread through the school. (*See id.* ¶¶ 57-60). Several students, "both cheerleaders and non-cheerleaders[,] approached Coach Luchetta-Rump to express their concerns that the Snaps were inappropriate." (*Id.* ¶ 59). "Students were visibly upset and voiced their concerns to [Coach] Luchetta-Rump repeatedly for several days." (*Id.* ¶ 60). Accordingly, "Coaches Gnall and Luchetta-Rump jointly decided to suspend B.L. from the cheerleading team for one year for violating the Cheerleading Rules by posting the offensive Snaps." (*Id.* ¶ 44). Specifically, "B.L. was disciplined for violating the Respect Provision and the Negative Information Rule of the Cheerleading Rules . . . ." (*Id.* ¶ 57). Even though electronic squabbling amongst cheerleaders at the High School "is a fairly typical occurrence," the coaches felt the need to enforce the Rules against B.L. "to 'avoid chaos' and maintain a 'team-like environment.'" (*Id.* ¶¶ 55-56). "The cheerleading coaches would not have suspended B.L. from the team if her Snaps had not referenced cheerleading," though. (*Id.* ¶ 58).

B.L.'s father appealed to the School Board, but the Board declined to get involved. (*Id.* ¶ 49-51). Accordingly, B.L., through her parents, filed suit against the District for

declaratory and injunctive relief. (*See* Doc. 1; Doc. 33-1 (giving up her claim for damages)). B.L. contemporaneously filed a motion for a temporary restraining order and preliminary injunction (Doc. 2); I granted the TRO pending resolution of the preliminary injunction motion (Doc. 5). After holding a hearing, I issued a preliminary injunction, finding that, among other things, B.L. was likely to succeed on the merits. *See B.L. by Levy v. Mahanoy Area Sch. Dist.*, 289 F. Supp. 3d 607 (M.D. Pa. 2017). The District subsequently answered the complaint (Doc. 16), discovery ensued, and both sides have moved for summary judgment. (Docs. 33, 37). B.L. also moves to exclude the expert report and testimony of Dr. Lawrence J. Mussoline, whom the District retained to opine on a number of matters related to cheerleading, school discipline, and sports teams. (Doc. 135).

All three motions have been fully briefed and are now ripe for review.

## II. Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   "A court may grant a motion for summary judgment if, after it considers all probative materials of record, with inferences drawn in favor of the non-moving party, the court is satisfied that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 218 (3d Cir. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986); *Brooks v. Kyler*, 204 F.3d 102, 105 n.5 (3d Cir. 2000)).   "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law.  A dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter . . . ." *American Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009) (citing *Anderson*, 477 U.S. at 248-49).

The moving party bears the initial burden to identify "specific portions of the record

that establish the absence of a genuine issue of material fact." *Santini*, 795 F.3d at 416 (citing *Celotex*, 477 U.S. at 323). If this burden is satisfied by the movant, the burden then "shifts to the nonmoving party to go beyond the pleadings and 'come forward with specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The non-movant's burden is not satisfied by "simply show[ing] that there is some metaphysical doubt as to the material facts." *Chavarriaga*, 806 F.3d at 218 (quotation omitted).

Although the parties have filed cross-motions for summary judgment, this legal standard remains the same. *Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 401 (3d Cir. 2016). Normally, a court considers each motion independently, *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 F. App'x 266, 270 (3d Cir. 2006), and the denial of one does not imply the granting of the other. *Bacon v. Avis Budget Grp., Inc.*, No. CV165939MKJBC, 2018 WL 6492923, at *7 (D.N.J. Dec. 7 2018). But where, as here, "review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts." *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F. Supp. 2d 425, 430 (M.D. Pa. 2006) (citing *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998)).

### III. Discussion

### A.

Courts have discussed the landscape of First Amendment law in public schools at length. *See, e.g.*, *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 211-14 (3d Cir. 2011). A brief discussion of the major school speech precedents suffices here.

The Supreme Court established in the landmark case of *Tinker v. Des Moines Independent Community School District* that public school students do not shed their speech rights at the "schoolhouse gate." 393 U.S. 503, 506 (1969). The plaintiffs in that case, students who wore black armbands to protest the Vietnam War, were suspended by their school after ignoring its ban on the armbands. *Id.* at 504. The Court held the school violated the students' First Amendment rights because the students' expression did not

"materially and substantially disrupt the work and discipline of the school," and because school officials did not reasonably forecast such disruption. *Id.* at 513. *Tinker* thus sets the baseline for what student speech is protected: anything that does not, or in the view of reasonable school officials, will not cause material and substantial disruption at school. Later cases set out exceptions to this broad dictate.

The first exception was created in *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986). In *Fraser*, a student gave a speech laden with sexual innuendo at a school assembly. *Id.* at 678. The school suspended the student, and the Supreme Court upheld the suspension on the ground that a school may punish students for their "offensively lewd," "obscene," "indecent," and "vulgar" speech without finding that substantial disruption would occur. *Id.* at 685. The Court noted that schools have a duty to "inculcate the habits and manners of civility," *id.* at 681 (quotation omitted), and so "[t]he First Amendment does not prevent . . . school officials from determining that to permit a vulgar and lewd speech . . . would undermine the school's basic educational mission," *id.* at 685. Justices Brennan and Marshall would have instead relied on the rule announced in *Tinker*, although they disagreed as to whether on the facts of the case the school could have reasonably forecast substantial disruption. *Compare id.* at 687-90 (Brennan, J., concurring in the judgment), *with id.* at 690 (Marshall, J., dissenting).

*Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988) established the next *Tinker* exception. In *Kuhlmeier*, the Court held that schools may "exercis[e] editorial control over the style and content of student speech in school-sponsored expressive activities so long as [its] actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273. Under the *Kuhlmeier* exception, schools "are entitled to exercise greater control" over "school-sponsored . . . expressive activities that students, parents, and members of the public might reasonably believe to bear the imprimatur of the school." *Id.* at 270-21. Justice Brennan, joined by Justices Marshall and Blackmun, criticized the majority opinion for "abandoning *Tinker*," creating a new "distinction between personal and school-sponsored speech," and relying on "the school's pedagogical message" as a "constitutionally sufficient

justification for the suppression of student speech." *Id.* at 280, 282 (Brennan, J., dissenting). It appears that of the Court's student speech precedents, only *Kuhlmeier* holds a court can balance a student's speech against "legitimate pedagogical concerns;" however, this balancing is limited to situations in which a reasonable observer would conclude the speech is essentially that of the school itself. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 834 (1995).

The final exception to *Tinker* was announced in *Morse v. Frederick*, 551 U.S. 393 (2007). The student in *Morse*, "[a]t a school-sanctioned and school-supervised event," held up a banner that the high school principal "reasonably regarded as promoting illegal drug use." *Id.* at 396. The principal ordered the banner be taken down, and the student who refused to comply was suspended. *Id.* The Court, upholding the suspension, held "that schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use." *Id.* Justice Alito concurred, but "on the understanding that the [majority] opinion does not hold that the special characteristics of the public schools necessarily justify any other speech restrictions." *Id.* at 423 (Alito, J., concurring). In his concurrence, Justice Alito also noted that the majority opinion "does not endorse the broad argument . . . that the First Amendment permits public school officials to censor any student speech that interferes with a school's 'educational mission.'" *Id.* (quotation omitted). That argument could "easily be manipulated in dangerous ways," and "would give public school authorities a license to suppress speech . . . based on disagreement with the viewpoint expressed." *Id.*

Under the Supreme Court's student speech precedents, there are thus four rules: (1) "Under *Fraser*, a school may categorically prohibit lewd, vulgar or profane language[;]" (2) "Under [*Kuhlmeier*], a school may regulate school-sponsored speech . . . on the basis of any legitimate pedagogical concern[;]" (3) Under *Morse*, a school may categorically prohibit speech that can reasonably be regarded as encouraging illegal drug use; and (4) "Speech falling outside of these categories is subject to *Tinker*'s general rule: it may be regulated only if it would substantially disrupt school operations or interfere with the right of others."

*Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 214 (3d Cir. 2001) (Alito, J.).

The Third Circuit has provided further clarification with regard to student speech in the digital era. In *J.S. ex rel. Snyder v. Blue Mountain School District* and *Layshock ex rel. Layshock v. Hermitage School District*, students were suspended for creating websites that lampooned school officials using vulgar language. *See J.S. ex rel. Snyder*, 650 F.3d 915, 920-22 (3d Cir. 2011) (en banc); *Layshock ex rel. Layshock*, 650 F.3d 205, 208-10 (3d Cir. 2011) (en banc). In decisions handed down the same day, the Third Circuit held that (1) student speech uttered off-campus is not rendered "on-campus speech" simply because it eventually reaches inside the school; (2) *Fraser* is inapplicable to off-campus speech; and (3) *Tinker* might apply to off-campus speech. *See J.S. ex rel. Snyder*, 650 F.3d at 926, 930-32; *Layshock ex rel. Layshock*, 650 F.3d at 215-19.

With this background in mind, I turn to the applicable legal framework and the parties' arguments. It is not clear if student speech claims are meant to be addressed under the three-step First Amendment retaliation framework. *Compare Monn v. Gettsyburg Area Sch. Dist.*, 553 F. App'x 120, 122 (3d Cir. 2014) (applying the First Amendment retaliation framework to students' claims of school officials' punishment for speech) *and Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006) (same), *with J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 928-33 (3d Cir. 2011) (en banc) (analyzing the student's speech under *Tinker* and *Fraser* without reference to the First Amendment retaliation framework). I assume that they are—with the caveat that *Tinker* places the burden on the school to show its action was constitutionally permissible. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969) ("[the State] must be able to show that its action was caused by something more than a mere desire" to suppress unpopular speech); *see United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816-17 (2000) (citing *Tinker* for the proposition that "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions"). Under the First Amendment retaliation framework, the student's speech must first be "protected." *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003). Next, the school must have punished her, *Walker-Serrano ex*

*rel. Walker v. Leonard*, 325 F.3d 412, 419 (3d Cir. 2003), or took "an adverse action . . . sufficient to deter a person of ordinary firmness from exercising h[er constitutional rights,]" *Mitchell*, 318 F.3d at 530 (quotation omitted). Finally, there must be a "causal link" between the student's protected speech and the school's punishment or sufficiently adverse action. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001) (quotation omitted).

Although the parties have not referenced this standard in their briefing, their arguments are primarily focused on the first step—that is, whether B.L.'s speech was protected. If, on the undisputed facts, B.L.'s speech was unprotected, then the District's motion for summary judgment must be granted; however, if B.L.'s speech was protected, then her motion for summary judgment will prevail.

**B.**

I need to clear away some argumentative brush before getting to the root of the dispute, though. The District first argues that B.L. waived her First Amendment rights when she joined the cheerleading squad. (Doc. 55 at 10-12). The District maintains that both B.L. and her mother voluntarily waived B.L.'s First Amendment rights by signing the "Application for Cheerleading Tryouts" (which conditioned participation on abiding by the Cheerleading Rules). (*Id.*). B.L. responds that there is no evidence to support a finding of waiver, and regardless, the District cannot condition extracurricular participation on a waiver of constitutional rights. (Doc. 49 at 27-30).

The District has not produced sufficient evidence that B.L. waived her speech rights. Courts must "indulge every reasonable presumption against waiver of fundamental constitutional rights." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (quotation omitted). The voluntary, knowing, and intelligent waiver of one's First Amendment rights must be shown by "clear and compelling" evidence. *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 145 (1967). "Such volition and understanding are . . . present[] where the parties to the contract have bargaining equality and have negotiated the terms of the contract, and where the waiving party is advised by competent counsel and has engaged in other contract negotiations." *Erie Telecomms., Inc. v. City of Erie*, 853 F.2d 1084, 1096 (3d Cir. 1988). *But see Yoder v. Univ.*

*of Louisville*, 526 F. App'x 537, 546-47 (6th Cir. 2013) (granting qualified immunity to the defendant based on a looser waiver standard). There is no evidence that any of these factors is present here: neither B.L. nor her mother had bargaining equality with the coaches or the school; the Cheerleading Rules were not subject to negotiation; and B.L. and her mother were not represented by counsel when they agreed B.L. would abide by the Rules. Additionally, conditioning extracurricular participation on a waiver of a constitutional right is coercive. *See Moran v. Burbine*, 475 U.S. 412, 421 (1986) (waiver is involuntary if it is coerced); *cf. Capua v. City of Plainfield*, 643 F. Supp. 1507, 1521 (D.N.J. 1986) (conditioning continued employment on agreeing to urine testing "coerced a waiver of any rights" employees had). B.L. did not, therefore, waive her First Amendment rights.

Next, the District contends that it cannot be liable because the coaches' actions are not vicariously attributable to it, *see Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978). (Doc. 51 at 23-26). B.L. has not shown, the District argues, that, consistent with the rule established in *Monell*, the District "implement[ed] an official policy, practice or custom" that violated B.L.'s constitutional rights. *Losch v. Borough of Parkesburg, Pa.*, 736 F.2d 903, 910 (3d Cir. 1984) (citation omitted). This argument can be dismissed out of hand because the District admits it "approved or ratified" the Cheerleading Rules pursuant to which B.L. was punished, (Doc. 16 at ¶ 18), and delegated its authority over the cheerleading team to Coaches Luchetta-Rump and Gnall, (*see, e.g.*, Doc. 40 at ¶ 45 ("The cheerleading coaches did not need—and did not receive—authorization from [the District] to suspend B.L. from the team."); *id* ¶ 51 ("The School Board decided that it should not get involved in the minutiae of extracurricular activities, and that coaches must be permitted to hold students accountable for their actions.")). *See Seamons v. Snow*, 206 F.3d 1021, 1029 (10th Cir. 2000) ("[T]he record indicates that Coach Snow, and only Coach Snow, was vested by the school district with the authority to make final decisions regarding membership on the . . . football team. Because of this delegation of authority, the school district can be held liable for Coach Snow's actions on team membership." (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986))).

Finally, the District argues that because students have no constitutional right to participate in extracurricular activities like cheerleading, B.L.'s mere removal from the squad could not have violated her rights. (Doc. 38 at 16-20; Doc. 55 at 4-7). In response, B.L. argues that whether she has a constitutional right to participate in extracurricular activities or whether her coaches' sanction was "harsh enough" is irrelevant to First Amendment analysis. (Doc. 34 at 19-20; Doc. 49 at 23).

I agree with B.L. What the District's argument does is put the constitutional cart before the horse. The court in *Johnson v. Cache County School District* (which the District relies on) made the same mistake. 323 F. Supp. 3d 1301, 1321 (D. Utah 2018) ("The court finds the cases recognizing the distinction between school suspension and participation in an extracurricular activity to be more persuasive given that there is no constitutional right to participate in an extracurricular activity."). The issue with this reasoning, which assumes all student athlete speech is *ipso facto* less protected, *see Lowery v. Euverard*, 497 F.3d 584, 605 (6th Cir. 2007) (Gilman, J., concurring in the judgment) is two-fold: it muddies the First Amendment analysis, and conflates it with Due Process analysis.

As to the first point, the threshold inquiry under standard First Amendment analysis is whether speech is protected—considering the speech at issue and the context in which it was uttered. *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). Take *Tinker*, for example. Student speech that would not materially disrupt school or invade the rights of others is protected. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513-14 (1969). That standard does not ask courts to consider the punishment the school doled out or its effect on independent constitutional interests in determining whether student speech was protected in the first place. *See id. Contra Lowery v. Euverard*, 497 F.3d 584, 588 (6th Cir. 2007) ("The Court must consider the content and context of the speech, *and the nature of the school's response*." (emphasis added)). Whether a school's chosen punishment was constitutionally impermissible is a separate question, with a hair trigger for liability. *See Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 419 (3d Cir. 2003) (a school cannot engage in "punishment for expression, a significant pattern of concrete suppression,

or some other form of clear suppression of the expression of [students]"); *Rauser*, 241 F.3d at 333 (retaliation is actionable if it is "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights" (quotation omitted)); *see also Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76 n.8 (1990) ("[T]he First Amendment . . . protects state employees . . . from even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights." (quotation omitted)). And whether the government, in retaliation, revoked something the speaker was not constitutionally entitled to is irrelevant to either question. *Rauser*, 241 F.3d at 333.

That is the second point. First Amendment analysis is distinct from Due Process analysis under the Fourteenth Amendment, which does measure constitutional interests against government actions, *see Isbell v. Bellino*, 983 F. Supp. 2d 492, 509-10 (M.D. Pa. 2012). As far as the First Amendment is concerned, though, that there is no general constitutional right to cheerlead, *see Blasi v. Pen Argyl Area Sch. Dist.*, 512 F. App'x 173, 175 (3d Cir. 2013), is just a truism. Students do not shed their First Amendment rights at the schoolhouse gate despite having no general constitutional right to public education, either. *Plyler v. Doe*, 457 U.S. 202, 221 (1982); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969). The right a public school infringes by punishing a student for protected speech is not the right to education or to play a sport, it is the right to freedom of speech. *See Tinker*, 393 U.S. at 511-14; *T.V. ex rel. B.V. v. Smith-Green Cmty. Sch. Corp.*, 807 F. Supp. 2d 767, 780 (N.D. Ind. 2011). By analogy, a school district violates the Constitution by discriminating against applicants for teaching positions on the basis of race, *Hazlewood Sch. Dist. v. United States*, 433 U.S. 299, 309 n.15 (1977), even though applicants do not have a constitutional right to or a property interest in a government job, *see Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 588 (1972) (Marshall, J., dissenting). The constitutional problem in both cases is not the government's actions themselves, but the reasons why they were taken. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283-84 (1977); *Perry v. Sindermann*, 408 U.S. 593, 597

(1972).

Take *Doninger v. Niehoff*, 527 F.3d 41 (2d Cir. 2008), for example, which the District relies on for the proposition that "exclusion from extracurricular activities does not require the same scrutiny as a suspension or expulsion from school." (Doc. 55 at 7). *Doninger* explains (albeit indirectly) the distinction between First Amendment and Due Process claims in this context. The *Doninger* court, *after* holding the student's speech likely unprotected under *Tinker*, noted that "given the *posture* of th[e] case," it "ha[d] no occasion to consider whether a different, more serious consequence than disqualification from student office would raise constitutional concerns." *Id.* at 53 (emphasis added). For that proposition, *Doninger* cited *Wisniewski v. Board of Education of the Weedsport Central School District*, which in turn declined to decide whether the First Amendment or Fourteenth Amendment would apply to a "distinct challenge to the extent of the [school's] discipline" for a student's speech. 494 F.3d 34, 40 (2d Cir. 2007) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). In other words, if a student challenges her school's punishment as excessive, the rubric of Due Process might be more appropriate in resolving that claim. In that case, it would be relevant that the law recognizes a student's property interest in public education but not in participation in extracurricular activities. *See, e.g.*, *Dominic J. v. Wyoming Valley W. High Sch.*, 362 F. Supp. 2d 560, 572 (M.D. Pa. 2005). But just as in *Doninger*, B.L. is not mounting that sort of challenge, so First Amendment standards apply.

And the Third Circuit has made the applicable standard clear: a public school's "punishment" for a student's protected expression opens the courthouse doors. *Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 419 (3d Cir. 2003). Accordingly, students have been found likely to succeed in First Amendment challenges to seemingly minor discipline. *See, e.g.*, *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 102 (3d Cir. 2013) (upholding preliminary injunction against school that denied the plaintiff's request to "distribut[e] invitations to her classmates to a Christmas party at her church"). If telling a student "Don't distribute invitations" can be unconstitutional, surely kicking a student off the team can be too—as the Ninth and Tenth Circuits implicitly hold. *See Pinard v. Clatskanie*

*Sch. Dist. 6J*, 467 F.3d 755, 771 (9th Cir. 2006) (remanding for a determination as to whether the coach's "decision to suspend [the plaintiffs] permanently from the team" was motivated by the plaintiffs' protected speech); *Seamons v. Snow*, 206 F.3d 1021, 1028 (10th Cir. 2000) (concluding plaintiff produced enough evidence to support his First Amendment claim against his coach, who suspended then dismissed him from the football team).

Contrary to what the District suggests, courts have not held that mere exclusion from an extracurricular activity reduces or fails to raise constitutional concerns. The dicta from *Doninger* and *Wisniewski* regarding Due Process do not imply a school's punishment must exceed removal from an extracurricular activity in order to offend the First Amendment. In fact, the Second Circuit expressly rejected that implication later in the *Doninger* litigation. *Doninger v. Niehoff*, 642 F.3d 334, 351 (2d Cir. 2011) ("To be clear, we do not conclude in any way that school administrators are immune from First Amendment scrutiny when they react to student speech by limiting students' participation in extracurricular activities."). Even the Sixth and Eighth Circuits, while noting that dismissal from an extracurricular activity does not impact a student's "regular education," did not go so far as holding such dismissal unactionable. *See Lowery v. Euverard*, 497 F.3d 584, 600-01 (6th Cir. 2007) (holding the plaintiffs' speech unprotected under *Tinker*); *Wildman ex rel. Wildman v. Marshalltown Sch. Dist.*, 249 F.3d 768, 772 (8th Cir. 2001) (holding "no basis for a claim of a violation of free speech" existed where the plaintiff's speech was unprotected under *Tinker* or *Fraser* and where the coach dismissed the plaintiff for refusing to apologize for that unprotected speech). To the extent *Lowery* or *Wildman* could be read to hold a dismissed athlete's rights are not infringed because she may still attend class and is free to continue her protected speech elsewhere—which is a stretch—that reading is inconsistent with First Amendment principles. *Compare Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (whether "ample alternative channels for communication" exist despite a reasonable government time, place, or manner restriction is relevant for *forum analysis*), *with K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 112 (3d Cir. 2013) (forum analysis is inapplicable

in student speech cases governed by *Tinker*); *see id.* at 102 (a student prohibited from distributing invitations in school, though not excluded from class and free to distribute invitations elsewhere, was still likely to succeed on a First Amendment claim); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283-84 (1977) (a public school may not fire a teacher "by reason of his exercise of constitutionally protected First Amendment freedoms," even though he is free to continue speaking and seek employment elsewhere).

In sum, the fact that this case involves cheerleading is only appropriately considered in determining whether B.L.'s speech was protected. *See Doninger v. Niehoff*, 527 F.3d 41, 52 (2d Cir. 2008); *T.V. ex rel. B.V. v. Smith-Green Cmty. Sch. Corp.*, 807 F. Supp. 2d 767, 781 (N.D. Ind. 2011). "By choosing to 'go out for the team,'" student athletes like B.L. do "voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657 (1995). But "players do not completely waive their rights when they join a team[,]" *Lowery v. Euverard*, 497 F.3d 584, 600 (6th Cir. 2007), as the First Amendment also reaches "the playing field," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969).

## C.

On to the substance. The District argues its punishment was permissible (and, conversely, that B.L.'s speech was unprotected) for three reasons: first, as a threshold matter, schools can punish students for off-campus speech, (Doc. 38 at 11-12); second, *Tinker* allows schools to punish student speech that has the potential to disrupt an athletic team, and speech that, in the absence of punishment, would likely result in "substantial disruption of the [school's] educational mission," (*id.* at 15; Doc. 51 at 12-17); and third, *Fraser* permitted the District's discipline, (Doc. 38 at 21-26). B.L. counters that her speech caused no substantial disruption and was thus protected under *Tinker*, and that *Fraser* cannot apply to off-campus speech. (Doc. 49 at 12-23).

The District's concession that B.L.'s speech occurred off-campus is all but fatal. The Third Circuit held in *J.S. ex rel. Snyder v. Blue Mountain School District* that a school cannot

punish a student for off-campus speech that is merely profane. 650 F.3d 915, 932-33 (3d Cir. 2011) (en banc). The *Fraser* exception to *Tinker*, the Third Circuit explained, "cannot be extended to justify a school's punishment . . . for use of profane language outside the school, during non-school hours." *Id.* at 932 (footnote omitted). In so holding, the Third Circuit rejected the school's argument that the student's speech was punishable because it was "lewd, vulgar, and offensive [and] *had an effect on the school and the educational mission of the District.*" *Id.* (emphasis added).

　　*J.S. ex rel. Snyder* thus forecloses nearly all the District's arguments. *Fraser* cannot justify its punishment. B.L. "spoke," through Snapchat, in street clothes, at the Cocoa Hut, on a Saturday; the District does not and cannot claim that constitutes on-campus speech. Nor can *Tinker* justify the District's punishment, even if the District rephrases its concern as "disruption of the educational mission" of the team or the school. As Justice Brennan made clear in his *Kuhlmeier* dissent, *Tinker* is not concerned with the disruption of a school's educational mission. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 280-82 (1988) (Brennan, J., dissenting). Moreover, a school cannot circumvent *Tinker*, *Fraser*, and *J.S. ex rel. Snyder* by simply defining its educational mission in a way that prohibits off-campus vulgarity. *See J.S. ex rel. Snyder*, 650 F.3d at 932 (implicitly rejecting this argument); *see also Morse v. Frederick*, 551 U.S. 393, 405 (2007) ("Had Fraser delivered the same [lewd] speech in a public forum outside the school context, it would have been protected."); *id.* at 423 (Alito, J., concurring) (school officials cannot simply "censor any student speech that interferes with a school's 'educational mission'"). If that were the law, public schools would "possess absolute authority over their students" and become "enclaves of totalitarianism." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969); *see J.S. ex rel. Snyder*, 650 F.3d at 933 ("Under this standard, two students can be punished for using a vulgar remark to speak about their teacher at a private party, if another student overhears the remark, reports it to the school authorities, and the school authorities find the remark 'offensive.'"); *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 216 (3d Cir. 2011) (en banc) ("It would be unseemly and dangerous precedent to allow the state, in the

guise of school authorities, to reach into a child's home and control his/her actions there to the same extent it can control that child when he/she participates in school sponsored activities."); *B.L. by Levy v. Mahanoy Area Sch. Dist.*, 289 F. Supp. 3d 607, 614 (M.D. Pa. 2018) ("school children" may not "serve as Thought Police—reporting every profanity uttered—for the District"). Therefore, neither *Tinker* (as uniquely interpreted by the District) nor *Fraser* can justify B.L.'s punishment.

That this is a cheerleading case does not change the result. Yes, context matters. Student athletes can expect a greater degree of regulation than students generally. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657 (1995). And "[t]he narrower goals of an athletic team . . . are not always consistent with the freewheeling exchange of views that might be appropriate in a classroom debate." *Blasi v. Pen Argyl Area Sch. Dist.*, 512 F. App'x 173, 175 (3d Cir. 2013); *see Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1190 (6th Cir. 1995) ("The plays and strategies are seldom up for debate."). Consequently, the same speech that is protected in the classroom might not be on the playing field. *Compare Layshock ex rel. Layshock*, 650 F.3d at 208-09, 219 (online, off-campus criticism of school principal protected), *with Lowery v. Euverard*, 497 F.3d 584, 585-86, 600-01 (6th Cir. 2007) (plaintiffs' petition criticizing their coach, apparently created off-campus, not protected).

But there is nothing unique about athletics that would justify a broader application of *Tinker* or *Fraser* to a student athlete's off-the-field profanity. For one, "[t]he examples given by the Court in *Vernonia* of increased regulation over student-athletes" do not support "similar restriction[s] on free-speech rights," *Lowery*, 497 F.3d at 605 (Gilman, J., concurring)—especially restrictions on speech uttered beyond the coach's bailiwick. More importantly, however, even though "[e]xecution of the coach's will is paramount," *Dambrot*, 55 F.3d at 1190, punishing speech that would not undermine the coach's will or the team's functioning serves no legitimate purpose. *See Seamons v. Snow*, 206 F.3d 1021, 1030 (10th Cir. 2000) ("[C]oaches may not penalize players for engaging in peaceful speech activity which does not create substantial disorder, materially disrupt class work, or invade the rights of others."); *cf. Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 514

(1969); *Blasi v. Pen Argyl Area Sch. Dist.*, 512 F. App'x 173, 175 (3d Cir. 2013) ("School officials have a legitimate interest in affording student athletes 'an educational environment conducive to learning team unity and sportsmanship and free from disruptions that could hurt or stray the cohesiveness of the team.'" (quoting the school district's brief in *Wildman ex rel. Wildman v. Marshalltown Sch. Dist.*, 249 F.3d 768, 771 (8th Cir. 2001))). The interest that a school or coach has in running a team does not extend to off-the-field speech that, although unliked, is unlikely to create disorder on the field. *Cf. Flaherty v. Keystone Oaks Sch. Dist.*, 247 F. Supp. 2d 698, 704 (W.D. Pa. 2003) ("While [the school principal] believes that he can discipline a student [athlete] for bringing 'disrespect, negative publicity, [and] negative attention to our school and to our volleyball team,' this is simply not sufficient to rise to the level of 'substantial disruption' under *Tinker*."); *Killion v. Franklin Reg'l Sch. Dist.*, 136 F. Supp. 2d 446, 448-49, 455 (W.D. Pa. 2001) (student athlete's online criticism of his school's athletic director was protected because, although "upsetting" to the athletic director, the speech was not threatening and led to no actual disruption). Nor does that interest encompass discipline for discipline's sake, as the District suggests. *See Killion*, 136 F. Supp. 2d at 456 ("We cannot accept, without more, that the childish and boorish antics of a minor could impair the administrators' abilities to discipline students and maintain control."); *Klein v. Smith*, 635 F. Supp. 1440, 1442 n.4 (D. Me. 1986) ("[T]he future course of the administration of discipline [will not] dissolve, willy-nilly, in the face of the digital posturing of [a] splenetic, bad-mannered little boy."). High school athletics are not reserved for the popular and the unfailingly polite.

On the other hand, a coach would have a legitimate interest in regulating student athlete speech that bears the imprimatur of the team or the school. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271-73 (1988). It is unclear to me, though, how a student athlete's off-the-field speech bears such an imprimatur, or how athletics constitute the sort of "vehicle[s] of student expression" *Kuhlmeier* was concerned with. *See id.* at 273. To the extent the District argues *Kuhlmeier* justifies its discipline because profanity conflicts with the coaches' legitimate pedagogical concerns, the District has not produced any evidence

that B.L.'s speech bore the imprimatur of the school or the squad, or that a reasonable observer would so conclude. A passing reference to cheerleading on B.L.'s private social media account does not equate to an imprimatur. *Cf. Morse v. Frederick*, 551 U.S. 393, 405 (2007) ("*Kuhlmeier* does not control this case because no one would reasonably believe that Frederick's banner [which read 'BONG HiTS 4 JESUS'] bore the school's imprimatur.").

The District is thus left to rely on *Tinker* (as it is normally applied), but it has not shown that B.L.'s speech created any substantial disorder or likelihood thereof. The most it can muster is "student concerns" over B.L.'s Snaps and an admittedly brief disruption of Coach Luchetta-Rump's math class, even though squabbling amongst squad members is a "fairly typical occurrence." (*See* Doc. 40 at ¶¶ 56, 59, 60; Doc. 40-13 at 59:23-25; 60:1-10). Such "general rumblings" do not amount to substantial disruption. *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 922-23 (3d Cir. 2011) (en banc); *see B.H. v. Easton Area Sch. Dist.*, 725 F.3d 293, 321-22 (3d Cir. 2013) (en banc) ("Student expression may not be suppressed simply because it gives rise to some slight, easily overlooked disruption[.]").

The coaches did not reasonably predict any substantial disruption, either. True, Coach Luchetta-Rump raised the specter of potential "chaos." (Doc. 40-13 at 32:4-22). But her understanding of "chaos" is at odds with the "substantial disruption" standard. The only prior example of "chaos" Coach Luchetta-Rump could give (which again, she described as a "fairly typical occurrence") was a situation where one cheerleader texted another "something mean," so she spoke with both of them to "put the fire out" without resorting to punishment. (*Id.* at 32:4-22). And the only other time the "Negative Information Rule" was enforced was against Coach Gnall's own daughter, who was suspended from a few games for speaking ill of a rival school's cheerleading uniforms online—without any finding of actual or likely disruption. (*Id.* at 30:9-25; 31:1-19). Thus, even viewing Coach Luchetta-Rump's talismanic incantation of chaos in the light most favorable to the District, *Tinker* remains unsatisfied. "Undifferentiated fear or remote apprehension of disturbance" does not suffice. *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 257 (3d Cir. 2002) ("It may be

argued the school was entitled to conclude the T-shirt was likely to lead to disruption because [plaintiff's] wearing of the ["redneck"] shirt amounted to a promotion of values consistent with the items and activities that had caused racial unrest [in the past.] Again, mere association is not enough."); *cf. Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 212 (3d Cir. 2001) ("[I]f a school can point to a well-founded expectation of disruption—especially one based on past incidents arising out of similar speech—the restriction may pass constitutional muster."). The vague similarity of B.L.'s Snaps to speech that caused little disruption in the past is no ground for predicting substantial disruption in the future. Moreover, Coach Luchetta-Rump testified, at both the preliminary injunction hearing and at her deposition, that she punished B.L. for profanely referencing cheerleading, not because of any possibility of disruption. (*See* Doc. 40-13 at 47:2-11; 53:10-24; 62:8-11). She would have punished B.L.—under the same Rules—if B.L.'s Snap read: "Cheerleading is fucking awesome." (*Id.* at 47:7-11). The District cannot sidestep these admissions and have me theorize what a reasonable coach could have concluded about B.L.'s speech. B.L.'s mere off-campus profanity is what upset Coach Luchetta-Rump, not the potential for chaos about which the District's evidence, at best, raises "metaphysical doubt." *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210 (3d Cir. 2015) (quotation omitted).

All of this discussion can be distilled into a single point: Coaches cannot punish students for what they say off the field if that speech fails to satisfy the *Tinker* or *Kuhlmeier* standards. *See Tinker*, 393 U.S. at 514; *Kuhlmeier*, 484 U.S. at 273. Even then, whether *Tinker* applies to speech uttered beyond the schoolhouse gate is an open question. *See J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 926 (3d Cir. 2011) (en banc) (assuming without deciding that *Tinker* applies to off-campus speech); *id.* at 936 (Smith, J., concurring) ("[T]he First Amendment protects students engaging in off-campus speech to the same extent it protects speech by citizens in the community at large."). I need not weigh in on that question, though. The undisputed evidence shows that neither of these standards has been met, so B.L.'s speech was protected. Accordingly, the District violated B.L.'s rights when Coach Luchetta-Rump dismissed her from the cheerleading squad. And because B.L.

concedes all the relief she seeks can be granted on this basis alone, I decline to address her alternative arguments regarding the Cheerleading Rules' vagueness or viewpoint discrimination. (Doc. 53 at 16).

### D.

That leaves Dr. Mussoline. B.L. raises a panoply of reasons why Dr. Mussoline should be excluded from this case. (*See* Doc. 36). But the fact is that Dr. Mussoline's testimony and report would not save the District from summary judgment even if I had considered it. The District asked Dr. Mussoline to provide his opinions on immaterial matters. (*See* Doc. 36-1 at 2). For example, Dr. Mussoline was asked to opine on "how communities view cheer squads in general . . . [,]" "the reasonableness of the [Cheerleading Rules,]" and "how the conduct in which B.L. displayed [*sic*] impacts the interscholastic nature of sportsmanship and team bonds in a sport like cheerleading[.]" (*Id.*). Again, Coach Luchetta-Rump admitted she punished B.L. for off-campus profanity, in violation of the Constitution. Nothing Dr. Mussoline could say changes that. B.L.'s motion to exclude Dr. Mussoline will therefore be denied as moot. *See Logory v. Cty. of Susquehanna*, No. 3:09-CV-1448, 2013 WL 5201571, at *11 (M.D. Pa. Sept. 13, 2013).

### IV. Conclusion

For the foregoing reasons, B.L.'s motion for summary judgment will be granted, and the District's motion for summary judgment will be denied. B.L.'s motion to exclude Dr. Mussoline's expert report and testimony will be denied as moot.

An appropriate order follows.


March 21, 2019                                    /s/ A. Richard Caputo
Date                                             A. Richard Caputo
                                                 United States District Judge